UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re GRUPO TELEVISA SECURITIES LITIGATION | x : : : | Civil Action No. 1:18-cv-01979-LLS<br><br><u>CLASS ACTION</u> |
| This Document Relates To:<br><br>ALL ACTIONS. | : : : : x | AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiff Colleges of Applied Arts & Technology Pension Plan ("Lead Plaintiff"), on behalf of itself and a class of investors, alleges as follows based upon personal knowledge as to itself, and upon information and belief as to all other matters based on Lead Counsel's investigation, which included reviews of Grupo Televisa, S.A.B.'s ("Televisa" or the "Company") U.S. Securities and Exchange Commission ("SEC") filings; press releases; earnings calls; other public statements by defendants Televisa, Emilio Fernando Azcárraga Jean III ("Azcárraga III"), and Salvi Rafael Folch Viadero ("Folch") (together, Azcárraga III and Folch are referred to as "individual defendants") (collectively, the Company and the individual defendants are referred to as "defendants"); criminal Fédération Internationale de Football Association ("FIFA") corruption proceedings; media reports; market research; analyst and industry reports; and consultation with persons familiar with the Company's business. Lead Plaintiff believes additional evidentiary support exists for its allegations, given an opportunity for discovery.

## SUMMARY OF THE ACTION

1. With origins reaching back nearly a century when defendant former Chief Executive Officer ("CEO") Azcárraga III's grandfather opened a radio station in Mexico City in 1930, Televisa is now a sprawling multi-national media conglomerate, which operates the largest media and entertainment business in the Spanish-speaking world. Televisa sells Global Depositary Shares traded as American Depository Receipts ("ADRs")[1] on the New York Stock Exchange ("NYSE") under the "TV" ticker.

2. Televisa has interests in all aspects of large-scale media, including broadcast programming, professional sports and live entertainment, TV production, satellite services, cable

[1] An ADR represents ownership in a security issued by a foreign company in foreign markets. *See* Edward F. Greene, et al., *U.S. Regulation of the International Securities and Derivatives Markets* 2-19 (9th ed. 2009). Generally, a U.S. bank (the "depository") has custody of the security corresponding to an ADR and issues the ADR certificate to an investor in the United States. *See id.*

television, radio, show business, feature films, and Internet portals, all of which it operates through four segments: Content, Sky, Cable, and Other Businesses. The Company distributes TV content through various broadcast channels in Mexico and in over 50 other countries through 30 pay-television brands and television networks, cable operators, and over-the-top ("OTT") services.

3. Since the advent of Internet streaming services such as Netflix, media companies like Televisa have been under increasing pressure to bring in revenues through other means, not the least of which is exclusive programming of sporting events. That is where the World Cup comes in.

4. The FIFA Men's World Cup soccer tournament is the most widely viewed single-sport competition worldwide. In fact, the World Cup is watched by nearly half of the world's population. For example, it is projected that 3.4 billion people tuned in for the 2018 World Cup tournament alone.

5. One of the most powerful companies headquartered in Mexico, Televisa has long touted its coveted media rights to the World Cup. Since the 1970s, Televisa has played a key role in Latin America World Cup tournaments, viewing it as a "birthright" of sorts. On conference calls with investors, Televisa executives have repeatedly driven home how "crucial" TV rights to World Cup tournaments are to "the company's competitive position." Media rights to the World Cup tournaments have enabled Televisa to both hit financial targets across its platforms during tournament years and explain away disappointing results in off years. The Company has gone so far as to brag to investors about its contracting prowess in achieving media rights for these coveted events.

6. Unbeknownst to investors, it was not Televisa's ingenuity but its bribery that landed the media rights to this crown jewel of sporting events. Televisa used a wholly owned Swiss subsidiary, Mountrigi Management Group Ltd. ("Mountrigi"), located near FIFA headquarters in

Zurich, Switzerland, to carry out and conceal its scheme to bribe FIFA executives to illegally obtain the broadcasting rights to the 2018, 2022, 2026, and 2030 FIFA World Cup tournaments. To cover its tracks, Televisa cooked its books for years – and got away with it until auditors discovered its skimming scheme in late 2017 after criminal testimony and ledgers of payments came to light. Televisa and individual defendants Azcárraga III and Folch knew or recklessly disregarded that millions of dollars were being siphoned off through the exploitation of undisclosed weaknesses in the Company's internal controls over financial reporting.

7. Specifically, to carry out the bribery scheme, Televisa conspired with an Argentine marketing company, Torneos y Competencias SA ("Torneos") and its former CEO, Alejandro Burzaco ("Burzaco"), among others. Burzaco was highly connected to FIFA, the global governing body of professional soccer, known as "football" to much of the world outside the United States. Burzaco had years of experience paying bribes to FIFA executives – some $160 million over the years to the late Julio Humberto Grondona ("Grondona"), an Argentine FIFA executive often referred to as the second most powerful man in football worldwide. Grondona died in July 2014.

8. As we now know, in early 2013, Burzaco met with Grondona in Zurich to secure broadcasting rights for the 2026 and 2030 World Cups on behalf of his company Torneos, Televisa for Latin America territories, and Teleglobo for Brazil. Televisa, Torneos, and Teleglobo agreed to pay (and did pay) $15 million in bribes to Grondona by way of a Swiss bank account in the name of Julius Berg. In turn, Televisa used its subsidiary, Mountrigi, to pay $7.25 million to Torneos in April 2013 for the 2026 and 2030 World Cups as reflected in ledgers maintained by a former Torneos employee, Eladio Rodriguez.

9. Mountrigi may be a small obscure Swiss company to the rest of the world, but not to defendants. In addition to being a key strategic subsidiary to Televisa, Mountrigi and its executives

Miguel Diez de Urdanivia ("Diez") and Mauricio Simón Fajer ("Fajer") answered to Azcárraga III as officers of the Ibero-American Telecommunications Organization ("OTI"), where Azcárraga III has served as President since 2000. During the relevant time, Diez and Fajer served as secretary general and programming director of the OTI, respectively, reporting directly to Azcárraga III. Torneos subsidiary TyC International ("TyC") was also a member of the OTI with Televisa. OTI meets in person multiple times each year, including an annual meeting in the United States.

10. In 2015, a far-flung criminal probe into corruption with FIFA officials spilled out into open view. In the early morning hours of May 27, 2015, plain-clothed Swiss officers raided the five-star Baur au Lac hotel in Zurich and arrested six global FIFA officials gathered there for an annual meeting. To date, over two dozen individuals and entities from 20 different countries have been indicted by the United States in connection with the probe, and at least 24 have pled guilty or been convicted of crimes in connection with the probe, as recently as July 10, 2018. Swiss authorities have also announced a criminal investigation. The criminal investigations appear to be ongoing, particularly given that charges continue to be brought and sentencings continue to be deferred. For example, Burzaco's sentencing was recently deferred until February 21, 2019.

11. Among the two dozen people and organizations criminally charged with bribery, fraud, money laundering, and racketeering in the sprawling FIFA corruption probe, on November 16, 2015, Burzaco pled guilty to paying millions of dollars of bribes in a case styled *United States v. Juan Ángel Napout, et al*., No. 15-CR-252 (PKC) (E.D.N.Y.). On December 13, 2016, Burzaco's company, Torneos, entered into a deferred prosecution with the United States in a case styled *United States v. Torneos y Competencias S.A.*, No 16-CR-634 (PKC) (E.D.N.Y.). In the statement of facts and criminal information, the government identified two unnamed co-conspirator corporations that "obtained the rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup" through

bribes to FIFA executives. As explained further below, it would later become evident that those unnamed co-conspirator corporations were Televisa and its wholly owned subsidiary, Mountrigi.

12. On October 26, 2017, *The New York Times* published an exposé on Televisa's connection to the bribery scandal in a report entitled "How Did a Tiny Swiss Company Quietly Secure Valuable World Cup TV Rights?" The article implicated Televisa and Mountrigi in the FIFA bribery scheme and placed it squarely with the likes of Burzaco and Torneos in illegally obtaining rights to World Cup tournaments (the "October 26 NYT Exposé").

13. Literally within hours of the publication of the October 26 NYT Exposé, Televisa announced that individual defendants CEO Azcárraga III and Chief Financial Officer ("CFO") Folch were stepping down.

14. After this news, Televisa ADRs closed at $22.54 per share, down 5.6% on trading volume that exceeded 12.4 million shares.

15. In November 2017, the *Napout* case went to trial in Brooklyn. Burzaco was the prosecution's star witness, and he testified for multiple days about his company's and its business partners' agreements to pay $160 million in bribes to FIFA officials over the course of several years. Jose Maria Marin and Juan Angel Napout were convicted at the conclusion of the trial.

16. Among other things, Burzaco testified that he met in early 2013 with Grondona in Zurich to secure television, internet, and radio broadcasting rights for World Cup 2026 and 2030 on behalf of Torneos as well as on behalf of Televisa for the Latin America territories, Teleglobo for Brazil, and "the Montinea (phonetic) Group" for Mexico. Burzaco testified that they agreed to pay $15 million in bribes and did, in fact, pay Grondona by way of a Swiss bank account in the name of Julius Berg.

17. On news that Televisa was identified as a co-conspirator at the criminal FIFA trial, Televisa ADRs declined, closing at $19.50 per share, with a 2.4% total drop.

18. On November 19, 2017, Adolfo Lagos, head of Televisa cable (unit izzi) was reportedly shot dead by his own bodyguard on the outskirts of Mexico City while on a bike ride. On November 29, 2017, *Reuters* reported on Lagos' death and his temporary replacement, defendant Folch.

19. On November 29, 2017, court filings of Torneos ledgers showed that Televisa subsidiary Mountrigi paid $7.25 million to Torneos in April 2013 for World Cup 2026 and 2030 rights. This evidence was consistent with Burzaco's testimony about Televisa's involvement in the $15 million in bribes paid to Grondona to acquire the 2026 and 2030 World Cup TV rights. (Mountrigi also had the 2018 and 2022 World Cup rights for the same region.) These ledgers, along with Burzaco's testimony, gave rise to a duty by Televisa's auditors to undertake an investigation into the payment of bribes and determine how those bribes were paid.

20. On January 26, 2018, Televisa was forced by its longtime public accountant, PricewaterhouseCoopers ("PwC"), to come clean about its material weaknesses in internal controls over financial reporting, taking the extreme step of admitting that its financial statements were unreliable all the way back to December 2016:

> Grupo Televisa, S.A.B. ("Televisa" or the "Company"; NYSE:TV; BMV:TLEVISA CPO) is furnishing this Current Report on Form 6-K to disclose that the Company's management, in consultation with the Audit Committee of the Company's board and after discussions with PricewaterhouseCoopers, S.C. ("PwC"), the Company's independent registered public accounting firm, has concluded that certain material weaknesses in the Company's internal control over financial reporting existed as of December 31, 2016. As a result, the report of management on the effectiveness of the Company's internal control over financial reporting, our conclusion regarding the effectiveness of disclosure controls or procedures, and PwC's audit report (each included in the Company's Annual Report on Form 20-F for the year ended December 31, 2016) should no longer be relied upon for the reasons described below.

> The material weaknesses in the Company's internal control over financial reporting related to (i) the design and maintenance of effective controls over certain information technology controls which support systems that are relevant to the provisioning, updating and deleting of users' access to those systems, the periodic review of users' access to these systems, developers' access to certain of these systems and appropriate segregation of duties; (ii) the design and maintenance of effective controls over segregation of duties within the accounting system, including certain individuals with the ability to gain access to prepare and post journal entries across substantially all key accounts of the Company without an independent review performed by someone other than the preparer; and (iii) ineffective controls with respect to the accounting for certain revenue and related accounts receivable in our cable companies and content division.

21. Upon this news, the price of Televisa ADRs declined to $20.66 per share, down 1.4% on trading volume that exceeded 10.5 million shares.

22. Though obscured by accounting jargon (*i.e.*, "material weaknesses in internal control over financial reporting"), it is a big deal for a company to admit to an internal control deficiency, particularly for such a lengthy period of time. That is because the Company is telling the market that it can no longer trust its financial reporting to be reliable. All those assurances in its SEC filings, press releases, and earnings calls are suddenly called into question.

