UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | x | |
|---|---|---|
| In re GRUPO TELEVISA SECURITIES LITIGATION | : : | Civil Action No. 1:18-cv-01979-LLS |
| | : | CLASS ACTION |
| | : | |
| This Document Relates To: | : : | LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' |
| ALL ACTIONS. | : : | MOTION TO DISMISS THE AMENDED |
| | x | COMPLAINT |

1503398_1

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................5

        A.      Televisa Begins Losing Its Edge.................................................................5

        B.      Televisa's Covert Bribery Scheme for World Cup Media Rights .........................6

        C.      The FIFA Bribery Scheme Begins to Unravel.........................................7

        D.      *The New York Times* Exposes Televisa's Bribery Scheme...................................8

        E.      Evidence of Televisa's Bribery Mounts in the Criminal FIFA Trials ...................9

        F.      Televisa Announces a Material Weakness in Its Internal Controls and
                Parts Ways with Longtime Accountant PwC.........................................12

III.    DEFENDANTS' MISREPRESENTATIONS OF THE RECORD BETRAY THE
        WEAKNESS OF THEIR ARGUMENTS ..........................................................13

IV.     DEFENDANTS IMPROPERLY RELY ON EXTRINSIC DOCUMENTS ...................16

V.      APPLICABLE LEGAL STANDARDS ON A MOTION TO DISMISS .........................19

VI.     LEAD PLAINTIFF'S 66-PAGE COMPLAINT PROVIDES SUFFICIENT
        PARTICULARS ....................................................................................................20

        A.      The Complaint Alleges the "Who, What, When, Where, and Why" of
                Defendants' Fraud....................................................................................20

        B.      The Complaint Adequately Alleges the Bribery Scheme ......................................21

        C.      The Complaint Adequately Alleges the Internal Control Deficiencies ................25

        D.      Defendants' Self-Serving Opinion Should Be Disregarded ...................................33

        E.      Defendants' Misrepresentations and Omissions Are Actionable .........................35

                1.      Statements Regarding the World Cup and Bribes ....................................35

                2.      Statements Regarding the Adequacy and Design of Internal
                        Controls and SOX Certifications ................................................................40

                3.      Statements Regarding Televisa's Code of Ethics and Anti-
                        Corruption Policies ....................................................................................42

1503398_1

**Page**

F.    The Complaint Adequately Alleges Scienter ...................................................45

    1.    The Complaint Adequately Alleges Corporate Scienter ...........................46

    2.    The Complaint Adequately Alleges Individual Defendants' Scienter ......................................................................................................49

        a.    The Misleading Statements Concerned a Core Operation of Televisa's Business ........................................................................49

        b.    Azcárraga III, Folch and PwC's Resignations Further Support an Inference of Scienter .....................................................50

        c.    Defendants' SOX Certifications and Purposefully Weak Internal Controls Are Probative of Scienter ...................................52

        d.    Defendants Had Motive and Opportunity .....................................53

        e.    Defendants' Self-Serving Explanation Fails to Overcome the Strong Inference of Scienter ................................................54

G.    Control Person Liability ...............................................................................56

H.    Alternatively, Lead Plaintiff Requests an Opportunity to Amend .......................56

VII.   CONCLUSION ......................................................................................................57

- ii -

# TABLE OF AUTHORITIES

Page

## CASES

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)................................................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).....................................................................................19

*Barrett v. PJT Partners, Inc.*,
    No. 16-CV-2841 (VEC), 2017 WL 3995606
    (S.D.N.Y. Sept. 8, 2017)................................................................................45

*Batwin v. Occam Networks, Inc.*,
    No. CV 07-2750 CAS, 2008 U.S. Dist. LEXIS 52365
    (C.D. Cal. July 1, 2008)...........................................................................30, 55

*Bay Harbour Mgmt. LLC v. Carothers*,
    282 F. App'x 71 (2d Cir. 2008) ....................................................................29

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................3, 19, 21, 26

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002).........................................................................37

*Capax Discovery, Inc. v. AEP RSD Inv'rs, LLC*,
    285 F. Supp. 3d 579 (W.D.N.Y. 2018) ........................................................20

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014).........................................................................56

*Chambers v. Time Warner Inc.*,
    282 F.3d 147 (2d Cir. 2002)..........................................................14, 18, 19, 20

*Chechele v. Scheetz*,
    466 F. App'x 39 (2d Cir. 2012) ....................................................................17

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)....................................................................48, 54

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
    957 F. Supp. 2d 277 (S.D.N.Y. 2013)..........................................................56

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)......................................................45, 53

- iii -

**Page**

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG,*
  752 F.3d 173 (2d Cir. 2014).............................................................................36

*Cohen v. S.A.C. Trading Corp.,*
  711 F.3d 353 (2d Cir. 2013).............................................................................19

*Cortec Indus., Inc. v. Sum Holding L.P.,*
  949 F.2d 42 (2d Cir. 1991)...............................................................................17

*Cruz v. TD Bank, N.A.,*
  742 F.3d 520 (2d Cir. 2013).............................................................................56

*Dekle v. Glob. Dig. Sols., Inc.,*
  131 F. Supp. 3d 1280 (S.D. Ala. 2015)...........................................................54

*Dobina v. Weatherford Int'l Ltd.,*
  909 F. Supp. 2d 228 (S.D.N.Y. 2012).......................................................52, 53

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.,*
  323 F. Supp. 3d 393 (S.D.N.Y. 2018)..............................................................18

*Elliott Assocs., L.P. v. Covance, Inc.,*
  No. 00 CIV. 4115 SAS, 2000 WL 1752848
  (S.D.N.Y. Nov. 28, 2000) ................................................................................25

*Emps.' Ret. Sys. of Gov't of Virgin Islands v. Blanford,*
  794 F.3d 297 (2d Cir. 2015).............................................................................20

*Feasby v. Industri-Matematik Int'l Corp.,*
  No. 99CIV.8761(HB), 2000 WL 977673
  (S.D.N.Y. July 17, 2000) .................................................................................29

*Freudenberg v. E*Trade Fin. Corp.,*
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)...................................................27, 30, 48

*Friedl v. City of N.Y.,*
  210 F.3d 79 (2d Cir. 2000)...............................................................................18

*Ganino v. Citizens Utils. Co.,*
  228 F.3d 154 (2d Cir. 2000)...................................................................35, 39, 46

*Garfield v. NDC Health Corp.,*
  466 F.3d 1255 (11th Cir. 2006) .......................................................................53

- iv -

**Page**

*Gauquie v. Albany Molecular Research, Inc.*,
No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591
(E.D.N.Y. July 26, 2016) ................................................................50

*Goel v. Bunge, Ltd.*,
820 F.3d 554 (2d Cir. 2016)........................................................17, 18

*Gould v. Winstar Commc'ns, Inc.*,
692 F.3d 148 (2d Cir. 2012)..............................................................46

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
17 F. Supp. 2d 275 (S.D.N.Y. 1998).................................................21

*Hall v. The Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008).........................................50, 52

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002),
*aff'd* 40 F. App'x 624 (2d Cir. 2002) ...............................................35

*Henning v. Orient Paper, Inc.*,
No. CV 10-5887-VBF, 2011 WL 2909322
(C.D. Cal. July 20, 2011) .....................................................30, 31, 55

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
93 F. Supp. 2d 424 (S.D.N.Y. 2000)..................................................54

*In re Am. Bus. Fin. Servs. Noteholders Litig.*,
No. 05-0232, 2008 U.S. Dist. LEXIS 61450
(E.D. Pa. Aug. 11, 2008).....................................................................51

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006)................................................23

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)...................................... *passim*

*In re Braksem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017)............................................38, 45

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008).................................................53

**Page**

*In re Commodity Exch., Inc.*,
   213 F. Supp. 3d 631 (S.D.N.Y. 2016) ..................................................................19

*In re Electrobras Sec. Litig.*,
   245 F. Supp. 3d. 450 (S.D.N.Y. 2017) ....................................................39, 42, 44

*In re Fannie Mae 2008 Sec. Litig.*,
   742 F. Supp. 2d 382 (S.D.N.Y. 2010) ..................................................................19

*In re FBR Inc. Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008) ..................................................................37

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
   No. 10 Civ. 3461 (PAC), 2014 WL 2815571
   (S.D.N.Y. June 23, 2014) ......................................................................................44

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   No. 12 Civ. 8557 (CM), 2013 WL 6233561
   (S.D.N.Y. Dec. 2, 2013) ........................................................................................49

*In re Insys Therapeutics, Inc. Sec. Litig.*,
   No. 17 Civ. 1954 (PAC), 2018 WL 2943746
   (S.D.N.Y. June 12, 2018) ......................................................................................52

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   No. 15 CIV. 6369 (JFK), 2018 WL 1449206
   (S.D.N.Y. Mar. 23, 2018) ......................................................................................55

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...............................................................29

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ..................................................................48

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009) ..................................................................44

*In re Par Pharm., Inc. Sec. Litig.*,
   733 F. Supp. 668 (S.D.N.Y. 1990) ..........................................................36, 37, 38

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015) ........................................................... *passim*

1503398_1

**Page**

*In re PetroChina Co. Ltd.*,
120 F. Supp. 3d 340 (S.D.N.Y. 2015)......................................................................42

*In re ProQuest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007).................................................................52

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016)......................................................................34

*In re Sierra Wireless, Inc. Sec. Litig.*,
482 F. Supp. 2d 365 (S.D.N.Y. 2007).....................................................................29

*In re Sipex Corp. Sec. Litig.*,
No. C 05-00392 WHA, 2005 WL 3096178
(N.D. Cal. Nov. 17, 2005)........................................................................................40

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
No. 00-cv-1041 (DLC), 2000 U.S. Dist. LEXIS 12504
(S.D.N.Y. Aug. 31, 2000), *aff'd* 31 F. App'x 762 (2d Cir. 2002) ..........................36

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008).....................................................................53

*In re Top Tankers, Inc. Sec. Litig.*,
528 F. Supp. 2d 408 (S.D.N.Y. 2007).....................................................................51

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005).....................................................................38

*In re Veeco Instruments, Inc., Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006) .......................................................................49, 52

*In re VEON Ltd. Sec. Litig.*,
No. 15-cv-08672 (ALC), 2017 WL 4162342
(S.D.N.Y. Sept. 19, 2017)..............................................................................20, 41, 47

*In re Virtus Inv. Partners Inc. Sec. Litig.*,
195 F. Supp. 3d 528 (S.D.N.Y. 2016).....................................................................38

*In re Vivendi Universal, S.A.*,
No. 02 CIV. 5571 (RJH), 2004 WL 876050
(S.D.N.Y. Apr. 22, 2004)..........................................................................................54

**Page**

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016).................................................................................35, 39, 42

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001).............................................................................................54

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
  No. 0:15-CV-02393-MGL, 2016 WL 3981236
  (D.S.C. July 25, 2016) ....................................................................................................50

*Lapin v. Goldman Sachs Grp., Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006)..............................................................................44

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015).............................................................................................56

*Ltd. v. Patriarch Partners, LLC*,
  286 F. Supp. 3d 634 (S.D.N.Y. 2017)..............................................................................18

*Luce v. Edelstein*,
  802 F.2d 49 (2d Cir. 1986)...............................................................................................57

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...........................................................................................47

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .................................................................................................. *passim*

*Mayo v. Fed. Gov't*,
  558 F. App'x 55 (2d Cir. 2014) .................................................................................14, 16

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016)..............................................................................22

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..............................................................................21, 29, 48, 52

*Okor v. Borough of Manhattan Cmty. Coll.*,
  No. 14-CV-1593 JPO, 2015 WL 3750630
  (S.D.N.Y. June 16, 2015).............................................................................................27, 39

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  __ U.S. __, 135 S. Ct. 1318 (2015)...............................................................................35, 36

- viii -

**Page**

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012)..................................................................46

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)............................................................40, 51

*Rescuecom Corp. v. Google Inc.*,
   562 F.3d 123 (2d Cir. 2009)........................................................................15, 19

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012)..................................................................44

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)................................................................................29

*Ronzani v. Sanofi S.A.*,
   899 F.2d 195 (2d Cir. 1990)................................................................................57

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007)......................................................................... *passim*

*Scott v. Chipotle Mexican Grill, Inc.*,
   67 F. Supp. 3d 607 (S.D.N.Y. 2014)...................................................................33

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996)...............................................................................26

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994)................................................................................20

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)................................................................................55

*Speakes v. Taro Pharm. Indus., Ltd.*,
   No. 16-CV-08318 (ALC), 2018 WL 4572987
   (S.D.N.Y. Sept. 24, 2018)...................................................................................22

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015)............................................................................47, 48

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)................................................................................47

- ix -

Page

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)........................................................................................................ *passim*

*United States ex rel. Ladas v. Exelis, Inc.*,
   824 F.3d 16 (2d Cir. 2016)........................................................................................20

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991)..........................................................................30, 32, 33

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013)........................................................................50

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
   672 F. Supp. 2d 596 (S.D.N.Y. 2009)........................................................................40

*Wagner v. Royal Bank of Scotland Grp. PLC*,
   No. 12 Civ. 8726 (PAC), 2013 WL 4779039
   (S.D.N.Y. Sept. 5, 2013)............................................................................................17

*Wallace v. Intralinks*,
   No. 11 CV 8861 (TPG), 2013 WL 1907685
   (S.D.N.Y. May 8, 2013)............................................................................................49

*Wexner v. First Manhattan Co.*,
   902 F.2d 169 (2d Cir. 1990)......................................................................................20

*Zu Guo Yang v. Shanghai Cafe Inc.*,
   No. 10 CIV. 8372(LLS), 2011 WL 1118832
   (S.D.N.Y. Mar. 24, 2011) ..........................................................................................19

## STATUTES, RULES AND REGULATIONS

15 United States Code
   §77..............................................................................................................................36
   §77k............................................................................................................................36
   §77l............................................................................................................................36
   §78........................................................................................................................36, 55
   §78j(b)....................................................................................................................4, 38
   §78t(a)........................................................................................................................56
   §78u-4....................................................................................................................1, 56

17 Code of Federal Regulations
   §229.304................................................................................................................32, 33
   §240.10b-5 ..............................................................................................................4, 35

- x -

**Page**

Federal Rules of Civil Procedure
    Rule 9(b) ...............................................................................................20, 21, 56, 57
    Rule 12(b)(6)................................................................................................. *passim*
    Rule 56...........................................................................................................18

Lead Plaintiff Colleges of Applied Arts & Technology Pension Plan ("Lead Plaintiff") respectfully submits this opposition to Defendants Grupo Televisa, S.A.B. ("Televisa" or the "Company"), Emilio Fernando Azcárraga Jean III ("Azcárraga III"), and Salvi Rafael Folch Viadero's ("Folch") (collectively, "Defendants") Motion to Dismiss its Amended Complaint ("Complaint") for Violations of the Federal Securities Laws ("Motion" or "MTD").  ECF No. 38.

## I.      INTRODUCTION

Defendants' overwrought Motion calls to mind Shakespeare's famous phrase "[thou] doth protest too much."   William Shakespeare, Hamlet, act 3, sc. 2.   While Defendants express indignation at Lead Plaintiff's claims, Televisa's status as one of Mexico's most powerful companies does not immunize them from liability for defrauding shareholders here in the United States.

Indeed, Lead Plaintiff's allegations are more than sufficient under the Private Securities Litigation Reform Act ("PSLRA") to plausibly claim that Defendants engaged in a secret bribery scheme by exploiting weaknesses in Televisa's internal controls.  ¶¶5-6, 20.[1] The Complaint relies upon the sworn testimony of co-conspirators with personal knowledge of the bribes that Televisa paid, exhibits from the criminal trial providing a paper trail of Televisa's bribes, prosecutors' charging documents and deferred prosecution agreement with one of Televisa's co-conspirators, Televisa's announcement that its CEO *and* CFO would be stepping down within hours of a news article implicating the Company in the bribery scheme, and Defendants' own admissions that they designed materially, ineffective internal controls that allegedly allowed them to covertly funnel $7.25 million in bribes to a powerful corrupt FIFA executive to secure the broadcasting rights to the 2018, 2022, 2026, and 2030 World Cups.  *See, e.g.*, ¶¶10-11, 15-16, 49-50, 53-56, 60.

