# ORIGINAL

DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/25/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

In re GRUPO TELEVISA SECURITIES
LITIGATION

18 Civ. 1979 (LLS)

OPINION & ORDER

- - - - - - - - - - - - - - - - - -X

In this securities class action, defendants Grupo Televisa,
S.A.B. ("Televisa"), Emilio Fernando Azcárraga Jean III
("Azcárraga"), and Salvi Rafael Folch Viadero ("Folch") move to
dismiss the Amended Complaint for Violation of the Federal
Securities Laws (Dkt. No. 32) (the "complaint") under Federal
Rules of Civil Procedure 12(b)(6) and 9(b) and the Private
Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.
For the following reasons, the motion (Dkt. No. 37) is denied.

## BACKGROUND[1]

### *Parties*

Lead plaintiff is the College of Applied Arts & Technology
Pension Plan, a pension plan that purchased 146,400 Televisa
American Depository Receipts ("ADRs") and has suffered nearly a
million dollars in losses due to defendants' alleged misconduct.

---

[1] The factual background is derived from the allegations in the complaint,
which the Court must accept as true in considering defendants' motion to
dismiss. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

-1-

Defendants are Televisa - a multinational media conglomerate based in Mexico, and two of its executives, Azcárraga and Folch. Azcárraga is Televisa's former CEO, and its current controlling shareholder and executive chairman. Folch is Televisa's former CFO, and currently serves as head of its cable division and on the board of directors.

Televisa is the largest mass media company in the Spanish-speaking world. Its media business includes television production and broadcasting, programming, direct-to-home satellite services, publishing and publishing distribution, cable television, radio production, show business, feature films, and Internet portals. It has long touted its coveted broadcasting rights to the World Cup, stating that they are "crucial" to "the company's competitive position." Those rights have enabled Televisa to hit financial targets across its platforms during tournament years and explain away disappointing results in off years.

## Claims

Lead plaintiff asserts two claims: one for a violation of § 10(b) of the Exchange Act and Rule 10b-5, and one for violation of § 20(a) of the Exchange Act (control person liability).

## *FIFA Bribery Scheme*

This case arises out of a sprawling investigation into bribery and corruption involving broadcast rights to several World Cup soccer matches granted by the Fédération Internationale de Football Association ("FIFA"). The complaint alleges that Televisa participated in the bribery scheme by using its wholly owned Swiss subsidiary, Mountrigi Management Group Ltd. ("Mountrigi") to bribe FIFA officials in exchange for broadcasting rights to the 2018, 2022, 2016, and 2030 FIFA World Cup tournaments. It further alleges that Televisa's internal controls over financial reporting were so inadequately designed that Televisa was able to avoid publicly disclosing the payments to FIFA, and that Azcárraga and Folch knew or recklessly disregarded that millions of dollars were being misspent.

The wide-ranging FIFA corruption probe became public in 2015, when Swiss officers arrested six FIFA officials gathered at a hotel in Zurich for an annual meeting. Since then, at least two dozen individuals and entities have been indicted by United States authorities in connection with the investigation. Several people have pled guilty or been convicted of related crimes, as recently as July 2018.

One of the people who pled guilty to crimes relating to the investigation was Alejandro Burzaco ("Burzaco"), the former CEO

of Torneos y Competencias SA ("Torneos"), an Argentine marketing company. Burzaco pled guilty on November 16, 2015 in United States v. Juan Ángel Napout, et al., No. 15 Cr. 252 (PKC) (E.D.N.Y. Nov. 16, 2015).

On December 13, 2016, Torneos entered into a deferred prosecution agreement with the United States in United States v. Torneos y Competencias S.A., No 16 Cr. 634 (PKC) (E.D.N.Y. Dec. 13, 2016). In the criminal information filed in Torneos that day, the government referred to Mountrigi as "Broadcasting Company Affiliate A, an affiliate of a major broadcasting company headquartered in Latin America, which obtained from FIFA rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup in certain territories in Latin America." Torneos, Information (Dkt. No. 9).

On October 27, 2017, as the result of newspaper reports of developments in the investigation, the price of Televisa ADRs dropped 5.6% ($1.34 per share), to close at $22.54 per share.

