UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  | x |  |
|---|---|---|
| In re GRUPO TELEVISA SECURITIES LITIGATION | : | Civil Action No. 1:18-cv-01979-LLS |
|  | : |  |
|  | : | CLASS ACTION |
|  | : |  |
| This Document Relates To: | : | MEMORANDUM OF LAW IN SUPPORT |
|  | : | OF LEAD PLAINTIFF'S MOTION FOR |
| ALL ACTIONS. | : | CLASS CERTIFICATION |
|  | x |  |

4841-8479-7098.v1

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ...........................................................................................................1

II.     STATEMENT OF FACTS COMMON TO THE CLASS ..............................................2

III.    PROCEDURAL HISTORY.............................................................................................5

IV.     ARGUMENT ..................................................................................................................7

        A.      Applicable Legal Standards for Class Certification...............................................7

        B.      The Proposed Class Satisfies the Standards for Class Certification Under
                Rule 23 ...................................................................................................................8

                1.      The Proposed Class Meets the Requirements of Rule 23(a).......................8

                        a.      The Class Members Are so Numerous that Joinder Is
                                Impracticable..................................................................................8

                        b.      Common Questions of Law and Fact Exist ....................................9

                        c.      Lead Plaintiff's Claims Are Typical of the Class ..........................10

                        d.      Lead Plaintiff and Lead Counsel Will Continue to
                                Adequately Represent the Interests of the Class...........................11

                2.      The Proposed Class Meets the Requirements of Rule 23(b)(3)................13

                        a.      Common Questions of Law and Fact Predominate ......................13

                                (1)     The *Basic* Presumption Applies.........................................15

                                        (i)     Televisa ADRs Experienced a High Weekly
                                                Trading Volume ....................................................17

                                        (ii)    Numerous Financial Analysts Covered
                                                Televisa During the Class Period...........................18

                                        (iii)   Televisa Had Market Makers and
                                                Significant Institutional Holdings ..........................19

                                        (iv)    Televisa Was Eligible to File Form F-3
                                                During the Class Period ........................................19

**Page**

(v)     The Price of Televisa ADRs Reacted to New Company-Specific Information During the Class Period .........................................................20

(vi)    Televisa Had a High Market Capitalization During the Class Period ........................................21

(vii)   Televisa ADRs Were Subject to a Narrow Bid-Ask Spread During the Class Period .............21

(viii)  100% of Televisa ADRs Were Held by Public Investors During the Class Period .............22

(2)    The *Affiliated Ute* Presumption Applies ...........................22

(3)    Damages Will Be Calculated on a Class-Wide Basis ........23

b.    A Class Action Is Superior to Other Methods of Adjudication.....................................................................................24

C.    Robbins Geller Should Be Appointed as Class Counsel ......................................26

V.    CONCLUSION.................................................................................................26

4841-8479-7098.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Affiliated Ute Citizens v. United States*,
 406 U.S. 128 (1972)....................................................................................................14, 22, 23

*Amchem Prods. Inc. v. Windsor*,
 521 U.S. 591 (1997).........................................................................................................1, 7, 13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013)........................................................................................................14, 15, 23

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)...................................................................................................14, 15, 16, 22

*Billhofer v. Flamel Techs., S.A.*,
 281 F.R.D. 150 (S.D.N.Y. 2012) ......................................................................................16, 18

*Cammer v. Bloom*,
 711 F. Supp. 1264 (D.N.J. 1989) ...........................................................................16, 17, 20, 22

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
 310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................................12, 18, 26

*City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*,
 No. 12 Civ. 0256 (LAK) (AJP), 2017 WL 3608298
 (S.D.N.Y. Aug. 22, 2017) ...........................................................................................9, 11, 14

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013).........................................................................................................................24

*Consol. Rail Corp. v. Town of Hyde Park*,
 47 F.3d 473 (2d Cir. 1995)............................................................................................................8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 563 U.S. 804 (2011)........................................................................................................14, 15, 23

*Gruber v. Gilbertson*,
 No. 16cv9727, 2019 WL 4439415
 (S.D.N.Y. Sept. 17, 2019) .................................................................................... *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014)...........................................................................................................14, 15

*In re Alstom SA Sec. Litig.*,
 253 F.R.D. 266 (S.D.N.Y. 2008) ...........................................................................................19

- iii -

**Page**

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret.*
  *Income Sec. Act (ERISA) Litig.*,
  281 F.R.D. 134 (S.D.N.Y. 2012) ........................................................................11

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) .....................................................................11, 24

*In re DVI Inc. Sec. Litig.*,
  249 F.R.D. 196 (E.D. Pa. 2008),
  *aff'd*, 639 F.3d 623 (3d Cir. 2011) ..................................................................18

*In re DVI Inc. Sec. Litig.*,
  639 F.3d 623 (3d Cir. 2011) ...............................................................................16

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  312 F.R.D. 332 (S.D.N.Y. 2015) ......................................................................7, 8

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) .................................................................................12

*In re JPMorgan Chase & Co. Sec. Litig.*,
  No. 12 Civ. 03852 (GBD), 2015 WL 10433433
  (S.D.N.Y. Sept. 29, 2015) ......................................................................13, 16, 24

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
  310 F.R.D. 230 (S.D.N.Y. 2015) .......................................................................25

*In re NYSE Specialists Sec. Litig.*,
  260 F.R.D. 55 (S.D.N.Y. 2009) ...........................................................................9

*In re Petrobras Sec. Litig.*,
  862 F.3d 250 (2d Cir. 2017) .....................................................................7, 13, 16

*In re SCOR Holding (Switz.) AG Litig.*,
  537 F. Supp. 2d 556 (S.D.N.Y. 2008) ................................................................26

*In re Signet Jewelers Ltd. Sec. Litig.*,
  No. 16 Civ. 6728 (CM), 2019 WL 3001084
  (S.D.N.Y. July 10, 2019) .............................................................................. *passim*

*In re Smith Barney Transfer Agent Litig.*,
  290 F.R.D. 42 (S.D.N.Y. 2013) .........................................................................23

- iv -

**Page**

*In re SunEdison, Inc. Sec. Litig.*,
    329 F.R.D. 124 (S.D.N.Y. 2019) ......................................................................14, 25

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    No. 15cv1249, 2017 WL 2062985
    (S.D.N.Y. May 15, 2017).....................................................................................1, 7, 10

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001).......................................................................................8

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016).....................................................................................21

*In re Vivendi Universal, S.A. Sec. Litig.*,
    242 F.R.D. 76 (S.D.N.Y. 2007),
    *aff'd*, 838 F.3d 223(2d Cir. 2016) ..........................................................................25

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) .......................................................17, 18, 19, 20

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .....................................................16, 17, 20, 22

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) ...........................................................................25

*Levin v. Res. Capital Corp.*,
    No. 1:15-cv-07081-LLS,
    slip op. (S.D.N.Y. Nov. 22, 2017) ...........................................................................7

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014).................................................................17, 21

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    328 F.R.D. 86 (S.D.N.Y. 2018) .............................................................................20

*Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) .............................................................................11

*Ret. Sys. v. Morgan Stanley & Co., Inc.*,
    772 F.3d 111 (2d Cir. 2014).......................................................................................9

