ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/8/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re GROUPO TELEVISA SECURITIES
LITIGATION

18 Civ. 1979 (LLS)

**OPINION and ORDER**

------------------------------------------------------------X

    The opposition to this motion for class certification raises two separate issues. The first is whether the incidents of public mention of Grupo Televisa's alleged acts of bribery had such an impact on its market price (beyond random variations) as to leave intact the presumption that the market's evaluation relied on the publicly available information about the company. Defendants say there was no impact; the market did not respond to news about Televisa; since one cannot presume market reliance on such news, each class member must prove he or she relied upon Televisa's statements, which omitted significant negative facts.

    The second is whether Colleges of Applied Arts and Technology Pension Plan ("CAAT"), which gained much more through its investment in a fund which prudently shorted Televisa's ADR's than it lost in its own long position, can represent a class of those holders who only lost money.

<u>Market Price Impact</u>

    The disputes involve four "events" tendered by defendants to establish non-responsiveness of the market to public assertions about Televisa's participation in the payment of bribes to obtain the media rights to the World Cup. If disclosures of the bribes had no impact on the market price of Televisa's securities, plaintiff cannot enjoy the "Basic" presumption[1] that the

---

[1] Basic Inc. V. Levenson, 485 U.S. 224 (1988) articulated it.

market reflected all available information in evaluating Televisa's ADR's.

The impact of each of the four disclosure events on Televisa's market price is considered, as they occurred, chronologically.

1.

On December 16, 2016 Reuters released, under Sports News, an "Exclusive: Televisa affiliate surfaces in widening FIFA bribery probe". It continues, in full text:

> NEW YORK (Reuters) -An unnamed company described in a sweeping probe of corruption in soccer's world governing body FIFA matches the description of a close affiliate of Grupo Televisa TLVACPO.MX, the largest broadcaster in Latin America, according to a Reuters review of U.S. and Swiss government documents.
> In court papers filed on Tuesday, U.S. prosecutors said an affiliate of a major broadcasting company headquartered in Latin America helped to pay millions of dollars in bribes to obtain the rights for the next four World Cup tournaments in Argentina, Paraguay and Uruguay.
> Reuters has determined that the affiliate is Mountrigi Management Group Ltd., a Swiss company formed by Televisa that obtained the rights to broadcast the 2018 and 2022 games in those countries and across the region.
> Swiss company registration documents show that Mountrigi and Televisa are registered in that country under the same address and share several board members.
> The court documents do not state that either the companies or their executives are targets of the investigation. Neither company has been charged with wrongdoing.
> "We have no knowledge it refers to us," a Televisa spokesman said in an email, adding that the Department of Justice has not contacted the company to ask about the FIFA case.
> In the court documents, prosecutors said "Broadcasting Company Executive #1" helped pay the bribes to the FIFA official. The Televisa spokesman denied the documents referred to one of its executives. Reuters was unable to determine the identity of the executive.
> "We are certain all of the people from Mountrigi or Televisa that have dealt with FIFA have acted correctly and have not paid any bribes nor any kickback to FIFA official related to the acquisition of rights," the Televisa spokesman said.
> Willi Dietschi, a Swiss attorney who is listed in Swiss company registration documents as the president of the board of directors of both Mountrigi and Televisa's corporate entity in Switzerland, referred questions to the Latin American broadcaster.

John Marzulli, a spokesman for the U.S. Attorney for the Eastern District of New York located in Brooklyn, which is handling the case, declined to comment.

The reference marks the first time a Mexican company has come under scrutiny by U.S. prosecutors in the sweeping FIFA investigation. Mexican broadcasters have played an outsized role in international soccer since the early days of the sport's move into lucrative television markets.

So far 43 individuals and businesses from 20 countries have been indicted by U.S. prosecutors on racketeering, wire-fraud, money laundering and other charges arising from the probe. Twenty people and two related companies have pleaded guilty.

