**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re GRUPO TELEVISA SECURITIES
LITIGATION

Civil Action No. 1:18-cv-019179-LLS

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DEFINE THE CLASS

Herbert M. Wachtell
Ben M. Germana
David B. Anders
Tamara Livshiz
David E. Kirk
Adebola O. M. Olofin

*Of Counsel*

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000

*Attorneys for Defendants*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................ 2

ARGUMENT ................................................................................................... 5

I.    The class period must end no later than November 17, 2017, because investors
      that purchased Televisa ADRs after that date cannot claim reliance on a market
      price reflecting the alleged misstatements. ........................................................ 6

II.   The class period must begin no earlier than April 28, 2017, the date of Televisa's
      first public "statement" representing that it had secured the rights to broadcast the
      2026-2030 World Cups in Mexico and other territories in Latin America....................... 9

      A.    Televisa's first public statement about its acquisition of the 2026-2030
            World Cup broadcasting rights did not come until April 28, 2017. ..................... 10

      B.    Public statements concerning World Cups other than the 2026 and 2030
            World Cups cannot trigger a start of the class period............................................ 12

      C.    The Second Circuit's intervening decisions in *Danske* and *Singh* confirm
            that Grupo Televisa's statements relating to its Code of Ethics likewise
            cannot trigger a start of the class period. ............................................................ 17

CONCLUSION .............................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alstom SA Sec. Litig.*,
   253 F.R.D. 266 (S.D.N.Y. 2008) ...............................................................8

*Amara* v. *CIGNA Corp.*,
   775 F.3d 510 (2d Cir. 2014)......................................................................5

*Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)..........................................................................5, 7, 9, 10

*Ark. Tchrs. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
   879 F.3d 474 (2d Cir. 2018)....................................................................9, 18

*Basic Inc.* v. *Levinson*,
   485 U.S. 224 (1988)............................................................. *passim*

*Boucher* v. *Syracuse Univ.*,
   164 F.3d 113 (2d Cir. 1999).....................................................................1, 5

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................6

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
   752 F.3d 173 (2d Cir. 2014).....................................................................18

*Constr. Laborers Pension Tr. for S. Cal.* v. *CBS Corp.*,
   433 F. Supp. 3d 515 (S.D.N.Y. 2020)......................................................22

*DeMarco* v. *Lehman Bros., Inc.*,
   222 F.R.D. 243 (S.D.N.Y. 2004) .............................................................13

*Doe* v. *Uber Techs., Inc.*,
   2021 WL 3193166 (S.D.N.Y. July 28, 2021) .........................................21

*GAMCO Invs., Inc.* v. *Vivendi Universal, S.A.*,
   838 F.3d 214 (2d Cir. 2016).....................................................................7

*Goldman Sachs Grp., Inc.* v. *Ark. Tchrs. Ret. Sys.*,
   141 S. Ct. 1951 (2021)..................................................................3, 6, 9, 10

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)......................................................................3, 5, 7, 8

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
   2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .......................................................................10

*In re: Colls. of Applied Arts & Tech. Pension Plan*,
   No. 21-1499 (2d Cir. Aug. 24, 2021).....................................................................................4

*In re Karyopharm Therapeutics Inc., Sec. Litig.*,
   2021 WL 3079878 (D. Mass July 21, 2021)........................................................................19

*Katyle* v. *Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) .................................................................................................10

*Okla. Law Enf't Ret. Sys.* v. *Papa John's Int'l, Inc.*,
   517 F. Supp. 3d 196 (S.D.N.Y. 2021)..................................................................18, 19, 22

*Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*,
   ___ F.4th ___, 2021 WL 3744894 (2d Cir. Aug. 25, 2021) .......................................... *passim*

*Reiner* v. *Teladoc Health, Inc.*,
   2020 WL 6343217 (S.D.N.Y. Sept. 4, 2020)....................................................................20, 21

*In re Ribozyme Pharms., Inc. Sec. Litig.*,
   205 F.R.D. 572 (D. Colo. 2001) ...............................................................................................8

*In re Sanofi-Aventis Sec. Litig.*,
   293 F.R.D. 449 (S.D.N.Y. 2013) ..............................................................................................9

*Schiro* v. *Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019)..............................................................................19, 21

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2019 WL 3001084 (S.D.N.Y. July 10, 2019) ....................................................................6, 8

*Singh* v. *Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019).............................................................................................. *passim*

*Ulbricht* v. *Ternium S.A.*,
   2020 WL 5517313 (E.D.N.Y. Sept. 14, 2020) .....................................................................20

*Wachtel ex rel. Jesse* v. *Guardian Life Ins. Co. of Am.*,
   453 F.3d 179 (3d Cir. 2006).......................................................................................................5

*Waggoner* v. *Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017).................................................................................................1, 6

*In re Williams Sec. Litig.-WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) .............................................................................................10

*Yi Xiang* v. *Inovalon Holdings, Inc.*,
   327 F.R.D. 510 (S.D.N.Y. 2018) ..............................................................................5

**Rules**

Fed. R. Civ. P. 23(b)(3)..............................................................................................7, 8

Fed. R. Civ. P. 23(c)(1)...........................................................................................1, 4, 5

Fed. R. Civ. P. 23(c)(1)(B) .........................................................................................5

## PRELIMINARY STATEMENT

Rule 23(c)(1) of the Federal Rules of Civil Procedure requires that district courts "define, redefine, subclass, and decertify [a class] as appropriate in response to the progression of the case." *Boucher* v. *Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999) (citation omitted). Consistent with that principle, this Court instructed the parties to "clear[] up" the open "questions . . . about the definition of the class" in the present action. ECF No. 171. There has been no previous determination of the class parameters.

