**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re GRUPO TELEVISA SECURITIES LITIGATION | Civil Action No. 1:18-cv-01979-LLS |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Herbert M. Wachtell
Ben M. Germana
David B. Anders
Adebola O. M. Olofin
Benjamin L. Levander
Daniel J. Harper
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000

*Attorneys for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS .......................................................................................6

ARGUMENT ...........................................................................................................33

POINT I       SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE
PLAINTIFFS ARE UNABLE TO MEET THEIR BURDEN OF
ESTABLISHING THE EXISTENCE OF LOSS CAUSATION
CONNECTED TO BURZACO'S TESTIMONY. ................................................37

      A.     Loss causation is not satisfied because plaintiffs fail to show that
the market reacted negatively to Burzaco's testimony that Televisa
participated in bribery. ..............................................................................37

      B.     Loss causation is in any event not satisfied because the Burzaco
testimony did not constitute new news. ....................................................49

      C.     This Court has already ruled out the January 26, 2018 Form 6-K as
a potential corrective disclosure................................................................51

POINT II      SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE
DEFENDANTS MADE NO FALSE OR MISLEADING STATEMENT. ..........52

      A.     The record evidence reflects that Televisa's statements regarding
World Cups were not false or misleading...................................................55

      B.     The Spalding "Corruption" Report ...........................................................64

      C.     The record evidence reflects that the other alleged misstatements
were not false or misleading. .....................................................................66

POINT III     SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE
PLAINTIFFS CANNOT SATISFY MATERIALITY. ........................................68

      A.     Plaintiffs cannot establish the materiality of the challenged
statement relating to Televisa's acquisition of broadcasting rights
for the 2026 and 2030 World Cups............................................................68

      B.     Alleged misstatements concerning Televisa's Code of Ethics are
immaterial as a matter of law.....................................................................74

POINT IV     SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST CLASS
REPRESENTATIVE PALM TRAN FOR ADDITIONAL REASONS
PARTICULAR TO IT:  PALM TRAN HAS NO VIABLE INDIVIDUAL
CAUSE OF ACTION; IS BARRED AS LEAD PLAINTIFF;
MISREPRESENTED ITS INTENTIONS TO THIS COURT; AND IS
OTHERWISE UNFIT TO CONTINUE AS CLASS REPRESENTATIVE.........77

    A.    Palm Tran has no individual cause of action in that the undisputed
record rebuts the *Basic* presumption of reliance as to Palm Tran
because Palm Tran did not rely on any alleged misstatements.................77

    B.    Summary judgment should be granted because Palm Tran failed to
come forward with class claims within the statutory periods
prescribed for those claims. ........................................................................79

    C.    Palm Tran is unfit to serve as class representative. ...................................81

POINT V     SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST
PLAINTIFFS' SECTION 20 CLAIM. ..................................................................85

CONCLUSION.........................................................................................................................85

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpha Capital Anstalt* v. *Intellipharmaceutics Int'l Inc.*,
  2021 WL 2896040 (S.D.N.Y. July 9, 2021) ..........................................................................47

*American Pipe* & *Construction Co.* v. *Utah*,
  414 U.S. 538 (1974) ..............................................................................................79, 80, 81

*Anderson* v. *Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ......................................................................................................33, 34

*Ark. Tchrs. Ret. Sys.* v. *Goldman Sachs Grp.*,
  879 F.3d 474 (2d Cir. 2018) ....................................................................................41, 47, 52

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ......................................................................................34, 53, 85

*Aude* v. *Kobe Steel, Ltd.*,
  2018 WL 1634872 (S.D.N.Y. Apr. 4, 2018) .....................................................................82

*Barrett* v. *PJT Partners Inc.*,
  2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) ...................................................................65

*Basic Inc.* v. *Levinson*,
  485 U.S. 224 (1988) ......................................................................................69, 77, 78

*Bell* v. *Ascendant Solutions, Inc.*,
  2004 WL 1490009 (N.D. Tex. July 1, 2004) ....................................................................46

*Bellefonte Re Ins. Co.* v. *Argonaut Ins. Co.*,
  757 F.2d 523 (2d Cir. 1985) ..............................................................................50, 51

*Brooks* v. *Outboard Marine Corp.*,
  234 F.3d 89 (2d Cir. 2000) ..................................................................................................43

*CALPERS* v. *ANZ Secs., Inc.*,
  137 S. Ct. 2042 (2017) ..................................................................................................80, 81

*Celotex Corp.* v. *Catrett*,
  477 U.S. 317 (1986) ......................................................................................................37, 38

*China Agritech, Inc.* v. *Resh*,
  138 S. Ct. 1800 (2018) ..................................................................................................80, 81

*City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*,
    2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)..........................................................58

*Clarke* v. *JPMorgan Chase Bank, N.A.*,
    2010 WL 1379778 (S.D.N.Y. Mar. 26, 2010) .........................................................50

*Davidov* v. *Louisville Ladder Group, LLC*,
    2005 WL 486734 (S.D.N.Y. Mar. 1, 2005) ......................................................42, 43

*Dekalb Cnty. Emps.' Ret. Sys.* v. *Controladora Vuela Compania de Aviacion,*
    *S.A.B. de C.V.*,
    2016 WL 3685089 (S.D.N.Y. July 6, 2016) ...........................................................69

*Dodona I LLC* v. *Goldman Sachs & Co.*,
    132 F. Supp. 3d 505 (S.D.N.Y. 2015)....................................................................67

*Dura Pharms, Inc.* v. *Broudo*,
    544 U.S. 336 (2005)........................................................................................34, 37

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).....................................................................................69

*Ernst & Ernst* v. *Hochfelder*,
    425 U.S. 185 (1976)..................................................................................................54

*Finkelstein* v. *Liberty Dig., Inc.*,
    2005 WL 1074364 (Del. Ch. Apr. 25, 2005) ....................................................42, 43

*Fogarazzo* v. *Lehman Bros., Inc.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ..............................................................................71

*Francisco* v. *Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020)......................................................................65

*Fries* v. *N. Oil & Gas, Inc.*,
    285 F. Supp. 3d 706 (S.D.N.Y. 2018)......................................................................58

*Fund Liquidation Holdings LLC* v. *Bank of America Corp.*,
    991 F.3d 370 (2d Cir. 2021)................................................................................80, 81

*Gallo* v. *Prudential Residential Servs., Ltd.*,
    22 F.3d 1219 (2d Cir. 1994)................................................................................34, 48

*George* v. *China Automotive Sys., Inc.*,
    2013 WL 3357170 (S.D.N.Y. July 3, 2013) ............................................................46

*Giovanniello* v. *ALM Media*,
    726 F.3d 106 (2d Cir. 2013).....................................................................................81

*Goldkrantz* v. *Griffin*,
  1999 WL 191540 (S.D.N.Y. 1999) ...................................................................46

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ................................................................................77, 78, 79

*Improvement Co.* v. *Munson*,
  14 Wall. 442 20 L.Ed. 867 (1872) ...................................................................34

*In re Am. Intern. Grp., Inc. Sec. Litig.*,
  265 F.R.D. 157 (S.D.N.Y. 2010) ......................................................................46

*In re Barclays Bank plc Sec. Litig.*,
  2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017) ................................................47

*In re Barrick Gold Corp. Sec. Litig.*,
  341 F. Supp. 3d 358 (S.D.N.Y. 2018) ..............................................................46

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008) ..............................................................72

*In re Federal Home Loan Mortgage Corp. Sec. Litig.*,
  281 F.R.D. 174 (S.D.N.Y. 2012) ......................................................................46

*In re Global Brokerage, Inc.*,
  2021 WL 1160056 (S.D.N.Y. March 18, 2021) ...............................................46

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) ..............................................................54

*In re Omnicom Group, Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008) .........................................................37, 47

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ..................................................................34, 38, 47

*In re Pfizer Inc. Sec. Litig.*,
  233 F.R.D. 334 (S.D.N.Y. 2005) ......................................................................82

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir.1993) ..................................................................................53

*In re Vivendi Universal, S.A. Sec. Litig.*,
  183 F. Supp. 3d 458 (S.D.N.Y. 2016) ..............................................................79

*In re Vivendi Universal, S.A. Sec. Litig.*,
  2009 WL 1904569 (S.D.N.Y. July 1, 2009) ....................................................51

*In re Xcelera Com. Sec. Litig.*,
  2008 WL 7084626 (D. Mass. April 25, 2008) ........................................................................46

*Jackson* v. *Abernathy*,
  960 F.3d 94 (2d Cir. 2020) ........................................................................................54, 55, 65

*Kleinman* v. *Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013) ........................................................................................................53

*Lentell* v. *Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005) ....................................................................................38, 48, 51

*Leykin* v. *AT&T Corp.*,
  423 F. Supp. 2d 229 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007) .......................77

*Lyons* v. *Lancer Ins. Co.*,
  681 F.3d 50 (2d Cir. 2012) ........................................................................................33, 48, 62

*Matrixx Initiatives, Inc.* v. *Siracusano*,
  563 U.S. 27 (2011) ........................................................................................................................53

*Matsuhita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
  475 U.S. 574 (1986) ........................................................................................................................33

*Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*,
  2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ........................................................................54, 65

*Mitchell* v. *United States*,
  526 U.S. 314 (1999) ........................................................................................................................36

*Novak* v. *Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ........................................................................................................54

*Ohio Pub. Empls. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*,
  2018 WL 3861840 (N.D. Ohio Aug. 4, 2018) ................................................................42, 43

*Pearlstein* v. *BlackBerry Ltd.*,
  2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ........................................................................46

*Pennsylvania Ave. Funds* v. *Inyx Inc.*,
  2011 WL 2732544 (S.D.N.Y. July 5, 2011) ........................................................................46

*Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) ........................................................................................75, 76

*Purgess* v. *Sharrock*,
  33 F.3d 134 (2d Cir. 1994) ........................................................................................................51

*Rolf* v. *Blyth, Eastman Dillon & Co., Inc.*,
    570 F.2d 38 (2d Cir.1978)........................................................................................54

*S. Cherry St., LLC* v. *Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)......................................................................................54

*S.E.C.* v. *Aly*,
    2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018) .........................................................72

*S.E.C.* v. *Texas Gulf Sulphur Co.*,
    401 F.2d 833 (2d Cir. 1968)....................................................................................69

*Salahuddin* v. *Goord*,
    467 F.3d 263 (2d Cir. 2006)....................................................................................33

*Saylor* v. *Lindsley*,
    456 F.2d 896 (2d Cir. 1972)....................................................................................85

*Schiro* v. *Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019)......................................................................65

*SEC* v. *Yorkville Advisors, LLC*,
    305 F. Supp. 3d 486 (S.D.N.Y. 2018)......................................................................54

*Sindona* v. *Tisch*,
    1979 U.S. Dist. LEXIS 13206 (S.D.N.Y. Apr. 6, 1979), *aff'd*, 610 F.2d 807
    (2d Cir. 1979).........................................................................................................36

*Singh* v. *Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)................................................................................75, 76

*Slayton* v. *Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)....................................................................................58

*Sotheby's, Inc.* v. *Minor*,
    2010 WL 11601336 (S.D.N.Y. Mar. 30, 2010) .......................................................51

*State Tchrs. Ret. Bd.* v. *Fluor Corp.*,
    654 F.2d 843 (2d Cir. 1981)....................................................................................65

*Sterling Nat'l Bank* v. *A-1 Hotels Int'l, Inc.*,
    2004 WL 1418201 (S.D.N.Y. June 23, 2004) .........................................................36

*Stratte-McClure* v. *Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)......................................................................................53

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)....................................................................................54

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)...................................................................................53, 85

*United States* v. *Hatfield*,
   2014 WL 7271616 (E.D.N.Y. Dec. 18, 2014) ........................................................46

*United States* v. *Martoma*,
   993 F. Supp. 2d 452 (S.D.N.Y. 2014)...................................................................72

*Villare* v. *Abiomed, Inc.*,
   2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)........................................................65

*Villella* v. *Chem. & Mining Co. of Chile Inc.*,
   2018 WL 2958361 (S.D.N.Y. June 13, 2018) ........................................................78

*Weisman* v. *Darneille*,
   78 F.R.D. 669 (S.D.N.Y. 1978) ...........................................................................85

*Weiss* v. *Nat'l Westminster Bank, plc*,
   993 F.3d 144 (2d Cir. 2021) ................................................................................37

**Statutes and Rules**

15 U.S.C. § 10(b) ........................................................................................... *passim*

15 U.S.C. § 20(a) ........................................................................................... *passim*

17 C.F.R. § 240.3b-4 .............................................................................................32

17 C.F.R. § 240.10b-5 ..................................................................................... *passim*

17 C.F.R. § 240.13a-11(b) .....................................................................................32

28 U.S.C. § 1658 .........................................................................................79, 80

73 Fed. Reg. 58,300 (Oct. 6, 2008).........................................................................32

Fed. R. Civ. P. 56 .........................................................................................33, 35

Fed. R. Evid. 802 ................................................................................................35

## PRELIMINARY STATEMENT

On June 8, 2020, this Court issued its Order removing previous lead plaintiff Colleges of Applied Arts and Technology Pension Plan ("CAAT") from that role by virtue of its disqualifying short position in Televisa ADRs. ECF No. 134 at 10-11. On May 19, 2021, this Court thereafter removed previous lead counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller") from that position by reason of its failure to have disclosed such short position in its filings to the Court. ECF No. 227.

In reaching that latter ruling, this Court analogized Robbins Geller's conduct in this securities law proceeding to "omit[ting] to state material facts" necessary to make the statements made in its filings not misleading as required under Securities and Exchange Commission ("SEC") Rule 10b-5. *Id.* at 6. As this Court concluded: "In the world of securities law, that is a definition of fraud." *Id.*

But Robbins Geller's heritage here by way of factual misrepresentations to the Court is not limited to that previous fraud by omission. Rather, when one turns to the very Amended Complaint in this action — initially propounded by Robbins Geller and now explicitly adopted by new class representative Palm Tran[1] — one finds that Amended Complaint replete with falsity, not only by way of omission, but with multiple categorically untrue representations of fact designed to create an image of fraud on the part of defendants. Thus, this Amended Complaint itself rather epitomizes what "in the world of securities law" constitutes fraud.

By way of example only, the Amended Complaint alleges that defendant Grupo Televisa, S.A.B. ("Televisa" or the "Company") made an "off-book" payment of $7.25 million to Torneos,

---

[1] *See* Ex. 1, Transcript Excerpts for Deposition of Palm Tran, Inc. Amalgamated Transit Union Local 1577 Pension Plan's 30(b)(6) Representative, Dwight Mattingly, ("Palm Tran Tr.") 16:21-24. All exhibits cited in this memorandum are attached to the accompanying Declaration of Adebola O. M. Olofin submitted herewith (and are cited herein as "Ex. __," unless otherwise noted).

and took steps to "conceal" that payment from discovery by way of a "skimming" scheme, leaving "no apparent audit trail."  ECF No. 32 ("Amended Compl." or "Amended Complaint") ¶¶ 24-25, 46.  But these allegations of supposed concealment on Televisa's books of that $7.25 million consulting payment (which was actually paid to FPT Sports, S.A. ("FPT")) are made up of whole cloth and are most emphatically baseless.  As the incontrovertible evidence shows, the payment in question was entirely open on Televisa's books — open to Televisa's internal auditors, open to its external auditor PricewaterhouseCoopers ("PwC"), and open to the independent forensic auditors when they were later called in to investigate.  *See* Statement of Facts, § 8, *infra*.

Next, plaintiffs concededly have sought to paint a picture that the announcement of two Televisa executives "stepping down" from their posts in October of 2017 — coincident with plaintiffs' *New York Times* "exposé" — signified those executives' personal improper involvement with the supposed bribery scheme.  *See* Amended Compl. ¶¶ 59-60; Ex. 1, Palm Tran Tr. 41:3-41:23.  Once again, there is not an iota of truth in these claims.  The uncontroverted documentary evidence as well as unimpeached witness testimony conclusively establish that these executive successions had been planned and decided upon months *prior* to the *Times* "exposé."  *See* Statement of Facts, § 15, *infra*.  Moreover, the changes in position in no way reflected upon the integrity of the executives in question:  As to Mr. Emilio Fernando Azcárraga Jean III, his retirement from his post as CEO after 20 years in that role was not even effective until the end of that year, 2017, and he remained (and remains) Executive Chairman of the Company's Board of Directors (with particular ongoing responsibilities as to soccer).  *Id.* Likewise, following his departure from the role of CFO, Mr. Salvi Rafael Folch Viadero was

shortly thereafter placed in charge of Televisa's cable division and — having left the Company just last year — continues to sit on the Board of Directors.  *Id.*

And then we have the claim — once again adopted by Palm Tran on behalf of all plaintiffs — that the tragic death of a Televisa executive as a result of a street crime in Mexico City was somehow related to bribery and fraud.  *See* Amended Compl. ¶¶ 18, 62, 130; Ex. 1, Palm Tran Tr. 46:20-48:18.  Not only is there not a scintilla of evidence that the deceased executive in question was involved in the acquisition of media rights from FIFA, but there is likewise not a scintilla of evidence that his unfortunate death had anything to do with any issue in this litigation.  *See* Statement of Facts, § 17, *infra*.  In short, a cynical false allusion by Robbins Geller now expressly adopted by the current class representative.

Likewise totally false is the Amended Complaint's allegation that nonparties Messrs. Diez and Simón — who supposedly participated in the bribery scheme — were "executives" of Mountrigi Management Group, a Televisa subsidiary.  *See, e.g.*, Amended Compl. ¶¶ 9, 47.  At no time was either person an executive or employee of Televisa or any of Televisa's subsidiaries, including Mountrigi.  *See* p. 10, *infra*.

And then we have the yet again baseless claim that Televisa's announcement by way of a Form 6-K statement in January 2018 of particular material weaknesses in its internal controls — weaknesses that "existed as of December 31, 2016" — somehow had anything to do with a supposed decision to bribe a FIFA executive back in 2013.  *See* Amended Compl. ¶¶ 6, 44, 68.  Not only does that Form 6-K itself expressly set forth that there was no connection to any misconduct, *see* ECF No. 134 at 9-10, the documentary evidence as well as the recent deposition testimony of PwC's 30(b)(6) representative upon deposition is unequivocal:  no relationship whatsoever to any bribery claim, *see* Statement of Facts, § 18, *infra*; Point II.C.1, *infra*.

In sum, a series of knowingly or recklessly false claims in this proceeding alleging supposed fraud on the part of defendants.  But the problems with the Amended Complaint herein do not stop with the above egregious examples.  Rather, as discussed below, they extend to the questions of whether Televisa actually participated in any bribery scheme, to say nothing, by way of example, as to whether plaintiffs can show the existence of loss causation.

Thus, not only is wrongful participation in Mr. Burzaco's bribery scheme categorically denied in all sworn depositions of responsible persons at Televisa, *see* Point II.A, *infra*, but his previous testimony is manifestly incompetent hearsay, he is unwilling to waive his Fifth Amendment protection, the Government is opposed to permitting him to testify here, and such personal unwillingness and Government opposition has the potential to last for years.  *See* pp. 34-36, *infra*.  Moreover, the two governments — U.S. and Swiss — that have since at least 2015 aggressively been pursuing FIFA-related charges where deemed justifiable, have not only not initiated any proceeding of any nature against Televisa, but insofar as Televisa is aware, have also not commenced an investigation of the Company:  no subpoena; not so much as a request for an interview with any Company witness nor production of any Company document in connection with any such investigation into the Company.  *See* Point II, *infra*; Statement of Facts, § 12, *infra*.

And on the critical element of loss causation, which is likewise dispositive of this summary judgment motion (*see* Point I, *infra*), Robbins Geller's Amended Complaint (adopted by Palm Tran) once again tells an extremely misleading story.  Thus, the Amended Complaint proclaims:  "In response to the news of the October 26 NYT Exposé," the "price of Televisa ADRs dropped 5.6%"  on "October 27, 2017."  Amended Compl. ¶ 161.  But omitted from that recitation was that, as this Court has since recognized, the *New York Times* "exposé" came out

before the market opened on October 26, 2017, there was actually a "slight rise in the price" that day, and the drop the following day referred to in the Amended Complaint "was clearly in response to an unanticipated discouraging third-quarter earnings report" that came out the evening of October 26.  ECF No. 134 at 4, 7.

So, in an effort to salvage this case, plaintiffs' expert Dr. Steven P. Feinstein, originally retained by Robbins Geller — who at the class certification stage saw fit to submit an opinion touting the party line that the *New York Times* "exposé" caused a "severe" price drop — has now abandoned that allegation, and has concocted a totally baseless claim of supposed loss causation

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████  it is incontrovertible that Burzaco gave no such testimony whatsoever on that crucial fourth day:  November 17, 2017.  *See* Point I.A.1, *infra*.  Yet again:  shades of SEC Rule 10b-5.  Plaintiffs are thus left with *zero* support to meet their burden of establishing loss causation.  *See* Point I, *infra*.

But these are not the only fatal deficiencies in plaintiffs' case.  Plaintiffs cannot show that defendants made any false or misleading statement.  *See* Point II, *infra*.  Nor can plaintiffs demonstrate the materiality of the bulk of the challenged misstatements.  *See* Point III, *infra*.  And, as will be detailed below, Palm Tran itself has no claim, can establish no claim on behalf of the Class, and discovery has now shown it to be untrustworthy:  it has a maximum claim of $935, and in seeking appointment as Lead Plaintiff, it baldly misrepresented to this Court the extent of effort it intended to expend if appointed.  *See* Point IV, *infra*.