23. Based on the facts known to date, Televisa's internal control deficiencies went back to at least the first quarter of 2013 when Televisa participated with Burzaco in the payment of bribes to Grondona in order to illegally obtain media rights to the World Cup tournaments.

24. Indeed, to pull off the bribery scandal, Televisa had to suspend internal controls to: (1) transfer the funds from the Company's accounts to co-conspirators to pay the bribes; (2) avoid detection of the real purpose for those fund transfers; and (3) conceal the nature of those transactions from later discovery. Of the two major ways in which Televisa could have executed its bribery scheme (*i.e.*, "on-book" or "off-book" transactions), Televisa chose the latter fraud method because it posed the least risk of detection and the transactions could more readily be concealed. An "on-book" scheme would have meant that the cash (*i.e.*, checks or wire transfers) exited the entity

fraudulently, but would be recorded on Televisa's books so that an audit trail would exist. An "off-book" scheme, on the other hand, enabled Televisa to surreptitiously carry out the bribery scheme because the cash would never actually be reported to the entity, leaving no apparent audit trail, and the fraud would thus require a forensic accounting investigation to unearth the details underlying the illegal bribery scheme.

25. Televisa used an asset misappropriation scheme to execute its bribe payments. Specifically, Televisa employed a variation of "skimming," the process by which cash is removed from the entity before it enters the accounting system. Among the most common asset misappropriation schemes are accounts receivable schemes involving write-off of the receivables in connection with revenues, even though the customer actually paid off the outstanding accounts receivable balances.

26. The internal control deficiencies that Televisa belatedly disclosed meant that one or more individuals had access to Televisa's financial system so that the improper payments could be made and then the accounting for those payments could be concealed as legitimate transactions. This could not happen if Televisa had maintained financial and accounting controls with "appropriate segregation of duties." In other words, defendants authorized an individual to carry out the transfers to make bribery payments and then cover up or conceal the nature of the payments to avoid detection. And when Televisa disclosed the internal control deficiency concerning the Company's "accounting for certain revenue and related accounts receivable in [the] cable companies and content division," that effectively meant an individual could write off an account receivable in connection with a sale, but still apply the proceeds to an illicit bank account for the ultimate purpose of paying a bribe without a corresponding entry on the Company's books.

27. On July 10, 2018, Televisa filed a Form 6-K announcing that the Company's Audit Committee had decided to terminate PwC as its auditor and to hire KPMG Cárdenas Dosal, S.C. In doing so, Televisa failed to disclose, in violation of SEC rules, whether there were any "disagreements" between the Company and PwC and the nature of any such disagreements.[2] Ordinarily, when auditors are terminated from an audit engagement, and there have been no disagreements, a company's disclosure includes standard language as follows:

> During the two most recent fiscal years and the subsequent interim period through the date of [the auditor's] resignation, there were (1) no disagreements with [the auditor] on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure which, if not resolved to the satisfaction of [the auditor], would have caused [the auditor] to make reference to the subject matter of the disagreements in its reports on the financial statements for such years and (2) no "reportable events" (as defined in Item 304(a)(1)(v) of Regulation S-K).

28. Televisa did not do that here. The most plausible explanation for Televisa's failure to comply with Item 304 under these circumstances is that PwC had material disagreements about Televisa's accounting practices and accounting systems and was unwilling to turn a blind eye to Televisa's failure to comply with required internal controls and laws prohibiting bribes.

29. Investors have lost hundreds of millions of dollars since it was revealed that Televisa obtained its coveted World Cup media rights through bribes rather than through fair play. Lead Plaintiff now seeks redress for the losses caused by defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 on behalf of itself and all other individuals and entities (except defendants) that purchased or acquired Televisa ADRs from April 11, 2013, to January 25, 2018, inclusive (the "Class Period").

---

[2] *See* 17 C.F.R. §229.304 (Item 304), Changes in and disagreements with accountants on accounting and financial disclosure.

## JURISDICTION AND VENUE

30. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa) because Lead Plaintiff's claims arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5).

31. Venue is proper pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because Televisa ADRs trade on the NYSE, which is located within this District.

32. In connection with the conduct alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and/or the facilities of the national securities exchange.

33. Courts in the United States are the only adequate forum for Lead Plaintiff's class claims. Televisa's 2017 Form 20-F states (as does its prior Form 20-Fs):

> **The Protections Afforded to Minority Stockholders in Mexico Are Different From Those in the U.S.**
>
> Under Mexican law, the protections afforded to minority stockholders are different from those in the U.S. In particular, the law concerning fiduciary duties of directors is not well developed, there is no procedure for class actions or stockholder derivative actions and there are different procedural requirements for bringing stockholder lawsuits. As a result, in practice, it may be more difficult for our minority stockholders to enforce their rights against us or our directors or major stockholders than it would be for stockholders of a U.S. company.

## THE PARTIES

34. Lead Plaintiff Colleges of Applied Arts & Technology Pension Plan ("CAAT" or "Lead Plaintiff") has provided secure lifetime pension plans to college employees and their families for over 50 years. During the Class Period, Lead Plaintiff purchased 146,400 Televisa ADRs as described in the certification previously filed with the Court, and has suffered nearly a million

dollars in losses due to defendants' alleged misconduct. This Court appointed CAAT to serve as Lead Plaintiff in this action on May 17, 2018 (ECF 21).

35. Defendant Grupo Televisa, S.A.B. ("Televisa" or the "Company") is a multinational mass media company, which is the largest in the Spanish-speaking world. Televisa trades on the NYSE under the ticker symbol "TV." The Company has interests in television production and broadcasting, programming, direct-to-home satellite services, publishing and publishing distribution, cable television, radio production, show business, feature films, and Internet portals. Defendant Azcárraga III's grandfather, Emilio Azcárraga Vidaurreta, started the Televisa empire with a radio station in 1930, and Azcárraga III's father, Emilio Azcárraga Milmo, founded Televisa's predecessor company in 1973. The Company is based in Mexico City, Mexico and has locations, subsidiaries, and assets throughout Latin America and the United States, including in this District.

36. Defendant Emilio Fernando Azcárraga Jean III ("Azcárraga III") is the Chairman and former CEO of Televisa. Azcárraga III became Televisa's CEO at the age of 29 after his father died in 1997. On October 26, 2017, after the October 26 NYT Exposé was published, Televisa announced that Azcárraga III was stepping down as CEO as of January 1, 2018. Azcárraga III directly or indirectly owns several homes in the United States, including a home in Los Angeles, California, at which he lives part time, and a home in Miami Beach, Florida. Azcárraga III was issued a Florida driver's license and a social security number in Florida in 2005. A Ferrari, GMC Yukon, Mercedes convertible, and boat are all registered in Azcárraga III's name at his Miami Beach home. Azcárraga III's mother lives in San Diego, California. Azcárraga III is listed as a corporate officer for the following U.S. entities: Jean Inc., Emil, LLC, America's Business Counsel Foundation, Inc., Emshar Palm LLC, Unit 808 I.V. LLC, 1883 Sunset Island, LLC, and Emilio-Jean Incorporated.

37. Defendant Salvi Rafael Folch Viadero ("Folch") is Televisa's former CFO and a member of its Board of Directors (the "Board"). On October 26, 2017, after the October 26 NYT Exposé was published, Televisa announced that Folch was stepping down from his position as of January 1, 2018. Folch now serves as Televisa's Vice President of Strategic Planning, Corporate Vice President of Telecommunications, and a director. Folch is listed as an officer in corporate filings for at least eight different U.S. corporations, including a Nevada company called Bestel (USA), Inc., and a number of Florida companies, including FS Unit 3007, Inc., FS Unit 3010, Inc., and FS Unit 3207, Inc., Saral Publications, Inc., Tarabu, Inc., Televisa Dth Techco, Inc., and TVU Enterprises, Inc. Folch is associated with an address in Miami, Florida, and a P.O. Box in Newark, Delaware.

38. Individual defendants Azcárraga III and Folch made, or caused to be made, false or misleading statements or material omissions that caused the price of Televisa ADRs to be artificially inflated during the Class Period. Because of their positions with the Company, the individual defendants possessed the power and authority to control the contents of Televisa's SEC filings, press releases and public statements, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. These individual defendants were provided with copies of the Company's reports and press releases prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, their positions of power within OTI and the industry, and their personal knowledge and/or access to material information available to them but not to the public, these individual defendants knew that the adverse facts alleged in this Complaint had not been disclosed to, and were being concealed from, the public and that the positive representations being made were materially false or misleading. These two individual defendants are liable for the false or misleading statements alleged here.

## FACTUAL BACKGROUND

39. With origins reaching back nearly a century, when defendant Azcárraga III's grandfather opened a radio station in Mexico City in 1930, Televisa is now a sprawling multi-national media conglomerate, which operates the largest media and entertainment business in the Spanish-speaking world. Televisa has interest in all aspects of large-scale media, including broadcast programming, professional sports and live entertainment, TV production, satellite services, cable television, radio, show business, feature films, and Internet portals, all of which it operates through four segments: Content, Sky, Cable, and Other Businesses. The Company distributes TV content through various broadcast channels in Mexico and in over 50 other countries through 30 pay-television brands and television networks, cable operators, and OTT services.

40. Since the advent of Internet streaming services such as Netflix, broadcasting networks including Televisa have experienced increasing pressure to bring in advertising dollars through other means, such as exclusive programming of widely viewed sports games.

41. The FIFA Men's World Cup soccer tournament is the most widely viewed and followed single-sport competition in the world. In fact, the World Cup is watched by nearly half of the world's population. For example, it is projected that 3.4 billion people tuned in for the 2018 World Cup tournament.

42. FIFA is the global governing body of soccer, known as "football" to much of the world outside the United States. FIFA's TV Division appoints host broadcasters and licenses out the media rights to TV and other media platforms. FIFA is headquartered in Zurich, Switzerland. FIFA is comprised of as many as 209 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories. FIFA's purpose is, among other things, to promote soccer globally by organizing international competitions

and creating and enforcing rules that govern FIFA's member confederations and associations. FIFA has financed its efforts in significant part by commercializing the media and marketing rights associated with the World Cup.

43. On conference calls with investors, Company executives have repeatedly driven home how "crucial" rights to World Cup tournaments are to "the company's competitive position." Indeed, the Company's media rights in connection with the World Cup have consistently been touted as a means for it to hit its targets across its platforms and divisions in "on" years and explain away disappointing results in "off" years. The Company has gone so far as to brag about its strategy of forging agreements to acquire the sports rights for this coveted sporting event.

44. Unbeknownst to investors, it was not so much Televisa's ingenious contracting skills but its bribes that secured the rights to this crown jewel of sporting events. In fact, Televisa used Mountrigi to carry out and conceal the bribery scheme to obtain the broadcast rights to the 2018, 2022, 2026, and 2030 FIFA Men's World Cup tournaments. To cover its tracks, Televisa cooked its books for years through a skimming scheme. Televisa and individual defendants Azcárraga III and Folch knew or recklessly disregarded that millions of dollars were being siphoned off through the exploitation of the Company's material weaknesses in internal controls.

45. Specifically, to carry out the bribery scheme, Televisa conspired with an Argentine marketing company, Torneos, and its former CEO Alejandro Burzaco, to pay millions of dollars in bribes to FIFA officials to secure rights to World Cup transmissions. Burzaco was highly connected to FIFA and had years of experience in paying bribes and successfully executing transactions through bribery, having paid $160 million in bribes over the years to the late Julio Humberto Grondona, often referred to as the second most powerful man in football.

46. As we now know, in early 2013, Burzaco met with Grondona in Zurich to secure broadcasting rights for the 2026 and 2030 World Cup on behalf of his company Torneos, Televisa for Latin America territories, Teleglobo for Brazil, and "the Montinea (phonetic) Group" for Mexico. Torneos, Televisa, and Teleglobo agreed to pay (and did pay) $15 million in bribes to Grondona by way of a Swiss bank account in the name of Julius Berg. In turn, Televisa had Mountrigi pay $7.25 million to Torneos in April 2013 for the 2026 and 2030 World Cup rights as reflected in ledgers maintained by former Torneos employee, Eladio Rodriguez.