---

[1]    All "¶" and "¶¶" refer to Lead Plaintiff's Complaint (ECF No. 32).

No amount of obfuscation can hide the following facts in the Complaint:

- An October 26, 2017 *The New York Times* article ("*The New York Times* Exposé") identified Televisa's wholly-owned Swiss subsidiary Mountrigi Management Group Ltd. ("Mountrigi"), as an unnamed co-conspirator in the government's deferred prosecution agreement with Torneos y Competencias S.A.'s ("Torneos"). The article explained that Televisa's subsidiary Mountrigi, with the assistance of Torneos, agreed to, and did, pay millions of dollars in bribes to Fédération Internationale de Football Association ("FIFA") executive Julio Humberto Grondona ("Grondona") for the 2018, 2022, 2026, and 2030 World Cup rights (¶12).

- Within hours of *The New York Times* Exposé, Televisa announced that **both** its Chief Executive Officer ("CEO"), Defendant Azcárraga III, **and** Chief Financial Officer ("CFO"), Defendant Folch, would be stepping down (¶60).

- On November 14-15, 2017, Televisa's co-conspirator and Torneos' former CEO, Alejandro Burzaco ("Burzaco"), testified that Televisa participated in a bribery scheme to secure broadcasting rights for FIFA World Cups (¶¶15, 16, 130):

  > [Burzaco]: [In March 2013] I was in Zurich and Torneos was in an alliance with Teleglobo from Brazil and ***Televisa from Mexico***, the Montinea (phonetic) Group from Mexico, seeking to acquire from FIFA the TV and internet and radio rights for World Cup 2026 and FIFA World Cup 2030, for exclusivity and for the territories of Brazil in the case of Teleglobo and Latin America, of the case of Televisa, Torneos partnership.

  Q:    Were you and your partners able to acquire those rights?

  A:    Yes, Sir.

  Q:    And what agreement, if any, was reached in connection with the payment of bribes for those rights?

  A:    Among the three partners, ***we made an agreement to distribute the burden of paying $15 million in bribes***.

  Q:    To whom?

  A:    To Julio Grondona.

  Q:    And when you say you and your partners which partners are you referring to?

  A:    Teleglobo from Brazil and ***Televisa from Mexico.***

  Q:    Were $15 million, in fact, paid to Julio Grondona?

  A:    Yes, sir.

  Q:    And where did the money end up for Julio Grondona?

- 2 -

> A:     The money for Julio Grondona ended up in a sub-account at a
> Swiss bank in the name of Julius Berg.[2]

- On November 29, 2017, an exhibit in the criminal FIFA trial revealed that a ledger of "bribe" payments maintained by an employee of Televisa's co-conspirator included an April 2013 payment from Televisa/Mountrigi in the amount of $7.25 million, which was deposited into a Swiss bank account at Julius Baer maintained for corrupt FIFA official Grondona's benefit (¶¶53-54).[3]

- Not long after the criminal testimony, on January 26, 2018, Televisa admitted in a U.S. Securities and Exchange Commission ("SEC") filing that it had material weaknesses in its internal controls over financial reporting and that its longtime accountant, PricewaterhouseCoopers ("PwC"), had reversed its April 28, 2017 audit opinion of Televisa for 2016 (¶64).

- On July 10, 2018, Televisa announced that it was parting ways with PwC *without* confirming there was no disagreement between them (¶27).

In addition, Lead Plaintiff is entitled to all reasonable inferences from these facts at the pleading stage. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007); *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). That means Lead Plaintiff is entitled to the following inferences in its favor:  Defendants resorted to their illegal scheme because Televisa was facing increasing competitive pressure from Internet streaming services for advertising revenue. ¶3. In response to

---

[2]     Here, and throughout, emphasis is added and internal citations are omitted, unless otherwise noted. *See also United States v. Torneos y Competencias S.A.*, No 16-CR-634 (PKC), ECF No. 4 (E.D.N.Y.) ("Torneos Crim. Info. & Deferred Pros. Agmt." or "Torneos Information"); *United States v. Webb*, No. 15-CR-252 (PKC), Nov. 14, 2017 Trial Tr. at 242:21-243:19 (E.D.N.Y.) ("*Webb* 11/14/17 Trial Tr."); MTD Ex. A (*Webb* 11/15/17 Trial Tr.) at 488:22-489:20. References to "MTD Ex." are to Exhibits A-K attached to Defendants' Declaration of David B. Anders ("Anders Declaration"). ECF No. 39.

[3]     Defendants ignore well-established standards for a motion to dismiss by injecting (misleading) extrinsic evidence into the record about the bribery ledger, among other facts. As explained below, the Court should disregard Defendants' extrinsic evidence or convert the Motion into one for summary judgment and allow Lead Plaintiff to take discovery. *See* §IV, *infra*. If the Court is nevertheless inclined to consider any of Defendants' documents, it should also consider evidence of Eladio Rodriguez's ("Rodriguez") testimony that the heading of the ledger document was "*Illuminados*," which he testified at the criminal trial meant "bribes." *See* Ex. 1 (*Webb* 11/29/17 Trial Tr.) at 2170:13-18. References to "Ex." are to Exhibits 1-2 attached to the Declaration of Rachel L. Jensen in Support of Lead Plaintiff's opposition to Defendants' Motion, filed concurrently, unless otherwise noted.

1503398_1

that pressure, Televisa ensured it would get the broadcasting rights to the most widely viewed sporting competition in the world by out-bribing its competition.  ¶4.  And to conceal the funneling of millions of dollars in bribes, Defendants deliberately designed their internal controls in a materially deficient manner so as to avoid an apparent audit trail of the illicit transactions.  ¶¶20-29.  Viewed in the light most favorable to Lead Plaintiff, together these facts defeat Defendants' Motion.

As a fair assessment of the Complaint's factual allegations and their reasonable inferences satisfies the pleading standards, Defendants move the goal posts.  Defendants concoct requirements that nowhere exist, suggesting Lead Plaintiff should somehow have access to the files of Torneos (presumably other than the ledger about which Rodriguez testified).  *Compare* MTD at 11 *with* ¶¶53-54.  Or that Lead Plaintiff should cite to an anonymous source instead of an identified co-conspirator who swore under oath at a criminal trial.  *Compare* MTD at 3 *with* ¶¶15-16.  Neither is required.

What is most telling, however, is what Defendants concede through their silence.  To state claims for violations of Section 10(b) and Rule 10b-5, a plaintiff must plead: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  Here, Defendants do not challenge a number of these elements, including:  (1) the materiality of most alleged misrepresentations and omissions; (2) their connection to the purchase or sale of Televisa ADRs; (3) reliance; (4) damages; and (5) loss causation.  *See id.*  Nor do Defendants raise any other Federal Rule of Civil Procedure ("Rule") 12(b) defense, such as venue or personal jurisdiction.

Instead, throughout their Motion, Defendants confuse a motion to dismiss with a motion for summary judgment.  They cite materials outside the four corners of the Complaint, rebuke Lead Plaintiff for failing to "overcome" their own self-serving explanations, dispute allegations that must

- 4 -

be accepted as true at this stage, and play fact finder by declaring their misleading statements to be true and/or immaterial.  But before this Court is a motion to dismiss.  Defendants' blatant disregard of the well-established standards for a motion to dismiss should be rejected, as should their Motion.

## II.    STATEMENT OF FACTS

### A.    Televisa Begins Losing Its Edge

Televisa started as a radio station in Mexico City, Mexico in the 1930's owned by Defendant Azcárraga III's grandfather and grew into the largest media conglomerate in the Spanish-speaking world.  ¶1.  In recent years, however, the media industry has rapidly evolved, and Televisa found itself facing increased competition for advertising revenue with the advent of Internet streaming services, such as Netflix.  ¶¶1, 40.  Facing this new competition, Televisa sought to ensure its profits by securing the exclusive programming of widely viewed sports games.  ¶40.

FIFA, the global governing body of soccer, or "football" as it is known abroad, is headquartered in Zurich, Switzerland.  ¶42.  FIFA licenses the media rights for its football competitions to TV and other media platforms, such as the radio, to broadcasters and media companies around the world.  *Id*.  FIFA's commercialization of these media and marketing rights is essential to FIFA as it uses this income to finance its operations.  *Id*.

The FIFA Men's World Cup soccer tournament presented a golden opportunity for Televisa; it is the most widely viewed sporting competition worldwide with nearly half of the population tuning in.  ¶41.  In fact, Televisa's President of Television and Content, Pepe Baston, told investors that the World Cup "is an event that *we have to have*."  ¶82.  In addition to increasing Televisa's advertising revenue, exclusive broadcasting rights to the World Cup are particularly valuable because Televisa licenses out those rights to other companies.  ¶¶47, 52, 90.  For example, once Televisa secured 2018 World Cup rights, it sold broadcasting rights for Costa Rica, Columbia, and

- 5 -

other countries to the highest bidder.  ¶52.  Unsurprisingly, Televisa has bragged to investors that its media rights to the World Cup enables it to hit targets across its platforms and divisions during tournament years (¶¶43, 81, 90), and blames its losses on the World Cup in off years.  ¶5.

Given the increasing pressure on Televisa's advertising revenue and the wide viewership of the World Cup, Televisa knew its acquisition of the exclusive broadcasting rights to the crown jewel of sporting events was essential to the Company's success in a new competitive landscape.  ¶¶40, 43.

### B.    Televisa's Covert Bribery Scheme for World Cup Media Rights

From 2010 to 2013, Televisa sought to maintain its dominance in the broadcasting arena by securing the 2018, 2022, 2026, and 2030 World Cup broadcasting rights.  ¶50; Torneos Crim. Info. & Deferred Pros. Agmt.; MTD Ex. A (*Webb* 11/15/17 Trial Tr.) at 488:22-489:20.  Unbeknownst to investors, however, Televisa secured these rights not by outbidding its competitors, but by out-bribing them.  *Id.*; MTD Ex. A (*Webb* 11/15/17 Trial Tr.) at 488:22-489:20.  To carry out its bribery scheme, Televisa, including its wholly owned subsidiary Mountrigi, conspired with Torneos and its former CEO Burzaco to bribe the late FIFA Senior Vice President, Grondona, a man extolled as the second most powerful man in football.  ¶7; MTD Ex. A (*Webb* 11/15/17 Trial Tr.) at 488:22-489:20.

Specifically, in March 2013, Torneos's former CEO Burzaco, on behalf of Televisa and Teleglobo, met with the late Grondona in Zurich, Switzerland to obtain the broadcasting rights for the 2026 and 2030 World Cups.   ¶46; MTD Ex. A (*Webb* 11/15/17 Trial Tr.) at 488:22-489:20. Grondona's influence to secure the rights was theirs, but for a price.  Thus, Televisa, Teleglobo and Torneos agreed to pay, and did pay, $15 million in bribes to Grondona by way of a Swiss bank sub-account.  ¶¶46, 54; MTD Ex. A (*Webb* 11/15/17 Trial Tr.) at 488:22-489:20.  Televisa then had its subsidiary Mountrigi pay $7.25 million to Torneos for the 2026 and 2030 World Cups.  ¶8. Rodriguez, an employee of Torneos and Burzaco, recorded the bribe in a secret ledger as a payment from

- 6 -

Televisa's Mountrigi, on April 5, 2013, for the same World Cups.  ¶¶53-54.  Rodriguez further noted in the ledger that the $7.25 million payment was transmitted to a sub-account for the late Grondona's benefit at a Swiss bank, Julius Baer.  ¶54.  Lastly, Torneos's employee Rodriguez indicated in the ledger that a $300,000 payment was made to Jorge Arzuaga ("Arzuaga"), a banker at Julius Baer.  *Id.*

Following Televisa's transmission of millions of dollars in bribes to Grondona, it obtained rights to the 2018, 2022, 2026, and 2030 World Cup tournaments.  ¶56.  Then, Televisa, through Mountrigi, sold its fellow conspirators, Burzaco and Torneos, certain licensing rights to the TV contracts for the 2026 and 2030 World Cups.  ¶¶52, 56; Torneos Crim. Info. & Deferred Pros. Agmt.

Moreover, Defendants deliberately designed Televisa's internal controls to be materially deficient to conceal an apparent audit trail of the bribery transactions.  ¶¶20-29.

### C.  The FIFA Bribery Scheme Begins to Unravel

At daybreak on May 27, 2015, Swiss officers raided the five star Baur au Lac hotel in Zurich, Switzerland and arrested six FIFA officials in a sweeping criminal probe into FIFA corruption.  ¶48. Since then, dozens of individuals and entities have been indicted by the United States for crimes such as bribery, money laundering and racketeering, and at least 24 individuals or entities have pled guilty, or been convicted, in connection with the investigation.  *Id.*  The probe appears to be ongoing as sentencings continue to be deferred and charges continue to be brought.  *Id.*

Burzaco and Torneos, who conspired with Televisa to carry out the World Cup bribery scheme, were of those two dozen charged early on in connection with the FIFA corruption investigation.  ¶49.  Burzaco pled guilty and Torneos entered into a deferred prosecution agreement with the U.S. government.  *Id.*; Torneos Crim. Info. & Deferred Pros. Agmt.  Burzaco's sentencing has been deferred multiple times and is currently not scheduled until February 21, 2019.  ¶48.

On December 13, 2016, Torneos entered into a deferred prosecution agreement with the United States in *United States v. Torneos y Competencias S.A.*, No 16-CR-634 (PKC) (E.D.N.Y.).

¶49.  The statement of facts and criminal information to the deferred prosecution agreement stated:

> In or about and between 2010 and 2013, the defendant TORNEOS Y COMPETENCIAS S.A.'s wholly-owned subsidiary TyC International B.V. obtained the rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup to audiences in Argentina, Uruguay, and Paraguay ***through a series of contracts with the Off-the-Books Companies and Broadcasting Company Affiliate A***, which had secured the rights to broadcast the tournaments in these and other territories directly from FIFA. TORNEOS, through Alejandro Burzaco and others, and at times ***with the assistance of one or more representatives of Broadcasting Company Affiliate A***, ***including Broadcasting Company Executive #1, agreed to pay and did pay millions of dollars in bribe and kickback payments*** to Soccer Official # 1 – a high-ranking FIFA official who exercised enormous influence within the association - ***in order to secure his support for Broadcasting Company Affiliate A's acquisition of rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup in certain territories***, and the subsequent purchase and exploitation of certain of those rights by TyC International B.V. ("TyC").

¶50.

### D.    *The New York Times* Exposes Televisa's Bribery Scheme

On October 26, 2017, *The New York Times* pulled back the curtain on Televisa's FIFA bribes in an article entitled, "How Did a Tiny Swiss Company Quietly Secure Valuable World Cup TV Rights?"  ¶12.  The report, for the first time, directly implicated Televisa and its wholly owned subsidiary, Mountrigi, in the FIFA bribery scheme for the 2018, 2022, 2026, and 2030 World Cup broadcasting rights.  *Id.*  And, unlike a prior speculative article, it was the first report to connect Televisa to Burzaco.  *Id.*  It also detailed Mountrigi's role in Televisa and Torneos's 2013 scheme to bribe Grondona for the 2026 and 2030 World Cup rights.  The article explained that, unlike past years where the award of broadcasting rights were publicly announced after a bidding process, the first details for these tournament years was in co-conspirator Torneos's plea agreement.  *Id.*

- 8 -

Within mere hours of these revelations, Televisa announced that its CEO, Defendant Azcárraga III, and its CFO, Defendant Folch, would be stepping down from their respective positions.  ¶60.  The Company further announced that two individuals would assume Defendant Azcárraga III's position as CEO.  *See* MTD Ex. F.