The Napout case went to trial in November 2017, with Burzaco testifying for the prosecution.[2] Burzaco testified that, in early 2013, he met with Julio Humberto Grondona (an Argentine FIFA official) to secure broadcasting rights for the 2026 and

---

[2] At the conclusion of the trial, José Maria Marin and Juan Ángel Napout were convicted.

-4-

2030 World Cup tournaments on behalf of Torneos, Televisa, and

Teleglobo, and that they agreed to pay $15 million in bribes to

Grondona. He testified that Televisa paid bribes in exchange

for broadcasting rights:

> Q    Have you ever worked in partnership with other sports
>      media marketing companies?
>
> A    Yes, sir.
>
> Q    What are some examples of companies you worked with?
>
> A    We had many partners in different parts of the world,
>      such as Fox Sports in the U.S.; Televisa from Mexico;
>      Media Pro from Spain; TV Globo from Brazil; Full Play
>      from Buenos Aires, Argentina; Traffic, which is based
>      in Brazil, but was with a branch in Miami.
>
>      We were partners with Grupo Clarin in Argentina. We
>      had many partners and many different joint ventures in
>      many parts of the world.
>
>      THE COURT:    Just for the record, Clarin is spelled
>      - C-L-A-R-I-N; is that correct?
>
>      THE WITNESS:    That's Correct.
>
>      THE COURT:    Okay.
>
> Q    To your knowledge, which, if any of those companies,
>      was involved in paying bribes to secure contracts for
>      media rights to soccer?
>
> A    To my knowledge, with exception of Clarin, all of the
>      companies.

Napout, Trial Tr. at 488:19-489:20 (Nov. 14, 2017). The

following day, Burzaco named Televisa again:

> Q    Did you have other business to tend to while you were
>      in Zurich?

A    Yes, sir.

Q    What business was that?

A    I was in Zurich and Torneos was in an alliance with
     Teleglobo from Brazil and Televisa from Mexico, the
     Montinea (phonetic) Group from Mexico, seeking to
     acquire from FIFA the TV and internet and radio rights
     for World Cup 2026 and FIFA World Cup 2030, for
     exclusivity and for the territories of Brazil in the
     case of Teleglobo and Latin America, for the case of
     Televisa, Torneos partnership.

Q    Were you and your partners able to acquire those
     rights?

A    Yes, sir.

Q    And what agreement, if any, was reached in connection
     with the payment of bribes for those rights?

A    Among the three partners, we made an agreement to
     distribute the burden of paying $15 million in bribes.

Q    To whom?

A    To Julio Grondona.

Q    And when you say you and your partners which partners
     are you referring to?

A    Teleglobo from Brazil and Televisa from Mexico.

Q    Were $15 million, in fact, paid to Julio Grondona?

A    Yes, sir.

Q    And where did the money end up for Julio Grondona?

A    The money for Julio Grondona ended up in a sub-account
     at a Swiss bank in name of Julius Berg.

Napout, Trial Tr. at 488:19-489:20 (Nov. 15, 2017).

-6-

The Napout court later received in evidence a Torneos
ledger of payment receipts which indicated that Mountrigi made a
$7.25 million payment to Torneos on April 5, 2013, with the
notation "Cobro Mundial 2026/30 de Mountrigi Management Group
LTD."[3]  The ledger entry reflected that Mountrigi's $7.25 million
payment was transferred from a Swiss bank account at Julius Baer
to a sub-account maintained for Grondona's benefit.  Eladio
Rodriguez, a former Torneos employee who maintained the ledger,
testified that heading of the ledger document was "Iluminados,"
which "means bribes," Napout, Trial Tr. at 2170:13-18 (Nov. 29,
2017), and that the ledger included "legitimate payments and
transactions" in addition to bribes, id. at 2173:19-21.

On November 14, 2017, upon news that Televisa was named in
the Napout trial as a participant in the FIFA bribery scheme,
the price of Televisa ADRs dropped 2.4%, to close at $19.50 per
share.

---

[3] An English translation is "World Cup 2026/30 from Mountrigi Management Group
LTD."

## *Televisa's Reporting and Internal Controls*

*False or Misleading Statements*

The complaint alleges that defendants made false and

misleading statements in Televisa's SEC filings, earnings calls,

and other public statements.