*Ret. Sys. v. Sonoco Prods. Co.*,
    270 F.R.D. 247 (D.S.C. 2010) ................................................................................18

- v -

**Page**

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)..............................................................................23, 24

*Shelter Realty Corp. v. Allied Maint. Corp.*,
    574 F.2d 656 (2d Cir. 1978)....................................................................................2

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016),
    *aff'd sub nom. Waggoner*, 875 F.3d 79 (2d Cir. 2017).........................................16

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008)....................................................................................7

*Tyson Foods, Inc. v. Bouaphakeo*,
    __ U.S. __, 136 S. Ct. 1036 (2016)........................................................................9

*Villella v. Chem. and Mining Co. of Chile Inc.*,
    No. 15 Civ. 2106 (ER), 2019 WL 4631530
    (S.D.N.Y. Sept. 24, 2019).....................................................................................20

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017),
    *cert. denied*, __ U.S. __, 138 S. Ct. 1702 (2018)........................................ *passim*

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) ......................................................................8, 24

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78a.................................................................................................... *passim*
    §78j(b) ...............................................................................................5, 11
    §78t(a).................................................................................................. *passim*
    §78u-4 ................................................................................................5, 11

**Page**

Federal Rules of Civil Procedure

    Rule 23 ...................................................................................................2, 7, 8

    Rule 23(a) ................................................................................................ *passim*

    Rule 23(a)(1) ....................................................................................................8

    Rule 23(a)(2) ....................................................................................................9

    Rule 23(a)(3) ..................................................................................................10

    Rule 23(a)(4) ............................................................................................11, 13

    Rule 23(b) ..................................................................................................7, 13

    Rule 23(b)(3) .......................................................................................... *passim*

    Rule 23(g)(1)(A)(i)-(iv) ................................................................................26

    Rule 23(g)(1) ..................................................................................................26

    Rule 23(g) .................................................................................................26, 27

    Rule 45 .............................................................................................................6

17 Code of Federal Regulations

    §239.13 ...........................................................................................................20

    §239.33 ...........................................................................................................20

    §240.10b-5 ...................................................................................5, 11, 14, 15

4841-8479-7098.v1

Pursuant to Federal Rule of Civil Procedure ("Rule") 23, and this Honorable Court's June 13, 2019 scheduling order (ECF 63), Lead Plaintiff Colleges of Applied Arts & Technology Pension Plan ("Lead Plaintiff" or "CAAT") respectfully submits this memorandum of law in support of its Motion for Class Certification.

## I.    INTRODUCTION

Class certification is readily available for claims under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78a, *et seq.  See, e.g.*, *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15cv1249, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) ("Generally, claims alleging violations of Section[] 10(b) . . . of the Exchange Act are especially amenable to class certification."); *see also Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017), *cert. denied*, __ U.S. __, 138 S. Ct. 1702 (2018); *Gruber v. Gilbertson*, No. 16cv9727, 2019 WL 4439415, at *2 (S.D.N.Y. Sept. 17, 2019).[1]  This case is no exception.  The questions of law and fact raised by the Exchange Act claims in this action will yield the same answers based upon the same evidence, all related to millions of ADRs of Grupo Televisa, S.A.B. ("Televisa" or the "Company") – a company traded on the New York Stock Exchange ("NYSE"), the most developed securities market in the world.[2]

In this case, Mexican media giant Televisa, along with its former CEO Emilio Fernando Azcárraga Jean III ("Azcárraga") and former CFO Savi Rafael Folch Viadero ("Folch") (collectively, "Defendants"), concealed that the Company had obtained valuable broadcasting rights to FIFA World

---

[1]    All internal citations, quotation marks, and footnotes are omitted, and all emphasis in quotations is added, unless otherwise noted.

[2]    As it did throughout the Class Period, Defendant Televisa sells Global Depositary Shares traded as American Depository Receipts (hereinafter, "ADRs") on the NYSE under the ticker symbol "TV."  *See* Amended Complaint for Violations of the Federal Securities Laws (the "Amended Complaint"), ¶1 & n.1, filed August 6, 2018.  ECF 32.  Citations to "¶___" are to the Amended Complaint, unless otherwise indicated.  All terms not defined herein have the meanings ascribed to them in the Amended Complaint.

Cups through an elaborate bribery scheme. Defendants likewise failed to disclose material deficiencies in the Company's internal controls over financial reporting. Once the truth was known, it was investors in Televisa ADRs who paid the price. The only realistic way these investors can have their day in court to recoup their losses is to certify this as a class action under Rule 23.

As set forth below, the requirements of Rule 23 are readily met. Time has only confirmed the wisdom of this Court's selection of CAAT as lead plaintiff. Indeed, CAAT and its counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller") have fairly and adequately protected the interests of the Class in prosecuting the Exchange Act claims, and will continue to do so. Further, common questions will predominate over any individual ones, and a class action is the superior and only practical way to adjudicate the claims. Accordingly, Lead Plaintiff respectfully requests that the Court certify the claims for class treatment and appoint CAAT and Robbins Geller to serve as Class Representative and Class Counsel, respectively, for a Class consisting of:

> All persons and entities who purchased or otherwise acquired Televisa ADRs during the period from April 11, 2013 through January 25, 2018, inclusive (the "Class Period") and who were damaged thereby (collectively, the "Class"). Excluded from the Class are Defendants; the officers, directors, and affiliates of Televisa at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

## II. STATEMENT OF FACTS COMMON TO THE CLASS

This is a federal securities class action against Televisa and its former CEO and CFO. The allegations of the Amended Complaint are to be accepted as true for purposes of this motion.[3]

From April 11, 2013, through January 25, 2018, Defendants allegedly violated the Exchange Act by concealing material information from Televisa ADR investors. ¶¶6, 20. Throughout this Class Period, Defendants failed to disclose the bribery scheme or internal control deficiencies, despite

---

[3]   "When considering a class certification motion, courts accept the allegations in the complaint as true." *Gruber*, 2019 WL 4439415, at *1 (citing *Shelter Realty Corp. v. Allied Maint. Corp.*, 574 F.2d 656, 661 n.15 (2d Cir. 1978)).

4841-8479-7098.v1

making public statements that highlighted Televisa's broadcasting rights,[4] code of ethics, and the sufficiency of its internal controls.  *See, e.g.*, ¶70; *see also* ECF 47 at 5-13.  For example, Defendants' SEC filings and other public statements during the Class Period did not disclose that Televisa's 2018, 2022, 2026, and 2030 World Cup media rights were obtained through bribery, or that its "internal controls were so inadequately designed or inefficient that Televisa . . . employees were able to engage in an unlawful bribery scheme."  ECF 47 at 9.