**OTHER BROADCASTERS**

Other unnamed broadcasters have previously been referred to by prosecutors in the wide-ranging investigation, which exploded on to the international stage in May 2015 when law-enforcement agents swept into a luxury hotel in Zurich and arrested more than half a dozen top FIFA officials.

An unnamed Miami sports marketing company that appeared in the indictment coinciding with the arrests turned out to be Media World, an affiliate of Spanish media giant Imagina Group. Later that year the FBI raided Media World's offices, and two executives pleaded guilty in the case. They have yet to be sentenced.

Another sports marketing company described in a superseding indictment as having paid bribes has longstanding ties to the U.S. entertainment company 21st Century Fox [NWSNA.UL], according to securities filings and other government documents.

Fox has not been accused of wrongdoing and has declined to comment on the case.

A media company could potentially be held criminally liable for bribery if it benefitted from a wrongful payment and its employees had knowledge of or were willfully blind to the transaction, legal experts have said.

**LATEST ALLEGATIONS**

The allegations relating to the Latin American broadcaster surfaced in papers filed on Tuesday in Brooklyn as part of a hearing on a deferred prosecution agreement between U.S. authorities and another company, the Argentine sports marketer Torneos y Competencias.

Torneos agreed to pay more than $112 million in penalties for wire fraud conspiracy.

In the criminal charging documents filed against Torneos, prosecutors allege that a wholly-owned subsidiary - called TyC International - obtained the rights to broadcast future World Cup tournaments through a series of contracts with a major Latin American broadcaster's affiliate.

That affiliate went on to pay millions of dollars in bribe and kickback payments to a high-ranking FIFA official with "enormous influence" to secure the World Cup rights,

3

> prosecutors allege. Those rights were awarded long before the host countries were even picked for some of the tournaments.
>
> After FIFA awarded the World Cup rights in 2018 to Mountrigi Management, the company licensed them to TyC international, FIFA documents show. Torneos declined to comment.
>
> The FIFA corruption case is ongoing.

Neither side argues that the Reuters article had any price impact on Televisa's ADR's. That is not surprising,

Despite its exciting headline, the article conveys little sense that Televisa is engaged in bribery. The closest it comes is that Mountrigi, a Swiss company that obtained the rights to broadcast was formed by Televisa, that neither company is named as an investigation target, that Televisa has no knowledge it refers to them and is certain all their people acted correctly. Forty-three others have been indicted, some of whom are named. There have been no guilty pleas and Torneos, an Argentine sports marketer, has paid over $112 million in penalties and has a deferred prosecution agreement. No prosecutor has mentioned Televisa, and neither it nor Mountrigi has been charged with wrongdoing.

At this point, the investor has decided there is no need to do anything about his Televisa holdings, but to wait and see. Televisa seems remote from the action.

2.

On the morning of October 26, 2017, ten months later, the New York Times released what has been called an "exposé", before the market opened. Televisa's price did not react, in fact, it rose slightly.

That is not surprising, either. Much of the tenor of the article dealt with how Mountrigi, a three-person operation wholly-owned by Televisa in the canton of Zug, not named in the charges,

quietly obtained lucrative World Cup broadcast rights and sold them to Torneos, a company run by Alejandro Burzaco, an Argentine businessman who last year pleaded guilty to bribing soccer officials. Its full text reads:

> LONDON - Investigations over the last few years by United States and Swiss law enforcement officials into corruption in global soccer have exposed dozens of people and companies that, according to prosecutors, conspired to illegally reap profits from broadcasting and sponsorship deals lied to the sport's biggest events.
>
> One company never named in any of the charging documents, but referred to obliquely, is a little-known entity based in the canton of Zug in Switzerland: Mountrigi Management Group, a three-person operation that illustrates how some of the biggest deals at the top of the world's most-popular sport were put together. Mountrigi - which borrows its name from Switzerland's Mount Rigi, also known as the Queen of the Mountains and as the muse for a series of paintings by the famed British watercolorist J. M. W. Turner - quietly amassed exclusive broadcast rights to the World Cup in much of the Americas, from Mexico down to Argentina, through 2030.
>
> Ordinarily, such rights deals are announced publicly after a formal bid process, but not on this occasion. Details of the unusual arrangement first appeared in a plea agreement involving a company charged in the United States' sprawling soccer investigation, and emerged again when the Swiss authorities this month accused FIFA's former top administrator of accepting bribes in return for lucrative TV contracts.
>
> "I've been following the sector for 18 years and had never heard of it," Frank Dunne, the editor of the respected industry newsletter TV Sports Markets, said about Mountrigi Management Group.
>
> In much of the Americas, soccer is followed with religious-like devotion, making Mountrigi's 16-nation contract extremely lucrative. Yet until the global corruption inquiries, many people working in the industry had little knowledge of the tiny company that appears to have struck gold with FIFA. United States law enforcement officials helped reveal that Mountrigi is a wholly owned subsidiary of a giant Mexican television network, Grupo Televisa.
>
> Mountrigi paid about $190 million for the 2018 and 2022 World Cups, Dunne said. The contracts for the 2026 and 2030 tournaments probably cost more, but much less than they would be worth today. Since the agreement, FIFA's new leadership has announced that the World Cup will be expanded to 48 teams from 32 in 2026 - and that the tournament will most likely be staged jointly in the United States, Mexico and Canada.
>
> Most of FIFA's top management was removed in the aftermath of the corruption scandal,

the biggest crisis since FIFA's creation 113 years ago. Current officials of the organization, which is based in Zurich, have declined to make public the details of the arrangement with Mountrigi.

Mountrigi and Televisa both declined to comment.

Mountrigi was supported in its dealings with FIFA by Alejandro Burzaco, an Argentine businessman, according to several people with knowledge of the negotiations who requested anonymity because they were not authorized to speak publicly. Burzaco last year pleaded guilty to bribing soccer officials so that the company he ran would be awarded rights to the biggest regional tournaments. The company, Torneos y Competencias, entered a deferred prosecution agreement with the United States Department of Justice, and agreed to pay $112.8 million to settle the case.

In court papers related to Torneos's agreement, prosecutors said an affiliate of a major broadcasting company headquartered in Latin America had helped to pay millions in bribes to get the rights in Argentina, Paraguay and Uruguay for the next four World Cups. Mountrigi, the Televisa affiliate, was awarded those rights and immediately sold them to Burzaco.

Burzaco had over the years funneled millions of dollars in bribes to Julio Grondona, who was responsible for FIFA's finance committee and was one of its most powerful leaders until his death in 2014.

Televisa said last year that neither its employees nor those of Mountrigi had ever "paid any bribes nor any kickback to FIFA officials related to the acquisition of rights."

The rights in question are also under scrutiny in Switzerland, where a statement from the attorney general's office said an unnamed businessman had bribed FIFA's former secretary general Jerome Valcke in return for "the award of media rights for certain countries at the FIFA World Cups in 2018, 2022, 2026 and 2030."

Mountrigi's rights, and those it sold to Torneos, are the only ones that match those described in the Swiss complaint. Niclas Ericson, the FIFA executive responsible for its television division at the lime, did not respond to a request for comment.

Burzaco's lawyer, Sean Casey, declined to comment when asked if his client was the unnamed businessman accused in Switzerland. The Swiss attorney general's office said it could not comment.

The Swiss also accused the Qatari businessman Nasser al-Khelaifi, who is the Paris St-Germain soccer club's chairman, of bribing Valcke in return for a separate package of rights to the 2026 and 2030 World Cups. Khelaifi, who denies the allegations, met with prosecutors on Wednesday.