That is the purpose of this motion. *First*, the class period must end no later than November 17, 2017. This closing date is the logical result of applying the principles set forth in *Basic Inc.* v. *Levinson*, 485 U.S. 224, 247 (1988), to the Court's June 8, 2020 Order, which found that Alejandro Burzaco's trial testimony between November 14-17, 2017 was the "*single* event" alleged in the Complaint constituting a potential "corrective" disclosure.[1] ECF No. 134 at 10. As *Basic* and its progeny make clear, investors who purchased Televisa ADRs after that point cannot invoke a presumption of reliance on a market price reflecting the alleged misstatements, rendering any claims by them ineligible for class treatment. *See Basic*, 485 U.S. at 249. And likewise excluded are investors that purchased after that date but sold out *before* the time of that "disclosure." *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 90 n.19 (2d Cir. 2017).

*Second*, the class period must begin no earlier than April 28, 2017, the date on which Televisa for the very first time made any public statement that it had in fact secured broadcasting rights for the 2026 and 2030 World Cups — and, therefore, the date of the earliest alleged "omission" of Televisa's supposed participation in a bribery scheme with respect to those World Cups that Burzaco's testimony could possibly have "corrected."

---

[1] Here and throughout, all emphasis within quotes has been supplied by Defendants unless otherwise noted.

Accordingly, this Court should define the class to encompass, at most, individuals and entities (excluding Defendants) that purchased or acquired Televisa ADRs from April 28, 2017, through and including November 17, 2017 (and still held such ADRs through that latter date).

## BACKGROUND

This securities action arises out of the U.S. Justice Department's sprawling criminal investigation into soccer-related corruption at Fédération Internationale de Football Association ("FIFA"). As a result of its investigation, the DOJ has brought charges against more than 50 individuals and entities from more than 20 countries, and has already secured convictions or pleas from no fewer than 24 of those individuals and entities.

But tellingly, despite that widespread investigation, neither Televisa nor the Individual Defendants in the present action have ever been served by the DOJ with so much as a subpoena or request for documents or testimony related to that extensive investigation.

Nonetheless, in its Complaint filed nearly three years ago, former lead plaintiff Colleges of Applied Arts & Technology Pension Plan ("CAAT"), through former lead counsel Robbins Geller Rudman & Dowd, asserted that Defendants via Mr. Alejandro Burzaco had paid bribes to secure certain FIFA World Cup media rights, and then made various misstatements to conceal the alleged scheme from the public. ECF No. 32 ("Compl."). CAAT purported to demand relief from this "fraud" on behalf of all investors who had "purchased or acquired Televisa ADRs from April 11, 2013 to January 25, 2018." *Id.* ¶ 29.

The Complaint alleged a series of events through which the so-called "truth" behind Televisa's involvement in the bribery scheme was revealed to the market, thereby "correcting" the claimed misstatements. *See, e.g., id.* ¶¶ 12, 158. As relevant here, the Complaint alleged that such "corrective disclosures" occurred: (1) "[o]n October 26, 2017, [when] *The New York Times* published an exposé on Televisa's connection to the bribery scandal" and "placed it squarely

with the likes of Burzaco and Torneos in illegally obtaining rights to World Cup tournaments";
(2) "on November 14, 2017, [when] Burzaco testified about his 2013 meeting . . . to secure rights
for World Cups 2026 and 2030 on behalf of Torneos[] [and] Televisa for the Latin America
territories"; and (3) on January 26, 2018, when Televisa issued a Form 6-K announcing certain
internal control deficiencies — an announcement that "came about directly as a result of the
public disclosure of Televisa's bribery payments."  *Id.* ¶¶ 12, 61, 64-68.

This Court, in its June 8, 2020 Order denying CAAT's class certification motion,
nevertheless surveyed these so-called "corrective" disclosures for the "price impact" required to
establish presumption of market reliance.  ECF No. 134 at 1-2; *cf. Halliburton Co.* v. *Erica P.
John Fund, Inc.*, 573 U.S. 258, 282 (2014) ("*Halliburton II*") ("Price impact is . . . an *essential
precondition* for any Rule 10b-5 class action.").  As the Court set forth in its ruling, two of those
alleged disclosures — the October 26, 2017 *New York Times* article as well as Televisa's January
26, 2018 Form 6-K involving internal controls — "fail[ed]" to generate any "unusual market
reaction" at all.  ECF No. 134 at 10; *cf. Goldman Sachs Grp., Inc.* v. *Ark. Tchrs. Ret. Sys.*, 141 S.
Ct. 1951, 1959 (2021) ("If a misrepresentation had no price impact, then *Basic*'s fundamental
premise completely collapses, rendering class certification inappropriate." (internal quotation
marks and citation omitted)).

That ruling left the putative class with only Burzaco's November 2017 testimony, which
the Court described as the sole alleged "corrective" disclosure explicitly linking Televisa to
"bribes [paid] for media rights."  *Id.* at 8.  Thus, that testimony was the "*single* event which

conveyed concrete, urgent, attention-getting information to . . . Televisa investors" sufficient to "produce[] a statistically significant price drop." *Id.* at 10.[2]

After reaching this conclusion, the Court nevertheless rejected class certification because aspiring class representative CAAT was atypical of the putative class. *Id.* at 10-11. Two weeks later, CAAT filed a second class certification motion, this time proffering Palm Tran, Inc. Amalgamated Transit Union Local 1577 Pension Plan ("Palm Tran") and another pension fund as potential class representatives. *See* ECF No. 140. On June 29, 2020, the Court certified a class with Palm Tran at the helm. *See* ECF No. 146. The certification order, however, did not define the scope of that class. *Id.*

Recognizing that the parameters of the certified class remained unsettled, the Court notified the parties on October 27, 2020 that the outstanding "questions . . . about the definition of the class" (as well as those concerning the conduct of former class counsel Robbins Geller) "should be cleared up." ECF No. 171. With that class counsel disqualification now resolved — *see* ECF No. 227; ECF No. 235 (Order Denying Robbins Geller's Petition for Writ of Mandamus, *In re: Colls. of Applied Arts & Tech. Pension Plan*, No. 21-1499 (2d Cir. Aug. 24, 2021)) — Defendants turn here to the open question of class definition.