Summary judgment should be granted in favor of defendants.

## STATEMENT OF FACTS

### 1.   The Parties and Relevant Televisa Executives

Class representative Palm Tran, Inc. Amalgamated Transit Union Local 1577 Pension Plan ("Palm Tran") is a multi-employer public defined benefit plan located in West Palm Beach, Florida, with approximately $120 million in assets under management.[2]  Its maximum claim in this action is $935.[3]

Headquartered in Mexico, defendant Televisa is one of the largest Spanish-language media companies in the world and the leading such in Mexico.[4]  The Company also has recently been approved by the Federal Communications Commission as the largest shareholder of TelevisaUnivision, the leading Spanish-language media company in the United States.[5]  Since 1993, Televisa ADRs have traded on the New York Stock Exchange.  Ex. 4, Televisa 2021 20-F at 111.

Defendant Emilio Azcárraga Jean III is the current Executive Chairman of the Board of Directors and Chairman of the Executive Committee of Televisa, and the former President and CEO of Televisa.  *Id.* at 93.  Mr. Azcárraga began working for Televisa in 1989, while his father,

---

[2] Ex. 2, Declaration of Dwight Mattingly of Palm Tran in Support of Renewed Motion for Class Certification, dated June 22, 2020 ("Mattingly Decl.") ¶ 4.

[3] ████████████████████████████████████████████████████████████
████████████████████████████████████ *with* Mattingly Decl. at Schedule A (only 725 shares held by Palm Tran past sole corrective disclosure set by this Court); *see also* ECF No. 295 at 6 (setting sole disclosure as November 2017 testimony of Alejandro Burzaco).

[4] Ex. 4, Televisa Form 20-F for the year ended December 31, 2021, filed Apr. 29, 2022 ("Televisa 2021 20-F") at 29-30 (leading status), 59 (principal offices located in Mexico).

[5] *Consent to Transfer Control of Certain Subsidiaries of Univision Holdings, Inc. to Searchlight III UTD, L.P., ForgeLight (United) Investors, LLC, and Grupo Televisa, S.A.B.; Univision Holdings, Inc.*, Memorandum Opinion and Order and Declaratory Ruling, 35 FCC Rcd 14835 (2020); *Univision Holdings II, Inc. Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, Declaratory Ruling, Federal Communications Commission DA 22-74 (MB 2022); *see also* Ex. 4, Televisa 2021 20-F at 43 (noting Univision's leading position).

Emilio Azcárraga Milmo, was CEO.[6]  Mr. Azcárraga assumed the role of Televisa President and CEO upon his father's illness, then death, in 1997,[7] and he continued to serve in those positions as well until January 1, 2018.[8]

Defendant Salvi Rafael Folch Viadero is a current member of Televisa's Board of Directors, the former CFO of Televisa, the former Vice President of Strategic Planning and subsequently, until April 30, 2021, the CEO of Televisa's Cable Division.[9]  Mr. Folch joined Televisa in 2000 following several years working as the Vice Chairman of Banking Supervision of the National Banking and Securities Commission of Mexico.[10]  He served as Televisa's CFO beginning in 2004 until October 26, 2017, at which time he assumed the role of Vice President of Strategic Planning.[11]

Prior to January 1, 2018, non-party Alfonso de Angoitia Noriega was Executive Vice President of Televisa, and since that date he has acted as Co-CEO of the Company.[12]

From January 2004 through July 2018, non-party Joaquín Balcárcel Santa Cruz served as Vice President and General Counsel of the Company.[13]  Since that date, Mr. Balcárcel has served

---

[6] Ex. 5, Transcript Excerpts for Deposition of Emilio Fernando Azcárraga Jean III ("Azcárraga Tr.") 48:6-12.

[7] Ex. 6, *Company Overview: History*, Grupo Televisa, S.A.B. ("1997:  Emilio Azcárraga Milmo — president of the company for more than 25 years, and creator of the leading media group in the Spanish-speaking world-passes away. Emilio Azcárraga Jean becomes president of the company."); Ex. 5, Azcárraga Tr. 49:18-50:2.

[8] Ex. 7, Televisa Form 20-F Annual Report for the fiscal year ended Dec. 31, 2017, filed Apr. 30, 2018 ("Televisa 2017 20-F") at 114-15.

[9] Ex. 4, Televisa 2021 20-F at 95.

[10] *Id.*; Ex. 8, Transcript Excerpts for Deposition of Salvi Rafael Folch Viadero ("Folch Tr.") 40:21-41:2.

[11] Ex. 8, Folch Tr. 42:17-25; Ex. 9, Televisa Form 6-K, dated Oct. 26, 2017 ("Televisa Oct. 26, 2017 6-K") at 2.

[12] Ex. 9, Televisa Oct. 26, 2017 6-K.  Former class counsel Robbins Geller initially noticed Mr. Angoitia's deposition, but ultimately withdrew that request.  *See* Ex. 10, Notice of Angoitia Deposition. Accordingly, no deposition of Mr. Angoitia has occurred in this litigation.

[13] Ex. 11, Employee Spreadsheet (TELCAAT00004629); Ex. 4, Televisa 2021 20-F at 99.

as Chief of Staff to Mr. Azcárraga in his role as the Executive Chairman of the Board of Directors of Televisa.[14]

Since 1996, non-party Jorge Agustín Lutteroth Echegoyen has served in the leadership of the finance function, first as Director of Controllership and then as Vice-President of Controllership of Grupo Televisa.[15]

## 2.      Televisa's Longstanding Relationship with FIFA and OTI

Located in Zurich, Switzerland, the Fédération Internationale de Football Association ("FIFA") is regarded as the premier international body governing organized soccer.[16]  Every four years, FIFA organizes the FIFA Men's World Cup, a soccer tournament in which 32 national soccer teams compete for a championship.[17]

At all relevant times, the Organización de Telecomunicaciones Iberoamericanas O.T.I., A.C. ("OTI"), was a trade association of Latin American media companies:  created in the 1970s, a principal objective of OTI was for its members to jointly pursue and secure important media rights for the Latin American region, such as broadcasting rights for the FIFA World Cups and the Olympics, while building strong relationships within the organization to facilitate the production and distribution of Spanish-language content.[18]  Though OTI mainly comprised

---

[14] Ex. 11, Employee Spreadsheet (TELCAAT00004629); Ex. 4, Televisa 2021 20-F at 99.
[15] Ex. 12, Transcript Excerpts for Deposition of Jorge Agustín Lutteroth Echegoyen ("Lutteroth Tr.") 23:18-20, 25:1-3, 27:4-9, 28:5-8.
[16] Ex. 13, Transcript Excerpts for Deposition of Gabriel Miguel Diez de Urdanivia Badillo ("Diez Tr.") 46:16-20; *see also* Ex. 14, U.S. Soccer Webpage on FIFA Site.
[17] Ex. 15, FIFA Webpage.
[18] Ex. 16, Transcript Excerpts for Deposition of Joaquín Balcárcel Santa Cruz ("Balcárcel Tr.") 70:25-71:12; Ex. 17, Transcript Excerpts for Deposition of Televisa 30(b)(6) Representative, Carlos Ferreiro ("Ferreiro Tr.") 212:18-213:2; Ex. 5, Azcárraga Tr. 25:4-23, 84:24-85:7.

Spanish-language cable operators, the organization also included certain Portuguese-language entities from Brazil and Portugal.[19]   Televisa was one of the original members of OTI.[20]



In 2000, Televisa's Azcárraga became President of OTI's general assembly.[22]   As President, Mr. Azcárraga's main responsibility was relationship-building among the various OTI members; he did not make decisions for OTI on a daily basis.   Ex. 5, Azcárraga Tr. 25:4-23.   At all relevant times, OTI was run by its Managing Director, Mr. Gabriel Miguel Diez de Urdanivia Badillo.[23]   Mr. Diez was responsible for maintaining the relationship between OTI and FIFA:  it was his job to "go out and try and secure the World Cup rights" as well as rights to the Olympics for OTI.   Ex. 13, Diez Tr. 47:12-16.

Prior to working for OTI, Mr. Diez worked at Banamex, now a division of Citigroup.   Ex. 5, Azcárraga Tr. 86:12-18.   Prior to 2011, Mr. Diez had negotiated and secured on behalf of OTI

---

[19] Ex. 18, OTI Board of Directors Meeting Minutes (May 13, 2013) at 1-2 (listing attendees at OTI Board Meeting); Ex. 5, Azcárraga Tr. 84:24-85:7.
[20] Ex. 19, Transcript Excerpts for Deposition of Mauricio Simón Fajer ("Simón Tr.") 42:3-6.
[21] Ex. 13, Diez Tr. 48:24-50:1; Ex. 5, Azcárraga Tr. 87:19-88:5.
[22] Ex. 13, Diez Tr. 47:17-20; Ex. 5, Azcárraga Tr. 25:14-16, 84:9-12.
[23] Ex. 13, Diez Tr. 45:12-48:3; Ex. 5, Azcárraga Tr. 25:16-17.  Messrs. Diez and Azcárraga had been married to sisters.  Ex. 5, Azcárraga Tr. 21:5-15.  The two men remained friendly after their brother-in-law relationship ended.  *Id.* at 21:2-11.

rights to broadcast three different World Cup tournaments:  ██████████████████

████████████████████████████████████████████████████████████.

By 2011, OTI had approximately six or seven full-time employees, including Mr. Diez

and Mauricio Simón Fajer, who was not typically directly involved with FIFA negotiations.[24]

Given the small size of OTI's full-time staff, member organizations would often provide OTI

with additional support, including legal services, as needed.  Ex. 16, Balcárcel Tr. 72:5-11.  For

instance, the Televisa legal department often provided legal advisory services for OTI.  *Id.*

at 70:19-72:25.  The provision of such legal support was to Televisa's ultimate benefit:  Televisa,

like all OTI members, would possess a right of first refusal in its territory once the Latin

American broadcasting rights were acquired by OTI.  *Id.* at 72:12-25; Ex. 13, Diez Tr. 261:3-10.

At no time was Mr. Diez or Mr. Simón ever an executive or employee of Televisa or any

of its subsidiaries.[25]

### 3.    Televisa's History of Negotiations with FIFA for World Cup Broadcasting Rights

Historically, once OTI acquired the World Cup rights from FIFA, Televisa would secure

its rights to broadcast the World Cup in Mexico by sublicensing such national rights from OTI.

Ex. 16, Balcárcel Tr. 72:12-20.  By way of example, OTI sublicensed the rights to broadcast the

2010 and 2014 World Cups in Mexico to Tarrague, a Swiss subsidiary of Televisa.  Ex. 17,

Ferreiro Tr. 212:3-13.[26]

In early 2010, Mr. Diez once again attempted to initiate negotiations with FIFA on behalf

of OTI to secure broadcasting rights for the 2018 and 2022 World Cups for the Latin American

---

[24] Ex. 5, Azcárraga Tr. 90:12-17; Ex. 19, Simón Tr. 51:18-25.
[25] *See* Ex. 17, Ferreiro Tr. 213:3-8; Ex. 16, Balcárcel Tr. 115:17-20; Ex. 13, Diez Tr. 31:4-7, 36:18; *see also* Ex. 19, Simón Tr. 160:20-25.
[26] As with many other major companies, Televisa made a practice of holding its intellectual property rights in a Swiss subsidiary.  *See* Ex. 20, Videoserpel Tax Confirmation Letter at TELCAAT00068794–95.

region.[27]  However, by this time, ████████████████████████████████████

███████████████████████████████████████.[28]  OTI, a voluntary trade association

with very few assets of its own, was unable to meet these demands ███████.[29]  A solution to

this financial hurdle was necessary if the World Cup rights were to be made available to OTI's

members.

Ultimately, Televisa — the largest media company in Latin America — agreed to step

forward and take on the financial burden and risk to the tune of hundreds of millions of dollars.[30]

The Company would in the first instance acquire the rights to the entire Latin American region;

all OTI members would then have the right of first refusal — but not the obligation — to

sublease such rights from Televisa for their respective territories.[31]

Televisa's decision to accept this role was the product of collaborative decisionmaking.[32]

As CEO of Televisa, Mr. Azcárraga generally did not choose to micromanage but rather

employed a decision-by-committee style of leadership.[33]  Thus, the decision whether to secure

the rights directly from FIFA and, if so, at what price, ultimately was a "collegiate decision"

made by Mr. Azcárraga, other senior-level executives, financial personnel and lawyers.[34]

Once Televisa decided to pursue the 2018-2022 rights from FIFA directly, a "hybrid"

approach to negotiations with FIFA ensued.  Ex. 5, Azcárraga Tr. 26:4-24.  Given Mr. Diez's

long experience in negotiating World Cup rights, he was — while maintaining his position as

---

[27] *See* Ex. 21, Email dated June 11, 2010, re "FOS SPORTS."
[28] Ex. 16, Balcárcel Tr. 75:2-76:20.
[29] Ex. 16, Balcárcel Tr. 75:2-76:5; Ex. 5, Azcárraga Tr. 26:4-11.
[30] Ex. 22, Declaration of Joaquín Balcárcel Santa Cruz, dated August 4, 2022 ("Balcárcel Decl.") ¶ 3.
[31] Ex. 16, Balcárcel Tr. 75:4-76:5; Ex. 13, Diez Tr. 261:3-14.
[32] Ex. 16, Balcárcel Tr. 75:19-76:13; Ex. 5, Azcárraga Tr. 28:8-30:15, 56:7-21, 57:22-58:5.
[33] Ex. 5, Azcárraga Tr. 28:8-30:15, 56:7-21, 57:22-58:5.
[34] Ex. 5, Azcárraga Tr. 26:4-24, 28:4-29:16, 30:11-15, 50:14-51:20, 56:7-21, 57:22-58:5; *see also* Ex. 17, Ferreiro Tr. 47:12-20.

OTI's Managing Director — once again to negotiate with FIFA for the Latin American 2018 and 2022 World Cup rights, but this time on behalf of Televisa's subsidiary and to the benefit of the other OTI members. Ex. 16, Balcárcel Tr. 75:4-76:20. Mr. Diez, accordingly, handled day-to-day negotiations of the World Cup rights for 2018-2022.[35] Consistent with Televisa's previous practice — and now given its role as contracting counterparty with FIFA — Televisa's legal department supported Mr. Diez in the legal aspects of contracting.[36] Eduardo Jose Bandera Quijano, Deputy General Counsel, provided such legal support.[37] In addition, in support of Mr. Diez's negotiations, Mr. Simón was in charge of estimation of all potential costs of the acquisition rights. Ex. 19, Simón Tr. 77:15-78:22.

In connection with his pursuit of the 2018 and 2022 World Cup rights, Mr. Diez also worked closely with Mr. Alejandro Burzaco, who was then CEO of Torneos y Competencias ("Torneos"), a sports-marketing company headquartered in Argentina. Ex. 13, Diez Tr. 65:2-5, 244:22-245:19. Mr. Burzaco was interested in securing broadcasting rights to those World Cups for Argentina, among other territories.[38] Mr. Burzaco's interests aligned with Televisa's insofar as it was understood that Televisa's acquisition of those rights would permit Torneos to then sublicense those rights from Televisa.[39] Televisa and Torneos had longstanding preexisting business relationships, as Televisa had sublicensed various content from Torneos, and Torneos had sublicensed content from Televisa.[40] As far as Televisa was aware, Mr. Burzaco had an

---

[35] Ex. 13, Diez. Tr. 47:12-24; Ex. 5, Azcárraga Tr. 25:1-23.
[36] Ex. 23, Bandera Tr. 29:2-7, 38:13-17; Balcárcel Tr. 70:2-11.
[37] Ex. 23, Transcript Excerpts for Deposition of Eduardo Jose Bandera Quijano ("Bandera Tr.") 14:4-15:15, 27:11-14.
[38] Ex. 19, Simón Tr. 60:5-18; Ex. 13, Diez Tr. 244:22-246:17.
[39] *Cf.* Ex. 13, Diez Tr. 245:8-23.
[40] Ex. 5, Azcárraga Tr. 274:20-275:12, 113:24-114:5; *see also* Ex. 16, Balcárcel Tr. 26:8-19.

unimpeachable reputation in the community, with prominent business partners including DirecTV and AT&T holding substantial ownership interests in Torneos.[41]

Negotiations ultimately proved successful for Televisa:  on March 3, 2011, FIFA and Videoserpel Limited ("Videoserpel"), a wholly owned Swiss subsidiary of Televisa, entered into an agreement whereby FIFA granted Videoserpel the rights to broadcast the 2018 and 2022 World Cups in Latin American countries, to wit, Argentina, Bolivia, Chile, Colombia, Costa Rica, Ecuador, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Panama, Paraguay, Peru, Uruguay, and Venezuela.  Ex. 22, Balcárcel Decl. ¶ 3.  In exchange, Videoserpel agreed to pay FIFA hundreds of millions of dollars for such rights.  *Id.*  For tax reasons, Videoserpel later transferred those rights to another Televisa Swiss subsidiary, Videopersel Limited, which was later renamed Mountrigi Management Group Ltd ("Mountrigi").  Ex. 17, Ferreiro Tr. 109:19-120:5, 114:4-19, 115:8-23.

Upon signing the 2018-2022 FIFA contract, Videoserpel sublicensed the Argentine rights to Torneos subsidiary, TyC International B.V. (TyC).  Ex. 22, Balcárcel Decl. ¶ 3.  Videoserpel likewise sublicensed the rights to broadcast those World Cups in Paraguay and Uruguay to FPT.  *Id.*

**4.     Televisa's Efforts to Secure the 2026 and 2030 World Cups**

While Televisa was pleased with the success of securing the 2018 and 2022 World Cup broadcasting rights, future problems loomed.  Prior to the execution of the contract between Videoserpel and FIFA for the 2018 and 2022 World Cup rights, Televisa learned that a Mexican competitor and rival — ████████████████████████ — had placed an eleventh-hour bid to compete for those rights.[42]  While that competing bid was unsuccessful, it signalled that

---

[41] Ex. 5, Azcárraga Tr. 274:20-275:3; Ex. 16, Balcárcel Tr. 26:8-19; Ex. 22, Balcárcel Decl. ¶ 4; *see also* Ex. 8, Folch Tr. 270:21-271:5.

[42] ████████████████████████████████████████████████████████████████
████████████████████████████████████████   Ex. 5, Azcárraga Tr. 160:25-161:25.

future bids could well be forthcoming.  Televisa therefore began considering a strategy to make a preemptive bid for the 2026-30 Latin American World Cup rights so as to nail them down early.[43]  The problem was to persuade the Executive Committee of FIFA to agree to enter into negotiations so far in advance of the tournament dates.

A key difficulty was that Mexico did not have a representative on the FIFA Executive Committee, and Televisa itself did not have a relationship with anyone on that Committee.  Ex. 5, Azcárraga Tr. 206:3-22.  But Mr. Burzaco did.[44]  Mr. Burzaco had a long-time relationship with Julio Humberto Grondona, a fellow Argentinian and member of the FIFA Executive Committee.[45]  Accordingly, Mr. Burzaco was contacted to see whether he could again be enlisted in a joint effort to acquire the next round of World Cup rights:  2026-30.[46]  Burzaco was agreeable to participate in the effort.[47]  This time, however, he asked that there be remuneration for his doing so if the effort were successful.  *See* Ex. 13, Diez Tr. 252:9-20.  Ultimately, Mr. Burzaco agreed upon $7.25 million in compensation.[48]  A handshake agreement was agreed upon, with Televisa's and Torneos's counsel thereupon drafting and agreeing on a proposed contract to be signed if the effort to bring FIFA to the table was successful and the 2026-30 media rights were acquired (the "Consulting Agreement").[49]  The Consulting Agreement —

---

[43] ███████████████████████████████████████████████████████

[44] Ex. 13, Diez Tr. 252:9-20; Ex. 5, Azcárraga Tr. 206:3-22.

[45] Ex. 5, Azcárraga Tr. 206:3-207:7, 278:20-279:2; Ex. 13, Diez Tr. 252:9-20.

[46] Ex. 22, Balcárcel Decl. ¶ 4; Ex. 5, Azcárraga Tr. 59:7-15, 205:25-206:12, 252:7-253:3.

[47] *See* Ex. 13, Diez Tr. 252:6-20; Ex. 24, Consulting Agreement between Mountrigi Management Group Ltd. and FPT Sports, S.A. dated Mar. 21, 2013 ("2013 Consulting Agreement") .

[48] Ex. 24, 2013 Consulting Agreement; Ex. 22, Balcárcel Decl. ¶ 4.

[49] *See* Ex. 25, Email from Laura Elliff to Eduardo Bandera (Feb. 14, 2013) (TELCAAT00000420).

between Televisa's subsidiary Mountrigi and Torneos's FPT — specified payment of the $7.25 million "upon execution" of the Mountrigi-FIFA contract.[50]

Once again, the overall FIFA negotiations were hybrid in nature:  Diez of OTI — along with Torneos's team — handled the direct negotiations with FIFA; Televisa would provide the required financial backup and directly contract for the rights via a Swiss subsidiary; Televisa's Mr. Bandera would provide the necessary lawyering.  Ex. 16, Balcárcel Tr. 70:2-17; 75:4-76:20.  The OTI members at large would then have the right of first refusal for sublicenses.  *Id.* at 75:4-76:5; Ex. 13, Diez Tr. 261:3-10.