47. Mountrigi may be obscure to the rest of the world, but not to defendants. In addition to being a key strategic subsidiary of Televisa, Mountrigi executives Diez and Fajer answered directly to Azcárraga III at the OTI, where Azcárraga III has served as President since 2000. Diez and Fajer have served as secretary general and programming director of the OTI, respectively, and interacted regularly with Azcárraga III as part of OTI's ongoing operations and at in-person meetings. Torneos subsidiary TyC was also a member of the OTI with Televisa. OTI members receive broadcasting rights to high value soccer matches through their OTI membership. For example, when FIFA licensed the 2014 World Cup broadcasting rights for Mexico to OTI, OTI then licensed those rights to Televisa. Similarly, when FIFA licensed the 2014 World Cup radio and television broadcasting rights for Argentina to OTI, OTI licensed those rights to Torneos. OTI meets regularly, including an annual meeting in the United States.

48. In 2015, a far-flung criminal probe into FIFA corruption spilled out into open view. In the early morning hours of May 27, 2015, plain-clothed Swiss officers raided the five-star Baur au Lac hotel in Zurich and arrested six global FIFA officials gathered there for FIFA's annual meeting. To date, over two dozen individuals and entities from 20 different countries have been indicted by the United States in connection with the probe, and at least 24 have pled guilty or been convicted of

crimes in connection with the probe, as recently as July 10, 2018. Swiss authorities have also announced a criminal investigation. The investigation appears to be ongoing, given that charges have continued to be brought, including as recently as July 2018, and criminal sentencings continue to be deferred. For example, Burzaco's sentencing was recently deferred until February 21, 2019.

49. Among the two dozen people and organizations criminally charged with bribery, fraud, money laundering, and racketeering in the sprawling FIFA corruption probe, on November 16, 2015, Burzaco pled guilty to paying millions of dollars of bribes in a case styled *United States v. Juan Ángel Napout, et al*., No. 15-CR-252 (PKC) (E.D.N.Y.). On December 13, 2016, Burzaco's company, Torneos, entered into a deferred prosecution with the United States in a case styled *United States v. Torneos y Competencias S.A.*, No 16-CR-634 (PKC) (E.D.N.Y.). In the statement of facts and criminal information, the government identified two unnamed co-conspirator corporations that "obtained the rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup" through bribes to FIFA executives. As explained in this Complaint, it would later became evident that the unnamed co-conspirator corporations were Televisa and Mountrigi.

50. In the Criminal Information filed in the *Torneos* case on December 13, 2016 ("Torneos Information"), the U.S. Attorney referred to Mountrigi through the pseudonym "Broadcasting Company Affiliate A"; to Televisa as a "major broadcasting company headquartered in Latin America"; and Grondona as "Soccer Official #1":

> In or about and between 2010 and 2013, the defendant TORNEOS Y COMPETENCIAS S.A.'s wholly-owned subsidiary TyC International B.V. obtained the rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup to audiences in Argentina, Uruguay, and Paraguay through a series of contracts with the Off-the-Books Companies and Broadcasting Company Affiliate A, which had secured the rights to broadcast the tournaments in these and other territories directly from FIFA. TORNEOS, through Alejandro Burzaco and others, and at times with the assistance of one or more representatives of Broadcasting Company Affiliate A, including Broadcasting Company Executive #1, agreed to pay and did pay millions of dollars in bribe and kickback payments to Soccer Official # 1 – a high-ranking

FIFA official who exercised enormous influence within the association - in order to secure his support for Broadcasting Company Affiliate A's acquisition of rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup in certain territories, and the subsequent purchase and exploitation of certain of those rights by TyC International B.V.

51. To date, the identity of "Broadcasting Company Executive #1" – the executive at Mountrigi who made the improper payments – has not been publicly revealed. Based upon information and belief, the unnamed Mountrigi executive is Diez or Fajer, both of whom answered directly to Azcárraga III, not only at Televisa but also at the OTI. Azcárraga III has served as president of the OTI since 2000, during which time Diez and Fajer were secretary general and programming director, respectively. Other Mountrigi officers include Willi Dietschi, Diego José Pani Villalobos, Luis Adrian Resendiz Gonzalez, and Axel Felipe Guillermo Saona Acuña (former legal counsel for FIFA).

52. Due to their positions of power within Televisa, the OTI, and connections within FIFA, Azcárraga III, Diez, and Fajer wielded influence over decision makers in the region to buy and sell rights to World Cups and other high-profile soccer tournaments. According to FIFA documents, Televisa and Mountrigi obtained clients throughout the continent in record time. In Argentina, for example, media rights were assigned to the companies Torneos, DirecTV International, and DirecTV Latin America. And in Colombia, Mountrigi sold the license to Caracol Televisión, RCN Televisión and DirecTV Latin America. Similarly, in Costa Rica, FIFA granted the rights to Televisa through Mountrigi, and it sold them to Televisora de Costa Rica. These transactions all bore similarities. FIFA granted the media rights without public auctions, and Televisa through Mountrigi resold certain of those media rights "to the highest bidder," which not incidentally appear to involve many of the same repeat players. And as explained herein, one of those repeat players was the FIFA prosecutor's star witness, Burzaco.

53. As we now know, after Televisa through Mountrigi acquired the 2018 and 2022 World Cup rights, it obtained exclusive rights to the 2026 and 2030 World Cups for Latin America by paying part of a $15 million bribe to Grondona in April 2013. Televisa/Mountrigi's $7.25 million payment for this bribe was recorded in a secret ledger of payments maintained by Eladio Rodriguez, an employee of Torneos. The notation in Rodriguez's ledger read "Cobro Mundial 2026/30 de Mountrigi Management Group LTD" and was dated April 5, 2013.

54. The bribery payment was deposited into an account identified as "Banco Julius Cta. Nro.2 de FPT (papa)." The name "papa" was a code that Torneos used to describe Grondona. The code name, which means the "Pope" in English, was bestowed on Grondona because he was so influential in the world of soccer. "Banco Julius" referred to Julius Baer (or Julius Bär), Switzerland's third-largest bank, which Torneos used to transfer bribery money. "FPT" refers to "FPT Sports," a subsidiary of Torneos. The ledger entry indicates that Mountrigi's $7.25 million payment was transferred to a Swiss bank account at Julius Baer to an FPT sub-account maintained for Grondona's benefit. The ledger also indicated that a $300,000 payment was made from the same FPT Sports sub-account to Julius Baer banker, Jorge Arzuaga. Arzuaga was employed by Julius Baer until 2015. Prior to that, Arzuaga was previously employed at Credit Suisse, another bank in Switzerland, until 2012, where he also arranged for the payments of bribes.

55. In connection with the U.S. Attorney's criminal probe, Arzuaga pled guilty to money laundering charges following the U.S. investigation into FIFA-related corruption. Arzuaga admitted to opening bank accounts in Switzerland for Grondona and channeling up to $25 million in bribes to him and other high-ranking FIFA officials on behalf of Torneos. Arzuaga admitted to being paid $1.046 million for facilitating this corruption, which spoils he agreed to forfeit to the authorities.

56. After Televisa funneled millions of dollars in bribes to Grondona, it paid about $190 million for the 2018 and 2022 World Cup rights and likely more for the rights for the 2026 and 2030 tournaments. Televisa, through Mountrigi, then immediately sold certain rights to Burzaco and Torneos for the lucrative TV contracts.

57. Through Mountrigi, Televisa illegally obtained exclusive broadcasting rights to World Cups through 2030 across Latin America, including 16 nations from Mexico down to Argentina. Although such rights deals are normally announced publicly after a formal bidding process, Televisa deliberately avoided any publicity. Televisa was able to hide the details of the transfer of exclusive rights for the transmission of these games because, unlike other agreements, in this case, FIFA did not disclose the deal as it usually had.

58. After the agreement, FIFA announced that the World Cup would be expanded from 32 teams to 48 teams in 2016, and the tournament would likely be held jointly in the United States, Mexico, and Canada. Televisa and Mountrigi had not signed deals in any of the other territories it had for the 2026 and 2030 World Cup events beyond the rights in Argentina, Paraguay, and Uruguay that it sold to Torneos as part of the agreement with Burzaco. As a result of its illegal bribery scheme, Televisa was in a position to be able to reap greater profits from the expanded World Cup and a potential U.S.-led tournament in 2026.

59. The October 26 NYT Exposé implicated Televisa and Mountrigi in the FIFA bribery scheme and placed it squarely with the likes of Burzaco and Torneos in illegally obtaining media rights to World Cup tournaments.

60. Literally within hours of the October 26 NYT Exposé, Televisa announced that the individual defendants, CEO Azcárraga III and CFO Folch, were stepping down.

61. Then, on November 14, 2017, Burzaco testified about his 2013 meeting with Grondona in Zurich to secure rights for World Cups 2026 and 2030 on behalf of Torneos, Televisa for the Latin America territories, and Teleglobo for Brazil, which they accomplished by paying $15 million in bribes by way of a Swiss bank account in the name of Julius Berg.

62. On November 19, 2017, Adolfo Lagos, head of Televisa cable (unit izzi) was reportedly shot dead by his own bodyguard on outskirts of Mexico City while on a bike ride.

63. On November 29, 2017, court filings revealed that Televisa subsidiary Mountrigi paid $7.25 million to Torneos in April 2013 related to 2026 and 2030 World Cup rights, according to ledgers revealed in federal court. This was consistent with Burzaco's testimony that Torneos, Televisa, and Brazilian firm Teleglobo had conspired to pay $15 million in bribes to those TV rights in Latin America. (Televisa/Mountrigi also had the 2018 and 2022 rights for the same region.) This evidence triggered Televisa's auditors to further investigate irregularities.

64. On January 26, 2018, Televisa admitted that it had material weaknesses in its internal controls over financial reporting. Specifically, Televisa announced that "the Company's management, in consultation with the Audit Committee of the Company's board and after discussions with PricewaterhouseCoopers, S.C. ('PwC'), the Company's independent registered public accounting firm, has concluded that certain material weaknesses in the Company's internal control over financial reporting existed as of December 31, 2016."

65. PwC's reversal of its April 28, 2017 audit opinion for the year ended December 31, 2016, which had stated that "the Company maintained, in all material respects, effective internal control over financial reporting," was an exceptional event because auditors rarely reverse an audit opinion previously rendered on the status of a company's internal controls. PwC's reversal of its

audit opinion also signals that the internal control deficiencies to which the Company admitted had existed for an extended period of time.

66. These material weaknesses, as described further below, related to the payment of bribes but were described in innocuous terms, such as:

> (i) the design and maintenance of effective controls over certain information technology controls which support systems that are relevant to the provisioning, updating and deleting of users' access to those systems, the periodic review of users' access to these systems, developers' access to certain of these systems and appropriate segregation of duties; (ii) the design and maintenance of effective controls over segregation of duties within the accounting system, including certain individuals with the ability to gain access to prepare and post journal entries across substantially all key accounts of the Company without an independent review performed by someone other than the preparer; and (iii) ineffective controls with respect to the accounting for certain revenue and related accounts receivable in our cable companies and content division.

67. As a result of these material deficiencies, the Company stated the following:

> [T]he report of management on the effectiveness of the Company's internal control over financial reporting [and] our conclusion regarding the effectiveness of disclosure controls or procedures, and PwC's audit report (each included in the Company's Annual Report on Form 20-F for the year ended December 31, 2016) should no longer be relied upon.

68. Defendants' admission of the above material internal control and disclosure control deficiencies came about directly as a result of the public disclosure of Televisa's bribery payments to FIFA officials in the fall of 2017.

69. On July 10, 2018, Televisa announced that it was parting ways with its longtime accountant PwC and had hired KPMG Cárdenas Dosal, S.C. as the Company's independent public accountant, whose engagement would commence with the review of the Company's financial results for the year ending December 31, 2018. As alleged herein, Televisa's announcement did not include any assurance that its decision was unrelated to material disagreements with PwC.