And while Televisa's subsidiary Mountrigi may have seemed like an "obscure" company to the rest of the world, it was not to Defendants – or Torneos.  ¶47.  Since 2000, Defendant Azcárraga III has been President of Ibero-American Telecommunications Organization ("OTI").  Two Mountrigi executives have also served in leadership roles at OTI – Miguel Diez de Urdanivia ("Diez") and Mauricio Simón Fajer ("Fajer").  ¶¶9, 47.  Diez and Fajer served as secretary general and programming director, respectively, answering directly to Defendant Azcárraga III and meeting with him on a routine basis. ¶¶9, 47.  Torneos's subsidiary TyC (which Torneos admitted was involved in the bribery scheme) was also a member of the OTI, which met multiple times a year and distributed broadcasting rights to the World Cup to its members.  ¶¶9, 47, 50.  While the identity of "Broadcasting Company Executive #1" from the Torneos Information has not been publicly revealed, based upon information and belief, it is Diez or Fajer, whom Defendants – particularly Defendant Azcárraga III – have interacted with regularly.  *See* ¶51.  In other words, there is a reasonable inference that Defendants coordinated about, and were aware of, the millions of dollars in bribes paid to FIFA official Grondona for the World Cup rights at the time.

### E.   Evidence of Televisa's Bribery Mounts in the Criminal FIFA Trials

In November 2017, the *Napout* case went to trial in Brooklyn, New York.  ¶15.  The trial proceedings were high drama, with security levels ordinarily reserved for major Mafia trials.  ¶130 (citing Richard Conway, *The FIFA trial reminiscent of a Hollywood drama*, BBC (Nov. 20, 2017) ("BBC Article"), https://www.bbc.com/sport/football/42060160)).

- 9 -

Burzaco was the prosecution's star witness and a marked man because of it. On November 14, 2017, Burzaco took the stand, not only under penalty of perjury but at the threat of assassination. ¶¶15, 16, 130. In fact, defendant Burga's bail conditions were tightened after he made throat-slitting gestures toward Burzaco at trial. *See* ¶130 (citing BBC Article); *United States v. Webb*, No. 15-CR-252 (PKC) Nov. 15, 2017 Trial Tr. at 604:3-627:5 (E.D.N.Y.). The weight of Burzaco's testimony is shown in part by its ramifications; his business partner named in the testimony jumped to his death in Argentina within hours. ¶130 (citing BBC Article). The media also reported that, after Burzaco's testimony, Adolfo Lagos ("Lagos"), Televisa's vice president was shot dead in Mexico, perhaps in connection with the trial. *See id.* (citing BBC Article).

Burzaco testified for multiple days about his company's and its business partners' agreements to pay $160 million in bribes to FIFA officials over several years. ¶¶15-16. At the conclusion of the trial, Defendants Juan Angel Napout and Jose Maria Marin were convicted. ¶15.

As to Televisa's role in the bribery scheme, Burzaco testified:

[Burzaco]: [In March 2013] I was in Zurich and Torneos was in an alliance with Teleglobo from Brazil and Televisa from Mexico, the Montinea (phonetic) Group from Mexico, seeking to acquire from FIFA the TV and internet and radio rights for World Cup 2026 and FIFA World Cup 2030, for exclusivity and for the territories of Brazil in the case of Teleglobo and Latin America, of the case of Televisa, Torneos Partnership.

Q:     Were you and your partners able to acquire those rights?

A:     Yes, Sir.

Q:     And what agreement, if any, was reached in connection with the payment of bribes for those rights?

A:     ***Among the three partners, we made an agreement to distribute the burden of paying $15 million in bribes.***

Q:     To whom?

A:     ***To Julio Grondona.***

- 10 -

Q:    And when you say you and your partners which partners are you referring to?

A:    Teleglobo from Brazil and *Televisa from Mexico*.

Q:    *Were $15 million, in fact, paid to Julio Grondona?*

A:    *Yes, sir.*

Q:    *And where did the money end up for Julio Grondona?*

A:    *The money for Julio Grondona ended up in a sub-account at a Swiss bank in the name of Julius Berg*.

¶16; MTD Ex. A (*Webb* 11/15/17 Trial Tr.) at 488:22-489:20.[4]

As the trial progressed, details about Televisa's involvement continued to emerge.  On November 29, 2017, Rodriguez, a former Torneos employee, testified about a secret ledger of bribe payments he maintained there.  ¶53.[5]  The ledger referenced a $7.25 million dollar payment on April 5, 2013, with the following annotation: "Cobro Mundial 2026/30 de Mountrigi Management Group LTD." ¶53.[6]  It also indicated Mountrigi's payment was deposited into an account identified as "Banco Julius Cta. Nro.2 de FPT (papa)."  ¶54.  "Papa," which means the Pope in English, was a

---

[4]    Defendants' argument that this sworn testimony from a co-conspirator somehow absolves Televisa of wrongdoing is ludicrous.  MTD at 22-24.  In addition, as Defendants themselves point out, the previous day Burzaco further testified that Televisa had engaged in bribery:

> [Burzaco]:    We had many partners in different parts of the world, such as Fox Sports in the U.S.; *Televisa from Mexico* . . . .
>
> *         *         *
>
> Q:    To your knowledge, which, if any other companies, was involved in paying bribes to secure contracts for media rights to soccer?
>
> A:    *To my knowledge, with the exception of Clarin, all of the companies*.

*Webb* 11/14/17 Trial Tr. at 239:2-22.  Burzaco even noted those partners that did *not* engage in bribery.  *Id.*  Televisa, notably, was not one of those innocent partners.  *Id.*

[5]    Defendants' citation to excerpts of Rodriguez's testimony is not only improper at this stage, but also misleading as it omits his testimony that the heading of the ledger was "*Illuminados*," which he testified "*means bribes*."  *Compare* MTD Ex. A *with* Ex. 1 (*Webb* 11/29/17 Trial Tr.) at 2170:13-18.

[6]    An English translation is "World Cup 2026/2030 from Mountrigi Management Group LTD."

code name for Grondona.  *Id.*  "Banco Julius" referred to Julius Baer, a Swiss bank that Torneos used to transfer bribery money to an account dedicated to Grondona.  *Id.*  "FPT" refers to "FPT Sports," a subsidiary of Torneos.  *Id.*  Thus, the ledger entry indicates that Televisa subsidiary Mountrigi's April 5, 2013 $7.25 million payment for the 2026 and 2030 World Cup rights was transferred to Swiss bank, Julius Baer, into a FPT Sports sub-account dedicated to the late Grondona. *Id.* This ledger entry is consistent with Torneos's former CEO Burzaco's testimony that the bribery payment for "Julio Grondona ended up in a sub-account at a Swiss bank in name of Julius Berg."

In addition to the $7.25 million dollar bribery payment, the ledger revealed that a $300,000 payment was made from the same FPT Sports sub-account to Julius Baer banker, Arzuaga.  *Id.* Since then, Arzuaga has pled guilty to money laundering.  ¶55.  Specifically, Arzuaga admitted to opening bank accounts in Switzerland for the late Grondona and channeling millions of dollars in bribes to him from Televisa's co-conspirator Torneos through those accounts.  *Id.*  Arzuaga further admitted that he was paid $1.046 million for facilitating those bribes.  *Id.*

### F. Televisa Announces a Material Weakness in Its Internal Controls and Parts Ways with Longtime Accountant PwC

Within two months of Burzaco's testimony about Televisa's involvement in the FIFA bribery scheme, Televisa was forced to come clean about its internal control weaknesses.  ¶68.  On January 26, 2018, Televisa admitted in a SEC filing that it had material weaknesses in its internal controls over financial reporting.  ¶64.  Televisa also announced that its longtime accountant, PwC, reversed its April 28, 2017 audit opinion of Televisa for the year ended December 31, 2016.  *Id.*

On July 10, 2018, Televisa announced that it was parting ways with PwC and, contrary to SEC requirements, failed to indicate whether it related to material disagreements with PwC.  ¶69.

- 12 -

### III.   DEFENDANTS' MISREPRESENTATIONS OF THE RECORD BETRAY THE WEAKNESS OF THEIR ARGUMENTS

Unable to deny the serious ongoing criminal proceedings about FIFA bribes or the multiple witnesses whose sworn testimony directly implicate Televisa, Defendants misstate a number of key facts. Ironically, a number of these misstatements are made in the context of accusing Lead Plaintiff of the same. *See* MTD at 2. Lead Plaintiff addresses the most egregious examples below.

First, Defendants misstate that the "[Complaint] represents to this Court that a previous Criminal Information against Torneos stated Televisa was a 'co-conspirator.'" MTD at 2 (citing ¶49). This claim is easily disproven. In fact, the Complaint states at ¶49 that, in the statement of facts and criminal information for Torneos, the government identified ***two unnamed co-conspirator corporations*** that "obtained the rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup." ¶49. The Complaint goes on to note it would ***later*** become evident that the unnamed co-conspirator corporations were Televisa and Mountrigi. *Id.* That "later" revelation was *The New York Times* Exposé and Burzaco's testimony. *See, e.g.*, ¶15. And Televisa has itself admitted that it obtained broadcasting rights to the 2018, 2022, 2026, and 2030 World Cups (identified in the Torneos Information). *See* ¶114. Defendants also concede its wholly owned subsidiary was the co-conspirator identified in the Torneos Information. MTD at 8-9.

Second, Defendants claim Lead Plaintiff's bribery scheme is "concoct[ed] out of thin air" "without a scintilla of factual back-up – not even so much as a single 'confidential informant.'" MTD at 3. Lead Plaintiff does not need a confidential witness; it cites sworn testimony from a co-conspirator (Burzaco) that "Televisa" "made an agreement [with co-conspirators] to distribute the burden of paying $15 million in bribes." ¶16; MTD Ex. A (*Webb* 11/15/17 Trial Tr.) at 488:22-489:20. Further, Rodriguez's testimony and the secret ledger corroborate this testimony. ¶¶53-55.

- 13 -

Third, Defendants claim that the Complaint omits that Burzaco's allocution at the time of his guilty plea did not mention Televisa.  MTD at 2.  But as Defendants know, Burzaco's guilty plea is redacted (on the pages Defendants cite) and it does not mention the three individuals he testified against in the criminal trial.[7]  Further, the Complaint never alleges Burzaco pled guilty to making bribes to the late FIFA official, Grondona, with Televisa; instead, it alleges (accurately) that Burzaco testified at trial in November 2017 that he bribed Grondona with Televisa.  ¶¶15-16.

Fourth, Defendants misstate that the Complaint does not quote "even a single word of Burzaco's testimony."  MTD at 17.  Again, this is easily disproven.  Lead Plaintiff quotes directly from Burzaco's testimony in the Complaint.  *See* ¶¶16, 46.  Further, query how Defendants think Burzaco's testimony in anyway absolves them, as it directly implicates them in the bribes:

> A:   ***Among the three partners, we made an agreement to distribute the burden of paying $15 million in bribes***.
>
> Q:   To whom?
>
> A:   ***To Julio Grondona***.
>
> Q:   And when you say you and your partners which partners are you referring to?
>
> A:   Teleglobo from Brazil and ***Televisa from Mexico.***
>
> Q:   ***Were $15 million, in fact, paid to Julio Grondona?***

---

[7]   Besides the lack of candor with the Court, it was improper for Defendants to include such a statement because it relies on a source that was neither attached to, nor referenced in, the Complaint.  *See Mayo v. Fed. Gov't*, 558 F. App'x 55, 56 (2d Cir. 2014) (on a Rule 12(b)(6) motion, a "court normally may not look beyond the four corners of the complaint"); *see also Roth*, 489 F.3d at 509 (despite general rule, court may consider documents attached to the complaint as exhibits or incorporated in it by reference or by judicial notice).  If, nevertheless, the Court considers these documents, Lead Plaintiff requests that the Motion be converted into a motion for summary judgement, and discovery be opened so that Lead Plaintiff may dispute these new facts Defendants have alleged.  *See Chambers v. Time Warner Inc.*, 282 F.3d 147, 154 (2d Cir. 2002).  Lead Plaintiff further requests that the Court consider any extrinsic documents in tandem with evidence that Burzaco's guilty plea is redacted.  *See United States v. Burzaco*, No. 15 CR 252 (RML), ECF No. 312-2 (11/16/15 Tr. of Crim. Cause for Guilty Plea) (E.D.N.Y. Apr. 18, 2016).

A:      *Yes, sir*.

Q:      *And where did the money end up for Julio Grondona?*

A:      *The money for Julio Grondona ended up in a sub-account at a Swiss bank in the name of Julius Berg*.

¶16; MTD Ex. A (*Webb* 11/15/17 Trial Tr.) at 488:22-489:20.

Fifth, Defendants accuse Lead Plaintiff of omitting that the ledger's author, Rodriguez, testified it "included 'legitimate payments and transactions.'" MTD at 3.  In making this accusation, however, Defendants impermissibly attach pages of his testimony while omitting the page before where Rodriguez testified the heading for the ledger was "bribes" in Spanish.  *See* Ex. 1 (*Webb* 11/29/17 Trial Tr.) at 2170:13-18.  Defendants further ignore testimony where he confessed to trying to destroy the ledger as evidence of corruption.  *See id.*  In any event, Defendants' argument ignores black letter law that the Court must draw all reasonable inferences in Lead Plaintiff's favor, not Defendants.  *See Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

Sixth, Defendants argue the "[Complaint] accuses Televisa at length of supposed violations of law in announcing a recent change of auditors . . . notwithstanding express provisions of law that specify" otherwise.  MTD at 4.  But Defendants' "express provisions of law" is an SEC manual which states on its cover page that it is "*non-authoritative*" and any other "authoritative or source material governs."  SEC Division of Corporation Finance, *Financial Reporting Manual*, at i (last updated Dec. 1, 2017) ("SEC Manual"), https://www.sec.gov/files/cffinancialreportingmanual_0.pdf. The SEC Manual further warns that its "*guidance is not a rule*, regulation or statement of the Commission and the Commission has neither approved nor disapproved this information."  *Id.*

Seventh, Defendants chide Lead Plaintiff for bringing up the murder of Televisa cable executive Lagos several days after Torneos's former CEO Burzaco's criminal testimony.  *See* MTD at 3.  As explained in the Complaint, however, the criminal trial was marred with claims of death

- 15 -

threats to Burzaco, the suicide of a conspirator, and Lagos's sudden death within a span of several days, leading the BBC to report that the criminal FIFA trial had been "overshadowed by suicide, claims of witness intimidation and now, potentially, murder."  ¶130.  In so reporting, the BBC suggested that Lagos's murder may be connected to the revelations of the criminal trial; this is not Lead Plaintiff's imagination run amok.  In addition, Lagos's death is necessary to explain why Defendant Folch returned to Televisa after his resignation to fill Lagos's void.  ¶18.

Eighth, Defendants claim *The New York Times* Exposé, published in English and Spanish, presented no new information.  MTD at 3.  Not true.  Prior to this exposé, one December 2016 article suggested Mountrigi may have been the unnamed co-conspirator, but Televisa vehemently denied it. ¶108.  The exposé, in contrast, left *no* reasonable doubt that Televisa and Mountrigi were implicated. *See* MTD Ex. I.  And, unlike the exposé, which implicated Televisa in bribes for the 2018, 2022, ***2026, and 2030*** World Cups, the 2016 article only mentioned 2018 and 2022 rights.  *Id*.  Further, whereas the 2016 article made *no* mention of Burzaco (MTD Ex. H), the exposé detailed Burzaco's role in the negotiations with Grondona based on information from "several people with knowledge of the negotiations who requested anonymity because they were not authorized to speak publicly." MTD Ex. I.  Lastly, the exposé revealed that, while Mountrigi quietly sold rights to its co-conspirator in furtherance of the bribery scheme, it had not sold any other rights, which was likely to increase Televisa's profits.  *Id.*  It was immediately following these revelations that Televisa announced that its CEO and CFO, the Individual Defendants here, were stepping down.  ¶60.

## IV.   DEFENDANTS IMPROPERLY RELY ON EXTRINSIC DOCUMENTS

Upon considering a Rule 12(b)(6) motion, a "court normally may not look beyond the four corners of the complaint."  *Mayo*, 558 F. App'x at 56.  There is a narrow exception for judicial notice and "'[d]ocuments attached to the complaint as exhibits or incorporated in it by reference.'"

*Roth*, 489 F.3d at 509.  In addition, a court may consider a document "upon which [the complaint] **solely** relies and which is **integral to the complaint**."  *Id.* (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (emphasis in original)).  Importantly, however, a document is not integral because a plaintiff "'[m]erely mention[s] a document in the complaint . . . indeed, even offering 'limited quotation[s]' from the document is not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  Further, while a court may consider SEC documents in which a plaintiff alleges misrepresentations were made, "the court is to consider them on a Rule 12(b)(6) motion 'only to determine **what** the documents stated,' and '**not to prove the truth of their contents**.'" *Roth*, 489 F.3d at 509 (emphasis in original).