**Form 20-F Filings.** Televisa did not make certain required

disclosures in their Form 20-F filings for 2012 through 2017.

In the Form 20-F filings for each of those years, Azcárraga and

Folch guaranteed that Televisa's internal controls over

financial reporting were effective:

> Based on the evaluation as of December 31, 2012, the
> Chief Executive Officer and the Chief Financial
> Officer of the Company have concluded that the
> Company's disclosure controls and procedures (as
> defined in the Exchange Act Rules 13a-15(e) and 15d-
> 15(e)) are effective to ensure that the information
> required to be disclosed by the Company in the reports
> that it files or submits under the Securities Exchange
> Act of 1934 is recorded, processed, summarized and
> reported within the time periods specified in the SEC
> rules and forms and that such information is
> accumulated and communicated to management, including
> our Chief Executive Officer and the Chief Financial
> Officer, as appropriate to allow timely decisions
> regarding required disclosure.

> \* \* \*

> Management assessed the effectiveness of the Company's
> internal control over financial reporting as of
> December 31, 2012. In making this assessment,
> management used the criteria established in Internal
> Control - Integrated Framework issued by the Committee

-8-

of Sponsoring Organizations of the Treadway Commission (COSO).

Based on this assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2012.

See, e.g., Televisa Annual Report (Form 20-F), at 116 (Apr. 11, 2013).

Azcárraga signed the Form 20-F on Televisa's behalf, and Azcárraga and Folch signed certifications pursuant to the Sarbanes-Oxley Act of 2002, in which they attested that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that they had "Designed such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision." Certifications of Chief Executive Officer and Chief Financial Officer. The statements regarding Televisa's business operations and internal controls did not disclose that Televisa's internal controls were so inadequately designed or inefficient that Televisa and Mountrigi employees were able to engage in an unlawful bribery scheme.

**Earnings Conference Calls.** Televisa executives boasted about the company's World Cup broadcasting rights during quarterly earnings conference calls between 2013 and 2017. For example, during Televisa's Q4 2012 Earnings Conference Call on February 26, 2013, Televisa's then-Executive Vice President, Alfonso de Angoitia, reported that "we also will transmit many matches of the World Cup, also on an exclusive basis." Am. Compl. ¶ 74. During the April 26, 2013 earnings call, de Angoitia assured investors that, despite increasing competition for sports content, "we hold the rights to the next three soccer World Cup's that are extremely relevant for Mexico." Id. ¶ 80. None of those statements indicated that Televisa obtained any of the World Cup broadcasting rights through bribery.

**Other Public Statement.** On November 15, 2017, after Burzaco testified in Napout, a Televisa spokesperson, Alejandro Olmos, stated that "Grupo Televisa in no way knew of, or condoned, any bribe or other improper conduct." Id. ¶ 118.

**Code of Ethics.** Televisa adopted a code of ethics, which provides, "Every person must act in accordance with this Code and with the applicable laws in Mexico and in any other jurisdictions in which the Group carries out activities." Code of Ethics, at 1. Ironically, the code adjures (at pp. 7-8):

We wish to succeed based on our merits, and not because we have paid or given something of value illegally to someone in order to obtain some favor or advantage. Likewise, personnel shall not acquire any type of commitment to attempt to obtain, receive or accept, directly or indirectly, any bribe, coercion or other payment or benefit from any employee or agent of current or potential suppliers, clients, lessors, lessees, competitors or other persons or entities related with the Group.

The code provides that "compliance with its content is mandatory" and that, "Upon receiving this Code of Ethics, the Board members, officers and employees of the Group will sign the attached Adherence Letter, as evidence of their acceptance and commitment to respect its content, and shall deliver such Letter to the Human Resources area." Code of Ethics, at preamble, 4 (June 2012). It also provides that "high-ranking executives of the Group shall bi-annually renew their acceptance and commitment with the contents of this Code." Id. at 4.

In its Form 20-F filings, Televisa stated that it had "adopted a written code of ethics that applies to all our employees." See, e.g., Televisa Annual Report (Form 20-F), at 117 (Apr. 11, 2013). Televisa's 2016 Annual Sustainability Report also stated, "In Grupo Televisa we have a Code of Ethics which objective is to guide and regulate the behavior of the directors, executives and employees, including all of the

corresponding divisions and subsidiaries." Grupo Televisa 2016
Sustainability Report, at 32.