The truth concerning Defendants' alleged bribery scheme and material weaknesses in internal controls became public through a series of disclosures and resulted in significant harm to Class members.  For example, on October 26, 2017, *The New York Times* published an exposé detailing Televisa's involvement in the FIFA bribery scheme through its wholly-owned Swiss holding company, Mountrigi Group Ltd. ("Mountrigi").  ¶12.  Among other things, the exposé identified Mountrigi as the unnamed co-conspirator, "Broadcasting Company Affiliate A," from the government's deferred prosecution agreement with Torneos y Competencias S.A. ("Torneos"):

> In or about and between 2010 and 2013, the defendant [Torneos'] wholly-owned subsidiary TyC International B.V. obtained the rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup to audiences in Argentina, Uruguay, and Paraguay through a series of contracts with the Off-the-Books Companies and Broadcasting Company Affiliate A . . . TORNEOS, through Alejandro Burzaco [("Burzaco")] and others, and at times with the assistance of one or more representatives of Broadcasting Company Affiliate A, including Broadcasting Company Executive #1, ***agreed to pay and did pay millions of dollars in bribe and kickback payments to [Julio Grondona ("Grondona")] – a high-ranking FIFA official*** who exercised enormous influence within the association – in order ***to secure his support for Broadcasting Company Affiliate A's acquisition of rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup*** . . . .

¶¶12, 50; ECF 47 at 3-5.  Within hours, Azcárraga and Folch stepped down from their respective positions as CEO and CFO.  ¶13.

---

[4]   The acquisition of these World Cup broadcasting rights were "crucial to the company's competitive position [as] [t]hose rights have enabled Televisa to hit financial targets across its platforms during tournament years and explain away disappointing results in off years."  ECF 47 at 2; *see also* ¶6.  Page number citations to docket entries ("ECF") refer to those page numbers generated by the electronic filing (CM/ECF) system.

- 3 -

Just weeks later, on November 14 and 15, 2017, prosecutors in the FIFA criminal trial elicited sworn testimony from Televisa's co-conspirator and Torneos' former CEO, Burzaco, who confessed to paying millions of dollars in bribes to a FIFA official on behalf of Torneos and Televisa. ¶¶15-16. Specifically, Burzaco testified that Televisa was "involved in paying bribes to secure contracts for media rights to soccer." *Id.*; *see also* ECF 47 at 3-5 (citing *United States v. Webb*, No. 15-CR-252 (PKC) (E.D.N.Y.) ("*Webb*"), Nov. 14, 2017 Trial Tr. at 239:5-22). Burzaco further testified that he traveled to Zurich, Switzerland in March 2013 as part of an "alliance with Teleglobo from Brazil and Televisa from Mexico" to secure FIFA World Cup media rights for "Latin America, for the case of [the] Televisa, Torneos partnership," and that the alliance agreed to – and did – pay $15 million in bribes to FIFA official Grondona via "a sub-account at a Swiss bank account in the name of Julius Berg" for such rights. ¶¶46, 54; *see also* ECF 47 at 5-7 (citing *Webb*, Nov. 15, 2017 Trial Tr. at 488:19-489:20).

As the FIFA criminal trial progressed, evidence corroborating Burzaco's testimony regarding Televisa mounted. For example, the federal government introduced as an exhibit a ledger maintained by Torneos employee Eladio Rodriguez, entitled "*Illuminados*," which he testified "means bribes." ¶54; *see also* ECF 47 at 5-7 (citing *Webb*, Nov. 29, 2017 Trial Tr. at 2170:13-18). The "*Illuminados*" ledger referenced an April 5, 2013 $7.25 million payment with the following annotation: "Cobro Mundial 2026/30 de Mountrigi Management Group LTD" (ECF 47 at 7) deposited into the "Banco Julius Cta. Nro. 2 de FPT (papa)" bank account. ¶54. Prosecutors elicited testimony that "papa" was a code name for Grondona and that "Banco Julius" referred to Julius Baer, a Swiss bank that Torneos used to transfer bribes to an account for Grondona, among other incriminating evidence. *Id.* In addition to the $7.25 million bribe, the *Illuminados* ledger revealed a $300,000 payment from the same FPT Sports sub-account to Julius Baer banker, Arzuaga. ¶54. Since then, Arzuaga has pled guilty to money

laundering, admitting to opening bank accounts in Switzerland for Grondona and channeling millions of dollars in bribes to him from Televisa's co-conspirator through those accounts.  ¶55.

Nevertheless, during the Class Period, Defendants tried to blunt the fallout by denying any involvement in the bribery scheme.  ¶118; *see also, e.g.*, ECF 47 at 10 ("On November 15, 2017, after Burzaco testified in *Napout*, a Televisa spokesperson . . . stated that 'Grupo Televisa in no way knew of, or condoned, any bribe or other improper conduct.'").  Ultimately, on January 26, 2018, two months after Burzaco's trial testimony, Televisa admitted it had material weaknesses in its internal controls over financial reporting, that its financial statements were unreliable, and that its accountants at PricewaterhouseCoopers ("PwC") had reversed their audit opinions.  ¶20.

### III.    PROCEDURAL HISTORY

This action was commenced on March 5, 2018, when plaintiff Melvin Gross filed a class action complaint against Defendants on behalf of purchasers of Televisa ADRs during the period from April 11, 2013, through January 25, 2018 inclusive, alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  *See* ECF 1.  That same day, counsel for Mr. Gross issued a press release notifying class members of their right under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4, *et seq.* (the "PSLRA"), to move for appointment as lead plaintiff.  *See* ECF 17-1.

On May 4, 2018, CAAT moved for appointment as lead plaintiff pursuant to the PSLRA, and for approval of its selection of Robbins Geller as lead counsel for the putative class.  *See* ECFs 12-14.  No opposition to CAAT's motion was filed.  On May 17, 2018, the Court appointed CAAT to serve as lead plaintiff and appointed Robbins Geller as lead counsel.  *See* ECF 21.

On August 6, 2018, Lead Plaintiff timely filed the Amended Complaint, detailing Defendants' concealed scheme and violations of the Exchange Act.  *See* ECF 32.  On October 15,

- 5 -

2018, Defendants filed a motion to dismiss the Amended Complaint.  *See* ECFs 37-40.  Lead Plaintiff opposed the motion on November 16, 2018 (ECFs 41-42), and Defendants filed their reply on December 14, 2018.  *See* ECFs 44-45.

On March 25, 2019, the Court issued an Opinion & Order denying Defendants' motion to dismiss.  *See* ECF 47.  Among other things, the Court found that Televisa had a duty to disclose the alleged bribery scheme, as it was material to a reasonable investor (*id*. at 19-20); that Mountrigi's scienter could be imputed to Televisa (*id.* at 22); and that Azcárraga and Folch were subject to liability as control persons under Section 20(a) of the Exchange Act (*id.* at 23).

On June 13, 2019, the parties appeared before the Court for a Rule 16(b) conference, and the Court entered a scheduling order.  *See* ECF 63.  Since then, Lead Plaintiff has been working diligently with Defendants to negotiate electronic discovery and document productions, including by participating in over a dozen lengthy meet-and-confer calls and exchanging extensive emails and letters.  In addition, Lead Plaintiff is aggressively pursuing third-party discovery.  For example, this Court issued letters of request under the Hague Convention for Televisa's former and current auditors in Mexico, PwC, S.C. and KPMG Cárdenas Dosal, S.C., respectively.  *See* ECFs 70-71.  In addition, Lead Plaintiff has served 24 different Rule 45 document subpoenas to U.S. analysts, entities related to the individual defendants, and entities implicated in the FIFA bribery and corruption scandal.  In addition, the United States Attorney's Office for the Eastern District of New York has provided 11 exhibits from the criminal FIFA proceedings, to date.

Defendants have indicated they intend to take Lead Plaintiff's deposition in late November. Lead Plaintiff intends to commence depositions next spring, after Defendants substantially complete their document production.