The United States has charged more than 40 individuals and businesses with a range of corruption-related crimes, and it has also brought to light details of sports rights deals that

> had traditionally been secured behind the scenes with little outside scrutiny.
> Since a powerful group of Brazilian and Argentine businessmen was exposed, some of the world's largest sports rights companies, including WME-IMG and Lagardere Sports and Entertainment, have been able to enter a market that had been closed to them for decades. Beyond the rights it sold to Torneos as part of the agreement with Burzaco, Mountrigi has not signed deals in any of the other territories it has for the 2026 and 2030 events. That means the company can reap greater than planned profits from the expanded World Cup and a possible United States-led tournament in 2026. For FIFA, which is reliant on the quadrennial World Cup for more than 90 percent of its income of more than $5 billion, the deal might bring regret.
> "They've expanded the World Cup and have got no chance of tapping into incremental value in all of the areas where that value is likely to have a large increase," Dunne said.

Once again, no case is made that Televisa is engaged in bribery. Certainly the investor gets the impression that Televisa's small subsidiary made a very lucrative transaction, and that he was dealing with unsavory parties. On balance, and perhaps with misgivings, the investor is glad for Mountrigi's profitable transaction, and still hopes for the best. The slight rise in the price is about what one would expect.

The Televisa price did drop the following day, but that was clearly in response to an unanticipatedly discouraging third-quarter earnings report, published the previous evening.

3.

From 9:30 A.M. to 5:30 P.M. on November 14, 15, 16 and 17, 2017 Alejandro Burzaco, the Argentine businessman who had pleaded guilty to bribing soccer officials so that his company Torneos would get rights to broadcast big events, testified in the United States District Court for the Eastern District of New York in a criminal prosecution of FIFA officials accused of taking bribes. He had paid over $112 million in penalties, and had a deferred prosecution agreement with the government. While it was not the main purpose of his testimony, over the course of the

four days[2] he identified Televisa as "involved in paying bribes to secure contracts for media rights to soccer." (Nov. 14).

He testified that with Televisa and Teleglobe from Brazil, Torneos paid $15 million to a Swiss account to acquire the TV, internet and radio World Cup rights in 2026, and FIFA World Cup in 2030, for Latin America in the case of the "Televisa, Torneos partnership". (Nov. 15). He testified that "Torneos and its Latin American partners" paid "huge amounts of bribes" for World Cup 2018, '22, '26 and '30. (Nov. 16).

Naturally that received considerable contemporaneous media coverage.

The direct evidence that Televisa was a participant, paying bribes for media rights, is what was missing from the first two "events."

The market reacted. Over the four-day period, its closing prices were down to a statistically significant degree, about 7% (-6.73%, -7.32%), which according to lead plaintiffs's economist, would be "highly unusual from random volatility alone". (Feinstein March 6, 2020 Report, p. 56 ¶126).

4.

On January 26, 2018 Televisa released a "Form 6-K Disclosure" that its accountants had found such material weaknesses in its internal control that the financial reporting portions of its December 31, 2016 Annual Report should no longer be relied upon. The Form 6-K stated:

> Mexico City, January 26, 2018 - Grupo Televisa, S.A.B. ("Televisa" or the "Company"; NYSE:TV; BMV:TLEVISA CPO) is furnishing this Current Report on Form 6-K to disclose that the Company's management, in consultation with the Audit Committee of the Company's board and after discussions with PricewaterhouseCoopers, S.C. ("PwC"), the Company's independent registered public accounting firm, has concluded that certain material weaknesses in

---

[2] I am thoroughly aware of the economists' debate over which days should be considered. For present purposes all are relevant, and as evidence they will be viewed as a whole.