---

[2] As this Court is aware, Defendants have previously set forth their position that the November 2017 testimony does not qualify as a corrective disclosure and no class should be certified. *See* ECF Nos. 94-96, 103, 115, 123, 125, 127-128, 130. Defendants respectfully reserve that position, but, for purposes of this motion to define the class under Rule 23(c)(1), Defendants accept the correctness of this Court's June 8, 2020 rulings that denied the class certification motion of former lead plaintiff CAAT, *see* ECF No. 134, including that the November 2017 testimony can qualify as a corrective disclosure at this stage, *see id.* at 7-8.

## ARGUMENT

Under Rule 23(c)(1), a district court that "certifies a class action must define the class and the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B). The plain meaning of this Rule is that the district court must supply "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Wachtel ex rel. Jesse* v. *Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187-88 (3d Cir. 2006). Further, the same Rule "requires courts to reassess . . . class rulings as the case develops, and to ensure continued compliance with Rule 23's requirements." *Amara* v. *CIGNA Corp.*, 775 F.3d 510, 520 (2d Cir. 2014) (citation and internal quotation marks omitted) (alteration in original). Accordingly, "[t]he district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case." *Boucher*, 164 F.3d at 118 (citation omitted) (alteration in original).

In securities class actions like this one, "a class definition ordinarily should have temporal limitations." *Yi Xiang* v. *Inovalon Holdings, Inc.*, 327 F.R.D. 510, 521 (S.D.N.Y. 2018) (citation omitted). And the boundaries of that "class period" must conform to certain bedrock securities-law principles. Specifically, investors are eligible for the *Basic* presumption of reliance — and, thus, for class membership — only if they "traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 278. That is because "plaintiff[s] whose relevant transactions were *not* executed between the time the misrepresentation was made and the time the truth was revealed cannot be said to have indirectly relied on the misrepresentation through [their] reliance on the integrity of the market price." *Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 472 (2013).

Thus — under controlling law here — the class period begins with the first actionable misstatement linked to a corrective disclosure, for "[a] security's market price cannot be affected

by a misrepresentation not yet made." *Id.*; *see also Goldman Sachs*, 141 S. Ct. at 1958 ("To

invoke the *Basic* presumption, a plaintiff must prove . . . that the plaintiff traded the stock

between the time the misrepresentation was made and when the truth was revealed."). And the

"class period ends when the truth has been disseminated to the market," thereby dispelling any

fraud-induced inflation in the stock value. *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays

PLC*, 310 F.R.D. 69, 97 (S.D.N.Y. 2015); *see also In re Signet Jewelers Ltd. Sec. Litig.*, 2019

WL 3001084, at *18 (S.D.N.Y. July 10, 2019) ("*Signet III*") ("In a securities fraud class action,

courts are required to cut off the class period on the date of a statement or event that cures the

market." (internal quotation marks and citation omitted)). Moreover, the class must exclude any

investors who purchased shares within the class period but then divested themselves of those

shares *before* the "truth" was revealed, as such investors cannot make out a claim for damages.

*Waggoner*, 875 F.3d at 90 n.19.

Applied here, the above principles yield a class period for this action that begins no

earlier than April 28, 2017, when it is submitted that the very first actionable alleged

misstatement linked to the sole remaining "corrective disclosure" occurred, and ends no later

than November 17, 2017, when the purported "truth" of that alleged misstatement was revealed.

I.    **The class period must end no later than November 17, 2017, because investors that
      purchased Televisa ADRs after that date cannot claim reliance on a market price
      reflecting the alleged misstatements.**

Defendants begin with the end: in the present action, the class period must close no later

than November 17, 2017. This conclusion is the result of applying the principles first announced

in *Basic* to the Court's rulings in its June 8, 2020 Order. There, the Court held unequivocally

that Alejandro Burzaco's November 2017 trial testimony was the "*single* event" alleged in the

Complaint — and, therefore, the *last* — capable of qualifying as a "corrective" disclosure. ECF

No. 134 at 10. In doing so, the Court identified the final date on which a purchaser of Televisa

ADRs could have relied on an allegedly inflated market price reflecting the claimed misstatements, for the revelation of the "truth" at that time would have nullified (or "corrected") any inflationary effects of the alleged fraud.  Consequently, all Televisa investors who acquired ADRs *after* November 17, 2017 fail to qualify for the *Basic* presumption of reliance — and, as a result, for class membership.

Under the *Basic* presumption, any investor who buys or sells stock "at the price set by the market does so in reliance on the integrity of that price," which, in an efficient market, captures "all publicly available information."  *GAMCO Invs., Inc.* v. *Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Basic*, 485 U.S. at 246-47).  "The fundamental premise underlying the presumption is that an investor . . . relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction."  *Halliburton II*, 573 U.S. at 278 (citation omitted).  That premise, however, no longer holds when "corrective" information has "entered the market and dissipated the effects of the [alleged] misstatements."  *Basic*, 485 U.S. at 249.  At that point, "there is 'no grounding for any contention that the investor indirectly relied on that misrepresentation through his reliance on the integrity of the market price.'"  *Halliburton II*, 573 U.S. at 278 (brackets omitted) (quoting *Amgen*, 568 U.S. at 473).  In other words, once an alleged misstatement is publicly corrected, a purchaser's reliance on the alleged fraud can no longer be presumed.  *Id.*