**5.    No Red Flags Were Flying.**

There was no basis for suspicion on the part of Televisa executives that there was anything amiss about the Consulting Agreement with FPT.[51]  Indeed, plaintiffs in this litigation have advanced no contention that, standing alone, the fact of such an agreement and payment was in any way improper.[52]  Mr. Burzaco was known to Televisa as the CEO of Torneos, a responsible Argentine sports-marketing company.[53]  The two companies had a long history of previous dealings.[54]  No adverse information had come to Televisa's attention suggesting corruption on the part of Mr. Burzaco.[55]  That was likewise the case with respect to FIFA

---

[50] Ex. 24, 2013 Consulting Agreement at 1 ("As a consideration for the services of the CONSULTANT under this Agreement, the Company will pay the CONSULTANT a success fee in the amount of U$S7,250,000. The success fee shall be paid upon execution of the respective agreement between the Company and FIFA.").

[51] Ex. 22, Balcárcel Decl. ¶ 4; Ex. 16, Balcárcel Tr. 26:8-19; Ex. 8, Folch Tr. 270:9-271:5; *see also* Ex. 5, Azcárraga Tr. 274:15-19.

[52] ██████████████████████████████████████████████████████████████████████████

[53] Ex. 5, Azcárraga Tr. 274:20-275:15; Ex. 16, Balcárcel Tr. 26:8-19; Ex. 8, Folch Tr. 270:9-271:5.

[54] Ex. 16, Balcárcel Tr. 26:14-18; Ex. 22, Balcárcel Decl. ¶ 4; Ex. 5, Azcárraga Tr. 113:24-114:5, 274:20-276:13.

[55] Ex. 5, Azcárraga Tr. 274:11-275:3; Ex. 16, Balcárcel Tr. 26:8-27:1; Ex. 22, Balcárcel Decl. ¶ 4; Ex. 8, Folch Tr. 270:9-271:5.

Executive Committee member Julio Grondona.[56]  FPT was understood to be a Torneos

subsidiary that held sublicense rights.[57]  There was no basic concept of impropriety of paying

FPT a consulting or lobbying fee if Mr. Burzaco proved helpful in bringing FIFA to the table for

negotiations — and, as noted, plaintiffs in this litigation have not contended otherwise.[58]  There

was nothing untoward about the amount:  against a contract price of many hundreds of millions

of dollars, a $7.25 million fee was in no way out of the ordinary.[59]

Nevertheless — although the draft of the Consulting Agreement was prepared and largely

agreed upon — given that no payment would be due unless there was success in acquiring the

World Cup rights from FIFA, there was no imperative for the parties to sign the Consulting

Agreement:  unless and until that occurred, they had a handshake deal.[60]  And critically:

Televisa had agreed to pay FIFA for the 2026-30 rights potentially more than ███ over the price

that had been agreed upon for the 2018-22 rights just two years previous.[61]  There is not an iota

of evidence that the thought that it would be necessary to bribe someone at FIFA to accept such

an offer ever entered the mind of anyone at Televisa.[62]

---

[56] Ex. 16, Balcárcel Tr. 26:8-19; Ex. 22, Balcárcel Decl. ¶ 4; Ex. 5, Azcárraga Tr. 274:11-19.

[57] Ex. 22, Balcárcel Decl. ¶ 4; *see* Ex. 16, Balcárcel Tr. 26:8-19; Ex. 8, Folch Tr. 270:21-271:5.  The Consulting Agreement was negotiated between Televisa's Mr. Bandera and Torneos's in-house counsel, Laura Elliff.  *See, e.g.*, Ex. 29, Email from Laura Elliff to Eduardo Bandera re "FIFA."

[58] ████████████████████████████████████████████████████████

[59] Ex. 22, Balcárcel Decl. ¶ 4 ; Ex. 16, Balcárcel Tr. 26:8-27:18; ████████████████████; Ex. 30, Ben Fritz and Eric Schwartzel, *Hollywood Isn't Enough for Talent Agency,* Wall St. J. (Feb. 3, 2014), at 2 (noting commissions under 5%); Ex. 31, James Andrew Miller, *How a Hollywood Talent Agency Won Big with Sports*, N.Y. Times (July 28, 2016), at 5 (noting 3-5% commissions).

[60] Ex. 25, Email from Laura Elliff to Eduardo Bandera (Feb. 14, 2013) (TELCAAT00000420).

[61] Ex. 22, Balcárcel Decl. ¶ 3.

[62] ████████████████████████████████████████████████████████
████████████████████████████████████████████  Televisa made no such payment.
*See* Ex. 16, Balcárcel Tr. 82:4-10, 117:3-10; Ex. 8, Folch Tr. 273:7-15; Ex. 13, Diez Tr. 255:10-256:15; Ex. 5, Azcárraga Tr. 285:9-20; Ex. 32, Expert Report of Denis O'Connor, dated Apr. 29, 2022 ("O'Connor Rep't") ¶¶ 16-21.

6.    **Code of Ethics**

During this period, as is customary with public companies, Televisa in its Form 20-F filings informed that it had adopted a Code of Ethics.[63]  Televisa's Code of Ethics set forth in generic terms that the Company aspires to high ethical standards, anticorruption, and anti-bribery.[64]  Likewise, Televisa's sustainability reports each year reference the Company's Code of Ethics.[65]  The Code itself as well as such references to the Code continued in subsequent years.[66]

7.    **Negotiations and Contract with FIFA for the 2026-30 Rights.**

Initially, in 2012, FIFA was indeed skeptical about entering into a contract so far in advance of the 2026-30 World Cup rights.  But the preemptive bid offered by Televisa was strongly persuasive.  Diez and Burzaco successfully lobbied FIFA's executives, including Mr. Grondona, to move forward to a deal.[67]  They were also joined in the effort by Marcelo Campos Pinto, then the director of sports at Teleglobo, the major television broadcaster in Brazil anxious to obtain the rights to broadcast the 2026-30 World Cups in that country.[68]  The negotiations included FIFA's management team and legal counsel as well as Televisa's and Torneos's counsel, represented by Mr. Bandera and Ms. Elliff, respectively.[69]  The price for Televisa's acquiring the same Latin America rights as for the earlier 2018-2022 rights was now nearly ▮ higher than the previous set of rights.  Ex. 22, Balcárcel Decl. ¶ 3.  And, although the parties had

---

[63] *E.g.*, Ex. 33, Televisa Form 20-F Annual Report for the fiscal year ended Dec. 31, 2012, filed Apr. 11, 2013 (Televisa 2012 20-F) at 117; Ex. 34, Televisa Form 20-F Annual report for the fiscal year ended December 31, 2013, dated Apr. 29, 2014 (Televisa 2013 20-F) at 138.

[64] *E.g.*, Ex. 35, Televisa Code of Ethics (dated June 2012) at 2-4 (laying out principles of conduct).

[65] *E.g.*, Ex. 36, Televisa 2015 Sustainability Report at 8.

[66] *E.g.*, Ex. 37, Televisa Form 20-F Annual Report for the fiscal year ended Dec. 31, 2014, filed Apr. 29, 2015 (Televisa 2014 20-F) at 137; Ex. 38, Televisa Form 20-F Annual Report for the fiscal year ended Dec. 31, 2015, dated Apr. 29, 2016 (Televisa 2015 20-F) at 139.

[67] Ex. 39, Jan. 24, 2013 Emails (TELCAAT00000396); Ex. 40, Feb. 10, 2013 Emails (TELCAAT00000406).

[68] Ex. 41, Apr. 16, 2012 Email (TELCAAT00020779).

[69] Ex. 42, Mar. 4, 2013 Emails (TELCAAT00000516); Ex. 43, Emails regarding contract negotiations (TELCAAT00002381); Ex. 25, February 2013 Email Thread re "FIFA" (TELCAAT00000420).

only two years earlier agreed upon a form of contract, there were arm's-length negotiations including a ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

Eventually, a form of contract was concluded, agreed upon, and signed by FIFA and Televisa's subsidiary Mountrigi, on March 21, 2013.  *Id.*  Simultaneously, Mountrigi entered into sublicense agreements with Torneos for Argentina and Torneos's FPT for Uruguay and Paraguay.  *Id.*  And, at the same time, Televisa and FPT executed the previously agreed-upon form of the Consulting Agreement.  Ex. 24, 2013 Consulting Agreement.

**8.     The Consulting Agreement fee was open on Televisa's books.  Moreover, the payment had nothing to do with any internal control deficiencies.**

Contrary to the bizarre and totally fictitious claims in the Amended Complaint, payment of the $7.25 million consultancy fee was in no way concealed "off the books" by Televisa.  As all percipient witnesses testified and both Televisa's ████████████ as well as the forensic accountants at AlixPartners confirmed, that payment was recorded on the books in the normal course and at all times entirely open:  open to Televisa's internal auditors; open to ████████ ████████████████; open, ultimately, to the forensic auditors brought in by Televisa to assist in

---

[70] Ex. 43, Emails regarding contract negotiations (TELCAAT00002381); Ex. 22, Balcárcel Decl. ¶ 3.

counsel's internal investigation.[71]  Likewise, entirely open were the emails of responsible

persons at Televisa approving the payment pursuant to the Consulting Agreement.[72]

Televisa maintains two distinct modes for paying out money:  Accounts Payable and

Direct-to-Treasury.  Ex. 32, O'Connor Rep't ¶¶ 39.  Payments made through Accounts Payable

are used for routine payments to registered vendors.  *Id.* at ¶¶ 40-44.  Direct-to-Treasury

payments are used for a number of other purposes including, as relevant here, if there is a reason

to expedite a particular payment.[73]  Both such modes of payment are "open" on the books of

Televisa.  Ex. 32, O'Connor Rep't ¶¶ 39, 114.  The $7.25 million payment to FPT was made via

Direct-to-Treasury.  *Id.* at ¶ 101.  The reason was expedition:  the parties to the Consulting

Agreement had called for payment contemporaneous with the execution of the contract with

FIFA for acquisition of the 2026-30 World Cup rights.[74]  Both that FIFA contract and the

Consulting Agreement were then executed on March 21, 2013.[75]

The existence of Mountrigi's obligation to FPT was known and approved by the relevant

persons of Televisa's legal, finance, and management teams.  Ex. 32, O'Connor Rep't Tbl. 8.

Nevertheless, there was a delay in Torneos providing the correct wire-transfer directives:  on

April 1, 2013, Torneos's attorney, Laura Elliff, emailed Mr. Diez an invoice from FPT

requesting payment of the agreed-upon $7.25 million.[76]

---

[71] Ex. 44, Transcript Excerpts for Deposition of Denis O'Connor (O'Connor Tr.) 282:22-283:7; *see* Ex.
12, Lutteroth Tr. 189:21-190:10; Ex. 5, Azcárraga Tr. 279:13-18; Ex. 8, Folch Tr. 67:6-68:5 & 239:17-
240:20; Ex. 16, Balcárcel Tr. 116:9-117:1; Ex. 32, O'Connor Rep't ¶¶ 45-48, 126-40; ███████████
████████████████████████████████████████

[72] *See* Ex. 32, O'Connor Rep't ¶¶ 130-34 & Tbl. 8.

[73] *Id.* at ¶¶ 45-47; *see also* Ex. 8, Folch Tr. 239:23-240:8; ██████████████████████

[74] Ex. 24, 2013 Consulting Agreement (noting, in section 4, that the success fee "shall be paid upon execution
of the respective agreement between the Company and FIFA); *see also* Ex. 8, Folch Tr. 205:11-22.

[75] Ex. 22, Balcárcel Decl. ¶ 3; Ex. 24, 2013 Consulting Agreement.

[76] Ex. 46, Email re "Invoice" (TELCAAT00000662); Ex. 47, Invoice Attached to Ex. 46
(TELCAAT00000663).

That same day, Mr. Diez forwarded that invoice to Messrs. Folch (Televisa's CFO), Balcárcel (General Counsel), and Bandera (Deputy General Counsel).  Ex. 48, Email dated April 1, 2013 re "Invoice."  In turn, Mr. Folch — given the previous delay — forwarded the invoice to Mr. Jorge Lutteroth (Televisa's Vice President and Corporate Controller), requesting that the invoice be paid "as soon as possible."  *Id.*  The payment was then routed through Direct-to-Treasury.[77]

Accordingly, the payment was duly authorized by the relevant persons of Televisa, and it was duly recorded on the books.  There was nothing clandestine or surreptitious about such procedure.  Ex. 32, O'Connor Rep't ¶¶ 126-40.

Likewise, plaintiffs' claim that Televisa's January 2018 Form 6-K acknowledging certain internal control deficiencies was related to the $7.25 million payment is once again entirely spurious.  Indeed, as Televisa set forth in the Form 6-K itself, and as confirmed by █████████████, the internal control deficiencies were entirely unrelated to any alleged bribe payment to a FIFA executive or other improper conduct.[78]

**9.      The $7.25 million payment was the sole payment made by Televisa to any third person in connection with the acquisition of the rights other than those explicitly called for by FIFA licensing contracts.**

There have been a number of contentions raised during discovery of supposed other payments being made by Televisa to various third parties allegedly in connection with acquisition of FIFA rights.  As testified to by Televisa's witnesses and confirmed by the forensic

---

[77] Ex. 32, O'Connor Rep't ¶ 130 & Tbl. 8.  Further delay nevertheless ensued.  Ex. 49, Email from Laura Elliff to Miguel Diez (Apr. 4, 2013); Ex. 50, Emails re Invoice Payment at -105818.

[78] ████████████████; *see* Ex. 51, Televisa Form 6-K Current Report, dated Jan. 26, 2018 ("Televisa Jan. 2018 6-K").

auditors, other than those called for by the terms of the FIFA contracts and the $7.25 million consulting fee to Torneos's FPT, no such payments whatsoever were made.[79]

Two *proposed* payments bear mention. *First,* ████████████████ ████████████████████████████████████ ████████████████████████████████████. Ex. 13, Diez Tr. 256:16-257:19. No such payment was made.[80] *Second,* ████████████ ████████████████████████████████. This proposal was not accepted by Televisa; no such payment was made.[81]

One bonus was paid — but not to some third person. Given Mr. Bandera's role as the principal lawyer responsible for handling the drafting of the legal papers in connection with the FIFA rights — an acquisition that directly benefited OTI's members as well as Televisa — Mr. Diez proposed that OTI pay Mr. Bandera a bonus.[82] ████████████████████████ ████████████████████████████████████ ████████████████████



---

[79] Ex. 13, Diez Tr. 256:1-15, 262:5-263:1; Ex. 16, Balcárcel Tr. 82:4-10, 117:3-10; Ex. 8, Folch Tr. 271:19-272:11, 273:7-15; Ex. 5, Azcárraga Tr. 285:8-20; *see* Ex. 32, O'Connor Rep't ¶¶ 124-25.

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

    Ex. 19, Simón Tr. 48:12-15; Ex. 16, Balcárcel Tr. 82:4-10, 117:3-10; Ex. 8, Folch Tr. 271:19-272:11, 273:7-15.

[81] Ex. 13, Diez Tr. at 272:17-273:19; Ex. 16, Balcárcel Tr. 82:4-10, 117:3-10; Ex. 8, Folch Tr. 271:19-272:11, 273:7-15; *see* Ex. 32, O'Connor Rep't ¶¶ 124-25 & Exhibit 4 p.4; Ex. 5, Azcárraga Tr. 285:8-20.

[82] Ex. 23, Bandera Tr. 141:9-19; Ex. 5, Azcárraga Tr. 225:4-227:25.

10.     **Government Investigations, Prosecutions, and the Internal Investigation**

As has been widely reported, in 2015 both the Swiss and U.S. Governments unveiled

criminal investigations and prosecutions against a number of persons including Mr. Burzaco,

who, *inter alia*, was charged with payment of bribes.[83]  The charging instruments further

described a co-conspirator matching the description of the deceased Mr. Grondona.[84]  As

previously noted, *see* pp. 12, 15, *supra*, Televisa had previously been unaware of any taint

connected to Burzaco or Grondona.  Accordingly, the prosecutions came as a shock to

Televisa.[85]

Neither Televisa, its subsidiaries, OTI, nor any of their employees or executives were

named as a party to the indictment and informations unsealed on May 27, 2015.  Ex. 54, May

2015 E.D.N.Y. Indictment.  Nevertheless, aware that the consulting payment had been made

back in 2013 to the subsidiary of Torneos, of which Burzaco was CEO — which payment in

light of the Government indictment now emerged as a "red flag" — Televisa decided to have an

investigation conducted:  initially this was by internal auditors, but then by outside counsel, to

determine whether there was any basis for wrongdoing on Televisa's part.  Thus, shortly after

learning of Mr. Burzaco's involvement in DOJ's criminal investigation, Televisa undertook such

a two-pronged internal investigation.  Ex. 16, Balcárcel Tr. 46:25-47:12.

*First*, the Company initiated an internal investigation through its Internal Audit

department.[86]  Internal Audit analyzed various transactions and payments made to FIFA and

---

[83] *See, e.g.*, Ex. 53, May 2015 DOJ Press Release; Ex. 54, Indictment, *United States* v. *Webb*, No. 15-cr-0252 (E.D.N.Y. May 20, 2015), ECF No. 1 ("May 2015 E.D.N.Y. Indictment") at ¶ 71; *The Office of the Attorney General of Switzerland seizes documents at FIFA*, Off. of the Att'y Gen. of Switz. (May 27, 2015), https://perma.cc/5PJZ-NXBJ.
[84] Ex. 54, May 2015 E.D.N.Y. Indictment at ¶ 54; *see* Ex. 55, *Argentine FA Chief, FIFA Executive Grondona* dies, Reuters (July 30, 2014) (describing Grondona consistent with the indictment).
[85] *See* Ex. 16, Balcárcel Tr. 26:8-27:1; Ex. 5, Azcárraga Tr. 274:15-275:3; *see* Ex. 22, Balcárcel Decl. ¶ 4.
[86] Ex. 16, Balcárcel Tr. 46:25-47:12; *see also* Ex. 56, AlixPartners Memo re Internal Audit Report.

other organizations and providers related to Televisa's acquisition of broadcasting rights for various soccer events, including the World Cups.[87]  *Second*, Messrs. Azcárraga, Angoitia, and Balcárcel agreed that the Company should hire outside counsel to conduct an internal investigation.[88]  The recommendation was that Wachtell, Lipton, Rosen and Katz ("Wachtell Lipton") conduct that investigation, given the firm's reputation as being "very highly respected" and "one of the best law firms in the U.S."[89]  Moreover, the firm had previously represented Televisa in various corporate and litigation matters and had gained its executives' confidence. Ex. 16, Balcárcel Tr. 34:22-38:8, 46:6-11.  Mr. Balcárcel, then Televisa's general counsel, reached out to Wachtell Lipton to retain the firm.  Ex. 16, Balcárcel Tr. 41:2-6.  As part of the investigation, Televisa conducted interviews of the relevant witnesses, and Wachtell Lipton was provided with unrestricted access to their electronic devices, computers, email accounts, and hard-copy documents.[90]  Wachtell Lipton further determined to retain AlixPartners LLP, an expert forensic accounting firm, to perform such forensic review for the purposes of identifying and evaluating any payments made in connection with Televisa's acquisition of broadcasting rights for the 2026 and 2030 World Cups.[91]

Wachtell Lipton ended its investigation in spring 2016, ultimately concluding that there was no credible evidence that Televisa itself made payment to any FIFA person and in no way knew of, or condoned, any payment by any third party to any FIFA person.  Televisa 2017 20-F at 137.[92]  In reaching that conclusion, Wachtell Lipton and Televisa were aware that Mr.

---

[87] Ex. 56, AlixPartners Memo re Internal Audit Report; Ex. 57, Internal Audit Report.
[88] Ex. 5, Azcárraga Tr. 42:7-14; Ex. 16, Balcárcel Tr. 41:2-14.
[89] Ex. 5, Azcárraga Tr. 43:2-9; Ex. 16, Balcárcel Tr. 46:2-18.
[90] *See* Ex. 5, Azcárraga Tr. 47:4-19; Ex. 23, Bandera Tr. 184:17-185:7.
[91] Ex. 16, Balcárcel Tr. 82:4-12; Ex. 32, O'Connor Rep't ¶ 12.
[92] The investigation and conclusions were with respect to acquisition of the 2026 and 2030 World Cup rights.  *See* Televisa 2017 20-F at 137.

Grondona was deceased, and that Wachtell Lipton had been unable to interview Mr. Burzaco, who had pleaded guilty and was understood to be cooperating with the Government.  Ex. 22, Balcárcel Decl. ¶ 6.  The results of Wachtell Lipton's internal investigation were disclosed to the Audit Committee of Televisa's Board of Directors, as well as to PwC, then Televisa's auditor. Ex. 16, Balcárcel Tr. 81:6-82:3.  PwC, for its part, held at least 19 meetings and telephone conferences with Televisa and its legal advisors concerning the Company's two-pronged internal investigation, and reviewed extensive materials in connection therewith.[93]

Months later, in December 2016, the DOJ filed a Criminal Information and Deferred Prosecution Agreement against Torneos, the sports-marketing company formerly controlled by Mr. Burzaco.[94]  The DOJ's papers referenced a company broadly matching Mountrigi's description as having "assisted" Burzaco in making his bribery payment to Grondona but did not assert that any such "assist[ance]" had been provided "knowingly."[95]

### 11.   Reuters

The Government filing was then, on December 16, 2016, widely published by *Reuters* under the title, "Exclusive:  Televisa affiliate surfaces in widening FIFA bribery probe."[96]  It is undisputed that there was no statistically significant movement in the price of Televisa ADRs resulting from either the Government filing or the *Reuters* article.[97]

---

[93] Ex. 58, PwC Memo dated Mar. 31, 2017 ("PwC 2017 Memo"); *see also* Ex. 45, Brodish Tr. 104:3-21.