## DEFENDANTS' FALSE OR MISLEADING STATEMENTS

70. Throughout the Class Period, defendants made materially false and misleading statements about the Company's business as well as its operational and compliance policies and practices. Specifically, defendants made false and misleading statements in Televisa's SEC filings and earnings calls, and their other public statements, and failed to make required disclosures in their Form 20-F SEC filings for fiscal years 2012 through 2017 as described below:

(a) Televisa used its Swiss subsidiary Mountrigi to carry out and conceal the bribery scheme to obtain the broadcast rights to the 2018, 2022, 2026, and 2030 World Cups;

(b) Defendants falsely or misleadingly stated that Televisa's directors exercised a duty of care and a duty of loyalty as required by the Mexican Securities Market Law because they carried out and/or concealed an illegal bribery scheme;

(c) Defendants falsely or misleadingly conveyed that Televisa and its directors, executives, and employees, including all divisions and subsidiaries, complied with its Code of Ethics, which requires them to comply with applicable law and prohibits bribes in their official work duties "as well as in any action executed in the name of . . . Grupo Televisa"; and

(d) Defendants signed false or misleading Certifications stating that they complied with §302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") when they were aware or deliberately reckless in disregarding that the Company's internal controls over financial reporting and disclosures were deficient and that their Certifications were unreliable.

71. Defendants knew that discovery of the foregoing conduct could risk Televisa's valuable rights to the prized World Cup tournaments, subject the Company and its executives to criminal and civil exposure, endanger the Company's reputation, and lead to other regulatory scrutiny and financial risks, but defendants hid the wrongful conduct and internal deficiencies

nevertheless. As a result of defendants' false and misleading statements, Televisa's shares traded at artificially inflated prices during the Class Period, and members of the Class (defined below) suffered significant losses and damages once the truth began to seep into the market.

72. The statements herein were materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants, including:

(a) the Company's internal controls were so inadequately designed and inefficient that employees were able to, and did, engage in an unlawful bribery scheme;

(b) the Company engaged in an unlawful bribery scheme in 2013 involving FIFA executives to acquire the broadcasting rights to the World Cup;

(c) Televisa employees violated the Company's own mandatory Code of Ethics;

(d) the Company's criminal and civil exposure resulting from its involvement in an unlawful bribery scheme;

(e) the reputational and brand risk posed by the evidence of an unlawful bribery scheme; and

(f) the operational costs required to remedy the Company's illegal practices and rehabilitate the Company's reputation.

73. Defendants' false or misleading statements known to date are detailed below. Lead Plaintiff reserves its right to amend its allegations to add additional false or misleading statements made by the Company and individual defendants as they are discovered and/or occur.

**2013 False or Misleading Statements**

74. On a February 26, 2013 Q4 2012 Earnings Conference Call, the Company's then Executive Vice President (now Co-CEO), Alfonso de Angoitia, boasted:

> [Televisa has] secured the rights to the English Premier League, which will be transmitted on Sky on an exclusive basis in Mexico, and we also will transmit many matches of the World Cup, also on an exclusive basis. So, Sky will continue to have top content, especially in what has to do with soccer, which is Mexico's national sport, and soccer around the world, but we will continue to be very disciplined and even considering those increases in costs of sports, will maintain margins around mid-40s.

75. On April 11, 2013, Televisa filed with the SEC its annual report of financial results on Form 20-F for the fiscal year ended December 31, 2012 (the "2012 20-F"). According to Televisa's 2012 20-F, the Company prepared the consolidated financial statements presented therein "in accordance with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board, or IASB."

76. In the 2012 20-F, the individual defendants guaranteed that the Company's internal controls were effective:

> Based on the evaluation as of December 31, 2012, the Chief Executive Officer and the Chief Financial Officer of the Company have concluded that the Company's disclosure controls and procedures (as defined in the Exchange Act Rules 13a-15(e) and 15d-15(e)) are effective to ensure that the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management, including our Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.
>
> * * *
>
> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2012. In making this assessment, management used the criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).
>
> Based on this assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2012.

77. Defendant Folch signed the 2012 20-F on Televisa's behalf. In addition, individual defendants Azcárraga III and Folch signed Certifications pursuant to Sarbanes-Oxley in which they

attested that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Azcárraga III and Folch also attested that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision." Lastly, they attested that they had designed disclosure controls to ensure that material information relating to the Company was made known to them.

78. The 2012 20-F, and the statements regarding the Company's business operations and internal controls referenced above, were materially false and misleading when made because they omitted the following true fact, which was then known to or recklessly disregarded by defendants. Contrary to the Company's assurances that its internal controls over financial reporting were effective, the Company's internal controls were so inadequately designed and/or inefficient that Televisa and Mountrigi employees were to engage in an unlawful bribery scheme.

79. Further, Televisa's certifications for the period ended December 31, 2012, were false and misleading because Televisa did not comply with Exchange Act Rule 13a-15, which required that the "issuer's management must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness of the issuer's disclosure controls and procedures, as of the end of each fiscal quarter."[3] As defined in Exchange Act Rule 13a-15:

> ***The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting*** and the

[3] 17 C.F.R. §240.13a-15(b).

> preparation of financial statements for external purposes in accordance with generally accepted accounting principles.[4]

80. On the Company's April 26, 2013 Q1 2013 Earnings Conference Call, de Angoitia assured investors that, despite increasing competition for sports content, "we have been structuring medium-term and long-term content agreements, when possible and at the right prices, with companies holding the sports rights that we believe that matter most for our audiences. For example, we hold the rights to the next three soccer World Cup's that are extremely relevant for Mexico."

81. On an October 25, 2013 Q3 2013 Earnings Conference Call, de Angoitia fielded questions from an analyst about Televisa's pay-television subscribers and the pace of subscriber growth, particularly in light of the Company's 2014 World Cup transmission rights: "Well, I think we'll continue to see a fast pace in terms of increased number of subscribers. . . . Of course, the World Cup is very important for SKY, and we're very bullish on SKY next year."

**2014 False or Misleading Statements**

82. During a February 21, 2014 Q4 2013 Earnings Conference Call, analysts were abuzz about the World Cup. In response to one analyst's question about its impact, the Company's President of Television and Content, Pepe Baston, emphasized that the World Cup "is an event that we have to have and we are going to as always put a lot of [quality in it]." De Angoitia added:

> As to SKY, SKY will benefit from the transmission of the World Cup. SKY will transmit 30 matches, the 30 matches that will go on free-to-air television. But also, on top of that it will have 24 matches on an exclusive basis, out of the total 64 matches.
>
> So, we have launched a package, a promotion, for the viewers of VETV, which is the lower-tier package. They will have access to those 24 exclusive matches only if they have six consecutive recharges in the prepaid service. And this is by June 2014, which is when the World Cup starts.

[4] 17 C.F.R. §240.13a-15(f). Here, and throughout, emphasis is supplied, unless otherwise noted.

> So, we believe that this will help SKY not only to maintain our subscribers and to reduce churn, but also to grow our subscriber base.

83. During that same February 21, 2014 Q4 2013 Earnings Conference Call, another analyst asked about the "impact of the World Cup costs that you registered in the fourth quarter on SKY." Defendant Folch responded:

> What you need to consider is that during the last quarter of 2013 we had the impact of the World Cup. We distributed among four quarters. So, we will not disclose the specific figure, but it's 25% of the cost. And we also had the English Premier League that we did not have last year. So, part of the increase in the cost that you see well on the expenses has to do with those two events.

84. On April 29, 2014, Televisa filed with the SEC its annual report on Form 20-F announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 20-F"). According to the 2013 20-F, the Company prepared the consolidated financial statements presented therein "in accordance with" International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB").

85. In the 2013 20-F, the individual defendants guaranteed that the Company's internal controls were effective:

> Based on the evaluation as of December 31, 2013, the Chief Executive Officer and the Chief Financial Officer of the Company have concluded that the Company's disclosure controls and procedures (as defined in the Exchange Act Rules 13a-15(e) and 15d-15(e)) are effective to ensure that the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management, including our Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.
>
> * * *
>
> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2013. In making this assessment, management used the criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

> Based on this assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2013.

86. In the 2013 20-F, defendants also assured investors that:

> There has been no change in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended) that occurred during the year ended December 31, 2013 that has materially affected, or is reasonably likely to materially affect, the Company's internal controls over financial reporting.

87. Further, in the 2013 20-F, the Company stated that it had "adopted a written code of ethics that applies to all of our employees, including our principal executive officer, principal financial officer and principal accounting officer." The Company further boasted in the 2013 20-F that:

> Companies listed on the Mexican Stock Exchange are not required to adopt a code of ethics. However, we have adopted a code of ethics which is available free of charge through our offices. See "– Code of Ethics" for directions on how to obtain a copy of our code of ethics. Waivers involving any of our executive officers or directors will be made only by our Board of Directors or a designated committee of the Board.

The Company directed investors to an "English version of the code of ethics [which] c[ould] be found at www.televisa.com/inversionistas-ingles."

88. The Code of Ethics (adopted in its current format in June of 2012) provides that "compliance with its content is mandatory." Moreover, "Board members, officers and employees of the Group" are required to sign an "[a]dherence [l]etter, as evidence of their acceptance and commitment to respect [the Code of Ethics'] content," which they are required to deliver to human resources, and "high-ranking executives" must "bi-annually renew their acceptance." Among other provisions, the Company's Code of Ethics requires:

> Every person must act in accordance with this Code ***and with the applicable laws in Mexico and in any other jurisdictions*** in which the Group carries out activities.

* * *

> We wish to succeed based on our merits, ***and not because we have paid or given something of value illegally to someone in order to obtain some favor or advantage***. Likewise, personnel shall not acquire any type of commitment to attempt to obtain, receive or accept, directly or indirectly, any bribe, coercion or other payment or benefit from any employee or agent of current or potential suppliers, clients, lessors, lessees, competitors or other persons or entities related with the Group.

89. Defendant Folch signed the 2013 20-F on Televisa's behalf. In addition, individual defendants Azcárraga III and Folch signed Certifications pursuant to Sarbanes-Oxley in which they attested that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Azcárraga III and Folch also attested that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision." Lastly, the individual defendants attested that they had designed disclosure controls to ensure that material information relating to the Company was made known to them.

90. On a July 8, 2014 Q2 2014 Earnings Conference Call, the Company continued to tout the importance of the World Cup on its financial performance across multiple sectors and sources of revenues. At the top of the call, President of Television & Content, Jose Baston, sounded an upbeat note, saying: "Our programs continue to reach very attractive audiences in all platforms, and were complemented with strong viewership from our coverage of the World Cup." Baston also boasted: "[A]dvertising revenues experienced strong growth and closed the first half of the year up 6.9%. The World Cup and the success of our shows around this event contributed positively to this revenue line." Baston went on to reiterate the positive impact of the World Cup rights on the Company's networks: "Our networks remain very strong, and the number of subscribers with access to our pay TV networks continues to grow both in Mexico and abroad. Our coverage of exclusive matches of

the 2014 World Cup allowed our pay TV sports network to lead the field in this category." Finally, the Company boasted "[o]ur third source of content revenue, licensing and syndication revenue, expanded 15.2%. This line item accounts for our export of content to over 70 countries, our programming agreement with Netflix and, most importantly, the royalties we receive from Univision. This quarter Univision performed very well and our royalties expanded 19.1%, thanks in part to the coverage of the World Cup."

91. On an October 24, 2014 Q3 2014 Earnings Conference Call, Baston continued to beat the drum of the importance on the World Cup to Televisa: "Univision report its coverage of the 2014 World Cup reach a record of 81 million total viewers, 65% more than the 2010 World Cup." This translated into "a cumulative growth of 18.6%" for royalties from Univision for 2014.

**2015 False or Misleading Statements**

92. On an April 24, 2015 Q1 2015 Earnings Conference Call, de Angoitia reiterated again that 2015 would not be as profitable as 2014 because 2014 was a year in which Televisa had rights to the "World Cup which is very important for Sky."

93. On April 29, 2015, Televisa filed with the SEC its annual report on Form 20-F announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 20-F"). According to the 2014 20-F, the Company prepared the consolidated financial statements presented therein "in accordance with" IFRS as issued by the IASB.