Here, in addition to citing extrinsic sources in their Motion, Defendants improperly attach 13 documents to the Anders Declaration for the truth of their contents.  *See* ECF No. 39.  These documents include news articles, press releases, criminal testimony, and SEC filings.  *Id.* Defendants nonchalantly claim "this Court may of course consider this content."  MTD at 29.  But "[w]hen a complaint alleges, for example, that a document filed with the SEC failed to disclose certain facts, it is appropriate for the court, in considering a Rule 12(b)(6) motion, to examine the document . . . 'only to determine **what** the document[] stated,' and '**not to prove the truth of its contents**.'" *Roth*, 489 F.3d at 509 (emphasis in original); *Chechele v. Scheetz*, 466 F. App'x 39, 40-41 (2d Cir. 2012) (sustaining refusal to consider SEC filings not incorporated into complaint for the truth); *see also Wagner v. Royal Bank of Scotland Grp. PLC*, No. 12 Civ. 8726 (PAC), 2013 WL 4779039, at *3 (S.D.N.Y. Sept. 5, 2013) (declining to judicially notice SEC documents where submitted for the truth).  The Court should decline to consider the exhibits for their purported truth.

In addition, the Anders Declaration attaches press releases that were neither attached to, nor referenced in, the Complaint.  *See* MTD Exs. F-G.  These documents do not fall within the narrow

- 17 -

exception for considering extrinsic documents and thus should be disregarded entirely.  Defendants also cite docket entries, websites, criminal documents, and manuals for the truth of their contents, the majority of which was not attached to, nor referenced in, the Complaint.  *See* Ex. 2.

The Court should disregard Defendants' reliance on documents that were neither attached to, nor referenced in, the Complaint.  *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 457 (S.D.N.Y. 2018) (disregarding defendants' documents as "extrinsic to the complaint. Plaintiffs do not cite to them in their pleading, and it is far from apparent that Plaintiffs relied on those documents in drafting the . . . amended complaint.").  This is especially true here, given that Defendants cite these documents in an attempt to dispute factual allegations that must be deemed true at this stage.  *See, e.g.*, MTD at 7 (citing Moneyhouse website to challenge allegations about Diez and Simon).  Allowance of Defendants' tactics would "'permit the improper transformation of the Rule 12(b)(6) inquiry into a summary-judgment proceeding – one featuring a bespoke factual record, tailor-made to suit the needs of defendants.'"  *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 646 n.4 (S.D.N.Y. 2017) (citing *Goel*, 820 F.3d at 560).

If, notwithstanding these authorities, the Court decides to consider the extrinsic documents attached to the Anders Declaration and otherwise cited in Defendants' Motion, the Motion must be converted to a motion for summary judgment under Rule 56, and Lead Plaintiff should be permitted to take discovery to dispute Defendants' counter-factual narrative.  *See Chambers*, 282 F.3d at 154 (holding "the [district] court was obligated to convert the motion to one for summary judgment and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56" because it considered extrinsic documents); *see also Friedl v. City of N.Y.*, 210 F.3d 79, 83-84 (2d Cir. 2000).  In fact, "[t]his conversion requirement is 'strictly enforced' whenever a district court considers extra-pleading material in ruling on a motion to

- 18 -

dismiss." *Chambers*, 282 F.3d at 154.  If this Court considers Defendants' extrinsic documents, moreover, Lead Plaintiff also respectfully requests that the Court consider Exhibits 1-2 to avoid being misled by the portrait painted by Defendants about their "evidence."

## V.   APPLICABLE LEGAL STANDARDS ON A MOTION TO DISMISS

In assessing Defendants' Motion under Rule 12(b)(6), the Court must consider the Complaint in its entirety and "***must 'accept as true*** all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations ***in the light most favorable to plaintiff***, and construe the complaint liberally.'" *Rescuecom*, 562 F.3d at 127 (cited in *Zu Guo Yang v. Shanghai Cafe Inc.*, No. 10 CIV. 8372(LLS), 2011 WL 1118832, at *1 (S.D.N.Y. Mar. 24, 2011) (Stanton, J., presiding)); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts must "accept all factual allegations in the complaint as true" when ruling on a motion to dismiss).  Further, at this early stage, "[f]act-specific question[s] cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 394 (S.D.N.Y. 2010) ("[t]he court only 'assess[es] the legal feasibility of the complaint'"; it does not weigh evidence).

"'Plausibility' is not certainty.  *Iqbal* does not require the complaint to allege 'facts which can have no conceivable other explanation, no matter how improbable that explanation may be.'" *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 649-50 (S.D.N.Y. 2016) (quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 360 (2d Cir. 2013)).  In deciding plausibility, the Court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 572 (inferences in plaintiff's favor).  The Court should not "scrutinize each allegation in isolation but . . . assess all the allegations holistically." *Tellabs*, 551 U.S. at 326; *Matrixx*, 563 U.S. at 50 (allegations must be "'taken collectively'").

Contrary to Defendants' contention, the "pleading standard does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage." *Emps.' Ret. Sys. of Gov't of Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).  As explained above, if the Court considers Defendants' extrinsic documents, their Motion is subject to conversion to summary judgment and discovery.  *See Chambers*, 282 F.3d at 154.

## VI.   LEAD PLAINTIFF'S 66-PAGE COMPLAINT PROVIDES SUFFICIENT PARTICULARS

### A.   The Complaint Alleges the "Who, What, When, Where, and Why" of Defendants' Fraud

Anchored in sworn testimony from the FIFA criminal trials and Defendants' own admission of internal control weaknesses, Lead Plaintiff has provided sufficient particulars to satisfy Rule 9(b):

> Accepting Plaintiffs' well-plead allegations as true, the court applies a four part test to determine whether Plaintiffs' fraud claims are sufficient.  *See United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127–28 (2d Cir. 1994). First, the complaint must "specify the statements that the plaintiff contends were fraudulent[.]"  *Chorches*, 865 F.3d at 81. Second, Plaintiffs must "identify the speaker[.]"  *Id.* Third, Plaintiffs must "state where and when the statements were made[.]"  *Id.* And fourth, Plaintiffs must "explain why the statements were fraudulent."  *Id.*
>
> [A]llegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge."  *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).

*Capax Discovery, Inc. v. AEP RSD Inv'rs, LLC*, 285 F. Supp. 3d 579, 586 (W.D.N.Y. 2018); *In re VEON Ltd. Sec. Litig.*, No. 15-cv-08672 (ALC), 2017 WL 4162342, at *4 (S.D.N.Y. Sept. 19, 2017).

Here, Lead Plaintiff's 66-page Complaint provides great detail about not just one, but dozens of false or misleading statements and omissions, who made them, when and where they were made, and why they were allegedly false or misleading:

| **Who**: | Televisa; its former CEO, Defendant Azcárraga III; and its former CFO, Defendant Folch. |
|---|---|

- 20 -

| **What**: | False or misleading statements and omissions concerning: (1) Televisa's acquisition of World Cup broadcasting rights; (2) the importance of those rights to Televisa's revenue and competitive position; (3) Televisa's role in a bribery scheme to acquire the broadcasting rights; and (4) the design and efficacy of Televisa's internal controls. |
|---|---|
| **When**: | Among others, the Complaint lays out specific false or misleading statements that were made on February 6, 2013; April 11, 2013; April 26, 2013; October 25, 2013; February 21, 2014; April 29, 2014; July 8, 2014; October 24, 2014; April 24, 2015; April 29, 2015; July 7, 2015; April 29, 2016; December 16, 2016; April 28, 2017; October 27, 2017; and November 15, 2017. |
| **Where**: | Conference calls, SEC filings, press releases, *Reuters* articles, Company reports, and Televisa's website. |
| **Why**: | To increase Televisa's advertising revenue by securing the most widely watched sporting event in the world for more than a decade; to avoid civil and criminal liability for engaging in a bribery scandal; and to avoid the reputational loss resulting from the same. |

*See, e.g.*, ¶¶74-122.  A review of "all the allegations holistically" plainly demonstrates that Rule 9(b) provides no basis for dismissal of Lead Plaintiff's allegations here.  *Tellabs*, 551 U.S. at 326.

## B.    The Complaint Adequately Alleges the Bribery Scheme

Defendants argue that Lead Plaintiff must plead the underlying bribery scheme with particularity.  MTD at 16.[8]  Contrary to their position, however, allegations of an underlying criminal conspiracy must be "plausible on [their] face," rather than pled "with particularity."  *Twombly*, 550

---

[8]    Defendants' reliance on *Novak* to argue that Lead Plaintiff's allegations are not particularized as to the underlying misconduct is perplexing.  *See* MTD at 15 (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).  There, the court **overruled** dismissal of a complaint and ordered the court "reconsider the particularity of the plaintiff's pleadings in light of the proper standards."  *Novak*, 216 F.3d at 314.  Further, Defendants cite *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 287 (S.D.N.Y. 1998), for the proposition that Torneos's former CEO Burzaco's testimony fails for lack of specificity.  MTD at 20-21.  That case is readily distinguishable.  There, **no specifics** were provided in deposition testimony, and the deponent testified that he only **"believed"** the allegedly fraudulent behavior may have occurred at Bear Sterns as well as Kidder Peabody.  *See Granite Partners*, 17 F. Supp. 2d at 284.  Here, in contrast, Burzaco testified that, in 2013, Televisa agreed to, and did, bribe the late FIFA official Grondona with Torneos.  ¶46.  His testimony was so specific that he named the Swiss bank account to which the bribe was transferred.  *Id.*  Moreover, Torneos employee Rodriguez's ledger corroborated Burzaco's testimony by indicating that the bribe was transferred from Televisa's wholly owned subsidiary on April 5, 2013, to Grondona's Swiss bank account.  ¶¶53-54.

- 21 -

U.S. at 547; *see Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) ("When a securities fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred.").[9]  Lead Plaintiff has done so here.  For example, Lead Plaintiff has pled the following:

- The Torneos Information, incorporated into Torneos's deferred prosecution agreement and filed by the U.S. Attorney's Office, stated that "in or about and between 2010 and 2013" Torneos, "through Alejandro Burzaco and others, and at times with the assistance of one or more representatives of Broadcasting Company Affiliate A, including Broadcasting Company Executive #1, agreed to pay and did pay millions of dollars in bribe and kickback payments to Soccer Official # 1 . . . to secure his support for Broadcasting Company Affiliate A's acquisition of rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup." (¶50)[10];

- On October 26, 2017, *The New York Times* Exposé confirmed that Mountrigi was the Broadcasting Affiliate A referenced in the Torneos Information and that Televisa conspired with Torneos and Torneos's former CEO Burzaco to bribe the late FIFA official Grondona for the 2026 and 2030 World Cup rights (¶12);

- Within hours after *The New York Times* Exposé was published, Televisa announced that both its CEO *and* CFO (the Individual Defendants here) would step down (¶60);

- On November 14-15, 2017, Torneos's former CEO Burzaco, the U.S. government's star witness, testified that, in March 2013, he met with the late Grondona in Zurich to secure rights for World Cups 2026 and 2030, and that his company, Televisa and Teleglobo, agreed to pay, and did pay, $15 million in bribes to Grondona for those rights by way of a Swiss bank sub-account (¶¶15, 16, 130);

---

[9]   While the court in *Menaldi*, 164 F. Supp. 3d at 578 n.5, concluded that it did not need to decide the issue of whether the underlying criminal conduct had to satisfy particularity or plausibility, courts in this District have cited its holding quoted above as concerning plausibility.  *See, e.g.*, *Speakes v. Taro Pharm. Indus., Ltd.*, No. 16-CV-08318 (ALC), 2018 WL 4572987, at *1 (S.D.N.Y. Sept. 24, 2018) ("Of course, a securities fraud action based upon the nondisclosure of uncharged illegal conduct must also plausibly articulate 'that the underlying conduct occurred.'") (quoting *Menaldi*, 164 F. Supp. 3d at 578).  Anyway, Lead Plaintiff's Complaint satisfies either standard.

[10]   Defendants allege that "nowhere" does the Criminal Information indicate that Defendants participated "knowingly" in the bribery scheme.  MTD at 8-9, 24, 35.  But to indict Televisa's "*co-conspirator*" with conspiracy to commit fraud, the government had to have probable cause that Torneos did so "knowingly and intentionally," and Televisa's co-conspirator entered into a deferred prosecution agreement in which it admitted to the Information which alleged that the co-conspirator "knowingly and intentionally" engaging in conspiracy.  *See* Torneos Info. & Deferred Pros. Agmt. (ECF No. 4-1) at 18.  Defendants simply ignore this.

- Two weeks later, Torneos employee Rodriguez's bribery ledger, which the government introduced as an exhibit in the criminal trial, indicated that Televisa subsidiary Mountrigi made an April 5, 2013 $7.25 million dollar payment to Torneos for the 2026 and 2030 World Cup rights that was deposited in a Swiss bank sub-account dedicated to Grondona (¶¶53-54);

- The same ledger indicated that $300,000 was also paid to a Swiss banker, Arzuaga, who later pled guilty to money laundering, and admitted that he funneled bribes from Torneos to the late FIFA official Grondona at Julius Baer (¶¶54-55);

- On January 26, 2018, Televisa admitted it had material weaknesses in its internal controls over financial reporting, and PwC reversed its April 28, 2017 audit opinion of Televisa for 2016 (¶64); and

- On July 10, 2018, Televisa announced that it was parting ways with its longtime accountant, PwC, and failed to confirm that there were no disagreements between itself and PwC (¶27).

The above facts, accepted as true and viewed in the light most favorable to Lead Plaintiff, clearly establish a plausible claim that Defendants engaged in a bribery scheme to secure the broadcasting rights to the 2018, 2022, 2026, and 2030 World Cups. ¶¶12, 15-16, 27, 50-54, 60, 64, 130. Though unnecessary, these allegations meet the particularity standard, too.

The cases on which Defendants rely are readily distinguishable and accentuate the numerous facts Lead Plaintiff has pled here. *See* MTD at 16. For example, in *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006), the plaintiffs had made "no allegations specifying how any . . . activities would actually violate state or federal antitrust laws" and the court was uncertain of the "legal theory upon which plaintiffs base their allegations of illegal conduct." *Id.* at 581-83, 585-89. Instead, the plaintiffs exclusively relied on a complaint that did not even implicate the defendant and alleged only a steering of business with "no explication of how the steering occurred or in what manner this activity violated competition laws." *Id.* at 579, 585.

Here, by contrast, Lead Plaintiff relies on far more than a complaint that does not implicate Televisa. Instead, it points to sworn testimony in a criminal trial directly implicating Televisa in the

- 23 -

bribery scheme, exhibits from that same trial that provided a paper trail of Televisa's bribes through Mountrigi, the announcement that Televisa's CEO and CFO (the Individual Defendants here) would be stepping down within hours of a news article implicating Televisa in the bribery scheme, and Televisa's own admission that it had designed ineffective internal controls. ¶¶15-16, 20-29, 50-51, 53-56, 60. And the theory of illegality here is no mystery; bribery is indisputably a serious crime.

Defendants' reliance on *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 632 (S.D.N.Y. 2017), is also misplaced. MTD at 17-20. At the outset, the court ***denied*** defendants' motions to dismiss in large part, upholding many of the allegations about the bribery scandal; many of defendants' misstatements; including about their code of ethics, anti-corruption policies, and denials of involvement in the bribery scandal; many of plaintiff's scienter allegations regarding the company and individual defendants; and granted leave to amend. *See Banco Bradesco*, 277 F. Supp. 3d at 664, 669. With respect to the bribery allegations that fell short, the plaintiff had relied on information about payments to an intermediary without information about the recipient. *See id.* at 632-33. Further, the plaintiff had pled ***no facts*** that the bribe recipient was known to the defendant or that anyone had communicated the recipient's involvement to anyone at Bradesco. *Id.* at 633.