## Televisa's Admissions

On January 26, 2018, Televisa admitted in a Form 6-K that
there were material weaknesses in its internal controls over
financial reporting, and that its 2016 Form 20-F should no
longer be relied upon:

Grupo Televisa, S.A.B. ("Televisa" or the "Company";
NYSE:TV; BMV:TLEVISA CPO) is furnishing this Current
Report on Form 6-K to disclose that the Company's
management, in consultation with the Audit Committee
of the Company's board and after discussions with
PricewaterhouseCoopers, S.C. ("PwC"), the Company's
independent registered public accounting firm, has
concluded that certain material weaknesses in the
Company's internal control over financial reporting
existed as of December 31, 2016. As a result, the
report of management on the effectiveness of the
Company's internal control over financial reporting,
our conclusion regarding the effectiveness of
disclosure controls or procedures, and PwC's audit
report (each included in the Company's Annual Report
on Form 20-F for the year ended December 31, 2016)
should no longer be relied upon for the reasons
described below.

The material weaknesses in the Company's internal
control over financial reporting related to (i) the
design and maintenance of effective controls over
certain information technology controls which support
systems that are relevant to the provisioning,
updating and deleting of users' access to those
systems, the periodic review of users' access to these
systems, developers' access to certain of these
systems and appropriate segregation of duties;
(ii) the design and maintenance of effective controls
over segregation of duties within the accounting

-12-

system, including certain individuals with the ability
to gain access to prepare and post journal entries
across substantially all key accounts of the Company
without an independent review performed by someone
other than the preparer; and (iii) ineffective
controls with respect to the accounting for certain
revenue and related accounts receivable in our cable
companies and content division.

Televisa Report of Foreign Issuer (Form 6-K), at 2

(Jan. 26, 2018).

In response to that news, the price of Televisa ADRs

dropped 1.4%, to close at $20.66 per share on January 26, 2018.

On April 30, 2018, Televisa filed its 2017 Form 20-F, which

stated that "none of these weaknesses resulted in improper

activities or inaccuracies in or adjustments to our previously

filed financial statements." Televisa Annual Report (Form 20-

F), at 25 (Apr. 30, 2018). It also discussed this action:

With regard to plaintiff's allegations regarding FIFA,
outside counsel long previously investigated the
circumstances surrounding Televisa's acquisition of
the Latin American media rights for the 2026 and 2030
FIFA World Cups and uncovered no credible evidence
that would form the basis for liability for Televisa
or for any executive, employee, agent or subsidiary
thereof. In particular, Televisa itself made no
payment to any FIFA person and in no way knew of, or
condoned, any payment by any third party to any FIFA
person.

Id. at 137.

On July 10, 2018, Televisa filed a Form 6-K announcing that

it accepted its audit committee's recommendation to terminate

-13-

PwC as its auditor and replace it with KPMG Cárdenas Dosal, S.C. Televisa Report of Foreign Issuer (Form 6-K), at 2 (July 10, 2018).

## DISCUSSION

### *Particularity*

The PSLRA provides that, for a plaintiff bringing a private securities fraud action:

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1)(B). "Thus, plaintiffs asserting claims under Rule 10b-5 'must do more than say that the statements ... were false and misleading; they must demonstrate with specificity why and how that is so.'" Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 235-36 (2d Cir. 2014) (quoting Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (omission in original). A complaint based on misstatements must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns,

Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007)
(citation omitted). Where the alleged bribery scheme forms part
of the circumstances constituting fraud, the facts of the
bribery scheme must be pleaded with particularity. See, e.g.,
In re Banco Bradesco S.A. Sec. Litig., 277 F. Supp. 3d 600, 632
(S.D.N.Y. 2017) ("As part of the 'circumstances constituting
fraud,' see Fed. R. Civ. P. 9(b), such schemes must be pleaded
with particularity.").

## Bribery

Lead plaintiff points to specific evidence admitted in the
Napout trial[4] that directly implicated Televisa in the bribery
scheme. The complaint discusses Burzaco's sworn testimony that
in March 2013 in Zurich, Burzaco, "Televisa from Mexico," and
two other partners "made an agreement to distribute the burden
of paying $15 million in bribes" in exchange for the broadcast
rights to the 2026 and 2030 World Cups. Burzaco testified that
the $15 million was paid to Grondona, and that the money for
Grondona was deposited in a sub-account at a Swiss bank. He
also identified Televisa as a company that was involved in
paying bribes to secure contracts for media rights to soccer.