Lead Plaintiff now timely files its motion for class certification pursuant to this Court's

June 13, 2019 scheduling order.  *See* ECF 63 at 10.

## IV.  ARGUMENT

### A.  Applicable Legal Standards for Class Certification

As aforementioned, class certification is readily available for Exchange Act claims.  *See, e.g.*, *Virtus*, 2017 WL 2062985, at *2 ("Generally, claims alleging violations of Section[] 10(b) . . . of the Exchange Act are especially amenable to class certification."); *see also Amchem Prods.*, 521 U.S. at 625; *Waggoner*, 875 F.3d at 97; *Gruber*, 2019 WL 4439415, at *2; *Levin v. Res. Capital Corp.*, No. 1:15-cv-07081-LLS, ECF 77, slip op. (S.D.N.Y. Nov. 22, 2017) (Stanton, J.).

To certify a class action under the procedure set forth in Rule 23, the proposed class must satisfy each prerequisite of Rule 23(a), as well as one of the requirements under Rule 23(b) – here, Rule 23(b)(3).[5]  *See* Fed. R. Civ. P. 23; *Amchem Prods.*, 521 U.S. at 615; *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008).

"[T]he Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation" and has noted that, "[i]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require."  *Facebook*, 312 F.R.D. at 340. This is particularly true with respect to "claims alleging violations of Section[] 10(b) . . . of the Exchange Act [which] are especially amenable to class certification."  *Gruber*, 2019 WL 4439415, at

---

[5]   In addition to these explicit elements of Rule 23(a), the implied "[a]scertainability" requirement "requires only that a class be defined using objective criteria that establish membership with definite boundaries."  *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM) (RWL), 2019 WL 3001084, at *9 (S.D.N.Y. July 10, 2019) (quoting *In re Petrobras Sec. Litig.*, 862 F.3d 250, 264 (2d Cir. 2017)).  This requirement is satisfied here.  The class definition is ascertainable as it delineates the Class' boundaries by the dates of their transactions in Televisa ADRs, and ascertaining members of the Class will be easily administrable by reference to investor records.  *See, e.g.*, *id.*; *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015) (ascertainability requirement met where members "may be ascertained with reference to investor records").

*2.  "And, [i]n light of the importance of the class action device in securities fraud suits, the [Rule 23] factors are to be construed liberally."  *Id.*

Importantly, "[a] motion for class certification should not become a mini-trial on the merits; the question before the Court is whether [a] [p]laintiff meets Rule 23's requirements, not whether [the] [p]laintiff will prevail on the merits."  *Signet*, 2019 WL 3001084, at *7; *see also In re Visa Check/ MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001) ("The question for the district court at the class certification stage is whether plaintiffs' . . . evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive.").  Here, the proposed Class meets all of the applicable requirements of Rule 23.

### B.  The Proposed Class Satisfies the Standards for Class Certification Under Rule 23

#### 1.  The Proposed Class Meets the Requirements of Rule 23(a)

Rule 23(a) requires that: (1) the class is so numerous that joinder of all members is impractical ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims of the representative parties are typical of the claims of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy").  Fed. R. Civ. P. 23(a).  Each of these requirements is met here.

##### a.  The Class Members Are so Numerous that Joinder Is Impracticable

Rule 23(a)(1) requires a class to be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity is readily satisfied in cases involving nationally traded securities where the class is comprised of investors in companies that have millions of shares of the security outstanding.  *See Wallace v. IntraLinks*, 302 F.R.D. 310, 315 (S.D.N.Y. 2014); *Facebook*, 312 F.R.D. at 341.  "[N]umerosity is presumed at a level of 40 members."  *Consol.*

- 8 -

*Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *accord Pa. Pub. School Emps.'*

*Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014).

Here, throughout the Class Period, Televisa ADRs were listed and traded on the NYSE with

over 350 million shares outstanding.  *See* Feinstein Rept., ¶31.[6]  During the Class Period, an average

of approximately 2 million Televisa ADRs exchanged hands daily – totaling over 10 million shares

traded weekly, which represented transactions in more than 3% of the Company's shares each week.

*Id*., ¶¶53-54.  Further, over 500 institutional investors owned Televisa ADRs during the Class

Period.  *See id.*, ¶63.  Thus, there are likely thousands of members of the Class – far more than

needed to satisfy the numerosity requirement.

### b.  Common Questions of Law and Fact Exist

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class."

Fed. R. Civ. P. 23(a)(2).  The commonality requirement is satisfied in this case, "as is typical of most

securities fraud putative class actions."  *Signet*, 2019 WL 3001084, at *8.  Establishing commonality

is a "low hurdle."  *Gruber*, 2019 WL 4439415, at *3.  Commonality is "met if plaintiffs' grievances

share a common question of law or of fact."  *City of Westland Police and Fire Ret. Sys. v. MetLife,*

*Inc.*, No. 12 Civ. 0256 (LAK) (AJP), 2017 WL 3608298, at *5 (S.D.N.Y. Aug. 22, 2017); *see also In*

*re NYSE Specialists Sec. Litig*., 260 F.R.D. 55, 70 (S.D.N.Y. 2009) ("Even a single common legal or

factual question will suffice.").  A "common question is one where the same evidence will suffice

for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-

wide proof."  *Tyson Foods, Inc. v. Bouaphakeo*, __ U.S. __, 136 S. Ct. 1036, 1045 (2016); *see also*

*Gruber*, 2019 WL 4439415, at *3 ("To scale that low hurdle, plaintiffs' claims must depend upon a

---

[6]    References to "Feinstein Rept." are to the Report on Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, dated October 30, 2019, attached as Exhibit 2 to the Declaration of Rachel L. Jensen in Support of Lead Plaintiff's Motion for Class Certification ("Jensen Decl."), filed concurrently herewith.

common contention and be of such a nature that [they are] capable of classwide resolution – which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

Virtually all of the questions of law and fact raised in this case are common to the Class. These questions include, among others, whether Defendants' conduct violated the Exchange Act; whether Defendants concealed that Televisa's World Cup broadcasting rights were obtained through bribery and that its internal controls were materially deficient; whether they acted with scienter; and whether investors suffered damages as a result of Defendants' wrongful conduct.  The answers to these common questions are likewise common and susceptible to generalized class-wide proof. Accordingly, this case satisfies the commonality requirement.  *See, e.g.*, *Signet*, 2019 WL 3001084, at *8 (finding commonality in securities fraud case where common questions included "whether (i) statements disseminated to the Class by Defendants during the Class Period misrepresented or omitted material facts; (ii) the alleged fraud was material to the putative Class; and (iii) Defendants acted knowingly or recklessly"); *see also Virtus*, 2017 WL 2062985, at *2 ("Courts in this Circuit find commonality satisfied where there are common issues relating to violations of federal securities laws, misrepresentations of material fact, scienter, and damages.").  Commonality is satisfied here.

### c.    Lead Plaintiff's Claims Are Typical of the Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(3).  Lead Plaintiff satisfies the typicality requirement because its claims – like those of other Class members – "arise from the same course of conduct and will be resolved based on similar legal arguments." *Signet*, 2019 WL 3001084, at *8. "In a securities class action, when plaintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements underlying their claims, the claims and

- 10 -

nature of evidence are generally considered sufficient to satisfy the typicality requirement." *Id.* (quoting *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012)); *see also Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 109 (S.D.N.Y. 2011) ("As long as plaintiffs assert, as they do here, that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish [the] necessary typicality.") (alteration in original).