> the Company's internal control over financial reporting existed as of December 31, 2016. As a result, the report of management on the effectiveness of the Company's internal control over financial reporting, our conclusion regarding the effectiveness of disclosure controls or procedures, and PwC's audit report (each included in the Company's Annual Report on Form 20-F for the year ended December 31, 2016) should no longer be relied upon for the reasons described below.
>
> The material weaknesses in the Company's internal control over financial reporting related to (I) the design and maintenance of effective controls over certain information technology controls which support systems that are relevant to the provisioning, updating and deleting of users' access to those systems, the periodic review of users' access to these systems, developers' access to certain of these systems and appropriate segregation of duties; (ii) the design and maintenance of effective controls over segregation of duties within the accounting system, including certain individuals with the ability to gain access to prepare and post journal entries across substantially all key accounts of the Company without an independent review performed by someone other than the preparer; and (iii) ineffective controls with respect to the accounting for certain revenue and related accounts receivable in our cable companies and content division.
>
> There is no indication that any of these deficiencies resulted in improper activities or inaccuracies in our financial statements. The Company's management has not identified, and PwC has not identified to the Company, any adjustments to our previously filed financial statements.
>
> The Company initiated remediation efforts with respect to these material weaknesses promptly after the identification thereof.
>
> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.
>
> The Company plans to amend its Form 20-F for the fiscal year ended December 31, 2016, following completion of further procedures and analysis with respect to the financial statements contained therein, consistent with the above disclosures.

There was a small, but noticeable price fall that day, and the economists disagree whether it was statistically significant, depending on their method of analysis. Next trading day, Monday January 29, 2018 Televisa's price rose slightly.

It is hard to derive any significance from this "event." It says there is no indication that any of the deficiencies led to improper activities. There is no reference to bribes paid five years before in 2013 as testified by Mr. Burzaco (Ex12, p. 489). It seems to contradict, at least to some

9

extent, earlier statements extolling their system of controls.

At most, the Form 6-K event can be read to show that it was possible that bribes could be paid, due to loose controls. That pales in significance, to investors who had known since November that bribes, big ones, were paid, from Burzaco's testimony.

* * * *

Three of the four events were unlikely to cause an unusual market reaction, and one cannot draw conclusions from their failure to do so. The single event which conveyed concrete, urgent attention - getting information to the Televisa investors produced a statistically significant price drop which would be "highly unusual from random volatility alone."

On the whole, the market behavior was consistent with an efficient market.

There is no showing sufficient to overcome the Basic presumption that the market price reflected the misimpressions caused by the omissions which concealed the actual state of Televisa's affairs.

## CAAT as Class Representative

One of the prerequisites of a class action is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class" F. R. Civ. P. 23(a)(3). Class certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 161 (1982). And "... actual, not presumed, conformance with Rule 23(a) remains ... indispensable." id at 160. The Supreme Court has repeatedly held that the "class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." East Texas Motor Freight System Inc. v. Rodriguez, 431 U.S. 395, 403 (1977).

During the class period plaintiff CAAT held a long position of 146,400 Televisa ADR's worth $3.47 million on which it claims losses of $968,000. The other class members, at the same market prices, must have suffered similar losses.

But CAAT had something the other members did not. Through its investment in Arrowstreet (Canada) Global World Alpha Extension Fund I, which had shorted Televisa's ADR's, CAAT's share had a short position of 460,710 ADR's (437,633 for the 3-months) with a

gain of over $10.94 million, roughly three times what CAAT had lost in its own long position.

Thus, CAAT's interest in the short sales by Arrowstreet enriched CAAT's overall economic position vastly more than it was injured by losses in its own long holdings of Televisa ADR's.

CAAT makes much of the fact that the short sales were made by a different entity, that the Televisa ADR's it sold were owned by Arrowstreet (CAAT held shares in Arrowstreet which held, and shorted, Televisa's ADR's) which used its own investment judgment, and CAAT compares it to an investment in a mutual fund. The comparison is inapt: CAAT owned 75% of the Arrowstreet Fund. But that argument is off the point. The point is not about title to chattels; it is about whether one whose net worth is increased by a drop in market price is a proper representative of a class of those whose net worth was diminished by it.

As an economic reality, the price drop which injured the other class members enriched CAAT thrice what it cost CAAT. CAAT is not typical of the class.

Accordingly, the motion for class certification is denied.

So Ordered.

Dated: New York, New York
June 8, 2020

*Louis L. Stanton*

LOUIS L. STANTON
U.S.D.J.