Without the *Basic* presumption, investors who bought securities after a corrective disclosure cannot qualify for class treatment.  Specifically, those investors "would have to prove reliance individually, so common issues would *not* 'predominate' over individual ones, as required by Rule 23(b)(3)."  *Halliburton II*, 573 U.S. at 281-82 (citing *Basic*, 485 U.S. at 242).  For this exact reason, district courts routinely terminate overbroad class periods that stretch past

the last "corrective statement."  *See, e.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 291

(S.D.N.Y. 2008) (rejecting plaintiff's end date and cutting off class at last corrective disclosure);

*Signet III*, 2019 WL 3001084, at *19 (closing class period on date of event that "cure[d] the

market" because the "*Basic* presumption of reliance does not attach to the subsequent [alleged]

corrective disclosures"); *In re Ribozyme Pharms., Inc. Sec. Litig.*, 205 F.R.D. 572, 579-81

(D. Colo. 2001) ("[T]he class period should end when curative information is publicly

announced or otherwise effectively disseminated to the market.").  The same is required here.

In this action, assuming the truth of the Complaint's allegations and accepting this

Court's June 8, 2020 rulings, the first and last corrective disclosure was Burzaco's November

2017 trial testimony.  The Court found that his testimony was the "*single* event" cited in the

Complaint that would have publicly "conveyed concrete, urgent [and] attention-getting

information" sufficient to expose the alleged bribery scheme underpinning the plaintiff's claims.

ECF No. 134 at 10.  This supposed revelation is the very sort of "corrective" news that, in the

Supreme Court's words, would have "entered the market and dissipated the effects of the

[purported] misstatements," *Basic*, 485 U.S. at 249 — *if*, of course, those "misstatements" ever

affected the share price at all.  As a consequence, no purchaser of Televisa ADRs after

November 17, 2017 could plausibly claim to have relied "on the integrity of [a market] price"

still reflecting the alleged falsehoods.  *Halliburton II*, 573 U.S. at 278 (citation omitted).  Such

purchasers accordingly fail to qualify for the *Basic* presumption, and, therefore, cannot satisfy

the predominance requirement of Rule 23(b)(3).

Thus, the class period in this action must end no later than November 17, 2017.

**II.    The class period must begin no earlier than April 28, 2017, the date of Televisa's first public "statement" representing that it had secured the rights to broadcast the 2026-2030 World Cups in Mexico and other territories in Latin America.**

The earliest appropriate start date for the class period is equally straightforward.  As set forth above, to qualify for the *Basic* presumption, plaintiffs must have "purchased the stock [at issue] *after* the misstatement was made."  *Ark. Tchrs. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 879 F.3d 474, 483 (2d Cir. 2018), *vacated in part on other grounds*, 141 S. Ct. 1951 (2021) ; *see also Amgen*, 568 U.S. at 472 (*Basic* presumption applies only *after* alleged misstatement because "[a] security's market price *cannot be affected by a misrepresentation not yet made*").  Accordingly, a class period can begin no earlier than the first actionable alleged misrepresentation or omission linked to the corrective disclosure of the fraud.  *See In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 459 n.12 (S.D.N.Y. 2013) ("Typically, the class period begins on the date of the first misstatement, as it is the injection of misinformation into the marketplace that distorts the price of the stock.").

In this action, the earliest possible opening date for the class period is April 28, 2017, *i.e.*, the date on which Televisa stated to the public *for the very first time* that it had acquired the 2026-2030 World Cup media rights, and, therefore, the date of the first alleged misstatement arguably susceptible to "correction" when Burzaco implicated Televisa in an alleged bribery scheme to procure those rights.  *See* pp. 12-16, *infra*.  Reinforcing this conclusion is the reality that developments throughout the litigation, including the Court's June 8, 2020 Order, have rendered inactionable all alleged misstatements and omissions preceding that date, including (1) alleged misstatements unrelated to Televisa's acquisition of broadcasting rights for the 2026-2030 World Cups, and (2) alleged misstatements related to Televisa's Code of Ethics.

A.   **Televisa's first public statement about its acquisition of the 2026-2030 World Cup broadcasting rights did not come until April 28, 2017**.

Although the Complaint contains an extensive section captioned "Defendants' False or Misleading Statements," a review of the paragraphs purporting to support that headline reveals a critical fact:  the *very first* public statement that Televisa ever made concerning its acquisition of broadcasting rights for the 2026-2030 World Cups occurred on April 28, 2017, when Televisa disclosed its acquisition of those rights in its Form 20-F for the 2016 fiscal year.  *See* Compl. ¶¶ 70-122, 114.  Under settled law, then, the class period cannot commence before that date, for, as noted above, "[a] security's market price *cannot be affected by a misrepresentation not yet made*."  *Amgen*, 568 U.S. at 472.

Moreover, it is axiomatic that an alleged misrepresentation is actionable only if its substance can be linked to a later corrective disclosure.  *See, e.g.*, *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *3 (S.D.N.Y. Mar. 23, 2020) ("The case law is clear that a corrective disclosure needs to be corrective and 'linked' to a specific alleged misrepresentation. . . . The analysis must focus on whether the disclosure was, in fact, corrective.").  Thus, while an alleged corrective disclosure need not *mirror* a prior misrepresentation, it must "at least *relate back* to the misrepresentation."  *Katyle* v. *Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) (citation omitted); *accord In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) (similar).