[94] Ex. 59, Torneos Deferred Prosecution Agreement; Ex. 60, Torneos Information.

[95] Ex. 59, Torneos Deferred Prosecution Agreement, Attachment B ¶ 34; Ex. 60, Torneos Information ¶ 34.

[96] Ex. 61, Mica Rosenberg, *Exclusive: Televisa Affiliate Surfaces in Widening FIFA Bribery Probe*, Reuters (Dec. 16, 2016) (December 2016 Reuters Article).

[97] ECF No. 134 at 4 ("Neither side argues that the Reuters article had any price impact on Televisa's ADRs.").

## 12.     U.S. and Swiss Prosecutors; FIFA

That same month, attorneys from the U.S. Attorney's Office for the Eastern District of New York contacted Televisa to inquire whether the Company intended to carry out an investigation related to its acquisition of World Cup rights.[98]  Wachtell Lipton responded that it had already conducted such an investigation and suggested meeting with the Department of Justice ("DOJ") to share the results thereof.[99]

Thereafter, on January 25, 2017, Televisa's General Counsel Mr. Balcárcel and attorneys from Wachtell Lipton met with the Government attorneys to discuss Wachtell Lipton's internal investigation and to answer questions from the Government.  Ex. 22, Balcárcel Decl. ¶ 9.  At the conclusion of the meeting, the Government representatives stated that if the Government had any further questions, then they would let Televisa know.  *Id.*  By April 28, 2017, three months later, none had been posed.  *Id.*  Moreover, in the more than five years since that meeting, the Government has not posed any such questions nor issued a subpoena or request for documents or testimony from Televisa or any of its executives or employees.  *Id.* ¶¶ 9, 12.

Wachtell Lipton further met in Switzerland on separate occasions with PwC Switzerland, then auditors for Mountrigi, and the Office of the Attorney General of Switzerland, to share the same information it had provided to the Department of Justice.  *Id.* ¶ 10; Ex. 58, PwC 2017 Memo at -1283.  Following its meeting with the Attorney General's Office, the Swiss prosecutor confirmed to Mountrigi's counsel that the Swiss Government had not opened any investigation of Mountrigi or Televisa.[100]

---

[98] Ex. 22, Balcárcel Decl. ¶ 8; ██████████████████████████████.
[99] Ex. 22, Balcárcel Decl. ¶ 8; ██████████████████████████████.
[100] Ex. 62, Letter from Swiss Prosecutor (Mar. 30, 2017); Ex. 22, Balcárcel Decl. ¶ 11.

Thus, at no time in the more than seven years since the U.S. and Swiss prosecutors announced their FIFA-related investigations and arrests has either Government to Televisa's knowledge launched an investigation, nor commenced any proceeding against Televisa or its subsidiary Mountrigi, and this notwithstanding Mr. Burzaco's post-guilty-plea story.  Ex. 22, Balcárcel Decl. ¶¶ 11, 13; *see* pp. 28-30, *infra*.  Further, ███████████████████ █████████████████████████████████████████████████████████████  And FIFA itself — under new leadership — has at no time sought to rescind its contracts awarding the 2018-30 World Cup rights to Televisa's Mountrigi.  Ex. 22, Balcárcel Decl. ¶ 17.

**13.     April 28, 2017:  Televisa's First Public Assertion of Having Acquired the 2026-30 World Cup Rights.**

Televisa, in its 2016 Form 20-F, filed April 28, 2017 — for the very first time — made public claim that it had acquired the FIFA 2026-30 World Cup media rights for Latin America.[102]  There was no statistically significant market movement in Televisa's ADRs resulting from that report.[103]

**14.     New York Times "Exposé"**

On October 26, 2017, *The New York Times* published what the Amended Complaint describes as an "exposé" — an article titled "How Did a Tiny Swiss Company Quietly Secure

---

█████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ .

[102] *See* Ex. 64, Televisa Form 20-F Annual Report for the fiscal year ended Dec. 31, 2016, filed Apr. 28, 2017 ("Televisa 2016 20-F") at 36.
[103] Ex. 65, Expert Rebuttal Report of Allen Ferrell, Ph.D., dated May 25, 2022 ("Ferrell Rep't") at 41 & Exhibit 7; ███████████████████████████████████████████

Valuable World Cup TV Rights?"[104] — which *Times* report, as later represented to this Court by former lead plaintiff CAAT, "left **no** reasonable doubt that Televisa and Mountrigi" were involved in Burzaco's bribery scheme.  *See* ECF No. 41 at 16 (emphasis in original).  The article essentially repeated the same set of facts based on the Government's filing published 10 months earlier by *Reuters*.

Once again, there was no statistically significant market movement in Televisa's ADRs resulting from that filing.  ECF No. 134 at 7.

**15.    October 26, 2017 Executive Reshuffling**

Likewise, on October 26, 2017, contemporaneous with the release of disappointing Third Quarter earnings, Televisa announced that it was shuffling its executive team.[105]  At the end of the year, after roughly 20 years in the position, Emilio Azcárraga would be leaving his post as Chief Executive Officer while staying on as Executive Chairman of the Board; he would be replaced by Co-Chief Executive Officers Alfonso Angoitia and Bernardo Gomez; and Salvi Folch would be relinquishing his position as Chief Financial Officer to become head of Strategic Planning with his responsibilities being split in two and going to Carlos Ferreiro (who would henceforth serve as Vice President of Finance) and José Antonio Lara (who would henceforth serve as Vice President of Administration).[106]

Per the Amended Complaint, these announced changes in position were precipitated by the *New York Times* "expose" that same day, thus signifying complicity on the part of Messrs. Azcárraga and Folch in Televisa's supposed participation in Burzaco's bribery scheme.[107]

---

[104] Ex. 66, Tariq Panja, *How Did a Tiny Swiss Company Quietly Secure Valuable World Cup TV Rights?*, NYTimes (Oct. 26, 2017) (Oct. 2017 NYTimes Article).
[105] Ex. 9, Televisa Oct. 26, 2017 6-K; Ex. 8, Folch Tr. 261:5-10.
[106] Ex. 9, Televisa Oct. 26, 2017 6-K; Ex. 8, Folch Tr. 261:5-10.
[107] Amended Compl. ¶¶ 12-14.

All evidence is to the contrary.  There was no stigma involved in this executive reordering.  As indicated, Mr. Azcárraga continued in the key post of Executive Chairman of the Board — indeed, with continuing responsibility specifically with respect to soccer.  Ex. 9, Televisa Oct. 26, 2017 Form 6-K.  And, upon the unfortunate death of Adolfo Lagos, CEO of Televisa's cable division, *see* pp. 30-31, *infra*, Mr. Folch assumed that position as interim CEO of the cable division.  Ex. 67, Televisa Nov. 29, 2017 Form 6-K.  Having subsequently retired as a Televisa executive, he continues as a member of its Board of Directors.  *See* Ex. 4, Televisa 2021 20-F at 95.

Moreover, the uncontroverted testimony of witnesses establishes that these changes of executive responsibility had been in the works for and decided upon for months prior to October.[108]  And such testimony is explicitly confirmed by the documentary evidence.[109]

**16.    Burzaco**

Just short of three weeks later, on November 14 and 15, 2017, Mr. Burzaco gave testimony purporting to implicate Televisa in a bribery scheme to obtain broadcasting rights to FIFA World Cups.  *See* Amended Compl. ¶¶ 16, 19, 46, 61, 126, 131, 162-63.  In particular, on Tuesday, November 14, Mr. Burzaco testified that Televisa was one of "many partners" that he worked with in "many parts of the world" that was "involved in paying bribes to secure contracts for media rights to soccer."  Ex. 69, Nov. 14 Trial Tr. at 239:5-22.  That afternoon, *Bloomberg*, reporting on Burzaco's testimony, wrote that "[s]ome of the world's biggest broadcasters, including Fox Sports, Globo and Grupo Televisa SAB, were implicated in corruption of

---

[108] Ex. 22, Balcárcel Decl. ¶ 15; Ex. 5, Azcárraga Tr. 264:11-266:11, 280:22-281:22, 282:10-283:7; *see* Ex. 8, Folch Tr. 258:16-259:24 (describing an August 2017 document, Ex. 68, that outlined a new structure at the Company).
[109] Ex. 68, Restructuring Presentation, August 2017; Ex. 22, Balcárcel Decl. ¶ 15.

international soccer, with a former sports-marketing executive telling a U.S. jury that the companies paid bribes to win lucrative, multiyear rights for tournaments."[110]

It is undisputed that there was no statistically significant market movement in Televisa's ADRs on November 14.[111]

The next day, Wednesday, November 15, Mr. Burzaco gave testimony specific to Televisa, to wit, that, back in March 2013, he had traveled to Zurich in furtherance of an "alliance" among Torneos, Teleglobo, and Televisa to acquire from FIFA exclusive broadcasting rights for the *2026* and *2030* World Cups for the territories of Brazil (on behalf of Teleglobo) and Latin America (on behalf of Televisa and Torneos).  Ex. 71, Nov. 15 Trial Tr. at 488:19-489:4.  Mr. Burzaco went on to testify that those three entities "made an agreement to distribute the burden of paying $15 million in bribes" to Julio Grondona, and did in fact pay those bribes. *Id.* at 489:5-20.  A number of major news outlets reported on Mr. Burzaco's testimony that same day, including *ESPN*, *Associated Press*, and *La Politica*, a Spanish-language outlet.  Ex. 65, Ferrell Rep't ¶ 39.  Once again, it is undisputed that there was no statistically significant price movement in the price of Televisa ADRs on November 15.[112]

Mr. Burzaco remained on the stand on Thursday, November 16.  He provided no new facts relevant to Televisa but briefly reiterated his prior testimony that "[w]e paid for World Cup 2018, '22, '26 and '30, huge amount of bribes among the partners, Torneos and its Latin American partners, as I gave testimony, sir."  Ex. 72, Nov. 16 Trial Tr. at 756:12-14.[113]  Once

---

[110] Ex. 71, Patricia Hurtado, *Fox, Globo Among Broadcasters Linked to FIFA Corruption*, Bloomberg (Nov. 14, 2017).

[111] Ex. 65, Ferrell Rep't ¶ 51 & Ex. 2; ██████████████████████████████████
██████

[112] Ex. 65, Ferrell Rep't ¶ 51 & Ex. 2; ██████████████████████████████████
██████

[113] As noted, Burzaco's prior testimony with respect to Televisa only specifically claimed Televisa's participation in the payment of bribes as to the 2026-30 World Cups.

again, it is undisputed that there was no statistically significant market movement in Televisa's ADRs on November 16.[114]

Mr. Burzaco remained on the stand during the morning of Friday, November 17.  *See* Ex. 73, Nov. 17 Trial Tr. at 863.  The Court that day adjourned its proceedings at 1:00 p.m.:  three additional witnesses testified during the time span after Burzaco left the stand.  *Id.* at 954-995. ████████████████████████████████████████████████████████████████, there was no testimony whatsoever on that date by Mr. Burzaco with respect to Televisa.  As set forth in Point I, *infra*, ██████████████████████████████████████ ████████████████████████████████████.[115]  Dr. Feinstein is subject to a proposed *Daubert* motion.  ECF Nos. 300, 302, 303.

Tellingly, not a single contemporaneous news article or analyst report identified by plaintiffs in this litigation construed Burzaco's testimony as implicating Televisa in a bribery scheme concerning rights to the 2018 or 2022 World Cups in any way, *see, e.g.*, Amended Compl. ¶¶ 162-63, and defendants are aware of none.

## 17.   Death of Adolfo Lagos

Shortly thereafter, in November 2017, Adolfo Lagos, head of Televisa's cable division, was killed after being criminally attacked while bicycling in Mexico City.[116]  Yet again, plaintiffs in their Amended Complaint cynically claim that this circumstance was connected to Televisa's supposed bribery scheme.[117]

---

[114] Ex. 65, Ferrell Rep't ¶ 51 & Ex. 2; █████████████████████████████████████
[115] ███████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████  The dispute is ultimately irrelevant to this motion:  the issue is whether price movement on the fourth day has any relevance. ████.
[116] Ex. 74, *Televisa Exec Shot Dead Outside Mexico City While Riding Bike*, Reuters (Nov. 19, 2017).
[117] Amended Compl. ¶¶ 18, 62, 130; Ex. 1, Palm Tran Tr. 48:2-18.

Yet again, a categorically false claim.  There is not an iota of evidence that Mr. Lagos had any involvement in the acquisition of the FIFA World Cup rights.  Ex. 22, Balcárcel Decl. ¶ 16.  There is not an iota of evidence that his unfortunate death had anything whatsoever to do with any such subject.  False pleading.

**18.    Internal Controls**

As noted above, on January 26, 2018, Televisa filed a Form 6-K acknowledging certain material weaknesses in internal control over financial reporting that existed as of December 31, 2016.  The Amended Complaint in this proceeding claims that such were related to Mr. Burzaco's alleged bribery scheme in 2013 and had price impact.  Amended Compl. ¶¶ 20-21, 64-68, 121, 133-41, 156, 164-69.  There is no evidence to support such claim.

Indeed, all evidence is definitively to the contrary.  As the Court recently concluded, "[d]espite attempts to stretch the Court's order, there is no open question of fact as to whether the January 26, 2018 Form 6-K was a corrective disclosure."  ECF No. 295 at 5.  In addition, there is nothing suggesting any linkage between internal controls and any alleged bribery; the Form 6-K itself explicitly recited that "[t]here is no indication that any of these deficiencies resulted in improper activities . . . ."  Ex. 51, Televisa Jan. 2018 6-K at 2.  ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

**19.    Plaintiffs' False Allegations of "Disagreement" Between Televisa and PwC**

Likewise, the Amended Complaint claims that Grupo Televisa in its July 10, 2018 Form 6-K filing with the SEC announcing KPMG as Televisa's new auditor wrongfully failed to

disclose the existence of "disagreement" with its former auditor PwC to conceal facts with respect to the asserted bribery.[118]

Once again, false; indeed, doubly false.  As a foreign filer, the law is clear that Grupo Televisa had no filing obligation on that subject at that point in time.[119]  And when the time came that it was called upon to speak to the subject in its subsequent Form 20-F for fiscal year 2018, Televisa — and PwC — concurred that no such "disagreement" had occurred:  ███████████ ████████████████████████████████████.[120]

## 20.    Swiss Judicial Proceedings

During the course of the present litigation, plaintiffs, pursuant to the Hague Convention, sought discovery in Switzerland of multiple entities.  ECF No. 109.  The requested discovery encompassed both the acquisition of media rights for the 2018-2022 World Cups as well as the 2026-2030 World Cups.[121]  The request as to the 2018-2022 games was expressly rejected by the Swiss District Court of Zurich given that there was "no presentation whatsoever regarding why there is a suspicion of corruption with regard to the acquisition and/or sale of the broadcast rights

---

[118] Amended Compl. ¶¶ 27-28, 69, 143-51.

[119] *See* Foreign Issuer Reporting Enhancements, 73 Fed. Reg. 58,300, 58,310-11 (Oct. 6, 2008) (adopting amendments requiring foreign private issuers "to provide disclosure about changes in and disagreements with their certifying accountants in their *annual reports on Form 20-F*" and explicitly rejecting any rule that would require foreign private issuers to disclose such information on the same "current basis required by domestic issuers" (emphasis added)); *see also* 17 C.F.R. § 240.3b-4 (defining foreign private issuer); 17 C.F.R. § 240.13a-11(b) (foreign private issuers *not* subject to the current reporting requirements of Form 8-K); Ex. 75, Televisa Form 20-F Annual Report, for the fiscal year ended December 31, 2018, filed Apr. 30, 2019 ("Televisa 2018 20-F"), at 128 ("In addition, under U.S. securities laws, as a foreign private issuer we are exempt from certain rules that apply to domestic U.S. issuers . . . .").

[120] Ex. 75, Televisa 2018 20-F at 150 (Televisa disclosure) & Exhibit 15.1 (PwC Letter agreeing with Televisa disclosure); ████████████████████████████████████.

[121] ECF No. 110 at ¶ 8(a)(7); ECF No. 111 at ¶ 8(a)(1)(g) (seeking banking records for period covering both negotiations for 2018-22 rights and 2026-30 rights).  Notably, neither letter request asserted that Burzaco provided any direct allegation of bribery with respect to the 2018-22 rights.  ECF No. 110 at ¶ 7; ECF No. 111 at ¶ 7.

concerning the 2018-2022 World Cups . . . ."[122]  Although the Swiss court afforded plaintiffs the

opportunity to "supplement and revise" its request, plaintiffs failed to do so.[123]  An appeal by

Plaintiffs was subsequently rejected by the Swiss appellate court.[124]

### 21.    Palm Tran's False Representations to this Court and Lack of Qualifications to Act as Class Representative.

The facts demonstrating that Palm Tran has no valid cause of action, is barred by the

statutes of limitations and repose, has made false representations to this Court, and lacks

qualifications to serve as class representative in this action are discussed in Point IV along with

the legal principles involved.

### ARGUMENT

Summary judgment is proper where the admissible evidence and pleadings demonstrate

"no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).

To defeat summary judgment, a party must establish more than "the mere existence of a

scintilla of evidence in support of [its] position," *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986), and more than "some metaphysical doubt as to the material facts," *Matsuhita Elec. Indus. Co.*

v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the party opposing summary judgment

"must point to specific evidence in the record" that would be sufficient for a reasonable jury to find

in its favor.  *Salahuddin* v. *Goord*, 467 F.3d 263, 273 (2d Cir. 2006).  If the evidence "is not

significantly probative, summary judgment may be granted."  *Lyons* v. *Lancer Ins. Co.*, 681 F.3d 50,

---

[122] Ex. 76, Order of August 27, 2020, *In the Matter of Colleges of Applied Arts & Technology Pension Plan*, District Court of Zürich (filed at ECF 264-2), at 10.
[123] *Id.* at 14; *see also* Ex. 77, Judgment at 25, *Colleges of Applied Arts & Technology Pension Plan* v. *FIFA*, Oct. 26, 2021, High Court of the Canton of Zurich (filed at ECF 269-1) ("The factual scope of the obligation to provide documents pursuant to the order of the lower court . . . was neither challenged nor objected to . . . .").
[124] *See* Judgment, Ex. 77, *Colleges of Applied Arts & Technology Pension Plan* v. *FIFA*, Oct. 26, 2021, High Court of the Canton of Zurich (filed at ECF 269-1).

56 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 249-50); *see also Gallo* v. *Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223 (2d Cir. 1994) (stating that summary judgment is proper where no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight"); *Anderson*, 477 U.S. at 251 (requiring evidence upon which a fact finder could find in favor of the party "upon whom the onus of proof is imposed) (quoting *Improvement Co.* v. *Munson,* 14 Wall. 442, 448, 20 L.Ed. 867 (1872)).

Accordingly, to sustain a Rule 10b-5 claim, a plaintiff bears such "onus of proof" as to each of six elements:  "(i) a material misrepresentation or omission; (ii) scienter; (iii) 'a connection with the purchase or sale of a security'[;] (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Dura Pharms, Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005)).  And, a Section 20(a) controlling-person liability claim requires a "primary violation" of Section 10(b).  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

*        *        *

There is no dispute that in connection with the acquisition of the 2026-30 World Cup rights, Televisa (per its Mountrigi subsidiary) entered into a Consulting Agreement with what it understood to be Torneos's subsidiary FPT to compensate for Burzaco's services in obtaining such rights.  And there is no dispute that Televisa then, as called for by that Consulting Agreement, paid FPT $7.25 million.

Plaintiffs in this action make no claim that there was *per se* any impropriety about Televisa entering into such consultation contract and making such payment.  *See* p. 16, *supra*.  Nevertheless, in November 2017, Burzaco — having entered a plea of guilty and commenced cooperating with the Government manifestly in a desire to better his position with respect to sentencing — testified in a

criminal trial of others in conclusory terms and without evidentiary back-up that Televisa made that $7.25 million payment with knowledge that it was to be used as part of that $15 million bribe payment.  Burzaco has never been subjected to cross-examination by defendants as to that assertion, and, as plaintiffs themselves are apparently of the view, such testimony as a cooperating Government witness must be viewed with skepticism.  *See* Ex. 78, Transcript Excerpts for Deposition of David Tabak ("Tabak Tr.") 94:20-95:5; *see also* n.152, *infra*.

It is indisputable that if that Burzaco testimony was false in ascribing such knowing participation by Televisa, it would not matter how the market reacted to such testimony:  such would not be Televisa's responsibility.  Conversely, even if hypothetically that testimony was truthful, unless plaintiffs could show that the market reacted negatively to Burzaco's testimony, no 10b-5 claim against Televisa could lie:  by way of example, plaintiffs could not meet their burden of establishing loss causation.