94. In the 2014 20-F, the individual defendants guaranteed that the Company's internal controls were effective:

> Based on the evaluation as of December 31, 2014, the Chief Executive Officer and the Chief Financial Officer of the Company have concluded that the Company's disclosure controls and procedures (as defined in the Exchange Act Rules 13a-15(e) and 15d-15(e)) are effective to ensure that the information required

> to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management, including our Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.
>
> * * *
>
> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2014. In making this assessment, management used the criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).
>
> Based on this assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2014.

95. In the 2014 20-F, defendants also assured investors:

> There has been no change in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended) that occurred during the year ended December 31, 2014 that has materially affected, or is reasonably likely to materially affect, the Company's internal controls over financial reporting.

96. Further, the Company stated that it had "adopted a written code of ethics that applies to all of our employees, including our principal executive officer, principal financial officer and principal accounting officer." The Company further boasted in its 2014 20-F that:

> Companies listed on the Mexican Stock Exchange are not required to adopt a code of ethics. However, we have adopted a code of ethics which is available free of charge through our offices. See "—Code of Ethics" for directions on how to obtain a copy of our code of ethics. Waivers involving any of our executive officers or directors will be made only by our Board of Directors or a designated committee of the Board.

The Company then directed investors to an "English version of the code of ethics" on its website.

97. The Code of Ethics (adopted in its current format in June of 2012) provides that "compliance with its content is mandatory." Moreover, "Board members, officers and employees of the Group" are required to sign an "[a]dherence [l]etter, as evidence of their acceptance and

commitment to respect [the Code of Ethics'] content," which they are required to deliver to human resources, and "high-ranking executives" must "bi-annually renew their acceptance." Among other provisions, the Company's Code of Ethics requires:

> Every person must act in accordance with this Code ***and with the applicable laws in Mexico and in any other jurisdictions*** in which the Group carries out activities.
>
> * * *
>
> We wish to succeed based on our merits, ***and not because we have paid or given something of value illegally to someone in order to obtain some favor or advantage***. Likewise, personnel shall not acquire any type of commitment to attempt to obtain, receive or accept, directly or indirectly, any bribe, coercion or other payment or benefit from any employee or agent of current or potential suppliers, clients, lessors, lessees, competitors or other persons or entities related with the Group.

98. Defendant Folch signed the 2014 20-F on Televisa's behalf. In addition, individual defendants Azcárraga III and Folch signed Certifications pursuant to Sarbanes-Oxley in which they attested that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Azcárraga III and Folch also attested that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision." Lastly, the individual defendants attested that they had designed disclosure controls to ensure that material information relating to the Company was made known to them.

99. Televisa's 2015 Annual Sustainability Report boasted that it maintains a "Code of Ethics." The report touted the Company's Code of Ethics was applicable to "directors, officials and employees of the company, including all its divisions and subsidiaries" with oversight from the Televisa Board's Audit and Corporate Practices Committee. The report further stated that "directors, officials and employees of the Group, as well as the employees of its subsidiaries, receive

the Code of Ethics and sign the Adherence Letter, as a sign of their acceptance and commitment to respect the provisions of the same."

100. During a July 7, 2015 Q2 2015 Earnings Conference Call, Baston, the Company's President of Television & Contents, tried to reassure investors that Televisa was not falling short because its financials were not fairly comparable to 2014, reminding them that "during the second quarter last year, we transmitted the World Cup." Nevertheless, analysts pushed for more information, and de Angoitia reiterated that, among other factors, "this quarter was the perfect storm because we experienced not having the World Cup and not having this soccer tournaments et cetera."

**2016 False or Misleading Statements**

101. On April 29, 2016, Televisa filed with the SEC its annual report on Form 20-F announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 20-F"). According to the 2015 20-F, the Company prepared the consolidated financial statements presented therein "in accordance with" IFRS as issued by the IASB.

102. In the 2015 20-F, the individual defendants guaranteed that the Company's internal controls were effective:

> Based on the evaluation as of December 31, 2015, the Chief Executive Officer and the Chief Financial Officer of the Company have concluded that the Company's disclosure controls and procedures (as defined in the Exchange Act Rules 13a-15(e) and 15d-15(e)) are effective to ensure that the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management, including our Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

* * *

> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2015. In making this assessment, management used the criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).
>
> Based on this assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2015.

103. In the 2015 20-F, defendants also assured investors:

> There has been no change in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended) that occurred during the year ended December 31, 2015 that has materially affected, or is reasonably likely to materially affect, the Company's internal controls over financial reporting.

104. Further, the Company stated that it had "adopted a written code of ethics that applies to all of our employees, including our principal executive officer, principal financial officer and principal accounting officer." The Company further boasted in its 2015 20-F that:

> Companies listed on the Mexican Stock Exchange are not required to adopt a code of ethics. However, we have adopted a code of ethics which is available free of charge through our offices. See "– Code of Ethics" for directions on how to obtain a copy of our code of ethics. Waivers involving any of our executive officers or directors will be made only by our Board of Directors or a designated committee of the Board.

The Company then directed investors to an "English version of the code of ethics" on its website.

105. The Code of Ethics (adopted in its current format in June of 2012) provides that "compliance with its content is mandatory." Moreover, "Board members, officers and employees of the Group" are required to sign an "[a]dherence [l]etter, as evidence of their acceptance and commitment to respect [the Code of Ethics'] content," which they are required to deliver to human resources, and "high-ranking executives" must "bi-annually renew their acceptance." Among other provisions, the Company's Code of Ethics requires:

> Every person must act in accordance with this Code ***and with the applicable laws in Mexico and in any other jurisdictions*** in which the Group carries out activities.

* * *

> We wish to succeed based on our merits, ***and not because we have paid or given something of value illegally to someone in order to obtain some favor or advantage***. Likewise, personnel shall not acquire any type of commitment to attempt to obtain, receive or accept, directly or indirectly, any bribe, coercion or other payment or benefit from any employee or agent of current or potential suppliers, clients, lessors, lessees, competitors or other persons or entities related with the Group.

106. Defendant Folch signed the 2015 20-F on Televisa's behalf. In addition, the individual defendants Azcárraga III and Folch signed Certifications pursuant to Sarbanes-Oxley in which they attested that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Azcárraga III and Folch also attested that they had "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision." Lastly, the individual defendants attested that they had designed disclosure controls to ensure that material information relating to the Company was made known to them.

107. Televisa's 2016 Annual Sustainability Report boasted: "Ethics and professionalism are two of the fundamental values of Grupo Televisa . . . . Our desire is to succeed based on our merits and not to gain undue advantages over others. In this sense, we prohibit any act of bribery, or delivery of something of value in exchange for obtaining a benefit for Grupo Televisa." The report touted the Company's Code of Ethics applicable to "directors, executives and employees, including all of the corresponding divisions and subsidiaries" with oversight from the Televisa Board's Audit and Corporate Practices Committee. The report stated that "[o]ur employees sign an adhesion letter to the Code of Ethics when they are hired. They assume the commitment to accomplish and respect the code. On the other hand, the executives endorse their commitment to the Code of Ethics twice a year. The referendum must be signed, and an adherence and compliance letter must be send through

the Human Resources area." In addition to the Code of Ethics, the Company represented that it had a specific anti-corruption policy applicable to "employees, agents and directors of the Company" that defines "an act of corruption [as] any activity that has the purpose of paying, promoting, offering, promising or authorizing the payment of any amount of money." And it represented that the Company, through its Internal Audit division, carried out "periodic audits to ensure compliance and obtain certifications issued by the executives of all subsidiaries." The Company stated that it was its policy to "denounce[] immediately" any "practice of corruption." In addition, the Company stated that, on a quarterly basis, the Board's Audit Committee is advised of corruption and other violations of the Code of Ethics and takes corrective measures.

108. On December 16, 2016, a *Reuters* article reported: "An unnamed company described in a sweeping probe of corruption in soccer's world governing body FIFA matches the description of a close affiliate of Grupo Televisa (TLVACPO.MX), the largest broadcaster in Latin America, according to a Reuters review of U.S. and Swiss government documents." Specifically, the article pointed to the court papers in the *Torneos* deferred prosecution agreement and suggested that the affiliate was Mountrigi. In the article, a spokesman for Televisa unequivocally ***denied*** that the court documents referred to one its executives, stating: "We are certain all of the people from Mountrigi or Televisa that have dealt with FIFA have acted correctly and have not paid any bribes nor any kickback to FIFA official related to the acquisition of rights."

**2017 False or Misleading Statements**

109. On April 28, 2017, Televisa filed with the SEC its annual report on Form 20-F announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 20-F"). According to the 2016 20-F, the Company prepared the

consolidated financial statements presented therein "in accordance with" IFRS as issued by the IASB.

110. In the 2016 20-F, defendants guaranteed that the Company's internal controls were effective:

> Based on the evaluation as of December 31, 2016, the Chief Executive Officer and the Chief Financial Officer of the Company have concluded that the Company's disclosure controls and procedures (as defined in the Exchange Act Rules 13a-15(e) and 15d-15(e)) are effective to ensure that the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management, including our Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.
>
> * * *
>
> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2016. In making this assessment, management used the criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).
>
> Based on this assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2016.

111. In the 2016 20-F, defendants also assured investors that:

> There has been no change in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended) that occurred during the year ended December 31, 2016 that has materially affected, or is reasonably likely to materially affect, the Company's internal controls over financial reporting.

112. In addition, the Company stated that it had "adopted a written code of ethics that applies to all of our employees, including our principal executive officer, principal financial officer and principal accounting officer." The Company boasted that:

> Companies listed on the Mexican Stock Exchange are not required to adopt a code of ethics. However, we have adopted a code of ethics which is available free of charge through our offices. See "– Code of Ethics" for directions on how to obtain a

> copy of our code of ethics. Waivers involving any of our executive officers or directors will be made only by our Board of Directors or a designated committee of the Board.

Further, the Company directed investors to an "English version of the code of ethics [which] c[ould] be found at www.televisa.com/inversionistas-ingles."

113. The Code of Ethics (adopted in its current format in June of 2012) provides that "compliance with its content is mandatory." Moreover, "Board members, officers and employees of the Group" are required to sign an "[a]dherence letter, as evidence of their acceptance and commitment to respect [the Code of Ethics'] content," which they are required to deliver to human resources, and "high-ranking executives" must "bi-annually renew their acceptance." Among other provisions, the Company's Code of Ethics requires:

> Every person must act in accordance with this Code ***and with the applicable laws in Mexico and in any other jurisdictions*** in which the Group carries out activities.
>
> * * *
>
> We wish to succeed based on our merits, ***and not because we have paid or given something of value illegally to someone in order to obtain some favor or advantage***. Likewise, personnel shall not acquire any type of commitment to attempt to obtain, receive or accept, directly or indirectly, any bribe, coercion or other payment or benefit from any employee or agent of current or potential suppliers, clients, lessors, lessees, competitors or other persons or entities related with the Group.

114. Further, the Company stated, "[w]e have secured the rights to broadcast the 2018 FIFA World Cup Russia, the 2022 FIFA World Cup Qatar and the 2026 and 2030 FIFA World Cups for Mexico and other territories in Latin America."

115. Defendant Folch signed the 2016 20-F on Televisa's behalf. In addition, the individual defendants Azcárraga III and Folch signed Certifications pursuant to Sarbanes-Oxley in which they attested the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading with respect to the period covered by this report." Azcárraga III and Folch also attested that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision." Lastly, the individual defendants attested they had designed disclosure controls to ensure that material information relating to the Company was made known to them.

116. Televisa's 2017 Annual Sustainability Report boasted: Televisa's Code of Ethics "provides the fundamental principles of ethical conduct to be followed by all those who are part of Grupo Televisa, and the adherence to its content is mandatory." In addition to the Code of Ethics, the Company represented that it had a specific anti-corruption policy applicable to employees, agents and directors of the Company that "explicitly prohibits corruption and bribery in any form and states that any act of corruption must be reported through the complaints system." And it represented that the Company, through its Internal Audit division, carries out the "[e]valuation and implementation of internal measures" to prevent corruption and bribery. The Company stated that it was its policy to "report [any act of corruption] through the Complaint System."