Here, on the other hand, Torneos's former CEO Burzaco testified under penalty of perjury (and at the threat of assassination) that Televisa affirmatively agreed to, and did, pay a portion of the $15 million in bribes to the late FIFA official Grondona via a bank account in the name of Julius Berg. ¶¶15, 16, 130. Burzaco's testimony thus forecloses an inference that Defendants improperly seek to inure to their favor instead of Lead Plaintiff's favor – that Televisa believed it was agreeing to make legal payments to an intermediary. In addition, the secret bribe ledger presented as an exhibit at trial confirmed that Televisa's/Mountrigi's $7.25 million payment for the 2026 and 2030 World Cup rights went directly to a bank account for Grondona. ¶¶53-54. Further, according to the

- 24 -

U.S. Attorney's statement in the Torneos Information, at least one executive from Televisa's wholly owned subsidiary, Mountrigi, "assist[ed]" Torneos and Burzaco in paying "millions of dollars in bribe and kickback payments" to the late Grondona for the 2018, 2022, 2026, and 2030 World Cup rights.  ¶50.  Again, unlike in *Banco Bradesco*, Lead Plaintiff has provided particularized facts demonstrating that Televisa and its executives at its wholly owned subsidiary were aware of the bribery scheme and the bribe recipient, Grondona.[11]

### C.  The Complaint Adequately Alleges the Internal Control Deficiencies

Likewise, Lead Plaintiff has pled sufficient facts about the weaknesses in Televisa's internal controls over financial reporting that allowed $7.25 million of the Company's revenue to be utilized for the illegal and illicit purpose of covertly bribing a corrupt FIFA executive to secure the broadcasting rights to the 2018, 2022, 2026, and 2030 World Cups.  ¶¶20-26.

For example, the Complaint alleges that, on October 26, 2017, *The New York Times* revealed Televisa and its wholly owned subsidiary participated in the bribery scheme.  ¶59.  Within hours of its publication, Televisa announced that both its CEO and CFO (the Individual Defendants) would be stepping down.  ¶60.  Then, both the criminal testimony and exhibits from the FIFA criminal trial corroborated the allegations in *The New York Times* Exposé and revealed further details about the bribery scheme.  ¶¶15, 53-54.  Nevertheless, Defendants continued to unequivocally deny their involvement.  ¶118.  Shortly thereafter, Defendants admitted that internal weaknesses existed.  *See* ¶20.  This temporal pattern is probative of fraud.  *See, e.g.*, *Elliott Assocs., L.P. v. Covance, Inc.*, No.

---

[11]  Defendants' citation to *Banco Bradesco* to suggest Lead Plaintiff must allege direct payments to the bribe recipient, rather than an intermediary, is misguided.  Under Defendants' logic, a company could always get away with bribery so long as it paid an intermediary who it arranged to pay the bribe to the recipient.  Our anti-corruption laws are not that impotent.

- 25 -

00 CIV. 4115 SAS, 2000 WL 1752848, at *7 n.10 (S.D.N.Y. Nov. 28, 2000) ("temporal proximity" may provide "circumstantial evidence of the falsity" of statement).[12]

Further, the alleged facts, accepted as true and viewed in the light most favorable to Lead Plaintiff, establish a plausible claim that Defendants used their materially weak internal control over financial reporting when engaging in a bribery scheme to secure the broadcasting rights to the 2018, 2022, 2026, and 2030 World Cups.  Lead Plaintiff alleges, for example, that Defendant Azcárraga III and Defendant Folch "[d]esigned" or "caused . . . to be designed under [their] supervision," Televisa's materially weak internal controls deliberately to facilitate the fraud.  ¶¶20-29, 77, 106. Lead Plaintiff further cited criminal testimony and exhibits about the $7.25 million dollar bribe for certain World Cup rights.  ¶¶44-46, 50, 53-54.  As a result of the publicity and scrutiny derived from the criminal proceedings, Defendants' now-dismissed auditor forced them to report material weaknesses in the Company's internal controls in a carefully crafted disclosure.  ¶¶66-68.  Shortly thereafter, Televisa quietly parted ways with its longtime auditor, PwC , without revealing whether any substantive disagreements were the cause for the termination.  ¶¶27-28, 64-65, 69, 150-151.[13]

Defendants deny that their admission of material weaknesses in internal controls relates to their bribes but in doing so both ignore that Lead Plaintiff is entitled to reasonable inferences in its favor and offer no plausible alternative explanation to boot.  *See Twombly*, 550 U.S. at 572. Moreover, Defendants try to cabin the allegations, rather than view them holistically.  *See, e.g.*,

---

[12]   *See also Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996) ("we need not turn a blind eye to the obvious: the proximity of the date of the allegedly fraudulent statements and omissions to both the end of the quarter than in progress and the date on which disclosure was eventually made").

[13]   Notably, the government's deferred prosecution agreement with Televisa's co-conspirator, Torneos, required Torneos to "accept[] responsibility for the conduct described in the Information by entering into this Agreement and by, among other things: (a) continuing **the implementation of enhanced internal controls**."  *See* Torneos Info. & Deferred Pros. Agmt. (ECF No. 4-2) at 2.

1503398_1

*Tellabs*, 551 U.S. at 326.  By failing to challenge loss causation, however, Defendants concede that their admission revealed the falsity of prior statements concerning the adequacy of their controls (¶20).[14]  Likewise, Defendants concede that Televisa failed to disclose the material weaknesses, which allowed Defendants to covertly funnel its bribes for the 2018, 2022, 2026, and 2030 World Cups.  ¶¶164-169.

Further, while Defendants' Form 6-K tried to limit the fall out by describing the weaknesses in oblique terms rather than saying "the internal controls were designed to enable Televisa to engage in bribery,"[15] a plausible reading of the carefully crafted disclosure read ***in light of the other allegations*** implies just that.  The key word used in the admission to describe the material internal control weaknesses was "design."  ¶66.  Specifically, Televisa admitted that it failed with regard to:

> (i) ***the design*** and maintenance of effective controls over certain information technology controls which support systems that are relevant to the provisioning, updating and deleting of users' access to those systems . . . ; (ii) ***the design*** and maintenance of effective controls over segregation of duties within the accounting system, including certain individuals with the ability to gain ***access to prepare and post journal entries across substantially all key accounts of the Company without an independent review*** performed by someone other than the preparer; ***and*** (iii) ***ineffective controls with respect to the accounting*** for certain revenue and related accounts receivable in our ***cable companies and content division***.

*Id.*[16]

---

[14]   Defendants have waived any argument to the contrary at this stage, so may not try to come up with an alternative explanation on reply. *See Okor v. Borough of Manhattan Cmty. Coll.*, No. 14-CV-1593 JPO, 2015 WL 3750630, at *4 n.6 (S.D.N.Y. June 16, 2015) ("declin[ing] to consider" arguments raised for the first time in defendants' reply in support of motion to dismiss because "'[a]s a general rule, courts will not consider arguments raised for the first time in a reply brief'").

[15]   Further, as courts have recognized, "a corrective disclosure [need not] be a 'mirror image' tantamount to a confession of fraud. Because corporate wrongdoers rarely admit that they committed fraud . . . ." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).

[16]   Televisa's 2017 20-F stated it slightly differently:  "[I]n our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control - Integrated Framework (2013)

1503398_1

As explained in the Complaint, these internal control deficiencies could only have existed from deliberate design, and not by an oversight, a mistake or incompetence. ¶141. If the internal control deficiencies were the result of innocent inaction, companies ordinarily remediate such deficiencies by including changes and improvements in staffing pertinent to those internal controls. *Id*. But in "Remediation Plan and Activities" section of Televisa's 2017 Form 20-F/A, Defendants assiduously avoided any reference to anyone responsible for, or in charge of, the internal controls over cash disbursements and the accounting for those disbursements. *Id*.

The suspension of the internal controls allowed Defendants to: (1) transfer funds from the Company's accounts to its co-conspirator, Torneos, to pay the bribes to the late FIFA official Grondona; (2) avoid detection of the actual purpose for those transfers; and (3) conceal the nature of those transactions from later discovery. ¶24. Of the two major ways in which Televisa could have executed the scheme (*i.e.*, "on-book" or "off-book" transactions), Televisa chose the "off-book" method because it posed the least risk of detection. *Id*. An "on-book" scheme would have meant that the cash (*i.e.*, checks or wire transfers) exited the entity fraudulently, but would be recorded on Televisa's books (like Rodriguez's ledger) and leave a paper trail. *Id*. The "off-book" scheme enabled Televisa to surreptitiously carry out the bribes because the cash would never actually be reported to the entity, leaving no apparent audit trail, and the fraud would thus require a forensic accounting investigation to unearth the details underlying the illegal bribery scheme. *Id*. Lead

---

issued by the COSO because material weaknesses in internal control over financial reporting exists . . . as the Company **did not appropriately design**, maintain or monitor certain controls in response to the risk of material misstatement, which contributed to material weaknesses in internal control over financial reporting as the Company (i) **did not design** and maintain effective controls over certain information technology controls, (ii) **did not design** and maintain effective controls over segregation of duties within the accounting system, including review and approval of manual journal entries, and (iii) **had ineffective controls** with respect to the accounting for certain revenue and related accounts receivable at certain divisions." ¶142.

Plaintiff has pled particularized facts that, when viewed in the context of the other allegations, present a plausible claim that the weak internal controls hid the bribery scheme.

Defendants' cases are inapposite as none involves a disclosure of materially weak internal controls. *See Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 375 (S.D.N.Y. 2007); *Novak*, 216 F.3d at 313-14;[17] *Bay Harbour Mgmt. LLC* v. *Carothers*, 282 F. App'x 71, 76 (2d Cir. 2008); *Feasby v. Industri-Matematik Int'l Corp.*, No. 99CIV.8761(HB), 2000 WL 977673, at *6-*7 (S.D.N.Y. July 17, 2000). Further, *Feasby*, the only case involving an accounting allegation, is readily distinguishable. There, plaintiffs alleged defendant "'falsif[ied] its reported financial results during the Class Period, utilizing various accounting tricks and artifices.'" 2000 WL 977673, at *7. The plaintiffs, however, did not include one statement of fact "upon which [their] pleaded information and beliefs are founded." *Id.* Here, unlike in *Feasby*, Lead Plaintiff relies on Defendants' **admission** that Televisa had a material weakness in its internal controls over financial reporting, Burzaco and Rodriguez's sworn testimony, Televisa's mysterious separation from PwC, and Televisa's failure to comply with SEC rules governing its Form 6-K disclosure of PwC's termination.  ¶¶44-46, 50, 53-54, 64-69, 150-151.

Defendants also complaint that Lead Plaintiff did not address the 2017 Form 20-F statement that Televisa's materially deficient internal controls did not involve "improper activities." MTD at 28.[18] Defendants cite no basis for this conclusory opinion, except presumably their own audit committee.  *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245-46 (N.D. Cal. 2008)

---

[17]   Defendants' reliance on *Novak* is misplaced.  MTD at 33.  There, the court did not make a finding as to particularity, and reversed dismissal for applying too stringent of a standard on the plaintiffs.  *See Novak*, 216 F.3d at 312-14.

[18]   Contrary to Defendants' position, while the Court may take judicial notice of the 2017 20-F, on a "Rule 12(b)(6) motion" it should do so "only to determine **what** the document stated,' and '**not to prove the truth of their contents**.'" *Roth*, 489 F.3d at 509 (emphasis in original).

("[O]fficers and directors are not exonerated when their own audit committee finds nothing wrong in the company's accounting practices.  To rule otherwise would create a huge fox-guards-the-chicken-house loophole in our private securities law enforcement."); *see also Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 U.S. Dist. LEXIS 52365, at *38-*39 n.7 (C.D. Cal. July 1, 2008) (finding strong inference of scienter where the "Audit Committee concluded that the restatement did not result from fraud").  The only basis to which Defendants could point is Televisa's statement in response to the filing of a complaint in which Televisa stated that a "long previous[]" (MTD Ex. B (2017 Form 20-F) at 137) investigation allegedly found that Defendants did not engage in a bribery scheme for the 2022 and 2026 World Cup broadcasting rights.  MTD at 4. This self-serving disclosure, which fails to even address bribery for the 2018 and 2022 World Cup broadcasting rights, is insufficient to overcome Lead Plaintiff's allegations.  *Henning v. Orient Paper, Inc.*, No. CV 10-5887-VBF (AJWx), 2011 WL 2909322, at *7 (C.D. Cal. July 20, 2011) (denying motion to dismiss despite defendants' "self-serving" investigation "given that Defendants' outside counsel and advisor failed to publish any statement setting forth their own, independent conclusions"); *see also Freudenberg*, 712 F. Supp. 2d at 202 ("corporate wrongdoers rarely admit that they committed fraud").  And neither Defendants' outside counsel nor its former auditor has published any corroborating statement regarding their "independent" conclusions.[19]

    Further, PwC offered no form of assurance that the internal control deficiencies did not result in improper transactions or activities.  *See* MTD Ex. B (2017 Form 20-F).  The only assurance that

---

[19]   Defendants' statement waives any attorney-client privilege or work-product protection as to this subject matter, and Lead Plaintiff as a matter of fairness should get an opportunity to scrutinize this self-serving opinion through discovery.  *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes," and "the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications.").

PwC offered was that the internal control deficiencies did not affect its opinion that the financial statements were fairly presented "in all material respects."  *Id.* at F-2.  But Lead Plaintiff does not allege that the bribery scheme resulted in a ***quantitative*** material misstatement of Televisa's financial statements.  Defendants' argument is thus beside the point.

In addition, Defendants' attempt to downplay Televisa's disregard of SEC rules is misleading.  MTD at 30.  Defendants argue that the SEC Manual allowed them to delay Televisa's disclosure regarding the true circumstances of its separation with longtime accountant PwC until April 2019, 294 days after its Form 6-K announcing its change in auditors.  *Id.*  But the SEC Manual cited by Defendants includes a prominent disclaimer on its cover page that it is "***non-authoritative***," and any other "***authoritative or source material governs***."  SEC Manual at i (cover page).  The SEC Manual further warns "of its informal nature" by noting that its "guidance is not a rule, regulation or statement of the Commission and the Commission has neither approved nor disapproved this information."  *Id.*  Defendants ignore this express disclaimer.

Similarly, Defendants deliberately ignore the SEC's actual ***authoritative*** rules governing changes of auditors in the instructions to the Form 6-K.  Those rules required Defendants to explain the circumstances regarding PwC's termination.  The Form 6-K instructions are clear on this point: A foreign private issuer is required to provide information in the Form 6-K that "is material with respect to the issuer and its subsidiaries concerning . . . changes in [the] registrant's certifying accountants" to the extent (i) made or required to be made public pursuant to the laws of its home jurisdiction, (ii) filed or required to be filed with a stock exchange on which its securities are traded (if made public by that exchange) or (iii) distributed or required to be distributed to its security holders.  Defendants' bluster about "nonsense" and "ignorance" of the SEC rules is out of line.

- 31 -

Further, a review of other foreign registrants' Forms 6-K and 20-F disclosures regarding a change in auditors supports Lead Plaintiff's position that, unlike Televisa, foreign registrants routinely comply with the SEC Rule 229.304, 17 C.F.R. §229.304 ("Item 304") requirements in the Form 6-K as well as in the subsequent Form 20-F filing.[20]  In every instance, the registrants made disclosures in accordance with Item 304, such as whether the auditor resigned, was dismissed, or was terminated by mutual agreement; whether or not there were any disagreements or reportable events; and specific details necessary to adequately explain the circumstances regarding the auditor's departure.  In the majority of the registrants' Forms 6-K, the registrants stated that there were "no disagreements" or "no reportable events" in connection with the auditor's termination.[21]  But even when there were "disagreements" or "reportable events," the foreign private issuers, unlike Televisa, complied with the SEC's authoritative rules governing the Form 6-K disclosures and explained the circumstances regarding the change in auditors, pursuant to Item 304.[22]

---

[20]   *See, e.g.*, Forms 6-K for JinkoSolar Holding Co., Ltd, filed on May 10, 2012 ("JinkoSolar 5/10/12 Form 6-K") and February 4, 2013 ("JinkoSolar 2/4/13 Form 6-K"); Form 6-K for Lianluo Smart Ltd., filed on November 21, 2017; Form 6-K for China Enterprises LTD filed on December 3, 2010; Form 6-K for Acorn International, Inc., filed on October 21, 2016; Form 6-K for Bitauto Holdings LTD, filed on May 8, 2015; Form 6-K for Amira Nature Foods Ltd., filed on April 14, 2014.