---

[4] The complaint relies heavily on Burzaco's testimony and the ledger exhibit
in the Napout trial. Those documents are integral to the complaint and may
be judicially noticed.

-15-

The complaint also refers to the ledger exhibit admitted in the Napout trial that corroborated Burzaco's testimony. The ledger reflected that in April 2013, Mountrigi (Televisa's wholly owned subsidiary) made a $7.25 million payment to Torneos with the annotation that it was made for the 2026 and 2030 World Cups. The complaint's allegations of the bribery scheme are stated with sufficient precision: they identify who (a representative from Televisa), what (distributing the burden of paying $15 million in bribes to Grondona), when (March and April 2013), where (Zurich), and how (Mountrigi transmitting $7.25 million to a sub-account for Grondona's benefit at Julius Baer, the Swiss Bank). Those allegations are sufficiently particularized, unlike those at issue in In re Banco Bradesco S.A. Sec. Litig., 277 F. Supp. 3d 600, 632-33 (S.D.N.Y. 2017).

## False or Misleading Statements

Likewise, the complaint pleads with particularity facts about defendants' false or misleading statements concerning Televisa's World Cup rights and internal controls. It alleges that defendants made misleading statements in earnings calls, public statements, and SEC filings.

First, it alleges that Televisa representatives like de Angoitia made statements during earnings calls such as "we hold

-16-

the rights to the next three soccer World Cup's that are extremely relevant for Mexico," which implied that Televisa obtained its valuable World Cup broadcasting rights legally. Second, it alleges that Olmos, a Televisa spokesperson, insisted after Burzaco's testimony in Napout that "Grupo Televisa in no way knew of, or condoned, any bribe or other improper conduct," which may be proved to be factually false.

The complaint also pleads with particularity facts about Televisa's internal controls which, when viewed in the context of the complaint's other allegations, state a claim that the weak internal controls hid the bribery scheme until PwC discovered the skimming scheme in late 2017 after the Napout trial testimony and ledgers came to light. Televisa's Form 20-F filings and accompanying Sarbanes-Oxley certifications stated that the company's internal controls were adequate, despite – what its subsequent disclosure revealed – PwC's conclusion that "certain material weaknesses in the Company's internal control over financial reporting existed as of December 31, 2016." Although Televisa asserted in its 2017 Form 20-F that the material weaknesses did not result "in improper activities or inaccuracies in or adjustments to our previously filed financial statements," the complaint's remaining factual allegations are

-17-

nevertheless particularized enough to allege that Televisa's statements were misleading.

Misstatements made in its certifications concerning the design and efficacy of internal controls are actionable. See Petrobas, 116 F. Supp. 3d 368, 380-81 (S.D.N.Y. 2015) (allegations that "the Company's management was professing its opinion that the company's internal controls were effective, that same management was well aware of the extensive corruption in the Company's procurement activities . . . are sufficient to infer that the Company disbelieved the alleged statements at the time they were made"). The complaint alleges that the internal control deficiencies could only have resulted from deliberate design, and not from oversight, incompetence, or mistake. It alleges further that Televisa's suspension of internal controls allowed it to employ a "skimming" scheme to pay bribes, a process by which cash would be removed from Televisa before it entered the accounting system. Am. Compl. ¶ 25.

## Duty to Disclose and Materiality

The complaint adequately alleges that Televisa's failure to disclose the payment of bribes to FIFA officials rendered the statements discussed above misleading.