Here, CAAT, just like other Class members, purchased Televisa ADRs during the Class Period. *See* Rorwick Decl., ¶4.[7] Further, Lead Plaintiff's claims turn on the same legal theories and facts – Defendants' alleged violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, by concealing bribes and material deficiencies in Televisa's internal controls over financial reporting. *See, e.g.*, ¶6. And the injury Lead Plaintiff allegedly suffered is the same as the injuries suffered by other Class members.  ¶34.  Accordingly, typicality is satisfied here.

### d.      Lead Plaintiff and Lead Counsel Will Continue to Adequately Represent the Interests of the Class

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This requirement is satisfied where, as here:  (1) the class representative's interest is to vigorously pursue the claims of the class and is not "antagonistic to the interests of other class members"; and (2) the proposed class counsel "are qualified, experienced and able to conduct the litigation." *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016); *MetLife*, 2017 WL 3608298, at *7.

The Court has seen fit to appoint CAAT to serve as Lead Plaintiff under the PSLRA and approved Robbins Geller as Lead Counsel.  *See* ECF 21.  At no point during that process did any of

---

[7]     References to the "Rorwick Decl." are to the Declaration of Kevin Rorwick (CAAT) in Support of Lead Plaintiff's Motion for Class Certification, dated October 30, 2019, and attached as Exhibit 1 to the Jensen Decl.

the other movants or Defendants raise any potential issue concerning Lead Plaintiff's or Lead Counsel's adequacy.  And, as discussed below, the Court's selection of Lead Plaintiff has only been validated in the intervening months, as CAAT and Robbins Geller have fairly and adequately protected the interests of the Class – and will continue to do so.

First, Lead Plaintiff's interests are aligned with those of the Class.  Lead Plaintiff, like all Class members, purchased Televisa ADRs during the Class Period and was allegedly injured by Defendants' misconduct.  *See* ECF 14-2; ¶34.  Lead Plaintiff's interest in establishing Defendants' liability and maximizing the recovery are aligned with the interests of absent Class members.

Further, since this Court appointed CAAT as Lead Plaintiff, it has demonstrated its willingness and ability to serve as an adequate class representative.  CAAT has followed through with its commitment to take an active role in directing the litigation and overseeing Lead Counsel's efforts.  Among other things, Lead Plaintiff has: (i) supervised and monitored the progress of the case; (ii) reviewed key pleadings and filings; (iii) participated in in-person and telephonic conferences with Lead Counsel regarding case developments and litigation strategies; (iv) produced 744 documents to Defendants; and (v) agreed to sit for a deposition.  *See* Rorwick Decl., ¶5.  In addition, CAAT intends to continue working with Robbins Geller to vigorously prosecute this action and maximize the recovery for the Class.  *See id.*, ¶6.

Finally, Lead Plaintiff has ensured that the interests of the Class will continue to be protected by retaining counsel who are "qualified, experienced and able to conduct the litigation."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).  "Courts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits."  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 100 (S.D.N.Y. 2015).  Among other things, Robbins Geller has conducted a thorough investigation of

- 12 -

Defendants' conduct, defeated Defendants' motion to dismiss, worked with a financial expert, and continues to pursue comprehensive discovery from Defendants and third parties. In short, Robbins Geller has diligently prosecuted Class members' claims to date, and is committed to doing so for as long as it takes to secure a successful outcome.

Lead Plaintiff is well-suited to represent the Class and, like other Class members, has been injured by Defendants' wrongful course of conduct. Lead Plaintiff and Lead Counsel are willing and able to prosecute this action on behalf of absent Class members and "will fairly and adequately protect" their interests. Fed. R. Civ. P. 23(a)(4). The adequacy requirement is, therefore, satisfied.

### 2. The Proposed Class Meets the Requirements of Rule 23(b)(3)

Upon finding the four requirements of Rule 23(a) are met, the Court must then determine whether the action can be maintained as a class action under one of the three subsections of Rule 23(b). Here, Lead Plaintiff seeks class certification under Rule 23(b)(3) because, as explained below: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### a. Common Questions of Law and Fact Predominate

"Predominance is a test readily met in certain cases alleging . . . securities fraud[.]" *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 03852 (GBD), 2015 WL 10433433, at *4 (S.D.N.Y. Sept. 29, 2015) (quoting *Amchem Prods.*, 521 U.S. at 625). Predominance is satisfied where "(1) resolution of any material legal or factual questions . . . can be achieved through generalized proof, and (2) these [common] issues are more substantial than the issues subject only to individualized proof." *Petrobras*, 862 F.3d at 270; *see also Waggoner*, 875 F.3d at 93. The predominance inquiry boils down to "whether proposed classes are sufficiently cohesive to warrant

- 13 -

adjudication by representation." *MetLife*, 2017 WL 3608298, at *14. "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*").

In securities fraud cases like this one, it is well established that "materiality, falsity, and loss causation are considered common question[s]." *Gruber*, 2019 WL 4439415, at *6 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 474-75 (2013)). Indeed, the Supreme Court has held that, because loss causation is a common question, plaintiffs are not required to "show loss causation as a condition of obtaining class certification." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*"). Scienter is likewise a common question because Defendants' state of mind did not differ with respect to individual class members. *See, e.g.*, *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 146-47 (S.D.N.Y. 2019) (scienter is a common question). This means that four of the six elements of the Section 10(b) claims are undeniably common.[8] All the elements of the Section 20(a) claims are common as well, since they turn on the individual defendants' liability as control persons, which also did not differ among Class members. The remaining elements will likewise be established with common proof. First, reliance will be established class-wide through one or both of the presumptions that apply in securities fraud cases: the "*Basic*" presumption and/or "*Affiliated Ute*" presumption. Second, although not required in this Circuit, damages will be capable of measurement on a class-wide basis at the appropriate time.

---

[8] The elements of the Section 10(b) and Rule 10b-5 claims are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton I*, 563 U.S. at 810.

- 14 -

### (1)    The *Basic* Presumption Applies

Lead Plaintiff is entitled to the fraud-on-the-market presumption of reliance. This presumption is premised on the principle that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations" and that investors in such markets transact "in reliance on the integrity of that price." *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988). The Supreme Court held in *Basic*, and reaffirmed in *Halliburton II*, that investor-classes may, therefore,

> satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.

*Halliburton II*, 573 U.S. at 283-84; *see also Waggoner*, 875 F.3d at 93 & nn.25-26. The *Basic* presumption of reliance requires that: (1) the alleged false or misleading statement was public ("publicity"); (2) the relevant transaction took place between the time the misrepresentation was made and when the truth was revealed ("market timing"); and (3) the security traded in an efficient market ("market efficiency"). *Halliburton I*, 563 U.S. at 811; *Signet*, 2019 WL 3001084, at *11. All three requirements are met here.