Indeed, the Supreme Court reiterated this principle just recently in *Goldman Sachs Group, Inc.* v. *Arkansas Teachers Retirement System*, 141 S. Ct. 1951 (2021).  There, the Supreme Court vacated a Second Circuit order affirming a district court's class-certification order, instructing the Second Circuit to consider upon remand whether the *specific* "corrective" disclosure relied upon by plaintiffs "actually corrected the *generic* misrepresentation" alleged in

the complaint.  *Id.* at 1961.  As the Supreme Court explained, when there is a "mismatch" between the contents of an alleged misrepresentation and a "corrective" disclosure, the "inference" plaintiffs (like Palm Tran) rely on in cases proceeding under the so-called "inflation-maintenance theory" — *i.e.*, that the "back-end price drop" from the corrective disclosure equals the "front-end price inflation" from the alleged misrepresentation — "starts to break down."  *Id.*

Here, as noted above, this Court has already held that the "*single*" alleged corrective disclosure resulting in price impact occurred during Burzaco's trial testimony in November 2017.  ECF No. 134 at 8, 10.  In the course of that testimony, Burzaco explicitly (albeit erroneously) testified that Televisa participated in an agreement to "pay[] $15 million in bribes" for the "World Cup 2026 and . . . World Cup 2030."  ECF No. 39-1 (Excerpted Trial Tr.) at 488:19-489:12.  Accordingly, the earliest alleged misstatement that this "corrective" disclosure could "relate back" to is Televisa's April 28, 2017 Form 20-F, where Televisa stated *for the very first time* that it had "secured the rights to broadcast . . . the 2026 and 2030 FIFA World Cups for Mexico and other territories in Latin America."  Ex. A (Grupo Televisa, S.A.B. Form 20-F for Fiscal Year 2016) at 36; *accord* Compl. ¶ 114.  Until that date, Televisa had never represented to the investing public that it had procured those rights — and, therefore, the market price of Televisa ADRs could not possibly have been affected by any alleged "omission" concerning the means through which those rights were procured.

Thus, the class period cannot begin before Televisa's acquisition of the 2026-2030 World Cup rights was announced on April 28, 2017, as that was the *first* public statement from the company that could be linked to Burzaco's November 2017 trial testimony implicating Televisa in a scheme to obtain those World Cup rights through bribery.

**B.      Public statements concerning World Cups other than the 2026 and 2030 World Cups cannot trigger a start of the class period**.

Given that Burzaco's testimony linked Televisa to a bribery scheme involving the 2026-2030 World Cup rights, statements concerning *different* World Cup tournaments cannot justify opening the class period before April 28, 2017.  To be sure, the Complaint includes entirely conclusory allegations of "fraud" regarding the acquisition of media rights for the 2018-2022 World Cups, and the Court has recognized as much in previous Orders.  *See, e.g.*, Compl. ¶¶ 6, 44, 56; ECF No. 47 at 3; ECF No. 134 at 8.  But those unsubstantiated and conclusory allegations of "fraud" cannot support a class period untethered to Televisa statements concerning the *2026-2030* World Cups.

To arrive at this conclusion, one need look no further than the Complaint itself, which treats Burzaco's testimony as explicitly implicating Televisa in a bribery scheme to procure the *2026-2030* World Cup rights — and *only* those World Cup rights.  *See* Compl. ¶¶ 16, 19, 46, 61, 126, 131, 162-63.  For example, in its recitation of alleged "corrective" disclosures, the Complaint ties the purported price drop following Burzaco's testimony solely to the precise moment "[o]n November 14, 2017" when "Burzaco identified Televisa as a company that paid bribes . . . to secure its media rights to the World Cups in *2026 and 2030*."  *Id.* ¶ 126, ¶ 129 (alleging price drop).  Moreover, the *sole* use of Televisa dollars cited in the Complaint as a supposed "bribe" — a $7.25 million payment to Burzaco that, in reality, was an on-the-books consulting fee paid pursuant to a legitimate contract — is repeatedly described as "consistent with Burzaco's testimony about Televisa's involvement in . . . bribes . . . to acquire the *2026* and *2030* World Cup TV rights."  *Id.* ¶ 19; *see also* ¶¶ 63, 131.

Thus, critically, the Complaint contains *no* allegation that any single dollar of Televisa money was ever paid to Burzaco and used by him in his bribery scheme *other than* those dollars

- 12 -

so used by him in connection with the acquisition of the 2026-2030 World Cup rights.  While

Burzaco then stated generically on November 16 that his company "and its Latin American

partners" had paid various bribes "for World Cup[s] 2018, '22, '26 and '30," he did not identify

*which* of those "partners" he was referring to in connection with each particular set of rights,

ECF No. 113-13 (Excerpted Trial Tr.) at 756:12-14 — and there is *no* reason to believe that he

was purporting to include *Televisa* in particular as to such earlier years.  That omission is critical,

as Burzaco had previously identified "*many* partners" who allegedly participated in his soccer-

related bribery schemes — without distinction:  which partners; which soccer events.  *See* ECF

No. 39-1 at 239:5-13-19.

Accordingly, on their face, both the Complaint allegations and Burzaco's testimony are

lacking *any* actual claim tying Televisa to any bribery scheme *other than* the one alleged in

connection with the 2026-2030 World Cups.  And in fact, not a single contemporaneous news

article or analyst report identified by Robbins Geller construed Burzaco's reference to the 2018-

2022 World Cups as implicating Televisa in any way, *see, e.g.*, Compl. ¶¶ 162-63, and

Defendants are aware of none.  Thus, if neither news outlets nor analysts tied Televisa to

Burzaco's statements regarding the *2018-2022* World Cups, then no basis exists to conclude that

investors drew such a non-existent link and there could be no market movement resulting

therefrom.  *Cf. DeMarco* v. *Lehman Bros., Inc.*, 222 F.R.D. 243, 245-46 (S.D.N.Y. 2004)

("[T]he [*Basic*] Court recognized that the manner in which information about a public company

gets translated into a market price is through the intervening analyses of market professionals.").