In this action, Burzaco's previous trial testimony is plainly inadmissible hearsay and — without *competent* testimony from Burzaco as to its truthfulness — plaintiffs cannot rely upon such prior testimony to establish wrongdoing by Televisa.  Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2).  It is also a given that — by this September 2, the deadline for plaintiffs' opposition papers to this motion per this Court's scheduling orders — no such testimony from Burzaco will be forthcoming:  the Government — as set forth in its recent Motion to Intervene (ECF No. 274) — is not willing to have him testify in this civil litigation so long as he is a witness in the Government's *Full Play Group* criminal prosecution.  Yet it is plain that plaintiffs desire to have this Court put off determination of this summary judgment motion in favor of defendants until some future date when Burzaco (who, as noted below, retains his Fifth Amendment right at least until his sentencing) and the Government are willing to have him testify here.

Defendants respectfully submit that there is no reason for this Court to do so. *First*, it is by no means clear when Burzaco may be willing to testify. That *Full Play Group* trial — based upon a prosecution commenced in *2015* — is now off until January *2023*, unless even further extended, with an anticipated duration of five to six weeks. Ex. 79, Memorandum & Order, *United States* v. *Webb et al.*, No. 15 Cr. 252 (E.D.N.Y. May 9, 2022), ECF No. 1786. And there is no assurance that any such testimony will be forthcoming even *after* that trial is complete. For example, if the criminal defendants in that case are convicted and pursue an appeal, how long would that appeal take? And if the Court of Appeals should reverse and direct a new trial, when would that trial take place? In other words, we are dealing with the potential of *years* of delay. Moreover, as developed only last month, Burzaco's sentencing has now been adjourned until May 2023. Ex. 80, Order Granting Motion to Continue Sentencing as to Alejandro Burzaco, *United States* v. *Webb et al.*, No. 15 Cr. 252 (E.D.N.Y. July 13, 2022). And Burzaco will continue to have a Fifth Amendment right not to testify at least until his sentencing. *See, e.g.*, *Sterling Nat'l Bank* v. *A-1 Hotels Int'l, Inc.*, 2004 WL 1418201, at *1 (S.D.N.Y. June 23, 2004) ("Fifth Amendment privilege continues until conviction and sentence have become final." (citing *Mitchell* v. *United States*, 526 U.S. 314, 325-27 (1999))).

This case has already been pending for over *four years*. This Court's right to control its calendar and sound judicial administration indicate that this action should not be put in indeterminate limbo by reason of Burzaco's and the Government's unwillingness to have his testimony available at this time. *Cf. Sindona* v. *Tisch*, 1979 U.S. Dist. LEXIS 13206, at *5, 8-9 (S.D.N.Y. Apr. 6, 1979) (ordering that action would be dismissed unless plaintiff who was asserting Fifth Amendment privilege answered questions at deposition within timeframe of court schedule), *aff'd*, 610 F.2d 807 (2d Cir. 1979).

*Second*, there is in any event no reason why this motion should not be decided at this time. For there are multiple independent grounds that call for summary judgment in favor of defendants that exist regardless of the truth or falsity of any story that Burzaco may come up with. "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for summary judgment." *Weiss* v. *Nat'l Westminster Bank, plc*, 993 F.3d 144, 162 (2d Cir. 2021) (citing *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-23 (1986)).

Accordingly, as shown in Point I below, summary judgment is proper because plaintiffs cannot establish loss causation. As shown in Point II, there has been no falsity on the part of Televisa: it entered into no bribery scheme. As shown in Point III, the bulk of plaintiffs' claimed misrepresentations fail to satisfy materiality. As shown in Point IV, plaintiff Palm Tran has no valid individual claim, its class claims are barred by the statutes of limitations and repose, it has a minuscule claim and is unqualified as a lead plaintiff. Finally, as shown in Point V, because summary judgment is required on the Rule 10b-5 claim, it is also required on the Section 20(a) claim because there is no primary violation.

## POINT I

**SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE PLAINTIFFS ARE UNABLE TO MEET THEIR BURDEN OF ESTABLISHING THE EXISTENCE OF LOSS CAUSATION CONNECTED TO BURZACO'S TESTIMONY.**

### A.    Loss causation is not satisfied because plaintiffs fail to show that the market reacted negatively to Burzaco's testimony that Televisa participated in bribery.

"Loss causation is a necessary element in a 10b-5 claim." *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) (citing *Dura,* 544 U.S. at 346-47). Where, as here (Amended Compl. ¶ 159), plaintiffs are proceeding under a "corrective disclosure" theory, loss causation can be established only if "the market reacted

negatively to [the] corrective disclosure . . . ."  *Id.* (citing *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005)).  As the Second Circuit has made clear, loss causation is not satisfied unless a "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell*, 396 F.3d at 173 (2d Cir. 2005).  Unless plaintiffs "mak[e] 'a showing sufficient to establish the existence of [the loss causation] element essential to [their] case,'" summary judgment must be granted.  *Omnicom*, 597 F.3d at 510 & n.3 (quoting *Celotex*, 477 U.S. at 322).

Here, as spelled out in the Amended Complaint, plaintiffs tied their principal theory of loss causation to supposed market results following the publication of the so-called "New York Times exposé."  Thus, the Amended Complaint alleges:  "The October 26 NYT Exposé implicated Televisa and Mountrigi in the FIFA bribery scheme and placed it squarely with the likes of Burzaco and Torneos in illegally obtaining rights to World Cup tournaments. . . . In response to [this] news . . . the price of Televisa ADRs dropped 5.6% . . . on October 27, 2017 . . . ."  Amended Compl. ¶¶ 160, 161.  But that loss causation theory alleged in the Amended Complaint omitted to disclose that:  (1) the *New York Times* report actually came out *before* the market opened on October 26, ECF No. 134 at 4, and the Televisa ADR price did not react that day — in fact, it went slightly *up*; and (2) *after* the market closed on October 26, Televisa disclosed much-worse-than-expected earnings for the third quarter, resulting in the substantial price drop on October 27 referenced in the Amended Complaint.  Therefore, as this Court already concluded in its June 8, 2020 decision, the result of the *New York Times* report was a "slight rise in the price," and the drop the following day "was clearly in response to an unanticipated[] discouraging third-quarter earnings report, published the previous evening."  *Id.* at 7.

1.      **Dr. Feinstein's conclusion of loss causation rests upon a patently false factual claim**.

So with the principal loss causation theory alleged in the Amended Complaint having been definitively rejected by the Court, plaintiffs — in an endeavor to try to salvage their case — have had to come up with a different loss causation theory.  And so we have their proffered expert, one Dr. Steven Feinstein.  Dr. Feinstein — albeit previously having contended in his report submitted at the class certification stage that the Televisa ADR price "slid[] significantly following the New York Times Exposé" — a "severe" and "highly statistically significant" drop, Ex. 81, Report Regarding Price Impact by Professor Steven P. Feinstein, Ph.D., dated March 6, 2020 (Feinstein Price Impact Rep't)  ¶¶ 133-36, — ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

████████████████████████████████████████████

████████████████████████████████████████████████

Tellingly, the *Amended Complaint itself* alleges *only* that as a result of the Burzaco testimony the price of Televisa ADRs dropped on November *14*, 2017 — the date on which there was first "news of criminal testimony [by Burzaco] identifying Televisa as a co-conspirator in the FIFA bribery scheme."  Amended Compl. ¶ 162. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ ; *see also* Ex. 65, Ferrell Rep't ¶ 51.

As such, there is indisputably *zero* evidence of loss causation with respect to the *only* drop identified in the Amended Complaint as allegedly having stemmed from Burzaco's testimony. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ this latest example of an opinion by Dr. Feinstein in search of a theory is predicated upon a demonstrably false factual misrepresentation, is manifestly unreliable, and cannot remotely sustain plaintiffs' burden upon summary judgment.  Indeed, defendants have previously requested leave to file a *Daubert* motion to have Dr. Feinstein's report stricken in its entirety.  ECF Nos. 300, 302, 303.

Thus:

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████

████████████████████ The dates on which Burzaco gave testimony about Televisa were Tuesday and Wednesday, November 14 and 15, 2017 — and it is undisputed that *neither* date

resulted in a statistically significant price movement.  █████████████████████

█████████████████████████; Ex. 65, Ferrell Rep't at ¶ 51 & Ex. 2.

On the next day, Thursday, November 16, Burzaco simply briefly referred back to his *prior*

testimony, *see* Ex. 72, Nov. 16 Trial Tr. at 756, but that allusion back is patently therefore not

only not "new news" as required by law, *see Ark. Tchrs. Ret. Sys.* v. *Goldman Sachs Grp.*, 879

F.3d 474, 485-86 (2d Cir. 2018), but is in any event wholly irrelevant in that it is undisputed that

there was no statistically significant price movement that day either.  ████████████████

████████████████; Ex. 65, Ferrell Rep't at ¶ 51 and Ex. 2.  █████████████

███████████████████████████████  Burzaco gave **no**

**testimony about Televisa whatsoever on Friday, November 17**.  *See* Ex. 73 (Nov. 17 Tr.); Ex.

65, Ferrell Rep't Ex. 1.[125]

██████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████████████████

██████████████████████████████████

████████  And without that conclusion, plaintiffs can offer *zero* to satisfy their burden of

establishing loss causation.  *See Davidov* v. *Louisville Ladder Group, LLC*, 2005 WL 486734, at

*3 (S.D.N.Y. Mar. 1, 2005) (Stanton, J.).  Moreover, as shown in defendants' proposed *Daubert*

---

[125] ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████



motion to exclude Dr. Feinstein (ECF No. 303), a false representation of this nature and magnitude calls for preclusion of his report and any testimony in its entirety.[126]

The Court should also be aware that this is hardly the first case in which Dr. Feinstein has seen fit to play fast and loose with the facts in "a stubborn desire to stick to a pre-conceived" result "regardless of the facts." *Finkelstein* v. *Liberty Dig., Inc.*, 2005 WL 1074364, at \*14-18 (Del. Ch. Apr. 25, 2005). As former Chief Justice Strine of the Delaware Supreme Court put it when sitting on the Delaware Court of Chancery, Dr. Feinstein deemed perfectly fit to put forward an opinion that was "simply incredible," had "no rational basis," "bear[s] no relationship to reality," was "unsupported" by the facts, and simply "pretend[ed]" things that were not true. *Id.*

Similarly, the United States District Court for the Northern District of Ohio recently excluded Dr. Feinstein and struck his expert report which had attempted to claim statistical significance of stock price movements — holding that his analysis was "unreliable," and that "correcting" for the "fundamental" flaws in Dr. Feinstein's analysis "leads to statistically insignificant results, undermining Dr. Feinstein's opinion." *Ohio Pub. Empls. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at \*2-8, 17, 20 (N.D. Ohio Aug. 4, 2018).



---

[126]

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Dr. Feinstein's opinion here is thus unreliable, calls for exclusion in its entirety, and leaves plaintiffs with no case.  *See*, *e.g.*, *Davidov* v. *Louisville Ladder Group, LLC*, 2005 WL 486734, at *3 (S.D.N.Y. Mar. 1, 2005) (Stanton, J.) (where "district court acted within its discretion in excluding [the expert's] testimony, the plaintiff has no evidence in the record" on required element of claim and "[a]s a result, summary judgment [is] properly granted") (quoting *Brooks* v. *Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000)).  But whether Dr. Feinstein's testimony is excluded in its entirety or not, the loss causation theory in his latest report — predicated as it is upon incontrovertibly false facts — cannot remotely defeat summary judgment.  Plaintiffs, thus, have *no* evidence sufficient to support the required element of loss causation.  Accordingly, this Court need go no further in granting summary judgment in favor of defendants.

**2.    Even putting aside that fatal false premise of Dr. Feinstein's opinion, Dr. Feinstein's analysis is totally unreliable for any number of additional reasons and contradicts the fundamental concept of an efficient market.**

As is shown in the expert rebuttal report dated May 25, 2022 of Dr. David I. Tabak — whom previous lead plaintiff extolled as a "[s]eminal financial economist" (ECF No. 112 at 20)



— ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████ [127]

---

[127] ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████. As Dr. Tabak

explains: "[S]electing the event window after seeing the results of tests of various event windows is

problematic — and renders statistical results unreliable — because it allows an analyst to choose the

statistical test that gives the most favorable results not because it is the most appropriate test, but

simply because of the results that it yields." *Id.* ¶ 42; *see also* Ex. 78, Tabak Tr. 54:17-58:4. █████

██████████████████████████████

    Indeed, tellingly, as explained more fully in Dr. Tabak's Rebuttal Report, ████████

███████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

    Moreover, ████████████████████████████████████████████

████ it is contrary to the very concept of an efficient market. Burzaco's testimony here about

Televisa was widely covered by the news media on the days it happened — November 14 and 15

— including by such well-known sources as the *Associated Press* and *Bloomberg*.[128]  Indeed,

████████████████████████████████████████████

███████████████████████████████████.

[128] Ex. 84, *Marketing CEO names Globo, Televisa in World Cup TV rights scandal*, ESPN (Nov. 15, 2017), https://www.espn.co.uk/football/blog-fifa/story/3272044/marketing-ceo-implicates-globo-televisa-in-world-cup-tv-rights-scandal; Ex. 85, Tom Hayes, *Witness says media giants paid World Cup bribe*,

plaintiffs claim in the Amended Complaint that Burzaco's testimony on November 14 "shocked

the public."  Amended Compl. ¶¶ 126-27.  Yet it is *undisputed* that there was *no* statistically

significant price movement in Televisa's ADR price on *either* that Tuesday or Wednesday,

November 14 or 15; nor for that matter the next day Thursday, November 16.  ████████████

████████████████████████████████████████████████████████████ Ex.

65, Ferrell Rep't at ¶ 51 & Exhibit 2.

████████████████████████████████████████████████████████████

████████████████████████████████████████ As explained in the rebuttal

report of Dr. Allen Ferrell Ph.D., Greenfield Professor of Securities Law at Harvard Law School,

any such theory flies in the face of the "large body of empirical finance literature" recognizing

that an "efficient market" is "one in which prices reflect all available information, and in which

any new information is *immediately* incorporated into the market price."  Ex. 65, Ferrell Rep't ¶

38.  Thus, courts have repeatedly rejected like attempts to manufacture statistical significance by

including the stock price results multiple days after the news in question occurs.  *See In re*

*Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 379-380 (S.D.N.Y. 2018) (four-day event

window "bordered on the nonsensical" given efficient market); *United States* v. *Hatfield*, 2014

WL 7271616, at *12-13 (E.D.N.Y. Dec. 18, 2014) (including results beyond one day after the

news date is "inconsistent" with an "efficient market"); *In re Xcelera Com. Sec. Litig.*, 2008 WL

7084626 (D. Mass. April 25, 2008) (rejecting expert's opinion that stock price movement on

---

Associated Press (Nov. 15, 2017); Ex. 86, Emily Saul, *Media companies hit with bribery claims at FIFA corruption trial*, N.Y. Post (Nov. 14, 2017), https://nypost.com/2017/11/14/media-companies-accused-of-bribery-at-fifa-corruption-trial/; Ex. 71, Patricia Hurtado, *Fox, Globo Among Broadcasters Linked to FIFA Corruption*, Bloomberg News (Nov. 14, 2017), https://www.bloomberg.com/news/articles/2017-11-14/fox-sports-paid-bribes-for-soccer-rights-fifa-witness-says; Ex. 87, *Burzaco confesó que Torneos, Televisa y O Globo pagaron coimas de US$ 15 millones a Grondona*, La Politica Online (Nov. 15, 2017), https://www.lapoliticaonline.com/nota/109587-burzaco-confeso-que-torneos-televisa-y-o-globo-pagaron-coimas-de-us-15-millones-a-grondona/.

August 2 was caused by news that came out after market close on July 31, because there was no statistically significant stock price movement on August 1 — the first trading day when the news was known); *Bell* v. *Ascendant Solutions, Inc.*, 2004 WL 1490009, at *2-3 (N.D. Tex. July 1, 2004) (excluding expert opinion that there was statistically significant price movement on date of news article, because article did not mention company).[129]

Dr. Tabak is of like view. If there is no statistically significant price movement on the first day in reaction to new news, the inquiry stops there: you do not extend the window of days.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████

That, too, is fatal to plaintiffs' case. For, as noted, to defeat summary judgment, plaintiffs must "mak[e] a showing sufficient to establish the existence of [the loss causation] element." *Omnicom*, 597 F.3d at 510 & n.3. And loss causation can only be established if "the market reacted *negatively* to [the] corrective disclosure." *Omnicom*, 541 F. Supp. 2d at 551, *aff'd*, 597 F.3d 501 (2d Cir. 2010). As the Second Circuit has also made clear, where, as here,

---

[129] Consistent with the efficient market hypothesis, experts in securities cases overwhelmingly utilize a one- or (at most) two-day event window. *See, e.g.*, *In re Federal Home Loan Mortgage Corp. Sec. Litig.*, 281 F.R.D. 174, 179 (S.D.N.Y. 2012) (using one and two day windows); *In re Am. Intern. Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 183 (S.D.N.Y. 2010), *rev'd on other grounds by In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229 (2d Cir. 2012)) (using one day window); *Goldkrantz* v. *Griffin*, 1999 WL 191540, at *4 (S.D.N.Y. 1999) (granting summary judgment for defendants where event study showed that no negative news was released on the individual days that exhibited statistically significant price drops); *Pennsylvania Ave. Funds* v. *Inyx Inc.*, 2011 WL 2732544, at *9-10 (S.D.N.Y. July 5, 2011) (relying on price reaction over a period of "less than a day" in assessing market efficiency); *In re Global Brokerage, Inc.*, 2021 WL 1160056, at *16 (S.D.N.Y. March 18, 2021) (analyzing one-day event windows), *report and recommendation adopted by In re Glob. Brokerage, Inc. f/k/a FXCM Inc. Sec. Litig.*, 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021); *George* v. *China Automotive Sys., Inc.*, 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) (analyzing one-day event windows); *Pearlstein* v. *BlackBerry Ltd.*, 2021 WL 253453, at *17 (S.D.N.Y. Jan. 26, 2021) (analyzing, in a report by plaintiffs' expert here, Dr. Feinstein, one-day event windows).

"the stock price movement is indistinguishable from random price fluctuations, it *cannot* be attributed to company-specific information announced *on the event date*." *Ark. Tchrs.*, 879 F.3d at 481 n.5 (emphasis added); *see also Alpha Capital Anstalt* v. *Intellipharmaceutics Int'l Inc.*, 2021 WL 2896040, at *6 (S.D.N.Y. July 9, 2021) (granting defendant summary judgment for lack of loss causation because "the observed [stock price] decline was statistically indistinguishable from a decline caused by chance or by broader market dynamics"); *In re Barclays Bank plc Sec. Litig.*, 2017 WL 4082305, at *19-25 (S.D.N.Y. Sept. 13, 2017) (granting defendants summary judgment for lack of loss causation because the stock price movement on each of the corrective disclosure dates was "statistically insignificant").

It is thus entirely beside the point whether the Televisa ADR price did or did not have statistically significant movement on the fourth day, Friday, November *17*.  On the prior day, Thursday, November 16, he referred back to prior testimony and on that final day, Friday, November 17, during his brief time on the stand he gave **no testimony about Televisa whatsoever**.  *See* Ex. 72, Nov. 16 Trial Tr. at 756:12-14; Ex. 73, Nov. 17 Trial Tr.  What matters under the securities laws is not what days Burzaco *was on the stand*, but what days there was a *corrective disclosure — i.e.*, "new news" revealing to the marketplace that Televisa engaged in bribery.  And, as detailed above, such days were exclusively Tuesday and Wednesday, November 14 and 15, *not* Thursday or Friday, November 16 or 17.  Again, as the Second Circuit has made clear, to "amount to a corrective disclosure," new news must "reveal to the market the falsity of the prior" representation.  *See, e.g.*, *Lentell*, 396 F.3d at 175 n.4.  Inasmuch as Burzaco on November 16 merely referred back to his prior testimony ("as I gave testimony sir") and did

not even so much as *mention* Televisa during his testimony on November 17, neither day's

testimony can possibly qualify as a corrective disclosure.[130]

Thus, even if Dr. Feinstein's counterfactual and unreliable opinion is not rejected in its

entirety under *Daubert*, it falls far short of the "significantly probative" evidence necessary to

defeat summary judgment.  *See Lyons*, 681 F.3d at 56-57 (where evidence "is not significantly

probative, summary judgment may be granted") (citation omitted); *Gallo*, 22 F.3d at 1223

(summary judgment proper where no rational finder of fact "could find in favor of the

non-moving party because the evidence to support its case is so slight").

**3.      Fisher Investments explains the reasons for price declines in Televisa's fourth
quarter 2017; Burzaco's testimony is not one of them**.

Televisa had a very disappointing fourth quarter in 2017.  ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████      Why, then, did Televisa's stock price go down on numerous days in that

fourth quarter?  That question was contemporaneously answered by Fisher Investments, the very

investment manager charged with making the investment decisions as to Televisa ADRs for both

former lead plaintiff CAAT and current class representative Palm Tran.  In a January 5, 2018,

internal memorandum explaining the reasons why Televisa's stock price slid down in the fourth

quarter of 2017, Fisher Investments wrote:  "Grupo Televisa a diversified Mexican media

company underperformed in 4Q *due to sales and profits that missed expectations.  Notably softer

than expected advertising revenues and subscriber growth weighed on returns*."  Ex. 88, Jan. 5,

---

130 ████████████████████████████████████████████████████
████████████████      But that disagreement is academic:  for the reasons discussed above, the results that
day do not matter.