117. On an October 27, 2017 Q3 2017 Earnings Conference Call, analysts were particularly concerned with the trends in Sky subscribers. Each of the Company's representatives on the call took turns reassuring investors that these trends would turn around in 2018, due to the World Cup. First, the Chair of the Board of Managers for Corporación Novavision and CEO of Corporación Novavision, Alexandre Moreira Penna da Silva, assured investors the difficult trends in Sky were "expect[ed] . . . to normalize by 2018, when we have the World Cup." The Company went on to explain: "In 2018, Sky will be the only platform that will carry 100% of the World Cup games, and almost 40% of them will be aired exclusively by Sky." And de Angoitia reiterated: "We need for subscriber trends and recharge rates in Sky to normalize and we expect this will happen in 2018,

a year in which Sky will be the only platform transmitting all 64 matches of the soccer World Cup." The Corporate Vice President of Telecom, Adolfo Lagos Espinosa, also emphasized: "Yes, World Cup years are great for Sky, since they're the only platform that has the 64 games on them basically and most of them are on an exclusive basis." An analyst point blank then asked: "Do you expect the World Cup transmission to have a positive impact on advertising revenues next year?" De Angoitia answered: "Yes, we do. It's a very important event, and we do. It's key for certain advertisers to be there. So that's part of the plan for – advertising plan for next year."

118. On November 15, 2017, after Burzaco's criminal testimony, the Company denied its involvement in the FIFA bribes. Alejandro Olmos, Televisa's spokesman, stated that "'[i]n particular, Grupo Televisa in no way knew of, or condoned, any bribe or other improper conduct.'"

119. Televisa's 2013, 2014, 2015, and 2016 20-Fs, the statements regarding the Company's internal controls and Code of Ethics therein, statements on earnings calls, and statements denying the bribery scheme were materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants:

(a) the Company's internal controls were so inadequately designed and inefficient that employees were able to, and did, engage in an unlawful bribery scheme in 2013 involving FIFA executives to acquire the broadcasting rights to the World Cup;

(b) the Company engaged in an unlawful bribery scheme;

(c) the Company's illegal business practices and mismanagement of the same;

(d) the violations of the Company's own Code of Ethics;

(e) the weaknesses in the Company's internal controls;

(f) the evidence being mounted in criminal and civil proceedings;

(g) the Company's criminal and civil exposure;

(h) the reputational and brand risk posed by the evidence;

(i) the Company's financial condition; and/or

(j) the operational costs required to remedy the Company's illegal practices and rehabilitate the Company's reputation.

120. Further, Televisa's certifications within its 2013, 2014, 2015, and 2016 20-F's were false and misleading because Televisa did not comply with Exchange Act Rule 13a-15(b), which requires that the "issuer's management must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness of the issuer's disclosure controls and procedures, as of the end of each fiscal quarter."[5] As defined in Exchange Act Rule 13a-15(f):

> ***The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***.[6]

121. Defendants' January 26, 2018 Form 6-K was a partial disclosure but nevertheless omitted material facts about the circumstances surrounding its internal control deficiencies and the bribery scandal. Furthermore, defendants' announcement that Televisa had parted ways with PwC was incomplete because it failed to acknowledge the existence of material disagreements with PwC.

122. Defendants' fraudulent scheme and course of business artificially inflated the price of Televisa ADRs and/or caused Lead Plaintiff and other members of the Class (as defined below) to purchase Televisa ADRs at artificially inflated prices.

---

[5] 17 C.F.R. §240.13a-15(b).

[6] 17 C.F.R. §240.13a-15(f).

**INVESTORS BEGIN TO LEARN THE TRUTH**

123. The October 26 NYT Exposé implicated Televisa and Mountrigi in the FIFA bribery scheme and placed it squarely with the likes of Burzaco and Torneos in illegally obtaining rights to World Cup tournaments.

124. Literally within hours of the October 26 NYT Exposé, Televisa announced that the individual defendants, CEO Azcárraga III and CFO Folch, were stepping down.

125. On this news, the price of Televisa ADRs dropped 5.6% ($1.34 per share), to close at $22.54 per share on October 27, 2017, on trading volume that exceeded 12.4 million shares.

126. On November 14, 2017, Burzaco identified Televisa as a company that paid bribes to Grondona in Zurich to secure its media rights to the World Cups in 2026 and 2030.

127. Burzaco's testimony shocked the public, which led media outlets worldwide to report on his testimony that Televisa bribed FIFA executives. For example, a Spanish newspaper, *La Politica*, reported, "Alejandro Burzaco declared this Wednesday for the second time before the US Attorney's Office . . . that Torneos, Televisa and Globo [sic] paid a $15 million bribe to Julio Grondona." *The Washington Post* reported that, "during testimony in the high-profile corruption trial . . . [s]ports marketing executive Alejandro Burzaco testified that he paid millions of dollars in bribes . . . in exchange for rights to broadcast soccer games." Further, the article revealed that one of the individuals Burzaco implicated in his testimony "threw himself under a train in a Buenos Aires suburb in an act of suicide" within hours of Burzaco's testimony. The *New York Post* reported that "Alejandro Burzaco Tuesday fingered . . . Televisa as he took the stand against ex-FIFA honchos." *The Guardian* similarly reported that "[s]ome of the world's largest broadcasters . . . were involved in bribe payments to Fifa [sic] officials in order to secure the broadcast rights to major South

American football tournaments, a key witness in the investigation into corruption at football's governing body has told a federal court in New York City."

128. Sports Media was abuzz about Burzaco's testimony that Televisa worked with his company to bribe FIFA executives for exclusive media rights to the World Cup. For example, ESPN reported on Burzaco's surprising testimony in its article entitled "Marketing CEO names Globo, Televisa in World Cup TV rights scandal." Similarly, Yahoo Sports' headline regarding the trial highlighted Televisa's role in the bribery scheme: *Televisa, Globo paid FIFA bribes for 2026/2030 World Cup rights: trial witness*. The article went on to state that the prosecution witness testified over two days about Televisa's involvement in the $15 million bribe. *Id.* Further, the media was quick to note that, while "Fox and Globo have denied any wrongdoing, . . . Televisa did not comment." Civil litigation against Fox and Torneos concerning the illegal bribery scheme is ongoing in the Southern District of Florida.

129. Upon news of the testimony that Televisa paid bribes to FIFA, Televisa ADRs declined, though they later rebounded slightly to close at $19.50 per share, with a 2.4% total drop.

130. On November 19, 2017, Adolfo Lagos, head of Televisa cable (unit izzi) was reportedly shot dead by his own bodyguard on outskirts of Mexico City while on a bike ride. The BBC reported on the dramatic news, revealing the "ongoing trial of three former South American football officials has been overshadowed by suicide, claims of witness intimidation and now, potentially, murder."

131. On November 29, 2017, exhibits in the criminal trial revealed that Televisa subsidiary Mountrigi paid $7.25 million to Torneos in April 2013 related to World Cup 2026 and 2030 rights, according to ledgers revealed in federal court. This was consistent with Burzaco's testimony that

Torneos, Televisa, and Brazilian firm Globo had conspired to pay $15 million in bribes to acquire the 2026 and 2030 World Cup TV rights in Latin America.

132. Mexican news outlets widely reported in Spanish on the further confirmation of Televisa's and Mountrigi's involvement in the illegal bribery scheme. *El Diario* noted that "[t]he dirty water continues to fall on the Mexican television [corporation.] Televisa denies it, but the dirty water of the FIFAGate continues to fall from a Brooklyn court." Another investigative journalist "noted that since the beginning of the investigations in 2015, the prosecution fixed its attention on Televisa." Further, the investigative report stated that the Department of Justice "wanted to determine how TyC obtained the rights of . . . or the way in which Mountrigi secured the contracts with FIFA. . . . It also sought to establish why Mountrigi/Televisa assumed the sale of rights to the other networks as if it were FIFA."

133. On January 26, 2018, Televisa admitted in a Form 6-K filing that "the Company's management, in consultation with the Audit Committee of the Company's board and after discussions with PricewaterhouseCoopers, S.C. ('PwC'), the Company's independent registered public accounting firm, has concluded that certain material weaknesses in the Company's internal control over financial reporting existed as of December 31, 2016." Specifically, Televisa advised investors:

> The material weaknesses in the Company's internal control over financial reporting related to (i) the design and maintenance of effective controls over certain information technology controls which support systems that are relevant to the provisioning, updating and deleting of users' access to those systems, the periodic review of users' access to these systems, developers' access to certain of these systems and appropriate segregation of duties; (ii) the design and maintenance of effective controls over segregation of duties within the accounting system, including certain individuals with the ability to gain access to prepare and post journal entries across substantially all key accounts of the Company without an independent review performed by someone other than the preparer; and (iii) ineffective controls with respect to the accounting for certain revenue and related accounts receivable in our cable companies and content division.

134. As a result of these material deficiencies, the Company stated the following:

> [T]he report of management on the effectiveness of the Company's internal control over financial reporting [and] our conclusion regarding the effectiveness of disclosure controls or procedures, and PwC's audit report (each included in the Company's Annual Report on Form 20-F for the year ended December 31, 2016) should no longer be relied upon . . . .

135. Televisa's Form 6-K also stated that "[a] material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."

136. PwC's reversal of its April 28, 2017 audit opinion for the year ended December 31, 2016, which had stated that "the Company maintained, in all material respects, effective internal control over financial reporting" was an exceptional event because auditors rarely reverse an audit opinion previously rendered on the status of a company's internal controls. PwC's reversal of its audit opinion also signals that the internal control deficiencies that the Company admitted to had existed for an extended period of time of at least two years.

137. On the news that the Company management's report about the effectiveness of the Company's internal controls and PwC's audit report for the year ended December 31, 2016, should no longer be relied upon, the price of Televisa ADRs fell $0.29 per share, from $20.95 per share to close at $20.66 per share on January 26, 2018, a 1.4% decline, after initially falling as much as 10% in response to the Company's announcement.

138. Though defendants' Form 6-K was sanitized to avoid further fall out, defendants' admission of the above internal control deficiencies came about directly as a result of the public disclosure of Televisa's bribery payments conducted through Mountrigi. Once PwC recognized the internal control deficiencies, it was required to go back to previous audits of internal controls to

determine, if possible, how such bribery payments were accomplished and concealed, so that PwC would comply with Public Company Accounting Standards Board ("PCAOB") AU [Audit] §9317, *Illegal Acts by Clients*, and with AS [Auditing Standard] 2401, *Consideration of Fraud in a Financial Statement Audit*.

139. The first two internal control deficiencies described in Televisa's January 26, 2018 Form 6-K obliquely referred to "certain information technology controls" and "controls over segregation of duties within the accounting system." What this means in lay terms is that one or more individuals were provided with access to Televisa's (and/or Mountrigi's) financial system so that improper payments could be made and then the accounting for the payment(s) could be concealed as a legitimate transaction(s), which could not happen if Televisa maintained financial and accounting controls with "appropriate segregation of duties." In other words, defendants had authorized one or more individuals to carry out the transfers of money to make bribery payments and then cover up or conceal the nature of the payments to avoid detection.

140. The third internal control deficiency described in Televisa's Form 6-K referred to "accounting for certain revenue and related accounts receivable in [the] cable companies and content division." That means one or more individuals was empowered to write off an account receivable in connection with a sale, without review or proper support, but still apply the proceeds to an illicit bank account for the ultimate purpose of paying a bribe without a corresponding entry on the Company's books. Again what this meant in practical terms is that defendants authorized one or more individuals to carry out the transfers of money to make bribery payments and then to cover-up or conceal the nature of the payments to avoid detection.