[21]   *Id.*

[22]   For example, the Form 6-K filed by foreign registrant JinkoSolar Holding Co., Ltd. on May 10, 2012, disclosed a change in auditors, and, unlike Televisa, confirmed "there were no disagreements" with its former auditor, PwC.  JinkoSolar 5/10/12 Form 6-K at Exhibit 99.1.  Further, the company disclosed there were no "reportable events," aside from internal control weaknesses described in the Form 6-K.  *Id.*  Then, on February 4, 2013, the company  disclosed another change in auditors, and reappointed PwC.  Again, unlike Televisa, the company explained that it "did not have any disagreements" with the departing auditor.  JinkoSolar 2/4/13 Form 6-K at Exhibit 99.1.  In addition, the Form 6-K disclosed that the departing auditor had identified a "reportable event" as the company received a subpoena from the SEC's Division of Enforcement "requesting documents from the [c]ompany as part of an investigation conducted by the Division."  *Id.*  And when the company ultimately filed its Form 20-F on April 30, 2013 (355 days after the May 10, 2012 Form 6-K and 85

- 32 -

Lead Plaintiff plausibly allege that Defendants engaged in a bribery scheme to secure broadcasting rights for World Cups and exploited Televisa's weak internal controls to do so.

### D.    Defendants' Self-Serving Opinion Should Be Disregarded

The Court should reject Defendants' attempt to skirt liability based on a self-serving statement in Televisa's 2017 Form 20-F in response to the filing of a complaint in this Action.[23] *See* MTD at 4, 13-14, 29, 32, 35 & 43.  Even if the Court were to judicially notice the Form 20-F, it may do so "only to determine ***what*** the document stated,' and '***not to prove the truth of their contents***.'" *Roth*, 489 F.3d at 509 (emphasis in original).  Thus, while Defendants repeatedly invoke this statement, they cannot use it to prove there was in fact an investigation that cleared Televisa of wrongdoing.  *See id.*  Lead Plaintiff is entitled to put any such statement to the test in discovery.[24]

Further, even if the Court were to consider the 2017 Form 20-F for the truth of its contents (which it should not do), the statement raises more questions than answers, and Lead Plaintiff is entitled to get answers to all those questions.  *See Bilzerian*, 926 F.2d at 1292; *Scott v. Chipotle Mexican Grill, Inc.*, 67 F. Supp. 3d 607, 611 (S.D.N.Y. 2014).  For example, it says outside counsel "***long previously*** investigated the circumstances surrounding Televisa's acquisition of the Latin American media rights for the 2026 and 2030 FIFA World Cups."  MTD Ex. B (2017 Form 20-F) at 137.  One is left to wonder what spurred this investigation, what was its scope, and when did this

---

days after the February 4, 2013 Form 6-K), the company simply reiterated the earlier Item 304 disclosures provided in the company's previous 6-Ks.

[23]    Defendants' complaint that Lead Plaintiff did not disprove their 2017 Form 20-F self-serving statement (made in response to the complaint) that they did not commit fraud is not a bar at the pleading stage.  If it were, the Court would allow the fox to guard the henhouse.

[24]    *See Bilzerian*, 926 F.2d at 1292 ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes," and "the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications.").

"long previous[]" investigation occur?  2013?  2015?  2017?  This is significant, given that Burzaco's and Rodriguez's testimony occurred *less than six months before* Televisa claimed a "long previous[]" investigation cleared it.  ¶¶15, 16, 53-54, 130.  And Televisa's admission occurred just *three months before* it said a "long previous[]" investigation cleared it.  ¶64.  And, at the time of this statement, Defendants had not yet revealed the separation from their accountant PwC.  ¶69.  Thus, it is entirely reasonable to infer that the "long previous[]" "exculpatory" investigation occurred prior to Torneos's former CEO Burzaco and Torneos's employee Rodriguez's testimony regarding Televisa and Televisa's own admission regarding its internal controls.  So even taking the statement at face value, this "long previous[]" investigation may not have evaluated the salient facts nor included a forensic audit.  Further, Defendants' statement leaves untouched the matter of the 2018 and 2022 World Cup rights, begging the question of whether those rights were the result of bribery?  This is just barely scratching the surface.  Far from overcoming the plausible claim that Defendants engaged in a bribery scheme to secure World Cup broadcasting rights, Televisa's carefully crafted statement regarding a "long previous[]" investigation screams for a further investigation.

In an attempt to rewrite the law, Defendants argue that Lead Plaintiff must prove "that the internal investigation 'did not uncover any unlawful activity of a material proportion.'"  MTD at 29.[25]  Defendants are playing word games; regardless of whether they consider a $7.25 million bribe to be quantitatively material, it is qualitatively so.  *See* §VI.E.1, *infra*.  The Complaint – which answers the "who, what, when, where, and how" – satisfies any particularity requirement.

---

[25]  Defendants' reliance on *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386 (S.D.N.Y. 2016), is misleading.  MTD at 29.  There, the court addressed scienter, not particularized pleading standards.  *See Sanofi*, 155 F. Supp. 3d at 406-07.  Moreover, the plaintiffs' *own* complaint alleged that defendants had conducted an undisclosed internal investigation to assert defendants were aware of the fraud.  *Id.*  Here, there was no reference in the Complaint to an internal investigation, and Lead Plaintiff does not attempt to rely on one to plead a plausible inference of scienter.

E.      **Defendants' Misrepresentations and Omissions Are Actionable**

Defendants next argue that, even if they bribed FIFA officials, there was no duty to disclose it.  *See* MTD at 31.  But in doing so, Defendants leave untouched many of Lead Plaintiff's alleged misstatements and thus on this basis alone, the Court should deny the Motion.

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). That means alleged misstatements are upheld at this stage unless "'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *Id.* at 162; *see also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016).  Further, "[t]he touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."  *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002), *aff'd* 40 F. App'x 624 (2d Cir. 2002); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, 135 S. Ct. 1318, 1330 (2015) ("whether an omission makes an expression of opinion misleading always depends on context").  Viewed through this lens, the alleged misstatements and omissions should be upheld at this stage.

1.      **Statements Regarding the World Cup and Bribes**

Defendants argue their statements regarding the bribery scheme and the World Cup are not actionable because there is no duty to disclose uncharged criminal conduct, unless necessary to

prevent "*other* statements" from being misleading.   MTD at 32 (emphasis in original).[26]  But Defendants do not attempt to show how their "other statements" are *not* rendered misleading.  *Id.*

A review of the statements in the Complaint reveals that Defendants triggered the duty to disclose the bribery scheme under their own authorities.  For example, on December 16, 2016, Televisa's spokesman stated:  "We are certain all of the people from Mountrigi or Televisa that have dealt with FIFA have acted correctly and have not paid any bribes nor any kickback to FIFA official related to the acquisition of rights."[27]  ¶108; *see also* ¶118 (Televisa's spokesman, Alejandro Olmos, stated on November 15, 2017, that "'Grupo Televisa in no way knew of, or condoned, any bribe or other improper conduct.'").[28]  These denials were misleading.  *See, e.g.*, *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) ("once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading"); *see also In re Sotheby's Holdings,*

---

[26]  Defendants' cases are unavailing.  For example, Defendants' quote from *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, concerns Section 11 and 12(a)(2) claims under the Securities Act, not Exchange Act claims. 752 F.3d 173, 184 (2d Cir. 2014).  Further, the court found UBS complied with its disclosure obligations when "disclosing its involvement in multiple legal proceedings and government investigations and indicating that its involvement could expose UBS" to monetary damages "UBS complied with its disclosure obligations under our case law." *Id.* Here, on the other hand, Defendants designed their internal controls to allow the bribery scheme to go undetected and denied any wrongdoing. ¶¶20-29, 108, 118.

[27]  Defendants challenge the falsity of this statement denying that the unnamed co-conspirator was Televisa's wholly owned subsidiary Mountrigi.  MTD at 34.  Now, however, faced with the fact that *The New York Times* Exposé revealed new information, Defendants argue it was "readily identifiable that 'Broadcasting Company Affiliate A' was a reference to [Televisa's wholly owned subsidiary,] Mountrigi."  *Compare* MTD at 9 *with* MTD at 34.  They cannot have it both ways.

[28]  Defendants are wrong to argue that a statement by an unnamed spokesman is not actionable.  *See* MTD at 34.  Their own authority holds otherwise.  *See Banco Bradesco*, 277 F. Supp. 3d at 662-64 (finding unnamed spokesman's statement in a news article denying involvement in bribery scheme was an actionable statement attributable to the company, defendants' position "would lead to the absurd result that a corporate defendant could never be found liable for securities fraud so long as it took care to ensure that its statements were attributed only to the company and not to an individual").

*Inc. Sec. Litig.*, No. 00-cv-1041 (DLC), 2000 U.S. Dist. LEXIS 12504, at *13 (S.D.N.Y. Aug. 31, 2000) ("Thus, 'when a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate.'"), *aff'd* 31 F. App'x 762 (2d Cir. 2002).[29]

Likewise, Defendants' other statements regarding the World Cup rights triggered a duty to disclose. *See, e.g.*, ¶¶80, 83, 90. For example, Defendants' April 26, 2013 statement that, despite increasing competition for sports content, "we have been structuring medium-term and long-term content agreements, when possible and at the right prices, with companies holding the sports rights . . . . For example, we hold the rights to the next three soccer World Cup's that are extremely relevant to Mexico" is misleading because a reasonable investor could believe it was Televisa's contracting prowess that allowed it to secure these coveted rights. ¶80. In light of allegations that it was Televisa's bribe to the late FIFA official Grondona that secured two of the three rights to the World Cup, Defendants' statement may be found to be misleading.

*Par Pharm.* is instructive here. There, a corporation and its subsidiary engaged in a bribery scheme with two U.S. Food and Drug Administration ("FDA") officials to secure speedy approvals for products and, in some cases, to delay the approval of competitors' products. *Par Pharm*, 733 F. Supp. at 672-73. Upon rejecting a similar argument that a corporation has no duty to reveal uncharged criminal conduct, the court found actionable alleged statements regarding its success in obtaining FDA approvals, "touting [defendant company's] competitive advantage in obtaining speedy FDA approvals and [its] earnings performance." *Id.* at 675, 677-78. The court reasoned that, absent disclosure of the bribery scheme:

---

[29]  *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) (when a corporation chooses to speak, it has a "duty to be both accurate and complete"); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 358 (S.D.N.Y. 2008) ("[C]ourts have found the requisite connection between improper activity and affirmative statements where defendants made specific statements that could be interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs was not occurring.").

> A reasonable jury could find that, by extolling Par's ability to obtain FDA approvals, by comparing Par's success in this regard to other companies in the industry and to its own previous performance, and by projecting continued success in obtaining rapid approvals, the statements conveyed to a reasonable investor the false impression that Par had a particular expertise in obtaining FDA approvals constituting a legitimate competitive advantage over other companies and that this advantageous expertise was responsible for its success in obtaining FDA approvals.

*Id.* at 677-78; *see also Braksem*, 246 F. Supp. 3d at 760-61 (rejecting defendants' no-duty-to disclose argument in part and holding statements concerning price paid for a product were materially misleading as disclosure of bribery scheme "would have called into question whether [the Company's] ability to secure favorable pricing in the future was durable and due to a legitimate competitive advantage, or whether – like all illegal arrangements – it was legally unenforceable and subject to abrupt termination").[30]   Similarly, here, Defendants' statements touting Televisa's contracting prowess, competitive advantage in securing the rights and the costs associated with the acquisition of rights (*e.g.*, ¶¶5, 80, 83, 90, 114) are actionable at this stage.

Furthermore, here, as in *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005), the defendants "made numerous statements during the Class Period concerning the sources and significance of the revenue generated by [the broadcasting rights]" in an "'exceedingly turbulent market'" without disclosing that the profitability was attributable, in part, to bribery.  *Id.* at 400-02; ¶¶80, 83, 93, 100, 117.  Thus, Defendants' statements regarding the World Cup broadcasting rights "put its source of revenue at issue, [the statements] gave rise to Section 10(b) liability because the company failed to disclose the illegal conduct that generated the revenue."  *In re Virtus Inv.*

---

[30]   Without any legal authority, Defendants assert that, "even if Televisa had secured the rights to broadcast these events by bribe, none of these statements [regarding the World Cup] would be any less true: there is no claim that Televisa does not continue to hold these rights."  MTD at 32.  As explained by *In re Braksem S.A. Sec. Litig.*, Televisa's contracts do not need to be terminated for the alleged statements to be actionable as an investor could be concerned "whether – like all illegal arrangements – it was legally unenforceable and subject to abrupt termination."  246 F. Supp. 3d 731, 760-61 (S.D.N.Y. 2017).

*Partners Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016) (defendants had duty to disclose illegal conduct where they made "half-truth" statements about certain factors contributing to their "sales," but omitted the fraudulent performance history that also contributed to those sales figures). Defendants' denials and half-true statements about the World Cup rights triggered a duty to disclose.

Defendants also argue that a bribery payment of $7.25 million is too trivial to be considered material to a reasonable investor and that Televisa has not yet been charged criminally.  MTD at 34 (citing ¶¶108, 118).[31]  A complaint may be dismissed on materiality if the alleged misstatements "'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *Ganino*, 228 F.3d at 162.

$7.25 million is a large sum of money to a reasonable investor.  But a bribe does not have to be quantitatively large to be material.  Illegal conduct is, by itself, material, regardless of the impact of such conduct on financial performance.  *See Ind. Pub. Ret. Sys.*, 818 F.3d at 96 (undisclosed kickback scheme involving "a single contract out of SAIC's more than 10,000 ongoing contracts and . . . worth a fraction of SAIC's yearly revenues" was material where the company was exposed to possible "significant civil and even criminal liability" and risks to future revenues); *In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 464 (S.D.N.Y. 2017) (failure to disclose bribery scheme is material without allegations concerning the "quantitative materiality" of scheme); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015) ("the quantitative analysis is not dispositive of materiality"; misstatements qualitatively material where "directly related to [company's] concealment of the unlawful bribery scheme, revelation of which would 'call into

---

[31]  Notably, Defendants have conceded the materiality of nearly all of the alleged misstatements as they do not challenge the following alleged misstatements on the basis of materiality: ¶¶74-77, 79-107, 109-117.  *See Okor*, 2015 WL 3750630, at *4 n.6 ("declin[ing] to consider" arguments raised for the first time in defendants' reply in support of motion to dismiss because "'[a]s a general rule, courts will not consider arguments raised for the first time in a reply brief'").

question the integrity of the company as a whole'").[32]  Thus, even if a $7.25 million bribe payment is

not material on a quantitative basis, it is on a *qualitative* basis.  ASC 250-10-S99-1 specifically cites

"concealment of an unlawful transaction" as "[a]mong the considerations that may well render

material a quantitatively small misstatement [or omission]."  And the lucrative TV rights that were

acquired by illicit means were material to investors, and thus, the $7.25 million bribe payment made

to acquire those rights was material to investors.  That Televisa had to bribe FIFA officials to secure

the lucrative TV rights to the World Cup as a quid pro quo makes the illicit payments prima facie

material to investors.  "Among the considerations that may well render material a quantitatively

small misstatement [or omission] of a financial statement item [is] whether the misstatement [or

omission] involves concealment of an unlawful transaction."  ASC 250-10-S99-1.

Regardless of the quantitative impact that the bribe had on Televisa's revenues, a reasonable

investor could have found the $7.25 million bribe material because the scheme exposed Televisa to

potential civil and criminal liability, placed Televisa's reputation with investors at risk, and put

Televisa's future advertising revenue associated with the World Cup at risk.

## 2.     Statements Regarding the Adequacy and Design of Internal Controls and SOX Certifications

False Sarbanes Oxley ("SOX") certifications concerning internal controls are actionable.