Televisa, through its representatives, made statements that "Grupo Televisa in no way knew of, or condoned, any bribe or other improper conduct," and that "we hold the rights to the next three soccer World Cup's that are extremely relevant for Mexico." Even if Televisa was not otherwise obligated to disclose that it or its subsidiary participated in bribing FIFA officials, speaking about the issue imposed a duty to do so. See Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

Statements concerning the price paid for a product are materially misleading where the bribery scheme "would have called into question whether Braskem's [the company's] ability to secure favorable pricing in the future was durable and due to a legitimate competitive advantage, or whether-like all illegal arrangements-it was legally unenforceable and subject to abrupt termination." In re Braskem Sec. Litig., 246 F. Supp. 3d 731, 760 (S.D.N.Y. Mar. 30, 2017). If the revenue generated by the World Cup broadcasting rights was partly attributable to bribery, Televisa's statements about its World Cup broadcasting rights were plausibly materially misleading. Because those statements "put its source of revenue at issue," they "gave rise

-19-

to Section 10(b) liability because the company failed to disclose the illegal conduct that generated the revenue." In re Virtus Inv, Partners Inc. Sec Litig., 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016).

Defendants also claim that participation in "a single commercial bribe" would be immaterial to a reasonable investor. Even if a reasonable investor did not consider $7.25 million a large sum, participation in the years-long bribery scheme is material because it exposed Televisa to potential civil and criminal liability, and imperiled its advertising revenue.

## Code of Ethics

The representations made in Televisa's code of ethics are actionable as well. "While generalized, open-ended or aspirational statements do not give rise to securities fraud (as mere puffery), statements contained in a code of conduct are actionable where they are directly at odds with the conduct alleged in a complaint." In re Signet Jewelers Ltd. Sec. Litig., No. 16 Civ. 6728 (CM), 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) (citation omitted). As the court held in In re Electrobras Sec. Litig., "when (as here alleged) the statements were made repeatedly in an effort to reassure the investing about the Company's integrity, a reasonable investor could rely

-20-

on them as reflective of the true state of affairs at the
Company." 245 F. Supp. 3d 450, 464 (S.D.N.Y. 2015).
Defendants' numerous statements here proclaimed the concrete
steps Televisa was taking to ensure that its executives and
employees did not violate the prohibition on bribery: it
required board members and employees to sign and deliver to
human resources an adherence letter, and to renew their
acceptance of the code twice a year.

## *Scienter*

The complaint pleads facts that give rise to a cogent
inference that Televisa acted with scienter in making false and
misleading statements regarding its participation in the FIFA
bribery scheme. Burzaco's testimony that Televisa agreed to and
bribed Grondona is corroborated by the Torneos ledger, which
shows that Mountrigi made a $7.25 million payment for the 2026
and 2030 World Cup rights in a bank sub-account dedicated to
Grondona. It is also corroborated by the criminal information
filed in the Torneos case, which refers to Mountrigi as
"Broadcasting Company Affiliate A" and alleges that it paid
millions of dollars in bribes and kickbacks to a high-ranking
FIFA official. Am. Compl. ¶ 50. Engaging in deliberately

illegal behavior, as well as admitting that there are material weaknesses in internal reporting, is probative of scienter.

Moreover, a subsidiary's (Mountrigi's) scienter may be imputed to the parent company (Televisa), particularly where the subsidiary is at the center of the alleged fraud. See In re Marsh & Mclennan Companies, Inc. Sec. Litig., 501 F. Supp. 2d 452, 482-83 (S.D.N.Y. 2006) (finding that plaintiffs adequately pleaded scienter where they "allege MMC's [the parent company's] awareness, reckless disregard, and complicity in the misbehavior at Marsh [the subsidiary]").

Televisa's disclosure of a purported internal investigation does tend "to seriously undermine" the inference of scienter. Slayton v. Am. Express Co., 604 F.3d 758, 777 (2d Cir. 2010), but it does not explain the documents cited by the complaint, such as the Napout trial testimony, which does support the inference that Azcárraga, Folch, and Televisa knew about the bribes.

## *Control Person Liability*

"To state a claim of control person liability under § 20(a), 'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful

-22-

sense, a culpable participant in the controlled person's fraud.'" Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (quoting ATSI Commc'ns, Inc., 493 F.3d at 108).

Lead plaintiff has adequately alleged (1) a primary violation by Televisa, (2) control of Televisa by Azcárraga (CEO) and Folch (CFO), and (3) scienter of Azcárraga and Folch. Thus, it has sufficiently pled control person liability.

## CONCLUSION

Defendants' motion to dismiss the complaint (Dkt. No. 37) is denied.

So ordered.

Dated: New York, New York
March 25, 2019

*Louis L. Stanton*
LOUIS L. STANTON
U.S.D.J.