*First*, the publicity requirement is satisfied because Defendants allegedly made material misrepresentations and omissions in SEC filings and other public statements to investors.[9] *See, e.g.*, ¶170. *Second*, the market timing requirement is satisfied because Lead Plaintiff and other Class members acquired Televisa ADRs during the Class Period and suffered losses when the truth was revealed. *See, e.g.*, ¶158. *Third*, as detailed below, Televisa ADRs traded in an efficient market throughout the Class Period. *See generally* Feinstein Rept.

---

[9]    "Even though materiality is a prerequisite for invoking the *Basic* presumption, [the Supreme Court has] held that it should be left to the merits stage, because it does not bear on the predominance requirement of Rule 23(b)(3)." *Halliburton II*, 573 U.S. at 282 (citing *Amgen*, 568 U.S. at 466-67).

As an initial matter, the burden to show market efficiency "is not an onerous one." *Petrobras*, 862 F.3d at 278; *see also Waggoner*, 875 F.3d at 97.  Establishing market efficiency at the class certification stage is a flexible inquiry, as the Second Circuit has "repeatedly – and recently – declined to adopt a particular test for market efficiency." *Waggoner*, 875 F.3d at 94 (citing *Petrobras*, 862 F.3d at 276).  The Second Circuit has likewise declined "to view direct and indirect evidence [of market efficiency] as distinct requirements, opting instead for a holistic analysis based on the totality of the evidence presented." *Id.* at 96-97.  Here, based on both direct and indirect evidence, Lead Plaintiff has established that Televisa ADRs traded in an efficient market during the Class Period, and therefore, that the *Basic* presumption of reliance applies.

Televisa ADRs traded at all relevant times on the NYSE, one of the largest securities exchanges in the world, on which billions of shares are traded each day – which virtually guarantees a liquid market for the securities listed on its trading platform.  The fact that Televisa ADRs traded on the NYSE is strong evidence that they traded in an efficient market throughout the Class Period. *See Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016) (a listing on the NYSE is a "good indicator of efficiency"), *aff'd sub nom. Waggoner*, 875 F.3d 79; *see also In re DVI Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("[T]he listing of a security on a major exchange such as the NYSE . . . weighs in favor of a finding of market efficiency."); *JPMorgan*, 2015 WL 10433433, at *7 (listing on NYSE weighed in favor of finding an efficient market); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) ("If . . . a security is listed on the NYSE . . . the market for that security is presumed to be efficient.").

In addition, when evaluating whether a security trades in an efficient market, courts consider a non-exhaustive list of factors – the so-called *Cammer* and *Krogman* factors, named after *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467, 478

- 16 -

(N.D. Tex. 2001).  *See, e.g.*, *Signet*, 2019 WL 3001084, at *11 ("[T]he Court looks to the *Cammer* and *Krogman* factors, the prevailing tests for market efficiency.").

The *Cammer* factors are: (1) average weekly trading volume of the security; (2) number of securities analysts following and reporting on the company; (3) extent to which market makers traded in the security; (4) the issuer's eligibility to file an SEC Form S-3 registration statement; and (5) demonstration of a cause-and-effect relationship between unexpected, material disclosures and changes in the security's price.  *See Signet*, 2019 WL 3001084, at *11; *see also Waggoner*, 875 F.3d at 94.  The *Krogman* factors are: (1) the market capitalization of the company; (2) the bid-ask spread of the security; and (3) the percentage of the security not held by insiders (*i.e.*, the public float).  *See Signet*, 2019 WL 3001084, at *11; *see also Waggoner*, 875 F.3d at 94.

Though not required, all of the *Cammer* and *Krogman* factors are satisfied here.  In support of this conclusion, Lead Plaintiff submits the expert report of Professor Steven P. Feinstein, who holds a Ph.D. in Economics from Yale University.  *See* Feinstein Rept., ¶7.  Dr. Feinstein analyzed each of the *Cammer* and *Krogman* factors and concluded that the market for Televisa ADRs was efficient throughout the Class Period.  *See id.*, ¶¶17-19, 142-144.  A brief review of each factor is set forth below.

**(i)    Televisa ADRs Experienced a High
Weekly Trading Volume**

The high trading volume of Televisa ADRs creates a strong presumption of market efficiency.  Courts hold that "[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one."  *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (quoting *Cammer*, 711 F. Supp. at 1293); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013).  Here, the average weekly trading volume of Televisa ADRs exceeded 3% – well

- 17 -

above the benchmark level for market efficiency.  *See* Feinstein Rept., ¶54.

**(ii)       Numerous Financial Analysts Covered<br>Televisa During the Class Period**

Televisa ADRs were the subject of extensive coverage by securities analysts, which also justifies a finding of market efficiency.  As set forth in Dr. Feinstein's expert report, Televisa was followed and covered by at least 28 securities analyst firms, including well-known firms such as Barclays, Credit Suisse, JPMorgan, Morgan Stanley, and UBS Equities.  *See* Feinstein Rept., ¶¶57-58.  This level of analyst coverage is more than enough to demonstrate market efficiency.  *See, e.g.*, *Winstar*, 290 F.R.D. at 446 (finding market efficient where three analysts followed security at issue); *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 256 (D.S.C. 2010) (six analysts sufficient).

Widespread media coverage and regular press releases from the Company also support a finding of market efficiency.  *See Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 92 (regular issuance of press releases, press coverage, and dissemination of information through news services supported finding of market efficiency); *Billhofer*, 281 F.R.D. at 153-54 (publication of over two dozen press releases and articles supported finding of market efficiency).  Here, in addition to Televisa's own regular press releases, major news sources published over 8,000 articles concerning Televisa during the Class Period.  *See* Feinstein Rept., ¶65.  In conjunction with widespread analyst coverage, Televisa's media coverage provides further support for the finding of market efficiency for Televisa ADRs.  *See, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209-10 (E.D. Pa. 2008) (three analysts with 80 analyst reports, together with news items and press releases, "favor[ed] a finding of market efficiency"), *aff'd*, 639 F.3d 623.

- 18 -

(iii)     **Televisa Had Market Makers and
Significant Institutional Holdings**

Televisa ADRs had multiple "market makers" – another factor favoring market efficiency.  A market maker is an entity that agrees to purchase or sell securities on demand to support a liquid market for the shares.  *See, e.g.*, *Winstar*, 290 F.R.D. at 446.  Here, Televisa ADRs had more than 180 market makers during the Class Period.  *See* Feinstein Rept., ¶73.  These market makers included the NYSE's Designated Market Maker ("DMM"), which was the lead market maker under whose supervision Televisa ADRs traded.[10]  *See id.*, ¶¶70, 73.  Trading in Televisa ADRs was also subject to the activity of numerous other market makers, including those from well-known firms such as Barclays, Goldman Sachs, JPMorgan, Morgan Stanley, and UBS.  *See id.*, ¶73.  This significant level of market maker activity indicates market efficiency.  *See, e.g.*, *Signet*, 2019 WL 3001084, at *12 (fact that stock traded on NYSE through a designated market maker was supportive of market efficiency); *see also Waggoner*, 875 F.3d at 94 (extent of market makers trading in the stock was relevant to market efficiency).

The multitude of institutional investors transacting in Televisa ADRs provides additional evidence of market efficiency.  *See In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (finding institutional investors "likely acted as arbitrageurs and facilitated the efficiency of the market").  Over 500 sophisticated institutional investors, which typically employ in-house financial analysts, invested in Televisa ADRs during the Class Period.  *See* Feinstein Rept., ¶¶62-63.