That is also consistent with this Court's observations in its June 8, 2020 Order, when it

rejected the notion that Televisa's January 26, 2018 Form 6-K could have "corrected" any

purported misstatements concerning the company's acquisition of World Cup media rights.  ECF

No. 134 at 9-10.  Specifically, in concluding that the Form 6-K was *not* a corrective disclosure and did *not* result in price impact, the Court observed that the Form 6-K made "no reference to bribes paid five years before *in 2013* as testified by Mr. Burzaco," citing directly to the portion of the testimony linking Televisa to an alleged bribery scheme for the *2026-2030* World Cup broadcasting rights only, *id.* at 9 (citing [testimony p. 489]).  For it was in fact *those* rights that were acquired in 2013:  it is uncontroverted in this litigation that the earlier 2018-2022 World Cup rights were acquired back in *2011*.

And, critically, the only other court to have analyzed Burzaco's Televisa-related testimony expressly concluded that such testimony was bereft of *anything* associating Televisa with a bribery scheme related to the 2018-2022 World Cups.  Specifically, the District Court of Zürich, Switzerland, upon *denying* former class counsel Robbins Geller's request in this very litigation for Hague Convention discovery from FIFA concerning its negotiations with Televisa over the 2018-2022 World Cup rights, concluded the following:

> [T]here is *no* presentation *whatsoever* regarding why there is a suspicion of corruption with regard to the acquisition and/or sale of the broadcast rights concerning the 2018/2022 World Cups as well, because of which the Plaintiff is supposed to have sustained financial harm.  It is thus not clear to this Court why documents of FIFA concerning the negotiation of a license with Televisa or a Televisa subsidiary with regard to the broadcast rights to the *2018/2022* World Cup tournaments are also supposed to be relevant to the action . . . .

Ex. B (District Ct. of Zürich's Aug. 27, 2020 Order) at § II, ¶ 6.1 (holding that FIFA could withhold documents concerning the 2018-2022 World Cups from Hague discovery for use in this action because "the requisite factual connection" to allegations in this action was "lacking"); *see also* Ex. C (District Ct. of Zürich's Nov. 24, 2020 Order) at § I, ¶ 2 ("In an order issued by this Court on August 27, 2020, the aforementioned request for mutual assistance was approved, *with*

*the exception* of the information concerning the acquisition and/or sale of the broadcast rights to

the *2018/2022* World Cups . . . .").

Needless to say, if Burzaco's testimony was held not sufficient even to provide a factual

predicate for *discovery* into Televisa's obtaining the 2018 or 2022 World Cup rights, then such

testimony can hardly be deemed a "corrective" disclosure revealing to the market that Televisa

acquired those rights through bribery.[3]

Moreover, the foregoing is fully consistent with what then-class counsel represented to its

own then-client Palm Tran in its 2020 Second Quarter Litigation Report.  Tellingly, there, the

firm explicitly set forth that Burzaco's testimony relating to Televisa in fact concerned the 2026-

2030 World Cups *alone*, describing the November 2017 "corrective" disclosure as follows:

> On November 14 and 15, 2017, at the corruption trial of three former executives
> of FIFA, Alejandro Burzaco, a former Chief Executive Officer of the sports-
> marketing company Torneos y Competencias S.A., testified that Televisa and
> other media companies had paid multi-million dollar bribes to FIFA executives in
> order to secure lucrative multi-year broadcasting rights *for the 2026 and 2030*
> World Cups.

*See* Ex. D at 31 (Litigation Report - Q2 2020 - Grupo Televisa, S.A.B.).

This concession is particularly revealing, for it makes clear that even Robbins Geller

interpreted its most important piece of "proof" implicating Televisa in the alleged bribery as a

reference strictly limited to the 2026-2030 World Cup rights.  And given that understanding,

Robbins Geller had enormous incentive to dig up each and every company statement mentioning

Televisa's acquisition of those rights, so that it could cast such statements as misrepresentations

and substantiate its allegations of "fraud."  Yet Robbins Geller, after scouring company

---

[3] Defendants were not participants in the Swiss proceedings as between Robbins Geller and
FIFA, and Robbins Geller withheld furnishing Defendants with copies of these orders until
March of this year, many *months* after the orders were issued.  Ex. E (March 2, 2021 Email from
E. Boardman to T. Livshiz).

information across every imaginable source, could not identify a *single* Televisa disclosure on the subject before April 28, 2017.  *See* Compl. ¶ 114.  Instead, to justify a class period with an earlier opening date, the Complaint cobbles together a lengthy list of "false or misleading statements" concerning *different* World Cups (in the instances where those statements involve World Cups at all).[4]  *See id.* ¶¶ 70-113 (citing various alleged misstatements predating April 28, 2017, *none* of which referred to the 2026-2030 World Cups).  But the Complaint's litany of purported misrepresentations *preceding* April 28, 2017 cannot obscure its own authors' conceded view that any "corrective" effect of Burzaco's testimony would have been limited solely to statements concerning Televisa's acquisition of media rights for the 2026-2030 World Cups, a transaction not publicly disclosed by Televisa until April 28, 2017.

Thus, any claimed misrepresentations and omissions concerning World Cups *other than* the 2026 or 2030 tournaments cannot be used to open the class period before April 28, 2017, for those statements lack the requisite link to Burzaco's testimony.