2018 Email from Michael Weston to Henry Wang, re: Q4 Best/Worst Securities (FI-006109) (emphasis added).  Thus, by the admission of plaintiffs' own investment manager Fisher, the three causes of price decline in the fourth quarter were:  (1) "sales and profits that missed expectations;" (2) "softer than expected advertising revenues;" and (3) "softer than expected . . . subscriber growth."  *Id.*  Totally *absent* from this pre-litigation contemporaneous diagnosis by plaintiffs' very own investment manager is any mention of Burzaco's November testimony — or bribery.  This assessment by Fisher further confirms what the statistical results establish:  no negative price reaction resulting from Burzaco's testimony.

*     *     *

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████  That representation is simply and incontrovertibly false.  Plaintiffs are thus left with *no* basis to support their burden of establishing loss causation.  And, going beyond that fatal flaw, Dr. Feinstein's testimony as a whole is, as shown, entirely unreliable, self-contradictory, and runs counter to the fundamental concept of an efficient market.  Plaintiffs cannot satisfy their burden of establishing loss causation.

### B.   Loss causation is in any event not satisfied because the Burzaco testimony did not constitute new news.

That the market did not react negatively to the Burzaco testimony is dispositive.  But it further bears noting that the lack of negative market reaction to Burzaco's testimony is hardly surprising:  such testimony was not unanticipated.

Defendants are mindful of this Court's June 8, 2020 decision denying class certification that indicated that the Burzaco testimony provided "direct evidence" that was missing from prior media accounts.  ECF No. 134 at 8.  But the *Amended Complaint itself* repeatedly represents that the October 26, 2017 "*New York Times* Exposé" had already "implicated Televisa and Mountrigi in the FIFA bribery scheme and placed it squarely with the likes of Burzaco and Torneos in illegally obtaining rights to World Cup tournaments."  *E.g.*, Amended Compl. ¶¶ 12, 59, 123.  And plaintiffs themselves have previously represented that the *New York Times* exposé "left *no reasonable doubt* that Televisa and Mountrigi" were participants in Burzaco's bribery scheme.  ECF No. 41 at 16 (emphasis added); *see also id*. at 2 ("The article explained that Televisa's subsidiary Mountrigi, with the assistance of Torneos, agreed to, and did, pay millions of dollars in bribes to [FIFA] executive Julio Humberto Grondona for the 2018, 2022, 2026, and 2030 World Cup rights"); *id*. at 8 ("*The New York Times* pulled back the curtain on Televisa's FIFA bribes . . . .").

Plaintiffs cannot just blithely walk away from these representations now because they no longer serve their litigation position.  "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding."  *Bellefonte Re Ins. Co.* v. *Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985); *see also Clarke* v. *JPMorgan Chase Bank, N.A.*, 2010 WL 1379778, at *14 (S.D.N.Y. Mar. 26, 2010) (granting summary judgment against plaintiff because "the allegations in the complaint are judicial admissions by which plaintiff is bound throughout the course of the proceeding") (cleaned up, quoting *Bellefonte*).

Similarly, "[a] court can appropriately treat statements in briefs as binding judicial admissions of fact."  *In re Vivendi Universal, S.A. Sec. Litig.*, 2009 WL 1904569, at *4

(S.D.N.Y. July 1, 2009) (quoting *Purgess* v. *Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994)); *see also Sotheby's, Inc.* v. *Minor*, 2010 WL 11601336, at *11 (S.D.N.Y. Mar. 30, 2010) ("It is well-settled that statements by a party's attorneys in legal papers or oral arguments can be binding judicial admissions.").

Accordingly, whether or not Burzaco's testimony was the first "direct evidence," Defendants' respectfully submit that inasmuch as — by *plaintiffs' own admission* and view of the evidence in their filings with this Court — the *New York Times* exposé left "no reasonable doubt" that Televisa and Mountrigi were involved in Burzaco's bribery scheme, Burzaco's testimony that Televisa was involved in his bribery scheme was not the first event to "reveal to the market" Televisa's claimed involvement in his bribery scheme. *See Lentell*, 396 F.3d at 175 n.4 (to "amount to a corrective disclosure," new news must "reveal to the market the falsity of the prior" representation). And this Court has already long since found (ECF No. 134 at 7) — and plaintiffs' expert Dr. Feinstein in any event now concedes (*see* Ex. 3, Feinstein Rep't ¶¶ 65, 110) — that the market did *not* react negatively to the *New York Times* exposé either.

Thus, while the fact that the market did not react negatively to the Burzaco testimony is dispositive, that per plaintiffs' own prior admissions the news that Televisa was involved in the bribery scheme was *already* known to the market with "no reasonable doubt" — and with concededly no negative market reaction — independently serves to negate plaintiffs' claim. *Ark. Tchrs*, 879 F.3d at 485-86 (vacating district court order for failing to consider whether claimed corrective disclosures actually were new news).

### C.  This Court has already ruled out the January 26, 2018 Form 6-K as a potential corrective disclosure.

Beyond his inadmissible, unreliable, and counterfactual opinion of loss causation based on Burzaco's testimony, ███████████████████████████

████████████████████████████████████████. But this Court has already twice ruled

that the Burzaco testimony was the "*single* event" that could constitute a potential "corrective"

disclosure, and "there is no open question of fact as to whether the January 26, 2018 Form 6-K

was a corrective disclosure." (ECF No. 134 at 10; ECF No. 295 at 5). ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████

## POINT II

### SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE DEFENDANTS MADE NO FALSE OR MISLEADING STATEMENT.

Summary judgment is further called for in that defendants' challenged statements were

not in fact false or misleading.  From the outset, plaintiffs' entire case has always rested on the

premise that Mr. Burzaco might one day be able to come up with competent testimony to support

his conclusory hearsay in the previous criminal trial.  However, as discussed above, *see* pp. 34-36,

*supra*, such competent testimony is not forthcoming at this time, and this litigation should not be

indefinitely delayed to accommodate plaintiffs' hope that Burzaco — if ever deposed — *might*

provide testimony favorable to their case.  Plaintiffs make *no* claim that Televisa's agreement to

pay the $7.25 million consulting fee was, in and of itself, wrongful.  *See* p. 16, *supra*.  And,

absent Burzaco's testimony, plaintiffs have *no* proof of Televisa's participation in Burzaco's

alleged bribery and, accordingly, have *no* evidence that Televisa's statements were false or

misleading.  Moreover, even if Burzaco testified, nothing in the record suggests that his

testimony would implicate any responsible person at Televisa — as opposed to any claim he

might put forward as to grounds for suspicion on the part of the third party who actually

conducted the negotiations with Burzaco and who had zero involvement in making the challenged statements.  *See* pp. 54-65, *infra*.

*     *     *

A Rule 10b-5 plaintiff must show that the defendant "made misstatements or omissions of material fact . . . ."  *Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (quoting *ATSI*, 493 F.3d at 100).  Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information."  *Kleinman* v. *Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (quoting *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 45 (2011)). Rather, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."  *Stratte-McClure*, 776 F.3d at 101 (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993)).  Thus, to survive summary judgment, a plaintiff must demonstrate a genuine issue of material fact that a challenged statement either was an "untrue statement of material fact" or omitted "to state a material fact necessary in order to make the statement[] made, in light of the circumstances under which [it was] made, not misleading."  17 C.F.R. § 240.10b-5(b); *see Kleinman*, 706 F.3d at 153.

Additionally, "[t]o establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'"  *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193-94 and n.12 (1976)).  A plaintiff may satisfy "the scienter element" through "a strong showing of reckless disregard for the truth."  *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).  The Second Circuit has emphasized that, in the securities fraud context, recklessness is "a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*."  *Id.* (internal

-53-

quotation marks omitted) (quoting *Novak* v. *Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000)). To qualify as reckless, defendants' conduct must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Novak*, 216 F.3d at 308 (internal quotation marks omitted) (quoting *Rolf* v. *Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir.1978)). "To survive a motion for summary judgment, the plaintiff must provide admissible evidence that defendants were aware of facts or had access to (i) information contradicting their statements, or (ii) facts demonstrating that defendants failed to review or check information that they had a duty to monitor." *SEC* v. *Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511-12 (S.D.N.Y. 2018) (citing *Novak*, 216 F.3d at 308). "[P]roof of negligent conduct is insufficient." *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) (citing *Ernst*, 425 U.S. at 214) (granting summary judgment in favor of defendants).

Further, "[w]here a defendant is a corporation," plaintiffs must establish "that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quoting *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). Specifically, the required state of mind must exist in "an individual defendant who made the challenged misstatement" or "other officers or directors who were involved in the dissemination of the fraud" — not some other employee or third-party representative. *Jackson*, 960 F.3d at 98; *see, e.g.*, *Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*, No. 19 Civ. 7536, 2021 WL 1199035, at *29 (S.D.N.Y. Mar. 30, 2021).

Because plaintiffs totally lack evidence that defendants' statements of having obtained broadcasting rights for either the 2018-22 or the 2026-2030 World Cups were false or misleading

in having "omitted to disclose" that such was the product of supposed participation in bribery, the Court should grant summary judgment in defendants' favor.

> **A.    The record evidence reflects that Televisa's statements regarding World Cups were not false or misleading.**

**1.    The 2026-2030 World Cups**

The 2026-2030 World Cups have from the first been the purported gravamen here. Plaintiffs assert that defendants misled investors by omitting to disclose a supposed bribery scheme in connection with Televisa's acquisition of broadcasting rights for these World Cups. Specifically, on April 28, 2017, Televisa made public for the *first* time that it had acquired broadcasting rights for those World Cups.  Amended Compl. ¶ 114; Ex. 64, Grupo Televisa S.A.B. Form 20-F, filed April 28, 2017, at 19-20.  Plaintiffs allege that this statement was "false and misleading when made" because it "omitted" to disclose that Televisa "engaged in an unlawful bribery scheme," which was "known to or recklessly disregarded by defendants." Amended Compl. ¶ 119.

Thus, to survive summary judgment, plaintiffs must point to more than a scintilla of evidence that:  (i) Televisa engaged in bribery to obtain broadcasting rights for the 2026 and 2030 World Cups; and (ii) a Televisa corporate actor involved in the allegedly misleading statement regarding Televisa's acquisition of those broadcasting rights knew of or recklessly disregarded such bribery.  *See Jackson*, 960 F.3d at 98.  Plaintiffs cannot do so.

Begin with what the record *does* show.  ███████████████████████

███████████████ standing alone, there is nothing inherently improper about entering into a consulting agreement such as the $7.25 million agreement with Mr. Burzaco.[131]  ██████



---

[131] ████████████████████████████████████████████████████████████████

████████████████████████████████████████  And
there was no reason for anyone at Televisa to think anything was amiss.[132]  No "red flags" were
flying.  *See* Statement of Facts, § 5, *supra*.

The percipient fact witnesses have uniformly testified that Televisa never paid any bribe
for World Cup broadcasting rights and that no one at Televisa had any idea that Mr. Burzaco was
engaged in a bribery scheme.[133]  All evidence corroborates this to be the case.  Prior to 2015, Mr.
Burzaco was known as an established and well-connected businessman whose company,
Torneos, had prominent business partners and counted major multinational corporations like
AT&T and DirecTV among its investors.[134]  Televisa and Torneos had a longstanding business
relationship, with each having sublicensed various content from the other.[135]  No adverse
information had come to Televisa's attention suggesting corruption on the part of Burzaco.[136]
And Mr. Burzaco had connections on the FIFA Executive Committee that Televisa lacked —
namely, a relationship with his fellow Argentinian Julio Grondona.[137]  Televisa knew that Mr.
Burzaco had a relationship with his countryman Mr. Grondona — who at the time was one of the
most powerful men in the soccer world — but had no reason to believe that such relationship
was corrupt.[138]

---

[132] *See* Ex. 22, Balcárcel Decl. ¶ 4; Ex. 16, Balcárcel Tr. 26:8-19; Ex. 8, Folch Tr. 270:9-271:5; *see also*
Ex. 5, Azcárraga Tr. 274:11-275:3;
[133] Ex. 5, Azcárraga Tr. 285:8-20, 286:8-15; Ex. 8, Folch Tr. 270:21-271:5, 271:19-272:11, 273:7-15; Ex.
16, Balcárcel Tr. 82:4-10, 117:3-10; Ex. 13, Diez Tr. 256:1-263:1; *see* Ex. 32, O'Connor Rep't ¶ 124.
[134] Ex. 5, Azcárraga Tr. 274:20-275:15; Ex. 8, Folch Tr. 270:9-271:5.
[135] Ex. 16, Balcárcel Tr. 26:14-16; Ex. 22, Balcárcel Decl. ¶ 4; Ex. 5, Azcárraga Tr. 113:24-14:5, 274:20-
276:13.
[136] Ex. 5, Azcárraga Tr. 274:11-275:3; Ex. 16, Balcárcel Tr. 26:8-27:11; Ex. 22, Balcárcel Decl. ¶ 4; Ex.
8, Folch Tr. 270:9-271:5.
[137] Ex. 5, Azcárraga Tr. 206:3-207:7, 278:20-279:2; Ex. 13, Diez Tr. 252:9-20.
[138] *See* Ex. 16, Balcárcel Tr. 26:8-19; Ex. 22, Balcárcel Decl. ¶ 4; Ex. 5, Azcárraga Tr. 274:15-275:3.

To the contrary, Televisa secured broadcasting rights for the 2026 and 2030 World Cups by making a highly attractive preemptive bid that provided tremendous value to FIFA. Specifically, FIFA licensed to Televisa (through its subsidiary Mountrigi) broadcasting rights for 16 Latin American countries, including Mexico, for nearly ███ *more* than the fee agreed upon for the 2018 and 2022 World Cup rights for the same region less than two years earlier.  Ex. 22, Balcárcel Decl. ¶ 3.  ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████  That is, Televisa offered FIFA a very rich deal; there was no reason to suspect that any bribe need be paid to bring FIFA to the table.[139]  Further, in paying a $7.25 million success fee for assistance in securing a contract for FIFA media rights pursuant to which Mountrigi would pay FIFA hundreds of millions of dollars, Mountrigi paid far *less* — relative to the overall value of the contract — than American and European firms charge on a percentage basis for their services in negotiating for sports media rights.[140]

Crucially, when the Department of Justice announced criminal charges against Mr. Burzaco, Televisa immediately and voluntarily undertook a multi-step internal investigation to determine whether it had engaged in any wrongdoing.  *First*, the Company's Internal Audit department undertook a thorough review of soccer-related payments made by Televisa, ultimately concluding that Televisa's transactions — even those involving the now-disgraced Burzaco — were conducted "according to usual business practices in the industry on the

---

[139] *See* Statement of Facts, § 5, *supra*; Ex. 13, Diez Tr. 258:9-20.
[140] *See, e.g.*, Ex. 30, Ben Fritz and Erich Schwartzel, *Hollywood Isn't Enough for Talent Agency,* Wall Street Journal (Feb. 3, 2014); Ex. 31, James Andrew Miller, *How a Hollywood Talent Agency Won Big with Sports*, N.Y. Times (July 28, 2016).

international level, which were legitimate, transparent and in good faith."[141]  *Second*, Messrs.

Azcárraga, Angoitia, and Balcárcel caused the Company to retain independent external counsel

to conduct an internal investigation — allowing outside counsel to review electronic and

hardcopy records, conduct formal interviews of relevant persons, and hire an accounting firm to

assist with a forensic examination of Televisa's records to see if they indicated complicity with

Burzaco's bribery of Grondona.[142]  Indeed, when the Department of Justice subsequently asked

whether the Company would carry out an investigation, outside counsel informed the

Department of Justice that it had already done so and suggested holding a meeting to discuss the

issue.[143]  The decision by Televisa's senior executives and legal personnel to order an internal

investigation by outside counsel is powerful evidence that Televisa was *not* engaged in bribery

because seeking such an investigation suggests that the Company and its management were

"endeavoring in good faith to ascertain and disclose" potential violations or issues.  *City of

Brockton Ret. Sys.* v. *Avon Prods., Inc.*, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014)

(quoting *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010)); *see also Slayton*, 604

F.3d at 777 ("Ordering an investigation . . . was a prudent course of action that weakens rather

than strengthens an inference of scienter." (internal quotation marks omitted)); *cf. Fries* v. *N. Oil

& Gas, Inc.*, 285 F. Supp. 3d 706, 722 (S.D.N.Y. 2018).

Further, the work of the internal investigation was disclosed to key stakeholders.  The

investigation was disclosed to the Audit Committee of Televisa's Board of Directors, as well as

to PwC, then Televisa's external auditor.  Ex. 16, Balcárcel Tr. 81:6-82:3.  Indeed, ████████

---

[141] Ex. 57, Internal Audit Report at 2; *accord* Ex. 16, Balcárcel Tr. 46:25-47:12; Ex. 56, AlixPartners Memo re Internal Audit Report.
[142] *See* Ex. 5, Azcárraga Tr. 42:7-14, 47:4-19; Ex. 16, Balcárcel Tr. 41:2-14, 82:4-12; Ex. 23, Bandera Tr. 184:17-185:7.
[143] Ex. 22, Balcárcel Decl. ¶ 8; ████████████████████████████ .

██████████████████████████████████████████████████████████

████████████████████████████

Notably, Televisa and its outside counsel also disclosed the internal investigation to prosecutors at the U.S. Attorney's Office for the Eastern District of New York.  Ex. 22, Balcárcel Decl. ¶ 9.  Televisa and its outside counsel voluntarily met with these Government attorneys in January 2017, answered the prosecutors' questions, and was told that if the Government had further questions it would be in touch:  no such further questions have been forthcoming.  *Id.*

Moreover, in the five-and-a-half years since Televisa and its outside counsel voluntarily met with the Government attorneys, the Government has made no request or subpoena for documents from Televisa, nor has it sought an interview from any of Televisa's employees or executives.  *Id.* ¶ 12.  Similarly, Televisa's outside counsel met in Switzerland with the Office of the Attorney General of Switzerland to share the same information it had provided to the Department of Justice; following that meeting, the Swiss prosecutor confirmed to Televisa's outside counsel that neither Mountrigi nor Televisa was under investigation.  *Id.* ¶¶ 10-11; Ex. 62, Letter from Swiss Prosecutor (Mar. 30, 2017).  █████████████████████

██████████████████████████████████████████████████████████[5]

Televisa's outside counsel also disclosed the internal investigation to FIFA.  Ex. 22, Balcárcel Decl. ¶ 7.  To date, FIFA, under new leadership, has not sought to rescind its contract with Televisa for the 2026 and 2030 World Cup rights (nor any other contract).  *Id.* ¶ 17.  Indeed,

---

[144] ██████████████████████████████████████████████████
[145] ████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

to the contrary, games of the 2026 World Cup have now been slated to be played in Mexico City at the Estadio Azteca stadium *owned by Televisa*.  *Id.*; *see* Ex. 4, Televisa 2021 20-F at 41.  The 2018 World Cup came and went without incident, and the 2022 World Cup is just around the corner.

So, given that there is no claim here that the Consulting Agreement and payment was improper in and of itself, what does the Amended Complaint here claim that would transform that innocent act into criminal bribery:

- First, we have the facially disturbing allegation that the $7.25 million payment to FPT was made by way of an "off-book" transaction and a "skimming" scheme, which evidences guilty knowledge.  Amended Compl. ¶¶ 24-25.  Total fiction.  Far from being an "off-book" transaction, the payment to FPT was incontrovertibly open on Televisa's books:  paid out by way of Televisa's Direct-to-Treasury mode of payment; recorded in the normal course; open to Televisa's auditors; open to Televisa's internal audit team when a post-2015 review was directed; and explicitly testified to being open-on-the-books by all percipient witnesses and confirmed by the report and testimony of the external forensic accountants brought in by outside counsel to conduct a forensic review of all Televisa's payments in connection with its acquisition of the 2026-2030 World Cup.  *See* Statement of Facts, § 8.

- And there was nothing remotely culpable about Televisa having used its Direct-to-Treasury mode of payment to forward the payment to FPT's bank as instructed.  As set forth above, the Consulting Agreement itself called for simultaneous payment upon execution of the FIFA contract, such payment had been delayed

through a mix-up of wire-transfer instructions, and one of the very purposes of Televisa's Direct-to-Treasury mode of payment is to provide for expedition when called for.  Moreover, there was a trail of e-mails from responsible executives authorizing the payment.  Nothing was being hidden.  *See* Statement of Facts, § 8.

- So next we have the claim that an executive shuffling of responsibilities of Messrs. Azcárraga and Folch was precipitated on October 26, 2017 by the *New York Times* exposé that day and accordingly supports a claim of corruption.  But the incontrovertible oral and documentary evidence again shows this claim to be entirely empty:  the executive changes had been in the works for months prior to the *New York Times* "exposé," and they in no way reflected upon the integrity of the two executives who continued to hold major positions of responsibility at the company.  *See* Statement of Facts, § 15.

- Then we were told that the circumstance in which a Televisa executive — having no relationship with the acquisition of the World Cup rights or the consulting payment to FPT — was killed in a tragic event while bicycling in Mexico City supports a claim of bribery.  Not an iota of support for any such claim.  Shame. Desperation pleading.  *See* Statement of Facts, § 17.