141. Critically, the internal control deficiencies that defendants described in defendants' January 26, 2018 Form 6-K could not have been caused by an oversight, a mistake, an error, or the

result of poor training or incompetence. Rather, such internal control deficiencies existed by deliberate design. If the internal control deficiencies were the result of innocent inaction, such as a lack of oversight or lack of training, companies ordinarily remediate such deficiencies by including changes and improvements in staffing pertinent to those internal controls. But in defendants' Form 20-F/A, in the section entitled "Remediation Plan and Activities," defendants assiduously avoided any reference to the staff person or persons that were responsible for, or in charge of, the internal controls over cash disbursements and the accounting for those disbursements:

> Once we identified the material weaknesses described under "Management's Annual Report on Internal Control Over Financial Reporting (Restated)", we developed a program to remediate the combination of deficiencies comprising these material weaknesses. Accordingly, we have already commenced the implementation of our remediation program for the material weaknesses affecting our internal control over financial reporting, at the corporate level and at the business segments on which we identified such weaknesses, including the enhancement and strengthening of existing internal controls, as well as the design and adoption of new compensating internal controls.
>
> Our program includes activities designed for the achievement of control objectives to be performed in the financial reporting cycle at all levels of the Company, at various stages within business processes, and over the technology environment. These control activities are preventive and detective in nature and encompass a range of supplementary automated and manual activities such as authorizations and approvals, verifications, reconciliations, and business performance reviews, as well as an appropriate segregation of duties.
>
> As of the date of this filing, we have already implemented, or are in the process of implementing, the aforementioned control activities as part of our remediation program, including the modification of related existing internal controls.

142. On April 30, 2018, Televisa filed with the SEC its annual report on Form 20-F (the "2017 20-F"), which included the following report from its public accountant concerning its opinions on the Financial Statements and Internal Control over Financial Reporting:

> [I]n our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the COSO because material weaknesses in internal control over financial reporting exists as of

that date related to deficiencies in risk assessment as the Company did not appropriately design, maintain or monitor certain controls in response to the risk of material misstatement, which contributed to material weaknesses in internal control over financial reporting as the Company (i) did not design and maintain effective controls over certain information technology controls, (ii) did not design and maintain effective controls over segregation of duties within the accounting system, including review and approval of manual journal entries, and (iii) had ineffective controls with respect to the accounting for certain revenue and related accounts receivable at certain divisions.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weaknesses referred to above are described in Management's Annual Report on Internal Control over Financial Reporting appearing under Item 15. We considered these material weaknesses in determining the nature, timing, and extent of audit tests applied in our audit of the December 31, 2017 consolidated financial statements, and our opinion regarding the effectiveness of the Company's internal control over financial reporting does not affect our opinion on those consolidated financial statements.

**Basis for Opinions**

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in management's report referred to above. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated

financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

143. On July 10, 2018, Televisa filed a Form 6-K announcing that the Company's Audit Committee had decided to terminate PwC as the Company's auditor and to replace PwC with KPMG Cárdenas Dosal, S.C., as follows:

**TELEVISA ANNOUNCES CHANGE OF INDEPENDENT PUBLIC ACCOUNTANT**

Grupo Televisa, S.A.B. ("Televisa" or the "Company"; NYSE:TV; BMV:TLEVISA CPO) informs that today, the Board of Directors of the Company, taking into account best corporate practices, adopted the previously announced recommendation of its Audit Committee to engage KPMG Cárdenas Dosal, S.C. as the Company's independent public accountant. The Board accordingly approved KPMG's engagement, which will commence with the review of the Company's financial results for the year ended December 31, 2018.

> The Company recognizes and appreciates the longstanding relationship between the Company and PricewaterhouseCoopers, S.C., its former independent public accountant.

144. In a separate Form 6-K filing on July 10, 2018, in which Televisa provided results for the second quarter of 2018, Televisa also revealed that the decision to terminate PwC and to replace PwC with KPMG Cárdenas Dosal, S.C. was made on July 5, 2018, three business days before the July 10, 2018 announcement, as follows:

> **External Auditors**
>
> On July 5, 2018, the Audit Committee of the Company determined to recommend to the Board of Directors of the Company that KPMG Cárdenas Dosal, S.C. be engaged as the independent public accountant of the Company, starting with the review of the Company's financial results for the year ended December 31, 2018. The Committee made this determination taking into account best corporate practices.

145. As Televisa is required to file all reports required by the SEC within the prescribed time limits, Televisa was also required to disclose the specific circumstances and reasons for making the change of auditors in accordance with the SEC Rule 229.304, 17 C.F.R. §229.304 (Item 304), *Changes in and disagreements with accountants on accounting and financial disclosure*. Item 304 required Televisa to disclose whether it had any "disagreements" with the auditors and, if applicable, the nature of those "disagreements." This SEC Rule states:

> The term "disagreements" as used in this Item shall be interpreted broadly, to include any difference of opinion concerning any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure which (if not resolved to the satisfaction of the former accountant) would have caused it to make reference to the subject matter of the disagreement in connection with its report. It is not necessary for there to have been an argument to have had a disagreement, merely a difference of opinion.

146. Normally, Item 304's requirements are addressed with the auditors and satisfied behind the scenes, well before the public announcement of an auditor's termination. Ordinarily, there is no material disagreement between the registrant and the auditor. In such routine cases, a company's announcement complies with all of the Item 304 disclosure requirements at the time of

the announcement. If, on the other hand, there are disagreements between the registrant and the auditor, and those disagreements could have serious adverse consequences for the company, then the disclosure of the nature of those disagreements may be delayed to allow the company's attorneys to carefully craft the language of the Item 304 disclosures to minimize the fallout when the company actually makes the required disclosures.

147. In Televisa's case, however, defendants have failed to comply with the detailed requirements of Item 304. In particular, defendants failed to "[s]tate whether the former accountant resigned, declined to stand for re-election or was dismissed and the date thereof." Defendants also failed to:

> State whether during the registrant's two most recent fiscal years and any subsequent interim period preceding such resignation, declination or dismissal there were any disagreements with the former accountant on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreement(s), if not resolved to the satisfaction of the former accountant, would have caused it to make reference to the subject matter of the disagreement(s) in connection with its report.

148. Item 304 further required defendants to report on "[a]ny matter that was either the subject of a disagreement . . . or a reportable event," and, if applicable, to:

> (A) describe each such disagreement; (B) state whether any audit or similar committee of the board of directors, or the board of directors, discussed the subject matter of each of such disagreements with the former accountant; and (C) state whether the registrant has authorized the former accountant to respond fully to the inquiries of the successor accountant concerning the subject matter of each of such disagreements and, if not, describe the nature of any limitation thereon and the reason therefore.

Item 304 further states that:

> The disagreements required to be reported in response to this Item include both those resolved to the former accountant's satisfaction and those not resolved to the former accountant's satisfaction. Disagreements contemplated by this Item are those that occur at the decision-making level, *i.e.*, between personnel of the registrant responsible for presentation of its financial statements and personnel of the accounting firm responsible for rendering its report.

149. Additionally, according to Item 304, there were specific time limitations imposed for complying with Item 304 disclosures, as follows:

> The registrant shall provide the former accountant with a copy of the disclosures it is making in response to this Item 304(a) that the former accountant shall receive no later than the day that the disclosures are filed with the Commission. The registrant shall request the former accountant to furnish the registrant with a letter addressed to the Commission stating whether it agrees with the statements made by the registrant in response to this Item 304(a) and, if not, stating the respects in which it does not agree. The registrant shall file the former accountant's letter as an exhibit to the report on registration statement containing this disclosure. If the former accountant's letter is unavailable at the time of filing such report or registration statement, then the registrant shall request the former accountant to provide the letter as promptly as possible so that the registrant can file the letter with the Commission within ten business days after the filing of the report or registration statement. Notwithstanding the ten business day period, the registrant shall file the letter by amendment within two business days of receipt; if the letter is received on a Saturday, Sunday or holiday on which the Commission is not open for business, then the two business day period shall begin to run on and shall include the first business day thereafter. The former accountant may provide the registrant with an interim letter highlighting specific areas of concern and indicating that a more detailed letter will be forthcoming within the ten business day period noted above. If not filed with the report or registration statement containing the registrant's disclosure under this Item 304(a), then the interim letter, if any, shall be filed by the registrant by amendment within two business days of receipt.[7]

150. Defendants' failure to comply with Item 304 indicates that disagreements between the Company and PwC do exist, and that PwC was unwilling to provide defendants with a letter disavowing any "disagreement" or any "difference of opinion concerning any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure" that (if not resolved to PwC's satisfaction) would have caused PwC to make reference to the subject matter of the disagreement in connection with its report.

151. Accordingly, the most plausible explanation for Televisa's failure to comply with Item 304 under these circumstances is that PwC had material disagreements about Televisa's

[7] 17 C.F.R. §229.304(a)(3).

accounting practices and accounting systems and was unwilling to turn a blind eye to Televisa's failure to comply with required internal controls and to comply with laws prohibiting bribes.

152. The price tag of defendants' fraudulent scheme has been steep for investors. Televisa ADR prices have declined significantly since the truth was revealed to the market.

## ADDITIONAL SCIENTER ALLEGATIONS

153. During the Class Period, defendants had the motive and opportunity to commit the alleged fraud. Defendants had actual knowledge of the misleading statements they made and/or acted in reckless disregard of the truth at the time. In doing so, defendants participated in a scheme to defraud and committed acts and practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Televisa ADRs during the Class Period. Defendants and third parties have exclusive control over communications concerning their fraudulent scheme.

154. On October 26, 2017, hours after the October 26 NYT Exposé was published, Televisa announced that the individual defendants, Azcárraga III and Folch, were stepping down.

155. In November 2017, it was confirmed through sworn testimony in the criminal trial and documents in the criminal proceedings that Televisa had conspired to pay, and did pay, millions of dollars to a FIFA official to secure the coveted World Cup rights. The prosecution's star witness Alejandro Burzaco and his company have known ties to, and business dealings with, defendants.

156. On January 26, 2018, the Company admitted that its internal control over financial reporting was ineffective. In doing so, the Company effectively admitted that its internal control was ineffective throughout the Class Period because each annual report during that time represented that "[t]here has been no change in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended) that occurred during the [preceding year]." Given that no change had been made, the material

weakness in Televisa's internal control over financial reporting that admittedly existed as of December 31, 2016, necessarily existed throughout the Class Period.

157. Individual defendants Azcárraga III and Folch were aware or deliberately reckless in disregarding that the Sarbanes-Oxley Certifications they signed during the Class Period, which attested to the accuracy and completeness of the Company's financial statements and effective internal controls, were false, in light of the Company's admitted internal control deficiencies. The individual defendants were top executives at the Company and led its day-to-day operations. As part of their jobs and through the OTI, the individual defendants interacted with other sports executives at Torneos and the executives at Mountrigi alleged to be involved in the FIFA bribes. In the course of Televisa's involvement in the FIFA bribery scandal, millions of dollars were siphoned off, and these individual defendants reviewed the Company's internal controls so they knew about the bribery scheme and the material weaknesses, or they were deliberately reckless to the truth.

## LOSS CAUSATION/ECONOMIC LOSS

158. As a result of defendants' scheme and materially false or misleading statements, Televisa ADRs were overvalued throughout the Class Period. Like other members of the Class who purchased at artificially inflated prices during the Class Period, Lead Plaintiff suffered an economic loss, *i.e.*, damages, when the trading price of Televisa ADRs declined upon disclosures that corrected, in whole or in part, defendants' alleged false or misleading statements.

159. The timing and magnitude of Televisa's ADR price declines negate any inference that the losses suffered by Lead Plaintiff and other Class members were caused entirely by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated in any way to defendants' fraudulent conduct. The economic losses, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class, were a direct result of defendants' scheme and

misrepresentations, which artificially inflated the price of Televisa ADRs, and the subsequent significant decline in the value of Televisa ADRs as the truth regarding the Company's bribes and internal controls were revealed to the market, correcting the misrepresentations and/or the economic impact thereof.