*See, e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617-

19 (S.D.N.Y. 2015) (SOX certifications actionable where statements therein were false or

misleading); *see also Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 602,

606-07 (S.D.N.Y. 2009) (SOX certifications actionable where appended to SEC filings with false

---

[32]    *In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 WL 3096178, at *2 (N.D. Cal. Nov. 17, 2005) ($350,000 sham transaction was material because it indicated that "top management" were "potentially corrupt," regardless of size of transaction compared to size of company).

and misleading statements).  In *Petrobras*, the court denied a motion to dismiss, in part, because defendants' allegedly false and misleading statements were contained in SOX certifications.  *See* 116 F. Supp. 3d at 380-81 (finding sufficient allegations that, while "management was professing its opinion that the company's internal controls were effective," they knew of "corruption in the Company's procurement activities").[33]  Similarly, here, while Defendants were flaunting the design and effectiveness of their internal controls, they were aware, or were deliberately reckless in not knowing, of the bribery scheme to secure the broadcasting rights to the World Cup.

Likewise, Defendants' misstatements within the certifications concerning the design and efficacy of their internal controls are also actionable.  *See Petrobras*, 116 F. Supp. 3d at 380-81.  The cases upon which Defendants rely are readily distinguishable.  *See* MTD at 33.  For example, Defendants rely on *Banco Bradesco* to argue statements regarding the adequacy of their internal controls do not become false or misleading because a bribery scheme occurred.  *Id.*  In *Banco Bradesco*, however, the court specifically noted that the plaintiff failed to allege that the company's "internal controls were not 'designed' to provide reasonable assurance regarding the reliability of financial reporting . . . or that the Company had identified but not disclosed . . . material weaknesses."  277 F. Supp. 3d at 648.  Here, on the other hand, Lead Plaintiff has not only alleged that the Individual Defendants **designed** the internal controls to ensure their scheme would go

---

[33]   Defendants' case law is unavailing.  MTD at 33.  In *VEON*, the court **denied** the defendant's "motion to dismiss in large part."  2017 WL 4162342, at *1.  Indeed, there, the court upheld the plaintiffs' allegations with regard to statements regarding internal controls within the SOX certifications.  *Id.* at *7-*8.  The quote Defendants cite concerns "references to sales and subscriber numbers in Uzbekistan" (*id.* at *6) not statements that the defendants were complying with "International Financial Reporting Standards" when they knew that they were not.  MTD at 33.

- 41 -

undetected, but also that the Company has **admitted** to material weakness in its internal controls that relate to the design of those internal controls.  ¶¶20-29, 72(a), 77, 106.[34]

### 3.    Statements Regarding Televisa's Code of Ethics and Anti-Corruption Policies

Defendants' assertion that statements concerning Televisa's Code of Ethics are unactionable is also wrong.  MTD at 34.  While courts have, at times, declined to uphold aspirational statements in corporate codes, "'[t]his is not to say that statements about a company's reputation for integrity or ethical conduct can never give rise to a securities violation.'  '[F]or example, a company's specific statements . . . that are clearly designed to distinguish the company from other specified companies in the same industry'" could be actionable.  *Electrobras*, 245 F. Supp. 3d at 463 (quoting *Ind. Pub. Ret. Sys.*, 818 F.3d at 98).  In addition, as Judge Rakoff explained in *Petrobras*, anti-corruption and ethical statements are actionable "when (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company."  116 F. Supp. 3d at 381.

Here, as in *Petrobras* and *Electrobras*, Defendants utilized their code of ethics to "distinguish the company from other specified companies in the same industry," and "to reassure the investors about the Company's integrity."  For example, within Televisa's 2013, 2014, 2015, and 2016 Forms 20-F, Televisa reassured investors that while:

---

[34]    Equally unavailing is Defendants' reliance on *In re PetroChina Co. Ltd.*, 120 F. Supp. 3d 340, 359-60 (S.D.N.Y. 2015).  *See* MTD at 33.  In granting the motion to dismiss, the court reasoned that the plaintiffs did not allege that the company put the source of its revenue at issue, and failed to "make any allegation as to how or why [the company's] internal controls were inadequate." *PetroChina*, 120 F. Supp. 3d at 359.  As discussed above, Lead Plaintiff alleges numerous particularized facts of the underlying bribery claim, alleged Defendants put the source of the Company's revenue from the World Cup at issue by repeatedly touting its importance to their financial success, and conceded the Company's internal controls were inadequate.  ¶¶20-29, 80, 83.

- 42 -

> Companies listed on the Mexican Stock Exchange are not required to adopt a code of ethics. However, we have adopted a code of ethics which is available free of charge through our offices. See "– Code of Ethics" for directions on how to obtain a copy of our code of ethics. Waivers involving any of our executive officers or directors will be made only by our Board of Directors or a designated committee of the Board.

¶¶87, 96, 104, 112.  As Televisa expressly notes, the Company was not obligated to reassure its investors that, unlike other Mexican corporations, it had adopted and followed a code of ethics.[35]

Defendants' curated excerpts to argue that all of the alleged statements regarding the code and its anti-corruption policy included unactionable, aspirational language are misleading.  MTD at 34.  For example, the alleged statements make clear that "compliance with [the code's] content is mandatory," and assured investors that Televisa took steps to ensure that its executives did in fact comply with it: "executives endorse their commitment to the Code of ethics twice a year.  The referendum must be signed, and an adherence and compliance letter must be sen[t] to the Human Resources area."  ¶¶88, 107.  Further, following press speculation about whether Mountrigi may have been involved in the bribery scheme, Televisa issued its 2016 Annual Sustainability Report, which reassured investors that its internal audit division took specific steps to prevent and detect any acts of bribery.  ¶107.  For example, the report said the Internal Audit Division carried out "***periodic audits to ensure compliance*** and obtain certifications issued by the executives of all subsidiaries."

---

[35]   Mexico is perceived to be one of the most corrupt countries in the world.  *See* Megan Trimble, *The 10 Most Corrupt Countries, Ranked by Perception*, U.S. News & World Report (Apr. 12, 2018) (Mexico perceived to be fifth most corrupt nation in the world, while United States is sixty-first), https://www.usnews.com/news/best-countries/articles/10-most-corrupt-countries-ranked-by-perception; *see also* Corruption Perceptions Index 2017, *Transparency International* (Feb. 21, 2018), https://www.transparency.org/news/feature/corruption_perceptions_index_2017.

- 43 -

*Id.*  And the Company assured investors that the Board's Audit Committee was advised of corruption and other violations of the code of ethics and takes corrective measures on a quarterly basis.  *Id.*[36]

These statements were false and misleading because they reassured investors that Televisa was complying with laws prohibiting bribery and taking steps to ensure no such act would occur at the same time as it was engaged in a bribery scheme.  *See Electrobras*, 245 F. Supp. 3d at 458 (statements in code of ethics that company would "'refuse and denounce any form or attempt of corruption, bribery, kickback and 'backscratching''' were actionable when it was engaged in bribery scheme); *see also Petrobras*, 116 F. Supp. 3d at 375-77, 380 (statements touting code of ethics and corruption prevention program were misleading where company was engaged in bribery scheme); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508-09 (S.D.N.Y. 2009) (upholding claim based on code of conduct where alleged statements also included "specific steps that [the company] was taking to ensure its independence and ratings integrity"); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461 (PAC), 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (statements such as "'[w]e have extensive procedures and controls that are designed to . . . address conflicts of interest'" actionable when company had "clear and egregious conflicts of interest").[37]

---

[36]  Notably, Televisa began its anti-corruption policy following the public eruption of the FIFA scandal. *See* Grupo Televisa, *Report 2016 Grupo Televisa Connecting with Sustainability*, at 1 (confirming that in 2016, "we started with the development of an anti-corruption institutional training campaign for our employees"), http://www.televisair.com/~/media/Files/T/Televisa-IR/documents/sostenibilidad%20ING%2010%2010%20AGO%20FB.PDF (last visited Nov. 15, 2018).

[37]  *See also Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 278-80 (S.D.N.Y. 2012) ("repeated assertions that [issuer] complies with letter and spirit of the law, values its reputation, and is able to address 'potential' conflicts of interest" actionable when alleged conduct "'involved both client conflicts and outright fraud'"); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 239-40 (S.D.N.Y. 2006) (statements in "business principles" about independence and integrity actionable where defendant was beset by conflicts).

- 44 -

The cases upon which Defendants rely support Lead Plaintiff's position.  MTD at 34.  For example, *Barrett v. PJT Partners, Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *5 (S.D.N.Y. Sept. 8, 2017), explained that code of conduct statements describing "concrete steps" a company took to ensure compliance with its ethical standards are actionable.  Here, Defendants' statements touted the concrete steps Televisa was taking to ensure that its executives and employees did not violate the prohibition on bribery.  *See, e.g.*, ¶¶88, 107.  Further, Defendants omit that, in *Braksem*, the court expressly stated that, unlike in *Petrobras*, the alleged statements, even when viewed holistically and in the appropriate context, did not attempt to reassure investors about the company's integrity. *Braksem*, 246 F. Supp. 3d at 756-57.  Here, on the other hand, Lead Plaintiff alleges that Defendants' statements were intended to reassure investors.  *See, e.g.*, ¶¶87, 88, 96, 104, 107, 112.

## F.      The Complaint Adequately Alleges Scienter

In assessing scienter, the Court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Tellabs*, 551 U.S. at 326.  And, while the inference of scienter must be strong and "at least as compelling as any opposing inference," it "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Id.* at 324.  Where, as here, the proposed inference of scienter is at least as compelling as any nonculpable explanation, "a tie on scienter goes to the plaintiff."  *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).  Further, a court must consider the factual allegations of the complaint in their entirety, and take into account only those "plausible opposing inferences" – *i.e.*, plausible nonculpable explanations for the defendant's conduct – that may be "rationally drawn from the facts alleged."  *Tellabs*, 551 U.S. at 310, 314.  Accordingly, it is

- 45 -

Defendants' burden to demonstrate that the allegations give rise to an inference of nonculpable conduct that is **stronger** than the inference of scienter. *Id.*

Lead Plaintiff may plead scienter by "'alleging facts to show that defendants had both motive and opportunity to commit fraud, **or** . . . by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ganino*, 228 F.3d at 168-69. A plaintiff need not plead both. *Tellabs*, 551 U.S. at 325; *Ganino*, 228 F.3d at 170. Recklessness is "conduct that [i]s 'highly unreasonable, representing an extreme departure from the standards of ordinary care [such] that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158-59, 160-61 (2d Cir. 2012).

### 1.    The Complaint Adequately Alleges Corporate Scienter

The inference that Televisa acted with scienter is at least as compelling as any inference of non-fraudulent conduct. During the Class Period, Defendants represented that obtaining exclusive rights to the World Cup was essential to Televisa's business, and that it had legally secured those rights. ¶¶82, 114. In reality, however, Defendants, with Torneos and Burzaco's assistance, were secretly bribing Grondona to secure the 2018, 2022, 2026, and 2030 World Cup rights. By failing to disclose that scheme, Defendants acted with scienter.

Contrary to Defendants' assertion that Lead Plaintiff must identify specific individuals to plead scienter (MTD at 37-40), Torneos's former CEO Burzaco's testimony implicating **Televisa's** knowledge and agreement to bribe the late FIFA official Grondona is sufficient to satisfy scienter at the pleading stage. *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 371 (S.D.N.Y. 2012) (Second Circuit "does not require a plaintiff to identify a specific individual within a corporation who acted with scienter" as "'[i]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the

- 46 -

fraud'") (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)); *see also Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 710 (7th Cir. 2008) ("But it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.").

Here, Torneos's former CEO Burzaco testified that, by early 2013:  (1) Televisa knew of the fraud; (2) agreed to bribe the late Grondona with Torneos and Teleglobo; and (3) did bribe Grondona by funneling the payment to a Swiss bank sub-account in the name of Julius Berg.  ¶¶15, 16, 130. Moreover, Burzaco's testimony is corroborated by Torneos employee Rodriguez's bribery ledger, which evidences Televisa/Mountrigi's April 5, 2013 $7.25 million dollar payment for the 2026 and 2030 World Cup rights deposited in a Swiss bank sub-account dedicated to Grondona.  ¶¶53-54.[38] The U.S. Attorney's office further corroborated the testimony in the Torneos Deferred Prosecution Agreement by asserting that, "in or about and between 2010 and 2013" Torneos, "through Alejandro Burzaco and others, and at times *with the assistance of one or more representatives of [Mountrigi], including Broadcasting Executive #1*, *agreed to pay* and did pay millions of dollars in bribe and kickback payments to Soccer Official # 1 . . . to secure his support for [Mountrigi]'s acquisition of rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup."[39] ¶50.  This supports

---

[38]  Defendants claim that Lead Plaintiff failed to allege anyone at "Televisa or Mountrigi was even *aware* of this ledger entry."  MTD at 40 (emphasis in original).  At the pleading stage, however, the Court must take as true Lead Plaintiff's "factual allegations" regarding the ledger, which includes the fact that someone at Televisa's wholly owned subsidiary transferred the identified bribe payment to Torneos as true.  *Tellabs*, 551 U.S. at 322.  This fact plainly points to a culpable state of mind.

[39]  A strong inference of scienter may be established by a deferred prosecution agreement's references to unnamed individuals, such as "Executive # 1."  *See VEON*, 2017 WL 4162342, at *6. Defendants' reliance on *Stratte-McClure* to argue "[n]owhere do we find *any* specific allegations as to *who* at Televisa (or Mountrigi) supposedly had . . . knowledge[]" of the bribery is misplaced. MTD at 39 (citing *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015)).  First, unlike in *Stratte-McClure*, Lead Plaintiff does identify who at Mountrigi had actual knowledge of the bribery scheme: "Broadcasting Executive #1 [who] agreed to pay and did pay millions of dollars

a strong inference of scienter.  *See Freudenberg*, 712 F. Supp. 2d at 197 ("'[c]orroboration from multiple sources also supports and inference of scienter'").  Furthermore, "engag[ing] in deliberately illegal behavior" demonstrates a strong inference of scienter.  *Novak*, 216 F.3d at 311.

There is no doubt that Lead Plaintiff has established that, by 2013, Televisa's wholly owned subsidiary, knew of the bribery scheme, through its employees, including Broadcasting Executive #1.  ¶50.  Indeed, the Torneos Information implicates "Broadcasting Executive #1" as an uncharged co-conspirator that actively participated in the bribery scheme.  *Id.*[40]  "Engag[ing] in deliberately illegal behavior" demonstrates a strong inference of scienter.  *Novak*, 216 F.3d at 311.  Although Defendants argue that the scienter of Broadcasting Executive #1 and/or Mountrigi is insufficient to establish scienter to Televisa (MTD at 40-41), courts in this District hold otherwise.  *See In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006) (imputing scienter of a subsidiary employee to the parent company).  This is particularly true, whereas here, where the subsidiary is "at the center" of the alleged fraud.[41]  *Id.*

---

in bribe and kickback payments." ¶50; *Stratte-McClure*, 776 F.3d at 106-07.  And, unlike in *Stratte-McClure*, Lead Plaintiff has pled circumstantial evidence of recklessness by Televisa and the Individual Defendants, thereby creating a strong inference of scienter.  776 F.3d at 106-07.

[40]   Defendants' reliance on *Banco Bradesco* is misguided.  MTD at 40.  It is true that the court found plaintiffs' scienter allegations lacking because they failed to allege that any employee made bribes or was aware of any bribes.  *Banco Bradesco*, 277 F. Supp. 3d at 633-34.  Here, however, that is not the case.  As alleged, the Torneos Information plainly states that Burzaco "***with the assistance of one or more representatives of [Mountrigi], including Broadcasting Executive #1, agreed to pay and did pay millions of dollars in bribe and kickback payments to Soccer Official # 1***."  ¶50.

[41]   Notably, in *Marsh*, 501 F. Supp. 2d at 483, the court expressly rejected the defendants' near identical argument relying on *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996).  MTD at 40.  Moreover, in *Chill*, the court only considered whether General Electric executives should have been on notice of a rogue bond trader's fraudulent activity.  It ***did not*** address whether the trader's scienter could be imputed to General Electric.  *Chill*, 101 F.3d 263.