(iv)     **Televisa Was Eligible to File Form F-3
During the Class Period**

Televisa's eligibility to file Form F-3 further bolsters a finding of market efficiency.  A domestic company is eligible to file a Form S-3 registration statement if it has filed SEC reports for

---

[10]   The NYSE's DMMs were formerly known as "specialists."  *See* Feinstein Rept., ¶70.

12 consecutive months and has a public float of at least $75 million.  *See* 17 C.F.R. §239.13.  "The ability to file this form indicates that the company is easily able to issue new securities," and is evidence of market efficiency.  *Winstar*, 290 F.R.D. at 447.  The same rules apply to a foreign company like Televisa, but instead of a Form S-3, the eligible foreign company files on Form F-3.  *See* 17 C.F.R. §239.33; Feinstein Rept., ¶75.  Televisa consistently filed SEC reports during the Class Period and maintained an average public float of $9.29 billion during the Class Period, well in excess of the required $75 million.  Feinstein Rept., ¶¶76, 78.  Thus, Televisa was eligible to file Form F-3 registration statements during the Class Period.  *Id.*, ¶¶78-79.  This factor supports a finding of market efficiency.  *See, e.g.*, *Villella v. Chem. and Mining Co. of Chile Inc.*, No. 15 Civ. 2106 (ER), 2019 WL 4631530, at *9 (S.D.N.Y. Sept. 24, 2019) (finding market efficiency where company "was eligible to file a Form F-3, the foreign equivalent of the Form S-3 cited in *Cammer*").

### (v) The Price of Televisa ADRs Reacted to New Company-Specific Information During the Class Period

At the outset, the Second Circuit has held that the fifth *Cammer* factor – "*Cammer* 5" – is not always required and that "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies."  *Waggoner*, 875 F.3d at 97.  When courts do consider the fifth *Cammer* factor, they require only a *prima facie* showing that, during the Class Period, the price of an issuer's securities responded to the release of "unexpected" company-specific news.  *See* *Cammer*, 711 F. Supp. At 1287.  Notably, where – as here – the seven other *Cammer* and *Krogman* factors are satisfied, "a court can dispose with *Cammer* 5 completely."  *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 97 (S.D.N.Y. 2018) (citing *Waggoner*, 875 F.3d at 97-98).

While not required, the fifth *Cammer* factor supports a finding of market efficiency here.  As detailed in his expert report, Dr. Feinstein conducted an event study, which is an empirical test of the

- 20 -

cause and effect relationship between movements in Televisa ADRs and Televisa-specific news.  *See* Feinstein Rept., ¶¶96-141.  The Second Circuit recognizes such event studies as "standard operating procedure in federal securities litigation" – used to "disentangle[] the effects of two types of information on stock prices – information that is specific to the firm under question . . . and information that is likely to affect stock prices marketwide." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016). Utilizing statistical analysis, Dr. Feinstein isolated the portion of Televisa's stock movements following the Company's earnings announcements during the Class Period that cannot be attributed to market or sector-specific factors.  *See* Feinstein Rept., ¶¶99-100, 109-124.  This analysis shows that there was a consistent cause-and-effect relationship between the release of material information about Televisa and the price of its ADRs, providing further evidence of market efficiency.  *See id.*, ¶¶18, 143.

### (vi)      Televisa Had a High Market Capitalization During the Class Period

The market capitalization of Televisa ADRs is another factor weighing in favor of market efficiency.  During the Class Period, Televisa ADRs had an average market capitalization of $9.29 billion – a figure exceeding the market capitalization of 90% of publicly traded companies listed in the United States.  *See* Feinstein Rept., ¶83.  This sizeable market capitalization supports market efficiency.  *See, e.g.*, *McIntire*, 38 F. Supp. 3d at 433 (market capitalization of $292-$585 million supported market efficiency).

### (vii)      Televisa ADRs Were Subject to a Narrow Bid-Ask Spread During the Class Period

Televisa ADRs were subject to a narrow bid-ask spread, further indicating market efficiency. "A bid-ask spread is the amount by which the asking price for an asset exceeds its bid price." *Signet*, 2019 WL 3001084, at *12 n.6.  "This percentage reflects the difference between the highest price a buyer is willing to pay for an asset and the lowest price that a seller is willing to accept." *Id.*  "A

- 21 -

large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478.  Here, the average bid-ask spread during the Class Period was only 0.04%, while the average market-wide bid-ask spread was a significantly larger 0.58%. *See* Feinstein Rept., ¶90.  This narrow bid-ask spread likewise supports a finding of market efficiency.  *See Signet*, 2019 WL 3001084, at *12 (finding that an average bid-ask spread of 0.3% "strongly indicates that the stock traded in an efficient market").

**(viii)     100% of Televisa ADRs Were Held by Public Investors During the Class Period**

Public investors held all of Televisa's ADRs during the Class Period.  *See* Feinstein Rept., ¶86.  When a large percentage of a company's outstanding shares are held by public investors, it "mean[s] that there was a large proportion of . . . shares that were available to non-insiders who could trade without restrictions and profit by trading on new information" – another indication of market efficiency.  *Signet*, 2019 WL 3001084, at *12.  Here, 100% of the Company's $9.29 billion ADR market capitalization was held by public investors, further demonstrating market efficiency. *See* Feinstein Rept., ¶¶85-87; *see also Signet*, 2019 WL 3001084, at *12 (concluding that a public float of 99.4% to 99.8[%] "weigh[ed] heavily in favor of a finding of market efficiency").

In sum, while not required, all of the *Cammer* and *Krogman* factors support a finding that the market for Televisa ADRs was efficient during the Class Period.  Thus, class-wide reliance will be presumed under the *Basic* fraud-on-the-market doctrine.

**(2)     The *Affiliated Ute* Presumption Applies**

Moreover, because the Amended Complaint alleges that Defendants failed to disclose their bribery scheme and Televisa's internal control deficiencies, the Class is also entitled to the presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).  In that case, the Supreme Court held that, for claims "involving primarily a failure to disclose" by persons

- 22 -

with a duty to disclose, "positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material."  *Id.* at 153.

*Gruber* is instructive.  In that recent decision in this District, the court applied the *Affiliated Ute* presumption even though – as here – the complaint also alleged affirmative misstatements.  *See Gruber*, 2019 WL 4439415, at *7.  The court reasoned that the defendants "had a duty to disclose other key information which was omitted," including a stock manipulation scheme.  *See id.*; *see also In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42 (S.D.N.Y. 2013).

Here, as well, this case is fundamentally about what Defendants did ***not*** tell investors.  For example, the Amended Complaint alleges that Defendants concealed their scheme to bribe FIFA executives to illegally obtain the broadcasting rights to the 2018, 2022, 2026, and 2030 FIFA World Cup tournaments.  ¶6.  In denying the motion to dismiss, this Court found that Defendants had a duty to disclose their participation in a bribery scheme because it would have been material to a reasonable investor.  *See* ECF 47 at 20.  Accordingly, Lead Plaintiff and the Class are also entitled to the presumption of reliance under the *Affiliated Ute* doctrine.