\* \* \*

As this Court is aware, the Complaint also alleges that a December 2016 *Reuters* article identified Mountrigi (a Televisa subsidiary) as an entity involved in Burzaco's bribery scheme to secure World Cup rights.  *See* Compl. ¶ 108.  Manifestly, that news report antedated Televisa's

---

[4] The Complaint attempts to cast earlier statements from eight of Televisa's quarterly earnings calls as actionable misstatements, but Burzaco's testimony could not possibly relate back to any of them, for none of those statements so much as suggests that Televisa had acquired the 2026-2030 World Cup rights at all.  *See* Compl. ¶¶ 74, 80-83, 90-92, 100.  Indeed, seven of the eight calls identified in the Complaint involved company statements concerning only the broadcasting of the 2014 World Cup — a tournament wholly irrelevant to this action.  *See id.* ¶¶ 74, 82-83, 90-92, 100. And none of the earnings-call statements constitutes an alleged misstatement or omission that could have been "corrected" when Burzaco linked Televisa to a bribery scheme for the 2026-2030 World Cup rights, for none of them references the 2026-2030 rights.  Thus, those inactionable statements cannot supply opening dates for the class period that precede Televisa's representation of its acquisition of 2026-2030 World Cup rights on April 28, 2017.

Form 20-F filing in April of 2017.  Nevertheless, this Court has previously ruled that the *Reuters* report conveyed no meaningful information whatsoever that would have allowed the investing public to draw a link between Televisa and the alleged bribery scheme.  *See* ECF No. 134 at 4, 7, 10.  Moreover, that *Reuters* article did not contain any confirmation from Televisa itself that the company had, in fact, acquired the 2026-2030 World Cup rights:  to the contrary, Televisa declined to so confirm and rather set forth a generic denial of any role in bribery.  *See id.* at 3-4 (laying out text of *Reuters* article).  Accordingly, this December 2016 *Reuters* report and Televisa's response therein cannot be deemed to constitute an affirmation prior to April 28, 2017 of having acquired the 2026-2030 World Cup rights, and thus cannot serve to open the class period at an earlier date.  Moreover, as previously set forth for this Court, it is undisputed (and indisputable) that there was no price impact — up or down — with respect to that *Reuters* piece.

**C.    The Second Circuit's intervening decisions in *Danske* and *Singh* confirm that Grupo Televisa's statements relating to its Code of Ethics likewise cannot trigger a start of the class period**.

Similarly, under the Second Circuit's recent holdings in *Plumber & Steamfitters Local 773 Pension Fund* v. *Danske Bank A/S*, ___ F.4th ___, 2021 WL 3744894, at *8 (2d Cir. Aug. 25, 2021) and *Singh* v. *Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019), statements concerning Televisa's ethics policies do not provide any basis for opening the class period before April 28, 2017.  In its Complaint, former lead plaintiff CAAT cherry-picked a series of statements from Grupo Televisa's Code of Ethics and SEC filings to allege that "Defendants falsely or misleadingly conveyed that Televisa and its directors, executives, and employees . . . complied with its Code of Ethics, which requires them to comply with applicable law and prohibits bribes in their official work duties."  *See* Compl. ¶ 70; *see also id.* ¶¶ 87-88, 96-97, 99, 104-07, 112-13.  And, in denying Defendants' motion to dismiss, the Court held that these statements could be actionable.  ECF No. 47 at 20-21.  However, at the motion to dismiss stage, this Court was

obliged to assume the accuracy of the plaintiff's claims, whereas at the class certification stage, the burden is on the plaintiff to justify class certification and the bounds thereof.  *See Ark. Tchrs.*, 879 F.3d at 482 n.7.  Further, at that time, this Court had neither the *Danske* nor *Singh* decisions before it, as *Danske* was handed down a mere three weeks ago and *Singh* was published several months following the close of briefing on Defendants' motion.  Accordingly, neither *Singh* nor *Danske* was considered at the motion-to-dismiss stage.

In *Singh*, the Second Circuit considered and rejected a plaintiff's attempt to cast as securities fraud "banal and vague corporate statements affirming the importance of regulatory compliance."  918 F.3d at 60.  Likewise, in *Danske*, the Second Circuit held that "bromides about being good and upright are plainly puffery."  2021 WL 3744894, at *7.  In concluding that such statements were *inactionable*, the Second Circuit in *Singh* and *Danske* calcified three fundamental principles:

*First*, the Second Circuit held that "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them."  *Singh*, 918 F.3d at 63 (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)).  Following *Singh*, district courts throughout this District have rejected as "inactionable puffery" nearly identical statements to the ones that this Court at the motion to dismiss stage had deemed potentially actionable.  **Compare** Compl. ¶ 88 (observing that Televisa's Code of Ethics stated that "[e]very person must act in accordance with this Code and with the applicable laws in Mexico and in any other jurisdictions"), **with** *Okla. Law Enf't Ret. Sys.* v. *Papa John's Int'l, Inc.*, 517 F. Supp. 3d 196, 208 (S.D.N.Y. 2021) (inactionable puffery where Papa John's Code of Ethics stated that "Papa John's complies with all applicable labor and employment laws" and

that "failure to comply with the standards contained in this Code . . . will subject a team member to corrective action"), *and Schiro* v. *Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 298 (S.D.N.Y. 2019) ("classic puffery" where company's code of ethics stated that it "reject[s] all forms of corruption," "does not tolerate bribery," and is "committed to conducting [its] business with transparency and integrity"); *cf. In re Karyopharm Therapeutics Inc., Sec. Litig.*, 2021 WL 3079878, at *8 (D. Mass. July 21, 2021) ("[D]efendants' broad representation that they were 'following the FDA guidance' constitutes an immaterial 'generic assertion[]' regarding compliance."). And, just three weeks ago, the Second Circuit held unequivocally that a statement by a company that it "strive[s] to conduct . . . business in accordance with internationally recognised principles in the area[ ] of . . . anti-corruption" was inactionable puffery that "[n]o investor would take . . . seriously in assessing a potential investment." *Danske*, 2021 WL 3744894, at *7.