- Nor does the Form 6-K filed by Televisa in January of 2018 reflecting certain deficiencies with the company's internal controls salvage plaintiffs' claim of bribery.  Indeed, this Court has already so ruled.  *See* Point I.C, *supra.*  But let there be no question:  as confirmed by ███████████████████████████ ███████████████████████████████████:  the deficiencies were not connected with any misconduct whatsoever.  *See* Statement of Facts, §§ 8, 18.

- Finally, we have the claim that Televisa wrongfully failed, in 2018, to make a Form 6-K filing of "disagreements" with its auditor, PwC, in order to cover up Televisa's participation with bribery.  Wrong in law; wrong in fact.  No such filing was required at the time claimed by the Amended Complaint.  And when the required filing was ultimately made with the SEC, both PwC and Televisa were in accord:  there had been no such "disagreement."  *See* Statement of Facts, § 19.

Thus, the only "falsity" revealed by discovery has been that of *plaintiffs'* complaint, the essential allegations of which are insupportable myth.  The record evidence instead reflects — *without contradiction* — that there was never participation in bribery by any Televisa executive or employee.  There is no disputed issue of fact.  Because plaintiffs lack even a scintilla of — let alone "significantly probative," *Lyons*, 681 F.3d at 56-57  — evidence of bribery required to render Televisa's statement false or misleading, summary judgment is called for.

## 2.  The 2018-2022 World Cups

Summary judgment is likewise called for with regard to any alleged misstatements regarding the 2018-2022 World Cups.  Indeed, defendants respectfully submit that no claims with respect to the 2018-22 World Cups are properly within the ambit of this litigation. Plaintiffs' complaint's allegations are conclusory and without factual support.  Defendants, of course, recognize that this Court, upon the recent class definition motion ruled otherwise, setting forth that the issue was "disputed" and that the issue was one for the "merits."  ECF No. 295 at 6.[146]  But defendants upon the present motion submit that the merits then make clear that the 2018-22 games are not within the purview of this litigation:  (1) Mr. Burzaco in his hearsay

---

[146] Defendants respectfully advise the Court that two days ago, on August 3, they petitioned the Court of Appeals pursuant to Rule 23(f) for leave to appeal this Court's ruling.

testimony only placed Televisa as being involved in a bribery scheme with respect to the 2026-30 games, *see* Statement of Facts, § 16, *supra*; (2) the Robbins Geller firm represented to its own client that the action related solely to 2026-30, *see* ECF No. 264-4 at 32; (3) no news article or analyst report identified by plaintiffs in this litigation construed Mr. Burzaco's testimony as implicating Televisa in a bribery scheme concerning rights to the 2018 or 2022 World Cups, and defendants are aware of none, *see* Statement of Facts, § 16, *supra*; and (4) when this issue was squarely before the Swiss District Court upon plaintiffs' Hague Convention request, that court in a decision, then affirmed upon plaintiffs' appeal, squarely held that there was "no presentation whatsoever regarding why there is a suspicion of corruption with regard to the acquisition and/or sale of the broadcast rights concerning the 2018-2022 World Cups," *see* Statement of Facts, § 20, *supra*.

But in any event, plaintiffs will be unable to come forward with any evidence of Televisa complicity as to any bribery scheme of Burzaco's with respect to the 2018-22 World Cups. Defendants paid not one illegal or improper cent to any FIFA person in connection with its acquisition of rights for those World Cups.  And, as noted below, although plaintiffs' putative "collusion" expert, Professor Spalding, ██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ Crucially, there is not one iota of evidence in the record suggesting that *any* of those emails or documents were shared with *any* Televisa employee (much less to an executive responsible for the alleged misstatements) — a fatal flaw in plaintiffs' case.  *See id.*  Moreover, a fatal flaw which plaintiffs attempt to overcome by the blatantly false allegation in their Amended Complaint that Messrs.

-63-

Diez and Simon were executives of Televisa's subsidiary Mountrigi:  they were <u>not</u>.  *See* Statement of Facts, § 2, *supra*.

### B.    The Spalding "Corruption" Report

Some further comment is in order with respect to that proffered report by Professor Spalding.  Lacking record *evidence* to support their theory of bribery and scienter, plaintiffs have proffered a putative "corruption" expert, Mr. Spalding.  Defendants have filed a proposed *Daubert* motion to strike his report as inadmissible.  *See* ECF Nos. 300, 310, 311.



And, as shown in the proposed *Daubert* motion, he lacks expertise on the majority of topics as to which he expresses views.  ECF No. 310 at 13-16.

Moreover, Spalding's report is dead wrong in its misleading and unreliable narrative of the evidentiary record:  he misstates incontrovertible facts; is ignorant of, or professes lack of

recollection of critical evidence; or miscomprehends the meaning of documents that he acknowledges reviewing.

███████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ Without such evidence, plaintiffs cannot survive summary judgment.  *See*, *e.g.*, *Jackson*, 960 F.3d at 98-99; *Villare* v. *Abiomed, Inc.*, 2021 WL 4311749, at *22 (S.D.N.Y. Sept. 21, 2021) (knowledge of employee who was not "a senior manager" and had no "role in the formulation" of the alleged misstatements "cannot be imputed" to the company); *Menora Mivtachim*, 2021 WL 1199035, at *29 (explaining that it "would be fatal to plaintiffs' theory of scienter" if the consultant who purportedly had scienter was not "even an employee of the organization whose scienter plaintiffs are trying to establish"); *Barrett* v. *PJT Partners Inc.*, 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017) (knowledge of individual who "was not a C-suite level employee" and did not have a role in disclosing the alleged misstatements to the market could not be imputed to corporation); *Schiro* v. *Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) (no corporate scienter in absence of showing that the facts known to junior employees "made their way up the entire corporate hierarchy to the . . . CEO and CFO [or to other senior management]"); *Francisco* v. *Abengoa, S.A.*, 481 F. Supp. 3d 179, 215 (S.D.N.Y. 2020) (no corporate scienter without "a 'connective tissue between' these employees [who had scienter] and anything that was reported [the company's] senior management" (quoting *Jackson*, 960 F.3d at 99)); *see also State Tchrs. Ret. Bd.* v. *Fluor Corp.*, 654 F.2d 843, 853 (2d Cir. 1981) (affirming grant of summary judgment where there was "no evidence on the record" that "any [company] officer acted with scienter").

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Should plaintiffs attempt to rely upon Spalding's testimony or the supposed evidence that supports it in opposition to this motion, defendants will show that, by his own admissions upon deposition, each of his "red flags of risk of bribery" conclusively show otherwise.

### C.   The record evidence reflects that the other alleged misstatements were not false or misleading.

Plaintiffs similarly challenge statements made by Defendants regarding Televisa's internal controls over financial reporting and code of ethics.  No triable issue of fact exists as to either category of statements.

### 1.   Internal Controls Statements

In a January 26, 2018 Form 6-K, Televisa disclosed three specific weaknesses in its internal controls over financial reporting.  The Amended Complaint in this proceeding claims that such weaknesses disclosed by Televisa helped facilitate Mr. Burzaco's alleged bribery scheme in 2013, and that prior statements about the adequacy of Televisa's internal controls were therefore misleading.  *See* Amended Compl. ¶¶ 20-21, 64-68, 121, 133-41, 156, 164-69.

As this Court has repeatedly explained, the challenged internal controls statements are actionable only insofar as they relate to alleged World Cup bribery.  *First*, at the motion to dismiss stage, this Court held that the challenged internal controls statements were actionable to the extent that, according to the Amended Complaint, "the weak internal controls hid the [World Cup] bribery scheme until PwC discovered the skimming scheme in late 2017 after [Mr. Burzaco's] trial testimony and ledgers came to light."  ECF No. 47 at 17.  *Second*, in case the

motion to dismiss ruling left any doubt (it did not), the Court subsequently held that "[t]he only documents relevant to this case are those relating to Televisa's obtaining World Cup rights, bribery payments, and whether [the internal controls issue] has a connection illuminating those matters."  ECF No. 169 at 2.  *Third*, the Court has twice rejected plaintiffs' argument that Televisa's Form 6-K disclosing the weaknesses in internal controls over financial reporting constituted a corrective disclosure — further making clear that Televisa's internal controls are relevant only insofar as they relate to alleged FIFA bribery.  ECF No. 295 at 5; ECF No. 134 at 8-10.

Defendants are entitled to summary judgment as to the internal controls statements because — contrary to plaintiffs' allegations — the weaknesses in internal controls disclosed by Televisa had *nothing* to do with any alleged FIFA bribery. ██████████████████ ████████████████████████████████ there was no connection whatsoever between the internal controls issues at Televisa and any claimed participation in bribery. ████████████ ████████████████████████████ Televisa's statement in its January 26, 2018 Form 6-K that "[t]here is no indication that any of these deficiencies resulted in improper activities."[147]  Thus, because discovery has revealed that any deficiencies in Televisa's internal controls had nothing to do with the World Cup bribery alleged in this case, the Court should grant summary judgment as to the challenged internal controls statements.  *See, e.g.*, *Dodona I LLC* v. *Goldman Sachs & Co.*, 132 F. Supp. 3d 505, 513, 517 (S.D.N.Y. 2015) (granting summary judgment where discovery revealed the challenged misstatements and omissions not to false or misleading).

---

[147] ██████████████████████ Ex. 51, Televisa Jan. 2018 6-K at 2.

2.      **Code of Ethics Statements**

Summary judgment is also appropriate as to the challenged statements regarding

Televisa's Code of Ethics ("Ethics Statements").  As discussed below, these statements are not

material as a matter of law.  *See* Section III(B), *infra*.  But the Court need not reach that issue

because such statements would only be false or misleading insofar as plaintiffs can present

competent evidence that Televisa executives violated the Code of Ethics by engaging in bribery

to obtain World Cup rights (or knew of such violations).  But, as reviewed above, there is not

one iota of evidence that Televisa engaged in bribery for World Cup rights.  *See* Sections II(A)-

(B), *supra*.  Thus, both as a matter of law and fact, summary judgment is required as to the

Ethics Statements.

**POINT III**

**SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE
PLAINTIFFS CANNOT SATISFY MATERIALITY.**

As set forth above, the alleged misstatements in this action do not give rise to liability

because plaintiffs cannot establish two essential elements of their Section 10(b) claim — namely,

loss causation and the actual falsity of those challenged statements.  But there's more: plaintiffs

are also unable to establish the *materiality* of the challenged statements regarding:  (1) Televisa's

acquisition of the 2026-30 World Cup broadcasting rights, and (2) Televisa's Ethics Statements.

Consequently, those alleged misstatements must be dismissed as a matter of law.

   A.      **Plaintiffs cannot establish the materiality of the challenged statement
           relating to Televisa's acquisition of broadcasting rights for the 2026
           and 2030 World Cups.**

Plaintiffs are unable to satisfy yet another required element of a 10b-5 claim as to

statements made regarding Televisa's acquisition of the 2026-30 World Cup broadcasting rights:

materiality.  "The materiality of a misstatement depends on whether 'there is a substantial

likelihood that a reasonable shareholder would consider it important in deciding how to [act].'"

-68-

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231-32 (1988)).  The materiality element is not satisfied unless there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 197 (quoting *Basic*, 485 U.S. at 231-32).  Material facts include those that "affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *S.E.C.* v. *Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968).  And "materiality is determined in light of the circumstances existing at the time the alleged misstatement occurred[.]" *Dekalb Cnty. Emps.' Ret. Sys.* v. *Controladora Vuela Compania de Aviacion, S.A.B. de C.V.*, 2016 WL 3685089, at *5 (S.D.N.Y. July 6, 2016) (internal quotation marks and citation omitted).

Televisa first publicly stated that it held the 2026-30 rights in April 2017 in its Form 20-F for the fiscal year 2016.  Ex. 64, Televisa 2016 20-F at 36.  At that point, the total mix of relevant information available to investors regarding Televisa's acquisition of those rights was:

- Just short of two years had gone by since U.S. prosecutors had launched their prosecutions and Swiss prosecutors had announced their investigation into FIFA, *see* Statement of Facts, § 10, *supra*:  neither government had brought any proceeding against Televisa, *see* Ex. 22, Balcárcel Decl. ¶¶ 11-13;

- Although Burzaco was cooperating with the Government,[148] in a Criminal Information and Deferred Prosecution Agreement filed in December 2016 against

---

[148] *See* Ex. 89, Minute Entry for Change of Plea Hearing as to Alejandro Burzaco, *United States* v. *Webb et al.*, No. 1:15-cr-00252, ECF No. 90 (E.D.N.Y. Nov. 16, 2015); Ex. 90, *Football:  State of play, year after US booked FIFA*, Expatica (May 26, 2015), https://www.expatica.com/ch/general/football-state-of-play-year-after-us-booked-fifa-59870/; Ex. 91, *FIFAGate:  ordenaron liberar a Alejandro Burzaco tras pagar una fianza de USD 10 millones*, infobae (Feb. 11, 2017), https://www.infobae.com/deportes-2/2017/02/11/fifagate-ordenaron-liberar-a-alejandro-burzaco-tras-pagar-una-fianza-de-usd-10-millones/.

Torneos — promptly reported by *Reuters* (*see* Ex. 61) — the Government, while
asserting that Televisa had "assisted" Burzaco's bribery scheme, chose not to
specify that such had been done "knowingly."  Ex. 60 (*Torneos* Information) at
¶ 34; Ex. 59 (*Torneos* Deferred Prosecution Agreement), Attachment B at ¶ 34;

- As of April 2017, FIFA, under new management, had not sought to rescind any of
its contracts with Televisa.  Ex. 22, Balcárcel Decl. ¶ 17.

Accordingly, the bottom line is that, on those facts existing as of that April 28, 2017 date,
when Televisa first publicly stated that it had the 2026-30 World Cup rights, it was
counterindicated that Televisa would suffer *any* material negative consequence from anything
that may have occurred in connection with the acquisition of those FIFA rights.  Moreover, the
proof of the pudding is in the eating:  in the more than five years since there have been no
material business repercussions for Televisa stemming from anything having to do with the
acquisition of the 2026-30 rights (nor the 2018-22 rights).  Ex. 22, Balcárcel Decl. ¶ 18.[149]

The above state of affairs as of April 2017 plainly demonstrates that plaintiffs cannot
establish the materiality of statements regarding the 2026-30 rights, even if Burzaco had
hypothetically given his testimony in April — the relevant date as a matter of law — rather than
November:  it is clear such testimony would not have changed investors' perspective.  For, there
is obviously an interrelationship between the independent requirement of materiality and that of
loss causation:  the absence of materiality is emblematic of the lack of loss causation.  And the

---

[149] And this securities lawsuit cannot itself create "materiality"; were this not the case, a plaintiff could
simply announce its intention to bring a suit and wait for the stock price to drop because of fear of a large
settlement or adverse liability finding.  Obviously, this would incentivize meritless strike suits as
plaintiffs could artificially manufacture the materiality and stock price drop needed for a securities fraud
suit, and thus would be directly contrary to goal of the PSLRA.  *See, e.g.*, H.R. CONF. REP. No. 104–369,
at 31-32 ("The private securities litigation system is too important to the integrity of American capital
markets to allow this system to be undermined by those who seek to line their own pockets by bringing
abusive and meritless suits.").

November non-reaction in the stock market makes clear that there is no cogent reason why a reasonable investor would have viewed Burzaco's testimony any differently had it occurred in April 2017 — when Televisa first announced it had the broadcast rights to the 2026 and 2030 World Cups[150] — than in November 2017, when Burzaco did testify that the rights were supposedly obtained by bribery.  Moreover, as plaintiffs' own attorney pressed at length upon the deposition of Dr. Tabak,[151] there is good reason to believe that the market had every reason to be skeptical of the truthfulness of testimony of Mr. Burzaco, a Government witness who had cut a deal of "cooperation" upon pleading guilty.[152]

But, for whatever reasons, the market's apathetic response to Burzaco's testimony in November is demonstrated by the behavior of Televisa's stock price.  As discussed in Point I above, the market was *not* negatively affected by the news of Burzaco's testimony, and that lack of price movement is likewise indicative of immateriality.  *See Fogarazzo* v. *Lehman Bros., Inc.*, 263 F.R.D. 90, 100 (S.D.N.Y. 2009) (noting that a defendant can "demonstrate that the alleged misrepresentations were immaterial . . . by showing that they did not lead to a distortion in price."); *see also United States* v. *Martoma*, 993 F. Supp. 2d 452, 457-58 (S.D.N.Y. 2014); *S.E.C.* v. *Aly*, 2018 WL 1581986, at *15 (S.D.N.Y. Mar. 27, 2018).

---

[150] *See* Statement of Facts, Section 13, *supra.*

[151] Ex. 78, Tabak Tr. 91:15-98:13.  Of particular note, plaintiffs' counsel asked Dr. Tabak if he was aware that federal courts, "will frequently instruct a jury in a federal case that accomplice testimony is of such nature that it must be scrutinized with great care and viewed with particular caution when you decide how much of that testimony to believe[.]"  *Id.* at 94:20-95:2.  This language matches standard federal jury instructions, as described in the next footnote.

[152] Ex. 92, Jury Instructions, *United States* v. *Webb et al.*, No. 15-cr-00252-PKC-RML, ECF No. 872 at 7 (E.D.N.Y. Dec. 26, 2017) ("[C]ooperator testimony is of such a nature that it must be scrutinized with great care and viewed with particular caution when you decide how much of that testimony, if any, to believe."); *see also, e.g.,* Sand et al., *Modern Federal Jury Instructions*, Criminal Instruction 7-11 ("In this case, there has been testimony from a government witness who pled guilty after entering into an agreement with the government to testify. . . . A witness who realizes that he may be able to obtain his own freedom, or receive a lighter sentence by giving testimony favorable to the prosecution, has a motive to testify falsely.  Therefore, you must examine his testimony **with caution and weight it with great care**." (emphasis added)).

And further confirming the immateriality of Burzaco's testimony is the near-total silence of analyst reports in the wake of Burzaco's testimony.  Analyst reports reflect the total mix of information available on a company.  *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 161 n.7 (S.D.N.Y. 2008) (citing analysts' reports "to show whether and when information was provided to the market such that the reports contributed to the total mix of information available to investors" (internal quotation marks and citation omitted)).  Here, not a single analyst revised its price target or recommendation downward based on Burzaco's testimony.  Ex. 65, Ferrell Rep't at ¶ 17.[153]  Of the thirty-five analyst reports published on or after November 14, 2017 through January 26, 2018, only four — published on November 15, November 16, and November 30 — even made any mention of the allegations of bribery *at all*, and none changed their rating or price target based on the allegations.  Ex. 65, Ferrell Rep't at ¶ 55.  Even more fundamentally, not a single analyst report from April 2013 through January 25, 2018 directly referenced the 2026 or 2030 World Cups as informing their Televisa valuations.  Ex. 65, Ferrell Rep't at ¶¶ 17, 84-85. Moreover, as noted above, *see* pp. 48-49, *supra*, the research analyst at Fisher Investments responsible for covering Televisa for both the CAAT and Palm Tran portfolios in 2017,[154] in a review of why Televisa's ADR price descended in the fourth quarter of 2017, does not so much as mention Burzaco's testimony or any bribery scheme supposedly participated in by Televisa.  *See*

---

[153] As these summary judgment papers were being completed, Dr. Ferrell called counsel's attention to errata in his report, none of which alter his conclusions:  (1) he stated that none of the four analyst reports that mentioned Burzaco's testimony from 11/14/17 to 12/17/17 (of 16 total reports in that period) lowered its price target or recommendation — two did, but not based on Burzaco's testimony; (2) he reviewed 848 reports — not 849;  (3) he actually reviewed reports over a longer period, 4/11/13 to 2/22/18, than stated in his report; (4) the first mention of the 2018 World Cup was 4/7/17, not 6/29/17; (5) 18 analysts discussed the 2018 World Cup, not 13; two of such reports — not none — increased its price target or recommendation referring to the games.

[154] ███████████████████████████████████████████████████

Ex. 88, (Jan. 5, 2018 Email from Michael Weston to Henry Wang, re: Q4 Best/Worst Securities [FI-006109]); *see also* pp. 48-49, *supra.*

Furthermore, as noted above, by April 2017, two years had passed — by November 2017, two-and-a-half years — with active prosecutions of FIFA bribery by the U.S. government (along with contemporaneous investigations by the Swiss government). *See* Statement of Facts, § 10, *supra*. Yet in that period of time, no proceedings of any nature — criminal or civil — had been commenced against Televisa regarding allegations of FIFA-related bribery or corruption. Ex. 22, Balcárcel Decl. ¶ 14.

Finally, the marketplace's judgment in *not* reacting to Burzaco's November 2017 testimony as to Televisa because it did *not* materially affect the company has been proven entirely *correct*. It has been more than *four-and-a-half years* since Burzaco testified — seven years since the U.S. and Swiss governments went public with their FIFA probes — yet no government has charged Televisa nor has FIFA taken any steps to walk away from any contract with Televisa. *Id.* ¶¶ 13, 17. Televisa has simply suffered no material business repercussions from Burzaco's claim. *Id.* ¶ 18. Televisa has sublicensed and broadcast the 2018 World Cup and the company continues to hold the broadcasting rights for the 2022, 2026 and 2030 World Cups, just as before — indeed, Azteca Stadium, which Televisa owns, has since been chosen to host matches for the 2026 World Cup. *See* Ex. 77, Televisa 2018 20-F at 48; Ex. 94, Televisa Form 20-F for the year ended December 31, 2020, filed Apr. 30, 2021 ("Televisa 2020 20-F") at 42; Ex. 3, Televisa 2021 20-F at 41. Televisa continues to broadcast a vast array of soccer programming, just as before: In 2021, Televisa offered exclusive content related to the Spanish Soccer League, La Liga and La Copa Del Rey, the English Premier League, the Carabao Cup, UEFA, EURO, EUFA Nations League and qualifying matches for the World Cup, as well as

special coverage of female soccer leagues from Germany, Spain, Sweden and the U.K.  Ex. 3,

Televisa 2020 20-F at 40.  There is zero indication that Televisa's ability to successfully

negotiate for media rights to show soccer matches has been negatively affected in any way.