160. The October 26 NYT Exposé implicated Televisa and Mountrigi in the FIFA bribery and placed it squarely with the likes of Burzaco and Torneos in illegally obtaining rights to World Cup tournaments. Then, within mere hours, Televisa announced that the individual defendants, CEO Azcárraga III and CFO Folch, were stepping down. The media widely reported on these surprising events. That same day, *Medio Tiempo* reported that, "on the same day as Emilio Azcárraga Jean's farewell to the general management of Grupo Televisa, the New York Times published a report detailing how the Mexican television consortium is involved in fraudulent practices to obtain broadcasting rights for World Cups." The following day, *La Politica Online*, reported on the links between the October 26 NYT Exposé and Azcárraga III's resignation, explaining that "The New York Times relates the departure of Emilio Azcárraga from Televisa's leadership to the plot of bribery at FIFA." Similarly, *Merca2.0* published an article entitled "The Secret behind the transmission rights of the national team, the real reason for the departure of Emilio Azcárraga?" And on October 30, 2017, *Remezcla* noted the suspect timing of Azcárraga III's resignation in its article titled "Televisa Lives Up to Shady Reputation by Reportedly Helping Bribe FIFA Officials." Further, a number of Mexican news outlets noted that Azcárraga III was unwilling to discuss the October 26 NYT Exposé, which detailed Televisa's connection to the FIFA bribery scandal.

161. In response to the news of the October 26 NYT Exposé and the individual defendants stepping down, the price of Televisa ADRs dropped 5.6% ($1.34 per share), closing at $22.54 per share on October 27, 2017, on trading volume that exceeded 12.4 million shares

162. On November 14, 2017, in response to the news of criminal testimony identifying Televisa as a co-conspirator in the FIFA bribery scheme, the price of Televisa ADRs declined, though they later rebounded slightly to close at $19.50 per share, with a 2.4% total drop. That same day, *Bloomberg* reported that "some of the world's biggest broadcasters, including Fox Sports, Globo and Grupo Televisa SAB, were implicated in corruption of international soccer, with a former sports-marketing executive telling a U.S. jury that the companies paid bribes to win lucrative, multiyear rights for tournaments." And then the *Associated Press* reported that, "earlier Wednesday, Burzaco testified that media giants Globo, of Brazil, and Televisa, of Mexico, teamed with a marketing firm to make a $15 million bribe to a FIFA executive to help them secure lucrative broadcasting rights to the World Cup in 2026 and 2030." Spanish newspaper *La Politica* reported, "Alejandro Burzaco declared this Wednesday for the second time before the US Attorney's Office . . . that Torneos, Televisa and [sic] Globo paid a $15 million bribe to Julio Grondona." *The Washington Post* reported that "during testimony in the high-profile corruption trial . . . [s]ports marketing executive Alejandro Burzaco testified that he paid millions of dollars in bribes . . . in exchange for rights to broadcast soccer games." Further, the article revealed that one of the individuals Burzaco implicated in his testimony "threw himself under a train in a Buenos Aires suburb in an act of suicide" within hours of Burzaco's testimony. The *New York Post* reported that "Alejandro Burzaco Tuesday fingered . . . Televisa as he took the stand against ex-FIFA honchos." *The Guardian* similarly reported that "[s]ome of the world's largest broadcasters . . . were involved in bribe payments to Fifa [sic] officials in order to secure the broadcast rights to major South American football tournaments, a key witness in the investigation into corruption at football's governing body has told a federal court in New York City." An Itau BBA analyst explained: "We believe that the latest news flow helping to drive the over 17.16% sell-off over the last month is the

potential involvement of several media companies in a corruption scandal related to the acquisition of FIFA content transmission rights." The analyst continued:

> Our take. We believe the news does not bode well for a quick share price recovery for the stock following the recent sell-off. And it could generate investor concerns about possible fines or remedial actions to limit the company's access to exclusive content amid the already challenging market sentiment on the stock.

163. Sports Media was abuzz with Burzaco's testimony that Televisa worked with his company to bribe FIFA executives for exclusive media rights to the World Cup. For example, ESPN reported on Burzaco's testimony in its article entitled "Marketing CEO names Globo, Televisa in World Cup TV rights scandal." Similarly, Yahoo Sports' headline regarding the trial highlighted Televisa's role in the bribery scheme: "Televisa, Globo paid FIFA bribes for 2026/2030 World Cup rights: trial witness." The article went on to state that the prosecution witness testified over two days about Televisa's involvement in the $15 million bribe. Further, the media was quick to note that, while "Fox and Globo have denied any wrongdoing, . . . Televisa did not comment." Civil litigation against Fox and Torneos concerning the illegal bribery schemes is ongoing in the Southern District of Florida.

164. Televisa's January 26, 2018 Form 6-K admitted to material weaknesses in the Company's internal control over financial reporting as of December 31, 2016. Specifically, Televisa advised investors:

> The material weaknesses in the Company's internal control over financial reporting related to (i) the design and maintenance of effective controls over certain information technology controls which support systems that are relevant to the provisioning, updating and deleting of users' access to those systems, the periodic review of users' access to these systems, developers' access to certain of these systems and appropriate segregation of duties; (ii) the design and maintenance of effective controls over segregation of duties within the accounting system, including certain individuals with the ability to gain access to prepare and post journal entries across substantially all key accounts of the Company without an independent review performed by someone other than the preparer; and (iii) ineffective controls with

> respect to the accounting for certain revenue and related accounts receivable in our cable companies and content division.

165. As a result of these material deficiencies, the Company stated the following:

> [T]he report of management on the effectiveness of the Company's internal control over financial reporting [and] our conclusion regarding the effectiveness of disclosure controls or procedures, and PwC's audit report (each included in the Company's Annual Report on Form 20-F for the year ended December 31, 2016) should no longer be relied upon . . . .

166. Televisa's Form 6-K also stated that "[a] material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."

167. PwC's reversal of its April 28, 2017 audit opinion for the year ended December 31, 2016, which had stated that "the Company maintained, in all material respects, effective internal control over financial reporting" was an exceptional event because auditors rarely reverse an audit opinion previously rendered on the status of a company's internal controls. PwC's reversal of its audit opinion also signals that the internal control deficiencies that the Company admitted to had existed for an extended period of time of at least two years.

168. Journalists reported on the market's reaction to the news of Televisa's admitted internal control problems. On January 26, 2018, *Reuters* reported that "Mexican broadcaster Grupo Televisa said on Friday it had reported weaknesses in its financial controls to the U.S. Securities Exchange Commission, sending its shares initially down as much as 10 percent." A *Casa de Bolsa Interacciones* analyst also noted that "Televisa today announced that it has found 'material weaknesses' in the internal control of its financial information for the year ending in 2016."

169. On the news that Televisa management's report about the effectiveness of the Company's internal controls and PwC's audit report for the year ended December 31, 2016 should

no longer be relied upon, the price of Televisa ADRs declined to $20.66 per share, down 1.4%, on trading volume that exceeded 10.5 million shares.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

170. Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's ADRs traded in an efficient market;

(d) The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADRs; and

(e) Lead Plaintiff and other members of the Class purchased Televisa ADRs between the time that defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, and they did so without knowledge of the misrepresented or omitted facts.

171. Throughout the Class Period, the market for Televisa ADRs was efficient for the following reasons, among others:

(a) Televisa ADRs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) The average weekly trading volume of Televisa ADRs exceeded 2% of the total outstanding ADRs;

(c) Over a dozen different firms and dozens of analysts covered Televisa stock and ADRs;

(d) As a regulated issuer, Televisa filed periodic public reports with the SEC; and

(e) Televisa regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as earnings calls, communications with the financial press, securities analysts, and other similar reporting services.

## NO SAFE HARBOR

172. Defendants' false or misleading statements during the Class Period were not forward-looking statements ("FLS") and thus did not fall within any "Safe Harbor."

173. Any verbal "Safe Harbor" warnings accompanying defendants' oral FLS issued during the Class Period were ineffective to shield those statements from liability.

174. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew that the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Televisa who knew that the FLS was false. Further, none of the historic or present tense statements made by defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

175. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all individuals and entities who purchased Televisa ADRs during the Class Period (the "Class") and were damaged thereby.[8] Excluded from the Class are defendants and their immediate families, current and former directors and officers of Televisa and their immediate

[8] Lead Plaintiff reserves the right to amend the Class definition and/or Class Period.

families, and defendants' current and former legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

176. The members of the Class are so numerous that joinder of all members is impracticable. Televisa ADRs are actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes there are thousands of Class members or more. Record owners and other members of the Class may be identified from records maintained by Televisa or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

177. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact that are common to the members of the Class and predominate over questions that may affect individual Class members include:

(a) Whether one or more defendants violated the Exchange Act and Rule 10b-5 promulgated thereunder;

(b) Whether one or more defendants made false or misleading statements of material fact during the Class Period;

(c) Whether one or more defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether one or more defendants knew or recklessly disregarded that their statements were false or misleading;

(e) Whether the price of Televisa ADRs was artificially inflated;

(f) Whether the market for Televisa ADRs was efficient; and

(g) The extent of damage sustained by Lead Plaintiff and other Class members and the appropriate measure of damages.

178. Lead Plaintiff's claims are typical of those of other Class members, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal securities laws as complained of herein.

179. Lead Plaintiff will adequately protect the interests of the Class and has retained Lead Counsel who are nationally recognized experts in class action securities litigation. Neither Lead Plaintiff nor Lead Counsel has any interests that conflict with those of the Class.

180. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

181. Lead Plaintiff incorporates the allegations above by reference as though set forth fully herein.

182. During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

183. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and other Class members in connection with their purchases of Televisa ADRs during the Class Period.

184. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Televisa ADRs. Lead Plaintiff and the Class would not have purchased Televisa ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false or misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act Against All Defendants

185. Lead Plaintiff incorporates the allegations above by reference as though set forth fully herein.

186. By reason of their positions of control and authority as officers and/or directors of Televisa, the individual defendants had the power and authority to cause Televisa to engage in the conduct complained of herein. These defendants were able to, and did, control, directly and indirectly, the decision-making of Televisa, including the content and dissemination of Televisa's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein. Televisa exercised control over and directed the actions of its senior managers, directors and agents, including the individual

defendants. Televisa controlled the individual defendants, and all of its employees and subsidiaries, including Mountrigi.

187. In their capacities as senior corporate officers and/or directors of Televisa, and as more fully described herein, the individual defendants participated in the misstatements and omissions set forth above. Indeed, these defendants had direct and supervisory involvement in the day-to-day operations of the Company and had access to non-public information regarding Televisa's business practices and internal controls. Televisa and the individual defendants had the ability to influence and direct and did influence and direct the activities of the Company and its employees and subsidiaries in their violations of §10(b) of the Exchange Act and Rule 10b-5.

188. As a result, Televisa, Azcárraga III, and Folch, individually and as a group, were control persons within the meaning of §20(a) of the Exchange Act.

189. As set forth above, defendants violated §10(b) of the Exchange Act. By virtue of their positions as controlling persons, the individual defendants are liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as Televisa is liable to Lead Plaintiff and the other members of the Class. Televisa exercised control over the individual defendants and all of its employees and, as a result of its aforementioned conduct, is liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as the individual defendants are liable to Lead Plaintiff and the other members of the Class.

190. This claim is brought within the applicable statute of limitations.

191. For these reasons, defendants violated §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, appointing Lead Plaintiff to serve as a class representative, and appointing Lead Counsel as Class Counsel;

B. Declaring that defendants are liable pursuant to the Exchange Act;

C. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' costs and expenses incurred in this action; and

E. Awarding such other relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

DATED: August 6, 2018

ROBBINS GELLER RUDMAN
& DOWD LLP
JONAH H. GOLDSTEIN
RACHEL L. JENSEN
RACHEL A. COCALIS

s/ Rachel L. Jensen
RACHEL L. JENSEN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jonahg@rgrdlaw.com
rachelj@rgrdlaw.com
rcocalis@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

Lead Counsel for Lead Plaintiff Colleges of Applied Arts & Technology Pension Plan

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on August 6, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Rachel L. Jensen

RACHEL L. JENSEN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: rachelj@rgrdlaw.com

# Mailing Information for a Case 1:18-cv-01979-LLS In re Grupo Televisa Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Rachel Cocalis**
  rcocalis@rgrdlaw.com
- **Jonah H. Goldstein**
  jonahg@rgrdlaw.com
- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com
- **Rachel L. Jensen**
  rachelj@rgrdlaw.com,rcocalis@rgrdlaw.com,michelew@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Phillip C. Kim**
  pkim@rosenlegal.com
- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com
- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,2879289420@filings.docketbird.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)