- 48 -

2.      **The Complaint Adequately Alleges Individual Defendants'
Scienter**

a.      **The Misleading Statements Concerned a Core
Operation of Televisa's Business**

"To fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557 (CM), 2013 WL 6233561, at \*26 (S.D.N.Y. Dec. 2, 2013).   "Core operations include matters 'critical to the long term viability' of the company and events affecting 'a significant source of income.'" *Id.*

Here, the core operations doctrine bolsters the inference of scienter as to Defendants Azcárraga III and Folch because Defendants' misleading misstatements and omissions concerned a critical aspect of Televisa's business.  Indeed, the media rights to the World Cup were so significant to the Company's business that it enabled Televisa to both hit financial targets across its platforms during tournament years and explain away disappointing results in off years.  ¶43.  Throughout the Class Period, Defendants reiterated that the World Cup was "very important" to Televisa and an event that Televisa "ha[s] to have."  ¶¶82, 92.  In fact, it is so integral to Defendants' advertising revenue that its mere existence during tournament years becomes a part of the Company's yearly advertising plan.  ¶117.  As such, knowledge of the bribery scheme "may be imputed to [Televisa's] officers and directors."  *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 233 (S.D.N.Y. 2006); *see also Wallace v. Intralinks*, No. 11 CV 8861 (TPG), 2013 WL 1907685, at \*9 (S.D.N.Y. May 8, 2013) (fact that "CEO and CFO . . . would likely remain informed about developments with a crucial part of [the company's] business" provided "additional evidence" of scienter).

- 49 -

The inference of scienter is further strengthened by Defendant Folch's decision (*see* ¶83) to "actively communic[ate] with the public about [an] important issue" as it reveals Folch's "sensitivity to it," and supports "the inference of scienter." *Gauquie v. Albany Molecular Research, Inc.*, No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591, at *2-*3 (E.D.N.Y. July 26, 2016); *see also KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-CV-02393-MGL, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016) ("Bolstering the inference that Individual Defendants knew about these core operations are the allegations that they repeatedly spoke on these issues at conferences, on conference calls, and in press releases."). As media rights to the World Cup was a core "product" for Televisa, and Defendant Folch actively communicated to the public about the subject, Lead Plaintiff has pled circumstantial evidence supporting an inference of scienter with regard to Defendants Azcárraga III and Folch.

### b.    Azcárraga III, Folch and PwC's Resignations Further Support an Inference of Scienter

Suspicious or unusual resignations, which Lead Plaintiff has pled here, "'add to the overall pleading of circumstantial evidence of fraud.'" *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008). Literally within hours of *The New York Times* Exposé detailing the bribery scheme being published, Televisa announced that Defendants Azcárraga III and Folch, who were respectively Televisa's CEO and CFO at the time, were stepping down from their current positions. Then, shortly after PwC reported the material weakness in Defendants' deliberately designed internal control over financial reporting, Televisa announced it was parting ways with PwC. ¶¶64, 69. *See Hall*, 580 F. Supp. 2d at 233 ("[CEO's] forced resignation and Deloitte's resignation 'add to the overall pleading of circumstantial evidence of fraud.'").

The suspicious timing of these resignations contributes to a strong inference of scienter. *See, e.g.*, *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) ("[T]he resignation

- 50 -

and retirement of company insiders alleged to have been involved in the scheme . . . all contribute to the inference of scienter."); *Plumbers & Pipefitters*, 89 F. Supp. 3d at 619 (suspicious timing of resignations by CEO and CFO supported an inference of scienter); *In re Am. Bus. Fin. Servs. Noteholders Litig*., No. 05-0232, 2008 U.S. Dist. LEXIS 61450, at *9-*10 (E.D. Pa. Aug. 11, 2008) (mid-audit resignation of auditor is a red flag that raises questions "regarding [a Company's] management integrity, financial condition, controls or reporting").[42]

Defendants' "innocent" explanation for Televisa's announcement that its two most senior executives would be stepping down within hours of the publication of an incriminating article is unpersuasive.  MTD at 41.  Defendants note that Defendant Folch is the head of Televisa's cable division.  *Id.*  But Defendant Folch only assumed that position at a later date because the head of the Cable division, Lagos, was unexpectedly shot to death by his bodyguard.  ¶18.  And Defendants' argument that Defendant Azcárraga III continued to have "direct responsibility" for Club America, a professional football team in Mexico – unrelated to FIFA world tournaments – does not undercut the allegations here.  And no amount of spin can undo the timing of the announcement at the pleading stage.

Notably, the media were not fooled by Defendants' "innocent explanations" of the resignation of Defendant Azcárraga III.  For example, *La Politica Online* reported on the links between *The New York Times* Exposé and his resignation, explaining, "The New York Times relates the departure of Emilio Azcárraga from Televisa's leadership to the plot of bribery at FIFA."  ¶160.  Similarly, *Merca2.0* published an article "The Secret behind the transmission rights of the national team, the real reason for the departure of Emilio Azcárraga?"  *Id.*  Moreover, Defendants' alternative

---

[42]  *See also In re Top Tankers, Inc. Sec. Litig*., 528 F. Supp. 2d 408, 415-16 (S.D.N.Y. 2007) (finding that an auditor's resignation "over disputes . . . concerning accounting practices" contributed to "an inference that there was some deficiency in . . . internal controls, which [made] the SOX certifications more important").

- 51 -

explanation provides no answers as to why the Company's two most senior leaders announced they would be stepping down on the same day.

In addition, Defendants' Motion ignores the suspiciousness of PwC's resignation entirely, thereby conceding the strong inference of scienter.  In sum, Defendants Azcárraga III and Folch's suspicious resignations, as well as PwC's departure, further bolster the inference of scienter.

### c.   Defendants' SOX Certifications and Purposefully Weak Internal Controls Are Probative of Scienter

Defendants' failure to maintain adequate internal controls to carry out the bribery scheme is additional evidence of scienter.  In this Circuit, a "failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter."  *Veeco Instruments*, 235 F.R.D. at 232; *see also In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17 Civ. 1954 (PAC), 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018) (company's disclosure that it had material weaknesses in its internal controls was probative of scienter); *Hall*, 580 F. Supp. 2d at 233 ("[T]he Company admitted that it had material weaknesses in its internal controls – weaknesses [were] probative of scienter.").[43]

Moreover, while there was speculation in a 2016 article, Televisa not only denied any wrongdoing but Defendants Azcárraga III and Folch continued to certify the Company's internal controls.  The blatant inconsistency between assuring investors that they had designed such disclosure controls and procedures (¶¶77, 106) to ensure that their financial statements to investors were truthful, while seeking to evade liability by ignoring the failure of the Company's internal controls is probative of scienter.  *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012) (defendant's participation in designing and evaluating the internal controls is relevant to scienter); *see also In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007)

---

[43]   Defendants' citation to *Novak*, 216 F.3d at 308, is unavailing.  MTD at 42.  There, upon finding that the plaintiffs had adequately pled scienter, the court overturned the district court's ruling.

(false SOX certifications "provide evidence either that [defendant] knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate").[44]

### d.        Defendants Had Motive and Opportunity

Although Lead Plaintiff is not required to plead motive and opportunity to adequately meet the scienter standard, the Complaint sufficiently alleges Defendants' motive and opportunity. *Lockheed Martin*, 875 F. Supp. 2d at 371. As stated therein, in recent years, Televisa has faced increasing competition for advertising revenue from rapidly rising streaming services, such as Netflix. ¶40. Thus, to maintain its competitive advantage within the Spanish-speaking world, Defendants believed Televisa had to secure the exclusive broadcasting rights to the crown jewel of sporting events. *Id.* Indeed, Televisa views the World Cup as its "birthright" and "an event that *we have to have*." ¶¶5, 82. Accordingly, Televisa, with the help of Mountrigi and Torneos, quietly agreed to, and did, bribe Grondona to secure those rights. ¶45.[45] In this District, this is sufficient to plead motive at the pleading stage. *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (noting a rise in competition, the threat of not securing exclusive rights to a key product, and secret negotiations were probative of scienter in holistic analysis).

---

[44]    Lead Plaintiff anticipates that Defendants will cite *In re Take-Two Interactive Sec. Litig.*, for the position that their SOX certifications are not probative of scienter. 551 F. Supp. 2d 247 (S.D.N.Y. 2008). There, in concluding that plaintiffs failed to adequately plead scienter, the court held that "a Sarbanes-Oxley certification is probative of scienter only if the complaint alleges specific contrary information, such as 'glaring accounting irregularities or other 'red flags,' of which the certifying defendant had 'reason to know.'" *Id.* at 304-05 (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)). Here, unlike in *Take-Two*, Defendants purposefully designed their accounting system to hide irregularities and were aware of numerous red flags, such as the fact that its unknown subsidiary acquired the broadcasting rights for decades to come absent the usual public bidding process. ¶¶12, 20-29, 52.

[45]    In light of the facts pled, Defendants' argument that "[t]here is not a word in the Amended Complaint" that Televisa believed a bribe was necessary is not well-taken. MTD at 37.

Further, unlike many fraud cases, this motive to secure broadcasting rights spanning over a decade to the most widely viewed sporting event seen as the Company's "birthright" during a period of increasing competition was unique to Televisa and does not apply to corporations generally. This also gives rise to a strong inference of scienter. *In re Vivendi Universal, S.A.*, No. 02 CIV. 5571 (RJH), 2004 WL 876050, at \*8 (S.D.N.Y. Apr. 22, 2004) (finding scienter where company was motivated to "maintain" its "entertainment empire" through a fraudulent deal and "clearly distinguishable from the more general motives that have been held insufficient to support scienter").[46] Notably, in reaching its holding that a desire to maintain its entertainment empire is sufficiently unique, *Vivendi Universal* rejected the defendants' nearly identical arguments and reliance on *Chill* and *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

Moreover, Defendant Azcárraga III's position as CEO and Defendant Folch's position as CFO provided them and Televisa with an opportunity to commit fraud. *See In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 444 (S.D.N.Y. 2000) (defendants' statuses as CEO and CFO provided opportunity to commit fraud, "[a]nd where senior executives have the opportunity to commit fraud, that opportunity may fairly be imputed to the corporation as well"). Lead Plaintiff has adequately alleged Defendants' motive and opportunity to commit fraud.

## e. Defendants' Self-Serving Explanation Fails to Overcome the Strong Inference of Scienter

Defendants' argument relies on the 2017 Form 20-F's disclosure concerning a "long previous[]" investigation of some of the alleged conduct is unpersuasive. As explained above, while the Court may take judicial notice of the 2017 Form 20-F, it cannot be considered for the truth of its

---

[46]   Contrary to Defendants' assertion (MTD at 37-38), Lead Plaintiff does not need to allege a personal motive by them. *See Dekle v. Glob. Dig. Sols., Inc.*, 131 F. Supp. 3d 1280, 1287 n.4 (S.D. Ala. 2015) ("A person can intend to defraud someone else even if the direct financial beneficiary of the fraud will be that person's company, rather than the person himself or herself.").

content because "they raise[] issues of fact that should not [be] determined at the pleading stage."
*Roth*, 489 F.3d at 511.  But even if the Court were to consider the 2017 Form 20-F for the truth of its
contents – which it should not – as explained previously, this curiously worded statement is hardly
more plausible than Lead Plaintiff's allegations.  In fact, it raises even more questions.  *See* §VI.D.[47]

Further, the cases upon which Defendants rely do not undermine Lead Plaintiff's strong
inference of scienter here.  MTD at 43 (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir.
2010)).  In *Slayton*, American Express, after learning of potential improprieties, ordered an
investigation and then disclosed the unhelpful *findings* of the investigations to the market.  604 F.3d
at 777.  Here, on the other hand, apparently Defendants did *not* order an internal investigation
regarding the 2018 and 2022 World Cups or the internal control deficiencies.  Moreover, it is
reasonable to infer that Defendants did *not* order an investigation after Torneos's former CEO
Burzaco or Torneos employee Rodriguez's testimony.  Thus, rather than suggest Defendants
diligently and swiftly took action in response to credible accusations of fraud, Defendants ignored
the allegations and cited a "long pervious[]" investigation to falsely reassure the market.  Further,
unlike in *Slayton*, Lead Plaintiff has alleged that Defendants had a motive to commit fraud.  *Slayton*,
604 F.3d at 776; ¶¶5, 40, 45, 82.  Lastly, unlike in *Slayton*, here, Lead Plaintiff did not rely on the
internal investigation to establish scienter.[48]  Indeed, while the plaintiffs in *Slayton* were entitled to

---

[47]   Further, courts find plaintiffs have adequately pled scienter where defendants have asserted an
investigation has "absolved" them.  *See, e.g.*, *Batwin*, 2008 U.S. Dist. LEXIS 52365, at *38-*39 n.7
(finding strong inference of scienter under the Exchange Act despite the fact that the "Audit
Committee concluded that the restatement did not result from fraud"); *Henning*, 2011 WL 2909322,
at *7 (denying motion to dismiss where defendants' "self-serving" investigation "given that
defendants' outside counsel and advisor failed to publish any statement setting forth their own,
independent conclusions").  Similarly, here, Defendants have pointed to no publication from outside
counsel regarding their "independent conclusions."

[48]   Defendants' reliance on *In re Inv. Tech. Grp., Inc. Sec. Litig.*, No. 15 CIV. 6369 (JFK), 2018 WL
1449206, at *6 (S.D.N.Y. Mar. 23, 2018), fails for the same reason.  *See* MTD at 44.

have the existence of the internal investigation presumed to be true on the motion to dismiss, here, the Court should not presume the truth of the contents of the 2017 Form 20-F.

Lead Plaintiff has pled a strong inference of scienter as to Defendants Azcárraga III, Folch and Televisa through criminal testimony, criminal documents and loads of circumstantial evidence.

### G.  Control Person Liability

For control person liability under Section 20(a), "'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).  "'[A]llegations of control are not averments of fraud and therefore need not be pleaded with particularity under Rule 9(b) or the PSLRA.  They need satisfy only the less stringent requirements of [Rule] 8.'"  *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 310 (S.D.N.Y. 2013).

Defendants' only argument is that Lead Plaintiff has failed to adequately allege a primary violation by Televisa or plead scienter as to the Individual Defendants.  MTD at 44-45.  As Lead Plaintiff has, in fact, adequately alleged a primary violation by Televisa and pled scienter as to the Individual Defendants as explained herein, Lead Plaintiff respectfully submits that the Court should likewise find it has adequately pled control person liability.

### H.  Alternatively, Lead Plaintiff Requests an Opportunity to Amend

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.  If, however, the Court finds the Complaint lacking in any way, Lead Plaintiff should have an opportunity to amend.  *See Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead.")*; see also Loreley Fin. (Jersey) No. 3 Ltd.*

*v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("[w]ithout the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies"); *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) ("When a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.'"); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend."). This is the first time the Court has considered the substance of Lead Plaintiff's pleadings, and it appears that the criminal and civil investigations concerning FIFA corruption is ongoing. ¶¶48, 128. Accordingly, Lead Plaintiff should be granted an opportunity to amend should the Court find that the allegations of the Complaint are inadequate in any material aspect.

## VII.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied. If, however, the Court finds the allegations of the Complaint lacking in any way, Lead Plaintiff should have an opportunity to amend and would respectfully request forty-five (45) days to do so.

DATED:  November 16, 2018                  Respectfully submitted,

                                           ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                           JONAH H. GOLDSTEIN
                                           RACHEL L. JENSEN
                                           RACHEL A. COCALIS


                                                 s/ Rachel L. Jensen
                                           ————————————————————————
                                                 RACHEL L. JENSEN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jonahg@rgrdlaw.com
rachelj@rgrdlaw.com
rcocalis@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

Lead Counsel for Plaintiff

1503398_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on November 16, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Rachel L. Jensen
RACHEL L. JENSEN

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  rachelj@rgrdlaw.com

1503398_1

# Mailing Information for a Case 1:18-cv-01979-LLS In re Grupo Televisa Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David B. Anders**
  dbanders@wlrk.com,calert@wlrk.com

- **Rachel Cocalis**
  rcocalis@rgrdlaw.com

- **Ben M. Germana**
  bmgermana@wlrk.com,CAlert@wlrk.com

- **Jonah H. Goldstein**
  jonahg@rgrdlaw.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Rachel L. Jensen**
  rachelj@rgrdlaw.com,rcocalis@rgrdlaw.com,michelew@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,2879289420@filings.docketbird.com,e_file_sd@rgrdlaw.com

- **Herbert M Wachtell**
  HMWachtell@wlrk.com,CAlert@wlrk.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`