### (3)   Damages Will Be Calculated on a Class-Wide Basis

Proof of loss causation or damages is not a prerequisite to class certification.  *See Amgen*, 568 U.S. at 475 ("this Court has held that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified"); *Halliburton I*, 563 U.S. at 813 (loss causation is a common question, and plaintiffs are not required to "show loss causation as a condition of obtaining class certification").  In this Circuit, moreover, certification does not require "a finding that damages are capable of measurement on a classwide basis."  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015).  Instead, "the fact that damages may have to be ascertained on an individual basis" is merely a factor

- 23 -

that courts "consider in deciding whether issues susceptible to generalized proof outweigh individual issues." *Id.* at 408.  Further, any damages model submitted at the class certification stage "need not be exact." *Waggoner*, 875 F.3d at 106 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)).

Nonetheless, damages here will be calculated on a class-wide basis, consistent with Lead Plaintiff's theory of the case.  *See* Feinstein Rept., ¶¶20, 145, 147-153.  Courts in this Circuit routinely find that damages in securities fraud cases can be calculated on a class-wide basis.  *See, e.g.*, *Signet*, 2019 WL 3001084, at *20 (event studies are a "generally accepted method for measuring damages in a securities fraud class action"); *Barrick Gold*, 314 F.R.D. at 106 (Section 10(b) damages are "measurable on a class-wide basis" and "do[] not create individualized damages issues that defeat predominance"); *JPMorgan*, 2015 WL 10433433, at *7 (accepting method to "calculate classwide, per-share damages through an event study analysis of the stock price inflation caused by Defendants' alleged misrepresentations or omissions"); *Wallace*, 302 F.R.D. at 318 ("Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability.").

Here, Dr. Feinstein has concluded that damages will be subject to measurement on a class-wide basis at the appropriate juncture.  *See* Feinstein Rept., ¶¶20, 147-153.  Class-wide damages can be calculated using a variety of commonly-utilized methods to measure the amount of artificial inflation caused by Defendants' omissions and false or misleading statements.  *See id.*, ¶¶147-152.  Under such an approach, Class members' trading activity will be used to calculate damages in a mechanical fashion.  *See id.*, ¶152.  Nothing more is required at this stage.

### b.   A Class Action Is Superior to Other Methods of Adjudication

Finally, Lead Plaintiff's claims satisfy the superiority requirement of Rule 23(b)(3).  "The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of

- 24 -

a class action against those of alternative available methods of adjudication." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 91 (S.D.N.Y. 2007), *aff'd*, 838 F.3d 223.  "Generally, securities actions easily satisfy the superiority requirement because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Gruber*, 2019 WL 4439415, at *9 (quoting *SunEdison*, 329 F.R.D. at 144); *see also In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015) (same).

Rule 23(b)(3) identifies four factors for assessing whether a class action is superior to other methods of adjudication: (1) the interests of members of the class in "individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3).  Each of these factors demonstrates that a class action is the superior method of adjudication here.

***First***, the interest of Class members in asserting individual claims is limited.  The Class consists of a large number of geographically dispersed purchasers of Televisa ADRs whose individual damages likely are small enough to keep individual litigation from being economically worthwhile.  The Class members, therefore, have little interest in asserting separate claims.  *See, e.g.*, *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y. 2008) ("the amount of potential recovery per plaintiff is not so high as to ensure that each plaintiff could or would bring an action individually").  ***Second***, Lead Plaintiff is not aware of any other pending Section 10(b) litigation regarding the alleged fraud.  ***Third***, concentrating the litigation in this Court has many benefits, including eliminating the risk of inconsistent adjudication and promoting the fair and efficient use of

- 25 -

the judicial system. ***Finally***, Lead Plaintiff does not foresee any management difficulties that will preclude this action from being maintained as a class action. To the contrary, litigating each claim separately would be wasteful and would effectively preclude investors from redress. *See In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008) ("Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources."). The superiority requirement is readily satisfied here.

### C.     Robbins Geller Should Be Appointed as Class Counsel

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel." Lead Plaintiff respectfully requests that the Court appoint Lead Counsel, Robbins Geller, as Class Counsel. In appointing class counsel, the Court considers counsel's work "in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Here, Robbins Geller is well qualified to prosecute this case on behalf of the Class. As a top securities fraud firm nationally, "[c]ourts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits." *Carpenters*, 310 F.R.D. at 100. Indeed, Robbins Geller has extensive securities litigation experience and has successfully prosecuted numerous securities fraud class actions on behalf of injured investors. *See* Jensen Decl., Ex. 3 (Firm Resumé of Robbins Geller). Further, Robbins Geller's litigation of this case thus far reflects the firm's ongoing commitment to this action. Accordingly, Lead Plaintiff requests that the Court appoint Robbins Geller to serve as Class Counsel pursuant to Rule 23(g).

### V.     CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court: (a) certify this

- 26 -

action as a class action pursuant to Rule 23(a) and Rule 23(b)(3); (b) appoint Lead Plaintiff as Class

Representative; and (c) appoint Robbins Geller as Class Counsel pursuant to Rule 23(g).

DATED:  October 30, 2019                          Respectfully submitted,

                                                  ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
                                                  JONAH H. GOLDSTEIN
                                                  RACHEL L. JENSEN
                                                  RACHEL A. COCALIS
                                                  LEA MALANI BAYS


                                                        s/ Rachel L. Jensen
                                                  RACHEL L. JENSEN

                                                  655 West Broadway, Suite 1900
                                                  San Diego, CA  92101
                                                  Telephone:  619/231-1058
                                                  619/231-7423 (fax)
                                                  jonahg@rgrdlaw.com
                                                  rachelj@rgrdlaw.com
                                                  rcocalis@rgrdlaw.com
                                                  lbays@rgrdlaw.com

                                                  ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
                                                  SAMUEL H. RUDMAN
                                                  ERIN W. BOARDMAN
                                                  58 South Service Road, Suite 200
                                                  Melville, NY  11747
                                                  Telephone:  631/367-7100
                                                  631/367-1173 (fax)
                                                  srudman@rgrdlaw.com
                                                  eboardman@rgrdlaw.com

                                                  ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
                                                  NOAM MANDEL
                                                  125 Park Avenue, 25th Floor
                                                  New York, NY  10017
                                                  Telephone:  212/791-0567
                                                  nmandel@rgrdlaw.com

                                                  Lead Counsel for Lead Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on October 30, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Rachel L. Jensen
RACHEL L. JENSEN

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  rachelj@rgrdlaw.com

# Mailing Information for a Case 1:18-cv-01979-LLS In re Grupo Televisa Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David B. Anders**
  dbanders@wlrk.com,calert@wlrk.com

- **Lea Bays**
  lbays@rgrdlaw.com

- **Erin Whitney Boardman**
  eboardman@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Rachel Cocalis**
  rcocalis@rgrdlaw.com

- **Ben M. Germana**
  bmgermana@wlrk.com,CAlert@wlrk.com

- **Jonah H. Goldstein**
  jonahg@rgrdlaw.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Rachel L. Jensen**
  rachelj@rgrdlaw.com,rcocalis@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **David E Kirk**
  dekirk@wlrk.com,calert@wlrk.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Tamara Livshiz**
  tlivshiz@wlrk.com

- **Noam Noah Mandel**
  Noam@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **Herbert M Wachtell**
  HMWachtell@wlrk.com,CAlert@wlrk.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)