*Second*, the *Singh* Court expressly rejected the plaintiffs' assertions that a reasonable investor would rely on descriptions of the defendant's compliance policies in its SEC filings as "representations of satisfactory compliance." 918 F.3d at 63. In the Second Circuit's view, descriptions of compliance efforts transform to actionable assurances of actual compliance *only* where such descriptions are expressed in "confident detail," with "specific[ity]," *and* with emphasis on a purported "clean compliance record" resulting from such compliance efforts. *Id.* at 63-64 (quoting as an example "lengthy" language from a company's prospectus that provided step-by-step, minute details of all compliance efforts taken by the company, with such language including a representation that "[a]s of December 31, 2009, no [regulatory] penalties had been imposed" on the company).

Here, by contrast, the Complaint is devoid of any such allegations suggesting that Grupo Televisa represented to the public with any specificity the success of its compliance efforts. Rather, Televisa's Code simply set forth policies promulgated by the Company to *further* its compliance efforts. *See* Compl. ¶¶ 88, 99 (noting Televisa's statements that "personnel *shall* not acquire any type of commitment to attempt to obtain . . . any bribe, coercion or other payment or benefit," that board members *must* sign an adherence letter "as evidence of their acceptance and commitment" to the Code, and that compliance with the Code's content was "mandatory"). Such statements are on all fours with the statements the Second Circuit recently rejected as inactionable in *Danske*. *See* 2021 WL 3744894, at *8 (no actionable misstatements when the company stated that it "'condemns . . . money laundering,' 'takes the steps necessary to comply with internationally recognised standards, including Know Your Customer procedures,' and has procedures for 'customer due diligence, reporting, . . . and communications'"); *accord Reiner* v. *Teladoc Health, Inc.*, 2020 WL 6343217, at *5 (S.D.N.Y. Sept. 4, 2020) (no actionable misstatements where company stated: "All of our employees, officers and directors *must* conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior."); *Ulbricht* v. *Ternium S.A.*, 2020 WL 5517313, at *9 (E.D.N.Y. Sept. 14, 2020) (company statements that "[a]ll employees *shall* in all cases abide by the laws" and "Senior Financial Officers *will* be held accountable for their adherence to this Code of Ethics" were "aspirational language characteristic of puffery" (emphases in original)).

*Third*, *Singh* reaffirmed that "context" matters. 918 F.3d at 63. Thus, in evaluating whether a statement is material, courts must take into account the "context and manner of presentation." *Id.* For example, where challenged statements are surrounded by "tentative" language that "suggests caution (rather than confidence) regarding the extent of . . . compliance,"

- 20 -

or where the challenged statements are surrounded by other statements "suggest[ing] a company actively *working* to *improve* its compliance efforts, rather than one expressing confidence in their complete (or even substantial) effectiveness," then a reasonable investor would not view such statements "as having significantly altered the total mix of information made available." *Id.* at 64 (footnote omitted).

Here, because "[n]one of the language relied on by plaintiffs herein represents — or even suggests — that the [Code of Ethics] had prevented, or could prevent, unethical conduct by all personnel to whom it applied," such statements are inactionable under the federal securities laws. *Reiner*, 2020 WL 6343217, at *9. One need only evaluate the aspirational language used by Televisa in the challenged statements. **Compare** ECF No. 47 (Mot. to Dismiss Op.) at 11 (quoting the following from Televisa statements: "We *wish* to succeed based on our merits, and not because we have paid or given something of value illegally to someone in order to obtain some favor or advantage . . . . In Grupo Televisa we have a Code of Ethics which *objective* is to guide and regulate the behavior of the directors, executives and employees."), **with** *Schiro*, 396 F. Supp. 3d at 298 (no actionable statement where company's statement that it "does not tolerate bribery in any form" was framed as a "*goal* of its compliance efforts, not a statement about the [c]ompany's actual compliance"), **and** *Reiner*, 2020 WL 6343217, at *5 (no actionable misstatements where company "touted" the fact that it "*strive[d]* to foster a culture of honesty" and maintained a "*commitment* to the highest level of ethical conduct"), **and** *Doe* v. *Uber Techs., Inc.*, 2021 WL 3193166, at *16 (S.D.N.Y. July 28, 2021) (language that Uber is "*aspires* and *commits* to" offering the safest rides constitutes "aspirational puffery" in light of *Singh*).

*     *     *

As has often been repeated in this District since *Singh*, and has now been reaffirmed by *Danske*, even at the motion to dismiss stage — where truth of allegations is assumed — "courts have allowed claims based on alleged misrepresentations contained in a code of ethics or code of conduct to survive . . . only in *rare* circumstances." *Papa John's Int'l., Inc.*, 517 F. Supp. 3d at 207; *accord Constr. Laborers Pension Tr. for S. Cal.* v. *CBS Corp.*, 433 F. Supp. 3d 515, 532 (S.D.N.Y. 2020) (similar). *A fortiori* is that so here, at the class definition phase where plaintiffs bear the burden of proof. Thus, the ethics-related statements challenged as material misrepresentations do not operate to open the class period prior to April 28, 2017.

## CONCLUSION

For the foregoing reasons, the Court should define the certified class to encompass, at most, individuals and entities (excluding Defendants) that purchased or acquired Televisa ADRs from April 28, 2017, through and including November 17, 2017, and exclude those who no longer held such ADRs by that latter date.

Respectfully submitted,

Ben M. Germana
David B. Anders
Tamara Livshiz
David E. Kirk
Adebola O. M. Olofin

*Of Counsel*

Dated: October 22, 2021

New York, New York

WACHTELL, LIPTON, ROSEN & KATZ

/s/ Herbert M. Wachtell

Herbert M. Wachtell
51 West 52nd Street
New York, New York  10019
(212) 403-1000

*Attorneys for Defendants*