Televisa is a reputable and stable company, and indeed recently — with Federal

Communications Commission approval[155] — has been permitted to acquire some 45% of the

U.S. Spanish language broadcaster formerly known as Univision Communications Inc. (now to

be known as TelevisaUnivision, Inc.).  Ex. 95, Grupo Televisa, S.A.B., Form 6-K, dated Apr. 15,

2021, at 2.  As of January 2022, TelevisaUnivision reached over 60% of the respective TV

audiences in both the U.S. and Mexico.  Ex. 96, Grupo Televisa, S.A.B., Form 6-K, dated Jan.

31, 2022, at 2.

So the marketplace's collective shrug in *not* reacting to Burzaco's testimony has been

entirely vindicated.  But more fundamentally, for purposes of this motion, plaintiffs cannot show

that there was other than a total lack of materiality as of the controlling date:  April 28, 2017.

And in a securities fraud case, that is what matters as to the materiality element:  because a

rational investor with knowledge of the facts would not have cared then, there is no materiality

and summary judgment is required.

### B. Alleged misstatements concerning Televisa's Code of Ethics are immaterial as a matter of law.

While this Court ruled in March 2019 that Televisa's Code of Ethics contained actionable

material misrepresentations, ECF No. 47 at 20-21; *see also* ECF No. 295 at 6, the Second

Circuit's subsequent decision in *Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank*

---

[155] *Consent to Transfer Control of Certain Subsidiaries of Univision Holdings, Inc. to Searchlight III UTD, L.P., ForgeLight (United) Investors, LLC, and Grupo Televisa, S.A.B.; Univision Holdings, Inc.*, Memorandum Opinion and Order and Declaratory Ruling, 35 FCC Rcd 14835 (2020); *Univision Holdings II, Inc. Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, Declaratory Ruling, Federal Communications Commission DA 22-74 (MB 2022).

*A/S*, 11 F.4th 90 (2d Cir. 2021), as well as its decision in *Singh* v. *Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019), now make clear that *all* such alleged misrepresentations concerning Televisa's Ethics Statements are immaterial as a matter of law.

As set forth in the Memorandum of Law in Support of Defendants' Motion to Define the Class, ECF No. 263 at 17-21, *Singh* and *Danske* calcified three fundamental principles concerning the materiality of corporate statements regarding ethics:

*First*, the Second Circuit made clear that "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them." *Singh*, 918 F.3d at 63 (citation omitted). *Compare* Amended Compl. ¶ 88 (observing that Televisa's Code of Ethics stated that "[e]very person must act in accordance with this Code and with the applicable laws in Mexico and in any other jurisdictions"), *with, e.g.*, *Danske*, 11 F.4th at 103 (statement that a company "strive[s] to conduct . . . business in accordance with internationally recognised principles in the area[ ] of . . . anti-corruption" was "plainly puffery" and thus immaterial).

*Second*, the Circuit expressly rejected plaintiffs' assertions that a reasonable investor would rely on descriptions of the defendant's compliance policies in its SEC filings as "representations of satisfactory compliance." *Singh*, 918 F.3d at 63. Rather, descriptions of compliance efforts transform to actionable assurances of actual compliance *only* where such descriptions are expressed in "confident detail" and with emphasis on a purported "*clean compliance record*" resulting from such compliance efforts. *Id.* at 63-64 (emphasis added). Accordingly, generic statements concerning the mandatory nature of a company's code of ethics are immaterial as a matter of law. *Compare* Amended Compl. ¶¶ 88, 97 (noting Televisa's statements that "personnel *shall* not acquire any type of commitment to attempt to obtain . . . any

bribe, coercion or other payment or benefit," that board members *must* sign an adherence letter "as evidence of their acceptance and commitment" to the Code, and that compliance with the Code's content was "mandatory" (emphasis added)), *with Danske*, 11 F.4th at 103 (no actionable misstatements when the company stated that it "'condemns . . . money laundering,' 'takes the steps necessary to comply with internationally recognised standards, including Know Your Customer procedures,' and has procedures for 'customer due diligence, reporting, . . . and communications'").

*Finally*, the Circuit reaffirmed that "context" matters.  *Singh*, 918 F.3d at 63.  Thus, in evaluating whether a statement is material, courts must take into account the "context and manner of presentation," as a reasonable investor would not view as material statements surrounded by "tentative" language that "suggests caution (rather than confidence) regarding the extent of . . . compliance," or statements that are surrounded by other statements "suggest[ing] a company actively *working* to *improve* its compliance efforts, rather than one expressing confidence in their complete (or even substantial) effectiveness."  *Id.* at 63-64.  Here, however, plaintiffs have failed to appreciate the context in which Televisa made the challenged Ethics Statements when presenting cherry-picking anodyne statements from Televisa's Code of Ethics as a blanket representation that was in compliance with all laws.

Televisa's Ethics Statements in the years from 2013 to 2017 are, accordingly, indistinguishable from those held inactionable under *Singh* and *Danske*.  Consequently, pursuant to those controlling decisions, this Court should conclude that the Ethics Statements challenged as false and misleading in the Amended Complaint are immaterial as a matter of law.  *Cf. Leykin* v. *AT&T Corp.*, 423 F. Supp. 2d 229, 239 & n.7 (S.D.N.Y. 2006) (Stanton, J.) (claimed

misstatements were inactionable; previous decision sustaining the misstatements was "no longer good law" based on subsequent case law), *aff'd*, 216 F. App'x 14 (2d Cir. 2007).

## POINT IV

**SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST CLASS REPRESENTATIVE PALM TRAN FOR ADDITIONAL REASONS PARTICULAR TO IT:  PALM TRAN HAS NO VIABLE INDIVIDUAL CAUSE OF ACTION; IS BARRED AS LEAD PLAINTIFF; MISREPRESENTED ITS INTENTIONS TO THIS COURT; AND IS OTHERWISE UNFIT TO CONTINUE AS CLASS REPRESENTATIVE.**

For the reasons set forth in Points I-III, *supra*, plaintiffs (including Palm Tran) have no viable claim.  But in addition, Palm Tran is barred individually and as class representative for still further reasons.

**A.      Palm Tran has no individual cause of action in that the undisputed record rebuts the *Basic* presumption of reliance as to Palm Tran because Palm Tran did not rely on any alleged misstatements.**

Summary judgment is also called for because Palm Tran did not rely on the purported misstatements alleged in the Amended Complaint.  Reliance on an alleged misrepresentation or omission is an essential element of a suit brought under § 10b and Rule 10b-5, as the element serves to "ensur[e] that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury."  *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (internal quotation marks omitted) ("*Halliburton II*").  To prove reliance, a plaintiff generally must demonstrate that it "was aware of a company's statement and engaged in a relevant transaction — *e.g.*, purchasing common stock — based on that specific misrepresentation."  *Id.* Of course, the Supreme Court in *Basic* v. *Levinson* then held that securities fraud plaintiffs may in certain circumstances invoke a "rebuttable presumption of reliance" to satisfy the reliance element of a securities fraud claim.  *Halliburton II*, 573 U.S. at 268 (citing *Basic* v. *Levinson*, 485 U.S. at 246).

But a "rebuttable" presumption obviously means that such presumption is subject to rebuttal.  And, to rebut the "*Basic* presumption of reliance" a defendant need only make "*any showing* that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price."  *Halliburton II*, 573 U.S. at 269 (emphasis added) (quoting *Basic*, 485 U.S. at 248).  Moreover, defendants may achieve an "individualized rebuttal" sufficient to deprive an individual plaintiff of that presumption upon a showing that severs that "link" as to that plaintiff.  *Id.* at 276.

Just such an "individualized rebuttal" of the *Basic* presumption is present here, for the uncontroverted record reveals that Palm Tran — via its investment manager Fisher — did not rely on any undisclosed alleged corruption on the part of Televisa when purchasing Televisa ADRs.  "Where, as here, a plaintiff wholly outsources their decision making to an investment adviser who acts as their agent, that agent's decision-making calculus is relevant to the reliance inquiry."  *Villella v. Chem. & Mining Co. of Chile Inc.*, 2018 WL 2958361, at *5 (S.D.N.Y. June 13, 2018).  ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████  ████████████████████████  Tellingly, on the same date in January 2018 that Televisa issued a Form 6-K announcing certain material weaknesses in its internal control over financial reporting, Fisher acknowledged in writing that the disclosure was not "surprising," and also set forth its view that, as a company headquartered in an emergent market, any risk of corruption at Televisa was already "widely understood and likely priced into Televisa shares."  Ex. 99, Fisher Report dated Jan. 26, 2018 [FI-000001]; ████████████████████████████████████  It cannot be

contested that if Fisher Investments believed when it purchased Televisa's ADRs that risk of corruption was "widely understood" and priced into the shares at that time, *i.e.*, downward, then Fisher Investments could not have been relying on the claims in the Amended Complaint that Palm Tran detrimentally relied on a manipulated inflated price of Televisa ADRs by reason of Televisa's having "omitted to disclose" supposed participation in bribery.

An investment manager's lack of reliance is of course imputed to its client.  *See In re Vivendi Universal, S.A. Sec. Litig.*, 183 F. Supp. 3d 458, 459, 466 (S.D.N.Y. 2016) (concluding that defendants had rebutted the Basic presumption because plaintiff's investment advisor was "indifferent to the fraud").  Thus, because the uncontradicted evidence demonstrates that Fisher, as Palm Tran's agent, "would have bought or sold the stock even had [it] been aware that the stock's price was tainted by fraud," *Halliburton II*, 573 U.S. at 269, Palm Tran is not entitled to the presumption of reliance.  Palm Tran's individual securities fraud claims must therefore fail.

> **B.    Summary judgment should be granted because Palm Tran failed to come forward with class claims within the statutory periods prescribed for those claims.**

Defendants further respectfully submit that Palm Tran's class claims are time-barred. Congress has mandated that any claims alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act must be initiated within two years after the "discovery of the facts constituting" the alleged violations.  28 U.S.C. § 1658(b)(1).  Here, this Court has determined that disclosure date to be November of 2017.  ECF No. 134.  But Palm Tran did not step forward to seek a position as class representative until June 2020.  Consequently, while the statute of limitations for Palm Tran's *individual* claims remains tolled by the equitable rule announced in *American Pipe* & *Construction Co.* v. *Utah*, 414 U.S. 538, 552-53 (1974), no such tolling applies to save Palm Tran's *class* claims, which were pressed for the first time more than two years after

the alleged corrective disclosure in this action.  *See China Agritech, Inc.* v. *Resh*, 138 S. Ct. 1800, 1810-11 (2018).

In addition, there is the further bar that any such claims must be brought within five years from the date of violation.  28 U.S.C. § 1658(b)(2).  And such five-year period is a statute of *repose* and does not under any circumstances give rise to tolling.  *CALPERS* v. *ANZ Secs., Inc.*, 137 S. Ct. 2042, 2051 (2017).  Accordingly, Palm Tran is further barred as to any alleged misstatements from before June 2015 by such statute of repose.

Defendants are of course aware of the Court's prior ruling that Palm Tran has "been an unnamed class member since the case began" and may therefore rely on *American Pipe* tolling to press otherwise untimely class claims following the Court's initial denial of class certification. ECF 154 at 1.  Nevertheless, we respectfully submit that the subsequent decision of the Second Circuit in *Fund Liquidation Holdings LLC* v. *Bank of America Corp.*, 991 F.3d 370 (2d Cir. 2021) calls for reconsideration of that ruling.

In *Fund Liquidation*, the Court of Appeals read *China Agritech* narrowly as limited to "follow-on" newly filed class actions only, rather than to "new class representatives joined within the *same* class action."  *Fund Liquidation*, 991 F.3d at 393 (emphasis in original). (Defendants respectfully preserve their position as to whether this is an accurate interpretation of that aspect of the Supreme Court's opinion.)  Nevertheless — on a separate issue — *Fund Liquidation* is plainly distinguishable from the case at bar and the very language of the Second Circuit's decision as well as that of the Supreme Court in *China Agritech supports* Defendants' position that Palm Tran is precluded here.

For here, as is noted, *Fund Liquidation* explicitly states that "new class representatives" must join within the "*same* class action."  *Fund Liquidation*, 991 F.3d at 393 (emphasis in

original).  But in the present litigation — as in *China Agritech* but *not* in *Fund Liquidation* itself— before the contender arrived on the scene, there had already been a *denial* of class certification.  *See* ECF No. 134; *China Agritech*, 138 S. Ct. at 1804.

Thus, while when Palm Tran came forth in 2020, it may have done so in the "same action": it did not do so in the "same *class* action."  For both the Court of Appeals and the Supreme Court have definitively held that once such denial of class action status has taken place, "the class is no longer putative:  having been subjected to a legal decision, the class is either extant or not."  *Giovanniello* v. *ALM Media*, 726 F.3d 106, 117 (2d Cir. 2013); *see also China Agritech*, 138 S. Ct. at 1804 (upon denial of class certification, a class action is "shorn of its class character," existing only as an individual action).  Thus, Palm Tran could not attempt to join the "same *class* action" following this Court's denial of class certification, as that class action had ceased to exist.  Accordingly, given the prior denial of class certification here (ECF No. 134), equitable tolling does not apply to Palm Tran's attempt to serve as class representative and is plainly precluded by *China Agritech, Fund Liquidation*, and *CALPERS*, making dismissal of Palm Tran's class claims required.

Put simply, when Palm Tran entered this action following the denial of class certification, years after "the discovery of the facts" underpinning its claims of securities fraud, Palm Tran needed to assert class claims that were timely without resort to *American Pipe* tolling, which does not exist as to either the two-year or five-years bars.  *China Agritech*, 138 S. Ct. at 1802; *CALPERS*, 137 S. Ct. at 2052-54.  It cannot do so.  Accordingly, summary judgment is required to be granted to defendants on Palm Tran's class claims.

### C.    Palm Tran is unfit to serve as class representative.

Even if Palm Tran possessed otherwise viable claims and was not barred by the statutes of limitations and repose, summary judgment should still be granted because Palm Tran is unfit

to serve as class representative.  "One of the principal legislative purposes of the PSLRA was to prevent lawyer-driven litigation."  *In re Pfizer Inc. Sec. Litig.*, 233 F.R.D. 334, 337 (S.D.N.Y. 2005); *accord Aude* v. *Kobe Steel, Ltd.*, 2018 WL 1634872, at *2 (S.D.N.Y. Apr. 4, 2018).  In furtherance of that purpose, Congress enacted procedural safeguards to "ensur[e] that parties . . . exercise control over the selection and actions of plaintiffs' counsel."  *Aude*, 2018 WL 1634872, at *2.

Here, however, since Palm Tran's appointment as class representative, discovery has shown that Palm Tran has not only made no effort to actually "exercise supervision . . . of the lawyers for the class,"  H.R. CONF. REP. 104-369, at 32 (1995), *as reprinted in* U.S.C.C.A.N. 730, 731, but has graphically *misrepresented* to this Court its supposed intent to do so.  This Court appointed Palm Tran following Robbins Geller's submission of a declaration from Dwight Mattingly, the chairperson of Palm Tran's board of trustees.  In that declaration, dated June 17, 2020, Mr. Mattingly assured the Court under oath that Palm Tran would take seriously its duty to exercise supervision over class counsel:

> I commit to the Court that [Palm Tran] will actively monitor the proceedings by reviewing periodic updates, drafts of significant pleadings, Court orders, and perform any other task that is required for the successful prosecution of this case.

*See* Ex. 2, Mattingly Decl. ¶ 10.  That commitment was false.  Just two days later, at a meeting of Palm Tran's board of trustees, in asking for retroactive approval of his application to this Court, Mr. Mattingly — as established by the documentary record — gave statements of his actual intent:

> Mr. Mattingly stated that the motion would be to approve Palm Tran becoming a part of the class *but it's a little bit more than being a member of the class and getting a payout if the case is won*. . . . The amount of time and expense would be minimal.  *It would be Mr. Mattingly testifying that the Plan did own these and did take a loss*.  Other than that it is records keeping and electronically giving the records that show that we owned the stock.

*See* Ex. 100, Palm Tran Special Meeting Minutes dated June 19, 2020, at 2 (emphasis added).

This candid description of Mr. Mattingly's actual intent is a far cry from the commitment he made under oath to this Court.  And the deposition testimony of Mr. Mattingly served only to underscore the falsity of that representation and Palm Tran's lack of oversight in this litigation. During that deposition, Mr. Mattingly admitted that he did not so much as read through the Amended Complaint in its entirety before proposing Palm Tran as a class representative — notwithstanding his representation in a sworn declaration to the Court that he had "reviewed" the Amended Complaint.  Ex. 1, Palm Tran Tr. 14:3-16:5.  Further, Mr. Mattingly admitted that he never took any steps whatsoever to look into the accuracy of the Amended Complaint's allegations after Robbins Geller's disqualification from this action for committing fraud upon the Court.  *Id.* at 32:12-17).  Rather, he testified that he would stand behind each and everyone one of them — even if they were false.  *Id.* at 48:15-18 ("Q:  *And if it's totally false, then you stand by this representation to the Court?* A:  *I do*."); *see id.* at 16:21-24 (adopting allegations of the Amended Complaint), 38:4-40:7 (refusing to disavow allegations even if false).  And he admitted that he has not reviewed drafts of documents bearing Palm Tran's name before they are filed with the Court, *id.* at 65:10-18, notwithstanding his representation to the Court that Palm Tran would "actively monitor the proceedings by reviewing . . . drafts of significant pleadings," Ex. 2, Mattingly Decl. ¶ 10.

Yet there is more to demonstrate Palm Tran's inadequacy as class representative.  Its *maximum* recovery in this litigation — even if it were able to assert a valid individual cause of action — is only *$935.* ██████████████

██████████████████████████████

██████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

But Mr. Mattingly, in obtaining from his trustees authority to serve as class representative, told

them that it was in the neighborhood of *$6,000*.  *See* Ex. 1, Palm Tran Tr. 78:3-10.  Of course,

$935 is a far cry from any neighborhood of $6,000.

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████ *see also* Ex. 1, Palm Tran Tr. 101:2-25.

Nonetheless, at a *special meeting of the trustees* held on June 4, 2020, to determine Palm Tran's

class action policy just four days *before* this Court's June 8, 2020 disqualification of CAAT —

coincidence? Mr. Mattingly denied having any discussion of CAAT's potential disqualification

at this meeting prior to this Court's Order, *see* Tr. 102:22-103:6 — he persuaded his trustees to

ignore that recommendation and have a minimum of *zero*.  *See* Ex. 102, Palm Tran Special

Meeting Minutes dated June 4, 2020 at 5.

The *de minimis* nature of Palm Tran's best-case maximum damages of $935 speaks

loudly to disqualification, as Congress's preference for "institutional investors" as lead plaintiffs

when enacting the PSLRA was predicated on the assumption that such investors would further

the PSLRA's purpose — "curb[ing] frivolous, lawyer-driven litigation" — because they were

more likely to have *real* injuries.  *Tellabs*, 551 U.S. at 322 (emphasis added).  Here, Palm Tran's

hypothetical claim — of some $935 — hardly meets Congress's intent to have a class

representative with proper incentive to actively monitor this litigation.  And Palm Tran has not done so.

The record evidence leaves no doubt that Palm Tran's role in this action — once CAAT was disqualified — was merely that of a "a key to the courthouse door" for Robbins Geller, as now succeeded to Boies Schiller.  *Weisman* v. *Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978) (quoting *Saylor* v. *Lindsley*, 456 F.2d 896, 900 (2d Cir. 1972)).  By reason of its false representation to this Court, its *de minimis* claim, and its abject abdication of any attempt to review the validity of Robbins Geller's false allegations or otherwise monitor the proceeding, Palm Tran is unfit to serve as class representative, and summary judgment should be granted against any such class claims.

## POINT V

## SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST PLAINTIFFS' SECTION 20 CLAIM.

Summary judgment is likewise required against plaintiffs on their claim under Section 20(a) against Azcárraga and Folch for control-person liability.  A Section 20(a) claim requires "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI*, 493 F.3d at 108.  Here, for the reasons set forth above, summary judgment must be granted against plaintiffs on their claim of a primary violation under Section 10(b).  As such, the Section 20(a) claim fails.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of defendants as set forth above.

Respectfully submitted,

*Of Counsel*:                                          /s/ Herbert M. Wachtell
                                                       Herbert M. Wachtell
Ben M. Germana
David B. Anders                                        WACHTELL, LIPTON, ROSEN & KATZ
Adebola O. M. Olofin                                   51 West 52nd Street
Benjamin L. Levander                                   New York, New York  10019
Daniel J. Harper                                       (212) 403-1000

Dated:  August 5, 2022                                 *Attorneys for Defendants*