# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re GRUPO TELEVISA SECURITIES LITIGATION | Civil Action No. 18-cv-1979-LLS |

## CLASS REPRESENTATIVE'S AMENDED MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION FOR (I) PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; AND (II) APPROVAL OF NOTICE TO THE CLASS

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Palm Tran, Inc. Amalgamated Transit Union Local 1577 Pension Plan and the Class*

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     HISTORY OF THE LITIGATION ......................................................................... 3

III.    NEGOTIATION OF SETTLEMENT ..................................................................... 6

IV.     SETTLEMENT TERMS ......................................................................................... 7

V.      PRELIMINARY APPROVAL IS WARRANTED AND WILL ALLOW CLASS
        REPRESENTATIVE TO NOTIFY THE CLASS ................................................. 8

        A.      The Rule 23(e)(2) Factors Are Satisfied .................................................. 11

                1.      Class Representative and Lead Counsel Have Adequately Represented the
                        Class ............................................................................................... 11

                2.      The Proposed Settlement Is the Result of Good Faith, Arm's Length
                        Negotiations .................................................................................. 12

                3.      The Relief Provided by the Settlement Is Adequate when Weighed
                        Against the Risks of Litigation .................................................. 14

                4.      The Proposed Method for Distributing Relief Is Effective ...................... 16

                5.      Lead Counsel's Fee and Expense Request Is Fair and Reasonable .......... 17

                6.      All Class Members Are Treated Equitably Relative to One Another ....... 36

        B.      The Proposed Settlement Meets the *Grinnell* Factors .......................... 37

VI.     NOTICE TO THE CLASS SHOULD BE APPROVED ................................... 40

VII.    PROPOSED SCHEDULE OF SETTLEMENT EVENTS ............................... 42

VIII.   CONCLUSION ..................................................................................................... 42

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) .................................................................................... 35, 38

*Blum v. Stenson*,
    465 U.S. 886 (1984) .......................................................................................... 19

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) .......................................................................................... 18

*Cabot E. Broward 2 LLC v. Cabot*,
    2018 WL 5905415 (S.D. Fla. Nov. 9, 2018) ........................................................ 23

*Christine Asia Co., Ltd. v. Yun Ma*,
    2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ........................................ 10, 34, 36, 38

*City of Providence v. Aeropostale, Inc.*,
    2014 WL 1883494 (S.D.N.Y. May 9, 2014) ................................................... 14, 18

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent., Inc.*,
    2021 WL 911216 (S.D.N.Y. Mar. 7, 2021) ........................................................... 13

*Cornwell v. Credit Suisse* Grp.,
    No. 08-cv-3758, ECF No. 117 (S.D.N.Y. July 20, 2011) ...................................... 25

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001) ......................................................................... 12, 38

*Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) .............................................................................. 10

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
    62 F.4th 704 (2d Cir. 2023) .............................................................................. 34

*Fresno Cnty. Employees' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*,
    925 F.3d 63 (2d Cir. 2019) ............................................................................... 34

*Goldberger v. Integrated Resources, Inc.*,
    209 F.3d 43 (2d Cir. 2000) .............................................................. 18, 19, 20, 23

*Gordon v. Vanda Pharms. Inc.*,
    2022 WL 4296092 (E.D.N.Y. Sept. 15, 2022) ...................................................... 18

*Hicks v. Stanley*,
    2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ................................................. 35, 36

*Hyland v. Navient Corp.*,
    48 F.4th 110 (2d Cir. 2022) .............................................................................. 36

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
    298 F.R.D. 171 (S.D.N.Y. 2014) ........................................................................ 11

*In re Agent Orange Prod. Liab. Litig.*,
  597 F. Supp. 740 (E.D.N.Y. 1984)................................................................. 39

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
  2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) .................................................. 23

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
  2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ...................................................... 35

*In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*,
  2009 WL 762438 (S.D.N.Y. Mar. 24, 2009) ................................................... 19

*In re Bayer AG Sec. Litig.*,
  2008 WL 5336691 (S.D.N.Y. Dec. 15, 2008) .................................................. 34

*In re BHP Billiton Ltd. Sec. Litig.*,
  2019 WL 1577313 (S.D.N.Y. Apr. 10, 2019) .................................................. 23

*In re CRM Holdings*,
  2016 WL 4990290 (S.D.N.Y. Sept. 7, 2016) ................................................... 18

*In re Deutsche Telekom AG Sec. Litig.*,
  2005 WL 7984326 (S.D.N.Y. June 9, 2005) .................................................... 25

*In re Elan Sec. Litig.*,
  385 F. Supp. 2d 363 (S.D.N.Y. 2005) ............................................................. 25

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
  2007 WL 2230177 (S.D.N.Y. July 27, 2007) ............................................ 12, 24

*In re Flag Telecom Holdings, Ltd.,*
  2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ........................................ 23, 24, 34, 39

*In re Gilat Satellite Networks, Ltd.,*
  2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) ................................................. 40

*In re Glob. Crossing Sec. & ERISA Litig.,*
  225 F.R.D. 436 (S.D.N.Y. 2004)............................................................... 10, 39

*In re Grana y Montero S.A.A. Sec. Litig.,*
  2021 WL 4173684 (E.D.N.Y. Aug. 13, 2021) ................................................. 26

*In re GSE Bonds Antitrust Litig.,*
  414 F. Supp. 3d 686 (S.D.N.Y. 2019)............................................................. 37

*In re Ikon Off. Sols., Inc., Sec. Litig.,*
  194 F.R.D. 166 (E.D. Pa. 2000) ..................................................................... 35

*In re Indep. Energy Holdings PLC Sec. Litig.,*
  2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) ............................................... 39

*In re Initial Pub. Offering Sec. Litig.,*
  243 F.R.D. 79 (S.D.N.Y. 2007)................................................................... 9, 11

*In re Initial Pub. Offering Sec. Litig.,*
  260 F.R.D. 81 (S.D.N.Y. 2009)....................................................................... 41

*In re JP Morgan Precious Metals Spoofing Litig.*,
No. 18-cv-10356, ECF No. 114 (S.D.N.Y. July 7, 2022) ................................................ 22, 25

*In re KeySpan Corp. Sec. Litig.*,
2005 WL 3093399 (E.D.N.Y. Sept. 30, 2005) ........................................................ 24

*In re Lloyd's Am. Trust Fund Litig.*,
2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ........................................................ 19

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ........................................................ 24

*In re Marsh ERISA Litig.*,
265 F.R.D. 128 (S.D.N.Y. 2010) ........................................................ 13, 38

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) ........................................................ 15

*In re Nasdaq Mkt.-Makers Antitrust Litig.*,
176 F.R.D. 99 (S.D.N.Y. 1997) ........................................................ 9, 11

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................ 24, 25

*In re PaineWebber Ltd. P'ships Litig.*,
147 F.3d 132 (2d Cir. 1998) ........................................................ 8

*In re PPDAI Grp. Inc. Sec. Litig.*,
2022 WL 198491 (E.D.N.Y. Jan. 21, 2022) ........................................................ 13, 15, 36

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995) ........................................................ 8

*In re Signet Jewelers Ltd. Sec. Litig.*,
2020 WL 4196468 (S.D.N.Y. July 21, 2020) ........................................................ 37

*In re Sumitomo Copper Litig.*,
189 F.R.D. 274 (S.D.N.Y. 1999) ........................................................ 13, 34, 38

*In re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008) ........................................................ 18, 24

*In re Top Tankers, Inc. Sec. Litig.*,
2008 WL 2944620 (S.D.N.Y. July 31, 2008) ........................................................ 18

*In re Vitamin C Antitrust Litig.*,
2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ........................................................ 39

*In re Warner Chilcott Ltd. Sec. Litig.*,
2008 WL 5110904 (S.D.N.Y. Nov. 20, 2008) ........................................................ 37

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005) ........................................................ 24, 36

*Landmen Partners Inc. v. Blackstone Grp. L.P.*,
2013 WL 11330936 (S.D.N.Y. Dec. 18, 2013) ........................................................ 23

*Lea v. Tal Educ. Grp.*,
    2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) .................................................................. 15, 23

*Levin v. Resource Capital Corp.*,
    No. 15-cv-7081, ECF No. 85 (S.D.N.Y. June 29, 2018) .................................................... 21, 23

*Levin v. Resource Capital Corp.*,
    No. 15-cv-7081, ECF No. 95 (S.D.N.Y. Aug. 3, 2018) ..................................................... 21, 23

*Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*,
    540 F.2d 102 (3d Cir. 1976) ............................................................................................ 20

*Maley v. Del Glob. Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002) ............................................................................. 25, 35

*Morris v. Affinity Health Plan, Inc.*,
    859 F. Supp. 2d 611 (S.D.N.Y. 2012) ............................................................................. 36

*Missouri v. Jenkins*,
    491 U.S. 274 (1989) ....................................................................................................... 24

*NECA IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    2016 WL 3369534 (S.D.N.Y. May 2, 2016) ................................................................... 25

*New Jersey Carpenters Health Fund v. DLJ Mortg. Cap., Inc.*,
    2016 WL 10980942 (S.D.N.Y. May 10, 2016) ................................................................ 23

*New York State Ass'n for Retarded Child., Inc. v. Carey*,
    711 F.2d 1136 (2d Cir. 1983) .......................................................................................... 24

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) ........................................................................................... 14, 39

*Nichols v. Noom, Inc.*,
    2022 WL 2705354 (S.D.N.Y. July 12, 2022) ................................................................. 39

*Pantelyat v. Bank of Am., N.A.*,
    2019 WL 402854 (S.D.N.Y. Jan 31, 2019) ..................................................................... 14

*Pearlstein v. BlackBerry Ltd.*,
    2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022) ................................................................ 21, 22

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
    No. 15-cv-7199, ECF No. 369 (S.D.N.Y. Sept. 5, 2019) ................................................ 23

*Rodriguez v. CPI Aerostructures, Inc.*,
    2021 WL 9032223 (E.D.N.Y. Nov. 10, 2021) ................................................................ 41

*Scheufele v. Tableau Software, Inc.*,
    No. 17-cv-5753, ECF No. 185 at 14 (S.D.N.Y. Aug. 10, 2021) ...................................... 21

*Scheufele v. Tableau Software, Inc.*,
    2021 WL 9681019 (S.D.N.Y. Sept. 17, 2021) ................................................................ 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ....................................................................................................... 35

*The Rick Nelson Co., LLC v. Sony Music Entertainment,*
    No. 18-cv-8791, ECF No. 97 (S.D.N.Y. May 25, 2021) .......................................................... 26

*Thompson v. Metropolitan Life Ins. Co.,*
    216 F.R.D. 55 (S.D.N.Y. 2003) ................................................................................................. 10

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
    396 F.3d 96 (2d Cir. 2005) ................................................................................................. passim

*Weber v. Gov't Emps. Ins. Co.,*
    262 F.R.D. 431 (D.N.J. 2009) ................................................................................................... 39

*Weinberger v. Kendrick,*
    698 F.2d 61 (2d Cir. 1982) ........................................................................................................ 41

*Woburn Ret. Sys. v. Salix Pharms., Ltd.,*
    2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017) .......................................................................... 25

**Statutes**

15 U.S.C. §78u-4 ................................................................................................................. 3, 18, 36

28 U.S.C. § 1715 ............................................................................................................................ 41

Private Securities Litigation Reform Act of 1995 ................................................................... 3, 18

**Rules**

Fed. R. Civ. P. 23 .................................................................................................................. passim

**Other Authorities**

Janeen McIntosh, Svetlana Starykh, & Edward Flores, Recent Trends in Securities Class Action
    Litigation: 2022 Full-Year Review (NERA Jan. 24, 2023) ....................................................... 14

Laarni T. Bulan & Laura E. Simmons, Securities Class Action Settlements—2021 Review and
    Analysis (Cornerstone Research Mar. 24, 2022) ....................................................................... 15

Herbert B. Newberg,
    *Newberg on Class Actions* § 14:6 ............................................................................................. 25

Rachel Scharf, *Ex-Fox Exec Convicted, Another Cleared in FIFA Bribery Trial,*
    Law360 (Mar. 9, 2023) .............................................................................................................. 22

Class Representative Palm Tran, Inc. Amalgamated Transit Union Local 1577 Pension Plan ("Class Representative"), on behalf of a certified Class[1] of similarly situated investors, respectfully submits this amended memorandum of law in support of its amended, unopposed motion for: (i) preliminary approval of the proposed $95 million Settlement[2] between Class Representative, on behalf of itself and the Class, and Defendants Grupo Televisa, S.A.B. ("Televisa"), Emilio Fernando Azcárraga Jean III, and Salvi Rafael Folch Viadero (collectively "Defendants" and together with Class Representative, the "Parties"); (ii) approval of the form and manner of the notice to be provided to the Class; and (iii) the scheduling of a hearing (the "Settlement Hearing") on the final approval of the Settlement, proposed Plan of Allocation, and Lead Counsel's application for an award of attorneys' fees and litigation costs and expenses, and deadlines related thereto. The Parties' agreed-upon, amended proposed Order Granting Preliminary Approval Pursuant to Fed. R. Civ. P. 23(e)(1) and Permitting Notice to the Class (the "Preliminary Approval Order") is filed herewith.

## I.   PRELIMINARY STATEMENT

The Parties have negotiated, at arm's length and with the assistance of an experienced and neutral mediator, a proposed settlement of all claims in this Litigation for $95 million in cash. This resolution, which represents a substantial recovery that falls well within the range of possible

---

[1] On June 29, 2020, the Court certified the Class, *see* ECF No. 146, and later clarified the Class definition as:

> [A]ll investors who had purchased or acquired Televisa [American Depositary Receipts] from April 11, 2013 to November 17, 2017, inclusive.

ECF No. 295 at 6.

[2] Unless otherwise stated or defined, all capitalized terms used herein shall have the meanings provided in the Stipulation of Settlement, as filed simultaneously herewith. All emphasis is added and all citations are omitted unless otherwise noted.

approval, involved over four years of hard-fought litigation, including a motion to dismiss Class Representative's detailed and lengthy Amended Complaint; production and review of over 300,000 pages of documents from Defendants and numerous nonparties; 20 depositions of fact and expert witnesses; a contested motion for class certification and class definition; multiple appeals to the Second Circuit; a partially briefed motion for summary judgment; and formal and informal mediation with an experienced mediator.  The terms of the Settlement are set forth in the Stipulation of Settlement (the "Stipulation"), filed simultaneously herewith.

Class Representative and Lead Counsel approve of the Settlement.  Class Representative is a union pension fund that actively oversaw the Litigation and authorized the Settlement.  Lead Counsel has deep litigation experience, including class action securities litigation, and is recognized as a leader in the field.  Based upon their experience and evaluation of the facts and the applicable law, Lead Counsel and Class Representative submit that the proposed Settlement is fair, reasonable, adequate, and in the best interests of the Class.  This is especially so considering the risk that the Class might recover substantially less (or nothing) if the action were litigated through summary judgment, trial, and the likely post-trial motions and appeals that would follow (a process that could last several years).  Indeed, Class Representative faced risks concerning establishing liability and damages, including the risk that Defendants' motion for summary judgment or forthcoming motions to exclude Class Representative's experts would be granted in whole or in part.  Given these and other risks inherent in this complex securities class action, and the Settlement's significant value, the Settlement represents an excellent result for the Class.  The proposed settlement resolves the Class's claims and satisfies all the criteria for preliminary settlement approval under federal law.

At this stage, the Court need only make a preliminary evaluation of the Settlement's fairness, such that the Class should be notified of the proposed Settlement.   Considering the substantial recovery obtained, and the risks and burdens entailed in summary judgment and trial, Class Representative respectfully requests that the Court grant preliminary approval of the Settlement and enter the Preliminary Approval Order.   That Order will, among other things:  (i) preliminarily approve the Settlement on the terms set forth in the Stipulation; (ii) approve the form and content of the Notice of Proposed Settlement of Class Action (the "Notice") and the Summary Notice of Proposed Settlement of Class Action (the "Summary Notice"), attached to the Stipulation as Exhibits A-1 and A-3; (iii) find that the procedures for distribution of the Notice and publication of the Summary Notice in the manner and form set forth in the Preliminary Approval Order constitute the best notice practicable under the circumstances and comply with the notice requirements of Due Process, Rule 23 of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C § 78u–4, *et seq*.; and (iv) set a schedule and procedures for:  disseminating the Notice and publication of the Summary Notice; objecting to the Settlement, the Plan of Allocation, or Lead Counsel's application for an award of attorneys' fees and litigation costs and expenses; submitting papers in support of final approval of the Settlement; and the Settlement Hearing.

## II.    HISTORY OF THE LITIGATION

This action was commenced in 2018, and alleges that Defendants bribed officials of the Fédération Internationale de Football Association ("FIFA"), soccer's world governing body, to secure broadcasting rights to the world's most-televised sporting event—the FIFA World Cup— and touted their acquisition of those rights, all while failing to disclose their participation in the bribery scheme and emphasizing their commitment to ethical business practices.  *See* ECF No. 1; ECF No. 32 (Amended Complaint).  Class Representative alleges that Defendants' false statements

and/or omissions surrounding the bribery scheme caused Televisa ADRs to be traded at artificially inflated prices, and that when the truth regarding Defendants' participation in the bribery scheme was revealed during the testimony of Alejandro Burzaco—a business partner of Defendants'—during criminal corruption trials of FIFA executives and other officials, the price of Televisa's ADRs dropped, causing damage to members of the Class.

Defendants deny all of Class Representative's allegations.  They deny participating in a bribery scheme to secure World Cup broadcast rights.  Specifically, Defendants deny that they made any allegedly false or misleading statements, that any of the allegedly false and misleading statements were made with scienter, and that the Class Members, including Class Representative, suffered any damages whatsoever.  Thus, on October 15, 2018, Defendants moved to dismiss the Amended Complaint.  *See* ECF No. 37.  The Court denied the motion on March 25, 2019.  *See* ECF No. 47.  Defendants initially answered the Complaint on April 15, 2019, *see* ECF No. 52, and later amended their Answer on July 21, 2020, *see* ECF No. 150.

On October 30, 2019, former lead plaintiff moved for class certification.  *See* ECF No. 74. The Court preliminarily denied class certification on June 8, 2020, finding that former lead plaintiff did not meet the typicality requirement for serving as a class representative.  *See* ECF No. 134 at 11. Thereafter, Palm Tran moved for appointment as Class Representative, *see* ECF No. 140, and on June 29, 2020, the Court certified a Class and appointed Palm Tran as Class Representative, *see* ECF No. 146.  Ultimately, the Class Period was defined as "all investors who had purchased or acquired Televisa [American Depositary Receipts] from April 11, 2013 to November 17, 2017, inclusive."  ECF No. 295 at 6.

Thereafter, on April 12, 2021, Defendants moved to decertify the Class and to remove Palm Tran and its original counsel.  *See* ECF No. 206.  Palm Tran—which, since being named Class

Representative, had also been represented by Sugarman Susskind Braswell & Herrera ("SSBH") as liaison counsel, *see* ECF No. 210—retained Boies Schiller Flexner LLP ("BSF") in connection with Defendants' motion to remove it as Class Representative. *See* ECF No. 207. The Court removed Palm Tran's original counsel but denied the motion to the extent it sought to decertify the Class and remove Palm Tran as Class Representative or its traditional counsel SSBH. *See* ECF Nos. 227, 228. The Court subsequently appointed BSF as Lead Counsel for the Class on October 8, 2021. *See* ECF No. 250.

Throughout this case, the Settling Parties engaged in hard-fought litigation. The Settling Parties conducted extensive fact, class certification, and expert discovery, taking 20 depositions, producing and reviewing hundreds of thousands of pages of documents, and exchanging reports and rebuttal reports of six expert witnesses totaling over 1,000 pages. Numerous discovery motions were litigated, including motions to compel and others concerning privilege issues.

Additionally, Class Representative sought discovery in Switzerland from multiple entities, seeking documents related to the award of media rights for the 2018-2030 FIFA World Cups. A Swiss court granted the requested discovery in part and denied it in part, a decision later upheld by a Swiss appellate tribunal. The case also was complicated by the United States' intervention in the case to stay the deposition of Alejandro Burzaco—potentially an important witness for both sides—pending his then-forthcoming testimony in an ongoing criminal matter in the Eastern District of New York. *See* ECF Nos. 274 (motion to intervene), 308 (granting motion to intervene and to stay).

In August 2022, Defendants moved for summary judgment on Class Representative's claims and requested leave to file *Daubert* motions seeking to exclude two of Class Representative's experts. *See* ECF Nos. 300, 316. Class Representative was diligently preparing oppositions to

both proposed *Daubert* motions, as well as Defendants' 80-page summary judgment motion that included over 100 exhibits, when the Parties agreed to engage in mediation. The Parties exchanged mediation statements with accompanying exhibits and engaged in a mediation, as well as numerous follow-up phone calls and discussions, and reached a settlement in principle as announced on November 23, 2022.[3] The Parties negotiated a memorandum of understanding ("MOU"), memorializing their agreement to settle Class Representative's claims against Defendants and end the Litigation, and executed it on December 28, 2022. The MOU included, among other things, the Parties' agreement to settle and dismiss the Litigation with prejudice and grant full mutual releases in return for a cash payment of $95 million by and/or on behalf of the Defendants for the benefit of the Class, subject to the negotiation of the terms of a Stipulation of Settlement and approval by the Court, which the Parties now seek.

## III.    NEGOTIATION OF SETTLEMENT

On October 10, 2022, the Parties engaged in a confidential mediation before Robert A. Meyer, Esq., an experienced mediator in large and complex civil matters and class actions. In advance of that mediation, the Parties exchanged and provided Mr. Meyer detailed mediation statements, along with supporting evidence. The Parties engaged in good faith negotiations but did not reach a settlement at that time, and the Litigation continued.

Settlement discussions did not end there, however, as Mr. Meyer is known for expertise in keeping negotiations alive even after the close of a mediation. In the present matter, Mr. Meyer engaged the parties in multiple teleconferences and negotiation discussions during October and early

---

[3] *See* Press Release, "Televisa reaches an agreement in principle to settle the consolidated securities class action litigation, paying approximately USD$21.5 million of the total settlement amount", Grupo Televisa S.A.B. (Nov. 23, 2022), *available at* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.televisair.com/~/media/Files/T/Televisa-IR/press-releases/2022/press-release-november-23-2022-gtv-eng.pdf.

November 2022, urging the parties to find a reasonable, fair settlement. As a result of these continued arm's-length negotiations, and as explained above, the Parties reached an agreement in principle to resolve the case for $95 million. The confidential MOU memorializing the agreement was executed on December 28, 2022.

Considering the substantial benefit to the Class, and the significant costs and risks of further litigation—and in recognition of the fact that the proposed Settlement is the result of arm's-length negotiations by experienced counsel overseen by a well-respected mediator—Class Representative respectfully submits that the proposed Settlement warrants preliminary approval so that notice can be provided to the Class.

## IV.    SETTLEMENT TERMS

The Settlement provides that Defendants will pay or cause to be paid $95 million into an Escrow Account, which amount plus accrued interest comprises the Settlement Fund. Stipulation, ¶¶1.33–1.34. Notice to the Class and the cost of settlement administration ("Notice and Administration Expenses") will be paid from the Settlement Fund. *Id*. ¶2.9. Subject to the Court's approval, Class Representative proposes that a nationally-recognized class action settlement administrator, Kroll Settlement Administration LLC ("Kroll"), be retained to administer the settlement. *Id*. ¶¶1.4, 5.1–5.13.

As set forth in the proposed Notice, Lead Counsel will submit an application in support of final approval of the Settlement and an application for an award of (i) attorneys' fees on behalf of itself and SSBH to be paid from the Settlement Fund in an amount not to exceed thirty percent (30%) of the Settlement Amount, and (ii) litigation costs, charges, and expenses in an amount not to exceed $1.5 million, plus interest accrued on both amounts at the same rate as earned by the Settlement Fund.

Following payment of Notice and Administration Expenses, Taxes, Tax Expenses, and Court-approved attorneys' fees, costs, charges, and expenses from the Settlement Fund, the remaining amount—the Net Settlement Fund—will be distributed to Authorized Claimants pursuant to the Court-approved Plan of Allocation.  Any amount remaining following the initial distribution (as a result of uncashed or returned checks or otherwise) will be redistributed amongst Authorized Claimants who cashed the checks sent in the initial distribution and who would receive a minimum of $10.00.  This redistribution process will continue until the balance remaining in the Net Settlement Fund is de minimis, at which point the remainder of the Net Settlement Fund will be donated to an appropriate non-sectarian, non-profit charitable organization(s) serving the public interest and unaffiliated with the Parties or their counsel, as selected by Lead Counsel and approved by the Court.  The proposed Plan of Allocation, which is set forth in the Notice, is comparable to plans of allocation approved in numerous other securities class actions.

The proposed Settlement is an excellent recovery on the claims asserted in this Litigation and is in all respects fair, adequate, reasonable, and in the best interests of the Class.

## V.   PRELIMINARY APPROVAL IS WARRANTED AND WILL ALLOW CLASS REPRESENTATIVE TO NOTIFY THE CLASS

In the Second Circuit, there is a "'strong judicial policy in favor of settlements, particularly in the class action context.'"  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)); *see also In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("It is well established that there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions.").

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of a class action settlement.  Fed. R. Civ. P. 23(e) ("The claims . . . [of] a class proposed to be certified for

purposes of settlement . . . may be settled . . . only with the court's approval.").  The approval process typically takes place in two stages.  *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997).  In the first stage, a court provides preliminary approval of the settlement and authorizes notice of the settlement be given to the class.  *See id.* ("Preliminary approval of a proposed settlement is the first in a two–step process required before a class action may be settled.").  That is what Class Representative seeks via this motion.  In the second stage, which will come only if the Court grants this motion, the court holds a fairness hearing and "makes a final determination as to whether the proposed settlement is fair, reasonable and adequate."  *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 87 (S.D.N.Y. 2007).

Pursuant to Rule 23(e)(1), the preliminary approval of a settlement is appropriate where "the parties . . . show[] that the court will likely be able to:  (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal."  Fed. R. Civ. P. 23(e)(1)(B).  Rule 23(e)(2), which governs final approval, identifies factors that courts must consider in determining whether a class action settlement is "fair, reasonable, and adequate," including whether:

    a)   the class representatives and class counsel have adequately represented the class;

    b)   the proposal was negotiated at arm's length;

    c)   the relief provided for the class is adequate, taking into account:

        (i)  the costs, risks, and delay of trial and appeal;

        (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        (iii)the terms of any proposed award of attorneys' fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3);[4] and

    d)   the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Overlapping with the factors listed in Rule 23(e) are the nine so-called *Grinnell* factors which the Second Circuit has counseled district courts to consider in determining whether to grant final approval to a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

The Rule 23(e) factors are not intended to "displace" any previously adopted factors but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."  Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.  Likewise, "[i]n finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'"  *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436,

---

[4] Here, the Parties have agreed that Defendants shall have the unilateral right to terminate the Settlement if the number of ADRs held by Class Members who timely and validly request exclusion from the Class exceeds the number set forth in a confidential supplemental agreement executed between Defendants and Class Representative through their counsel (the "Supplemental Agreement").  *See* Stipulation ¶7.3.  "This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement."  *Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *15 (S.D.N.Y. Oct. 16, 2019).

456 (S.D.N.Y. 2004) (quoting *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003)).

Here, Class Representative is requesting only that the Court take the first step in the settlement approval process and grant preliminary approval of the proposed Settlement.  As stated above, the proposed Settlement provides for a Settlement Fund of $95 million in cash, a substantial recovery that is unquestionably beneficial to the Class and plainly "within the range of possible approval." *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. at 87 ("Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted." (quoting *In re Nasdaq Market–Makers Antitrust Litig.*, 176 F.R.D. at 102)).

## A.  The Rule 23(e)(2) Factors Are Satisfied

### 1.  Class Representative and Lead Counsel Have Adequately Represented the Class

As the Court found in granting class certification, *see* ECF No. 146, Class Representative's interests in this case are directly aligned with those of the other Class Members, *see Wal-Mart*, 396 F.3d at 113 ("[A]dequate representation of a particular claim is determined by the alignment of interests of class members.").  Class Representative has demonstrated its ability and willingness to pursue the Litigation on the Class's behalf through its active involvement in the Litigation, including by searching for and producing documents, sitting for a deposition, reviewing numerous filings, staying apprised of developments in the case, participating in the mediation, and approving the Settlement.  *See In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 184 (S.D.N.Y. 2014) (finding that lead plaintiff had adequately represented the class where, similar to here, lead plaintiff spent time "reviewing pleadings, motions, and other documents; searching for and

producing documents; traveling to New York to appear for a deposition; and communicating with counsel concerning the status of the case, and staying apprised of all developments in the case, including discussions about the [s]ettlement"). Class Representative and Lead Counsel zealously advocated for the interests of Televisa ADR purchasers and have obtained an excellent result on the Class's claims. Class Representative's decision to settle this case was informed by a thorough investigation of the relevant claims; extensive fact and expert discovery; extensive briefing on motions to dismiss and for class certification, and discovery issues, as well as largely completing briefing in opposition to Defendants' motion for summary judgment; and participation in extensive settlement negotiations, which included a mediation and follow-up discussions. The Settlement is demonstrably the product of well-informed negotiations and vigorous advocacy on behalf of Televisa ADR purchasers. Accordingly, this factor weighs in favor of approval.

## 2. The Proposed Settlement Is the Result of Good Faith, Arm's Length Negotiations

Courts presume that a proposed settlement is fair and reasonable when it is the result of arm's-length negotiations between counsel. *See In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007) ("A proposed class action settlement enjoys a strong presumption that it is fair, reasonable and adequate if, as is the case here, it was the product of arm's-length negotiations conducted by capable counsel, well-experienced in class action litigation arising under the federal securities laws."). This is particularly true when, as here, a mediator assisted the parties in reaching a settlement. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (stating that a "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure"). As described above, the Settlement was reached only after extensive, arm's-length negotiations before Robert A. Meyer, Esq., a nationally recognized mediator experienced in securities class actions. In advance of that

mediation, the Parties exchanged and provided Mr. Meyer detailed mediation statements, along with supporting evidence.  The parties then participated in a mediation, which included the exchange of evidentiary submissions, but did not reach a settlement at that time.  Mr. Meyer engaged the parties in multiple teleconferences and negotiation discussions after the mediation, and as a result of these continued arms-length negotiations, the Parties reached an agreement-in-principle to settle the Litigation.  Notably, several courts in this Circuit have approved settlements in securities matters mediated by Mr. Meyer.  *See, e.g.*, *In re PPDAI Grp. Inc. Sec. Litig.*, 2022 WL 198491, at *8 (E.D.N.Y. Jan. 21, 2022) (granting final approval of settlement in securities class action where parties engaged Mr. Meyer as mediator); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent., Inc.*, 2021 WL 911216, at *11 (S.D.N.Y. Mar. 7, 2021) (granting preliminary approval of settlement in securities class action where parties settled following mediation before Mr. Meyer).

In addition, the Parties and their counsel were knowledgeable about the strengths and weaknesses of the case prior to reaching an agreement to settle.  Class Representative agreed to settle after fact and expert discovery was completed (except for the deposition of Mr. Burzaco).  Defendants had filed an 80-page motion for summary judgment and Class Representative had substantially briefed but not yet filed its opposition to that motion.  Had the Court denied Defendants' summary judgment motion, the only stage remaining in the litigation was trial.  Class Representative and Lead Counsel therefore had an adequate basis for assessing the strength of the Class's claims and Defendants' defenses when they agreed to the Settlement.  *See, e.g.*, *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 139 (S.D.N.Y. 2010) (granting final approval of settlement and concluding that "[t]he advanced stage of the litigation and extensive amount of discovery completed weigh heavily in favor of [settlement] approval" because "[t]he parties' counsel were clearly in a position to realistically evaluate the strengths and weaknesses of the claims, and to evaluate the fairness of

the proposed [s]ettlement"); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281–82 (S.D.N.Y. 1999) (granting preliminary approval of settlement where, as here, plaintiffs "were well informed of the strengths and weaknesses of their claims" after a large number of "documents had been inspected, depositions and private sworn interviews had occurred, plaintiffs had briefed numerous motions, and plaintiffs had consulted extensively with numerous experts"). These circumstances confirm the fairness of the proposed Settlement.

### 3. The Relief Provided by the Settlement Is Adequate when Weighed Against the Risks of Litigation

Courts consider both the best possible recovery and litigation risks in deciding "not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case." *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *9 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015). A court thus need only determine whether the settlement falls within a range of reasonableness that "'recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Pantelyat v. Bank of Am., N.A.*, 2019 WL 402854, at *7 (S.D.N.Y. Jan 31, 2019) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

If approved, the Settlement will provide Class Members with $95 million in cash less reasonable attorneys' fees, litigation expenses, Notice and Administration Expenses, Taxes and Tax Expenses. The recovery obtained represents an outstanding result for the Class, amounting to approximately 27% of the maximum estimated recoverable damages—far exceeding the median and average recovery in securities fraud class actions generally. *See, e.g.*, Janeen McIntosh, Svetlana Starykh, & Edward Flores, Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review (NERA Jan. 24, 2023) ("2023 NERA Report") (finding that the median settlement value-

to-investor losses ratio in cases asserting, as here, $200 million to $399 million in potential losses was 2.4% for cases filed and settled between December 2011 and December 2022); Laarni T. Bulan & Laura E. Simmons, Securities Class Action Settlements—2022 Review and Analysis (Cornerstone Research Mar. 8, 2023) ("2023 Cornerstone Report") (finding that the settlement value-to-investor losses ratio in securities fraud class actions asserting, as here, potential damages in the range of $250 million to $499 million was 4.3% for cases settling in 2022).

Courts in and outside this District have approved settlements with far smaller monetary recoveries, especially when viewed as a percentage of potential recoverable damages. *See, e.g.*, *In re PPDAI Grp.*, 2022 WL 198491, at *12 (approving settlement in securities class action where the settlement figure "represent[ed] 6.4% of the maximum estimated aggregate damages"); *Lea v. Tal Educ. Grp.*, 2021 WL 5578665, at *10 (S.D.N.Y. Nov. 30, 2021) (approving settlement in securities class action where the settlement figure "represent[ed] a recovery of 5.3% of the Settlement Class's maximum estimated damages"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving settlement in securities class action where the settlement figure was approximately 6.25% of estimated damages and noting that this is at the "higher end of the range of reasonableness of recovery in class actions securities litigations"). Here, the $95 million settlement amounts to approximately 27% of the Class's maximum estimated recoverable damages. That is *more than 10 times* the median settlement value-to-investor losses ratio in cases alleging between $200 million to $399 million in potential losses that were settled between December 2011 and December 2022. *See* 2023 NERA Report.

Additionally, although Class Representative and Lead Counsel believe their case against Defendants is strong, they acknowledge that Defendants have presented substantial arguments disputing the necessary elements of falsity, scienter, materiality, and loss causation, as well as the

amount of any damages.  For example, Defendants argued that Class Representative could not establish loss causation based on the circumstances and four-day length of the window used by Class Representative's expert in his event study.  Defendants also argued that Class Representative would have been unable to show that Defendants knowingly made false or misleading statements regarding their acquisition of the broadcasting rights to the World Cups at issue or that such alleged false or misleading statements were material.  And, while the Class Period has been set by the Court, Class Representative recognizes the risk that the Class Period could be changed at any point in the Litigation, including on appeal, which could result in substantially less damages to the Class.

Finally, Class Representative and Lead Counsel considered the significant risks that are presented by the uncertainty that arises in any jury trial, and that even a favorable verdict could be reduced or reversed in its entirety upon consideration of inevitable post-trial motions or on appeal. Moreover, even if ultimately successful, the trial and appellate process would likely consume a minimum of two years, if not longer, thereby delaying further the recovery by Class Members of damages they suffered beginning more than a decade ago.

The proposed Settlement therefore balances the risks, costs, and delays inherent in complex securities class action cases such as this one.  When viewed in the context of these risks and the uncertainty of any future recovery from Defendants, the Settlement is extremely beneficial to the Class.

### 4.  The Proposed Method for Distributing Relief Is Effective

The method of the proposed notice and claims administration process is effective.  This includes well-established, effective procedures for giving notice to potential Class Members, processing claims submitted by potential Class Members, and efficiently distributing the Net Settlement Fund.

The notice plan includes direct mailing of the Notice to all Class Members who can be identified with reasonable effort, supplemented by the publication of the Summary Notice in the national edition of *The Wall Street Journal* and once over a national newswire service. Additionally, a dedicated website will be created for the Settlement and will be updated regularly with information and key documents concerning the Settlement, including the Stipulation, Notice, Proof of Claim and Release form, Preliminary Approval Order and all briefs and declarations in support of the Settlement and an award of attorneys' fees and expenses.

The proposed claims process is also effective and includes a standard claim form that requests the information necessary to calculate the amount of a claimant's claim amount pursuant to the Plan of Allocation. The Plan of Allocation will govern how Class Members' claims will be calculated and how money will be distributed to Authorized Claimants. The Plan of Allocation was prepared with the assistance of Class Representative's damages expert and is based primarily on the expert's damages analysis estimating the amount of alleged artificial inflation in the price of Televisa ADRs during the Class Period.

Finally, Kroll Settlement Administration LLC, the Claims Administrator selected by Lead Counsel (subject to the Court's approval), will process claims under the guidance of the Parties, provide claimants an opportunity to cure any deficiencies in their claims or request the Court to review a denial of its claims, and will distribute the Net Settlement Fund pursuant to the Court-approved Plan of Allocation.

### 5.  Lead Counsel's Fee and Expense Request Is Fair and Reasonable

Lead Counsel will apply for an award of attorneys' fees on behalf of itself and SSBH of no more than thirty percent (30%) of the Settlement Amount plus litigation costs and expenses incurred in connection with the prosecution and resolution of this Litigation in an amount not to exceed $1.5 million, plus interest earned on both amounts at the same rate as earned by the Settlement Fund.

For the reasons set forth below, Lead Counsel respectfully submits that this request, which also will be further briefed in Lead Counsel's forthcoming motion for attorneys' fees and expenses,[5] is fair and reasonable.

First, the Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Courts in this District have consistently adhered to this precedent. *See, e.g.*, *In re CRM Holdings*, 2016 WL 4990290, at *2 (S.D.N.Y. Sept. 7, 2016) ("Pursuant to the 'equitable' or 'common fund' doctrine . . . attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work." (quoting *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 584-85 (S.D.N.Y. 2008))); *Aeropostale, Inc.*, 2014 WL 1883494, at *11 ("It is well established that where an attorney creates a common fund from which members of a class are compensated for a common injury, the attorneys who created the fund are entitled to a reasonable fee-set by the court-to be taken from the fund." (quoting *In re Top Tankers, Inc. Sec. Litig.*, 2008 WL 2944620, at *12 (S.D.N.Y. July 31, 2008))).

Second, "[w]hat constitutes a reasonable fee is properly committed to the sound discretion of the district court." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). Typically, courts use one of two methods to determine a reasonable fee: the percentage of recovery method, and the lodestar method. *See id*. The percentage of recovery method is specifically prescribed in the PSLRA. *See* 15 U.S.C. §78u-4(a)(6) ("Total attorneys' fees and expenses awarded

---

[5] A motion for final approval of the Settlement, including a motion for attorneys' fees and expenses, will be filed thirty-five (35) calendar days before the Settlement Hearing. *See Gordon v. Vanda Pharms. Inc.*, 2022 WL 4296092, at *5 (E.D.N.Y. Sept. 15, 2022) (noting that "it is premature to pass judgment on any anticipated fee application" at the preliminary approval stage).

by the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount" recovered for the class) (emphasis added).  And, it is the preferred method for calculating the reasonableness of attorneys' fees under precedent from the Supreme Court, Second Circuit, and courts in this District.  *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[U]nder the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class. . . ."); *In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 2009 WL 762438, at *2 (S.D.N.Y. Mar. 24, 2009) (explaining that while "both the lodestar and the percentage of the fund methods are available to district judges in calculating attorneys' fees in common fund cases," the "trend in this Circuit is toward the percentage [of the fund] method" (first quoting *Goldberger*, 209 F.3d at 50, and then quoting *Wal-Mart*, 396 F.3d at 121)).

Courts endorse the percentage of recovery method as the preferred means to determine the reasonableness of attorneys' fees because it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart*, 396 F.3d at 121 (quoting *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *11 (S.D.N.Y. Nov. 26, 2002)).  In contrast, the lodestar method—under which "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate"—has created "temptation for lawyers to run up the number of hours for which they could be paid," and "an unanticipated disincentive to early settlements." *Goldberger*, 209 F.3d at 47–49.  The lodestar method also requires courts to "engage in a gimlet-eyed review of line-item fee audits," which is "an inevitable waste of judicial resources." *Id.* at 49.

For these reasons, courts in the Second Circuit and this District typically utilize the percentage of recovery method.  But, regardless of which method a court utilizes, district courts

are guided by the traditional criteria in determining a reasonable fee:  (1) quality of the representation; (2) the requested fee in relation to the settlement; (3) the time and labor expended by counsel; (4) the risk of the litigation; (5) the magnitude and complexities of the litigation; and (6) public policy considerations.  *Id.* at 50.  Considering these factors, as are further discussed below, Lead Counsel's forthcoming fee request is reasonable.

*The quality of representation.*  Lead Counsel's fee request will be substantially premised on the successful outcome obtained for the Class.  When placed in context of similar settlements and analyzed in light of the specific risks faced in this case, Lead Counsel respectfully submits that the outcome was an excellent result.

The $95 million settlement amounts to approximately 27% of the Class's maximum estimated recoverable damages.  That is *more than 10 times* the median settlement value-to-investor losses ratio in cases alleging between $200 million to $399 million in potential losses that were settled between December 2011 and December 2022.  *See* 2023 NERA Report.  The overall recovery of $95 million is also *two-and-a-half times* the value of the average settlement recovery in securities class actions settled in 2022, *see id.*, and more than *seven times* the median settlement value, *see* 2023 Cornerstone Report.  Those figures alone indicate that Lead Counsel's request for no more than 30% of the Settlement Fund is reasonable.  *See Goldberger*, 209 F.3d at 55 ("[T]he quality of representation is best measured by results, and that such results may be calculated by comparing 'the extent of possible recovery with the amount of actual verdict or settlement.'" (quoting *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 118 (3d Cir. 1976))).

Indeed, courts in this District have awarded comparable percentages of the common fund to attorneys who recovered *lower* percentages of the estimated recoverable damages relative to this

case.  For instance, a court recently awarded fees representing 28% of an identical $95 million securities class action settlement where the settlement secured approximately 11% of recoverable damages.  *See Scheufele v. Tableau Software, Inc.*, No. 17-cv-5753, ECF No. 185 at 14 (S.D.N.Y. Aug. 10, 2021).  And another court in this District awarded fees of 33.33% of a $165 million securities class action settlement where the recovery represented 13.75% of the class's estimated maximum recoverable damages.  *See Pearlstein v. BlackBerry Ltd.*, 2022 WL 4554858, at *6 (S.D.N.Y. Sept. 29, 2022).  The *Pearlstein* court found the settlement impressive, noting that the 13.75% figure was "considerably above the high end of historical averages." *Id.*  As strong as the settlements in *Tableau Software* and *Pearlstein* were, the Settlement here is *double* the recovery (11% or 13.75% compared to 27%) on a settlement value-to-investor losses basis.[6]  Lead Counsel is seeking a similar percentage of recovery to what counsel in those cases sought for an objectively more favorable settlement.

Further, the Settlement here exceeds what the Class might have recovered even if Class Representative had prevailed at trial.  Most significantly, and as the Court recognized, there remained critical questions of fact to be determined at trial as to whether Class Representative would be able to prove that representations made by Defendants prior to 2017 were fraudulent and caused damages to shareholders.  Throughout the litigation, Defendants argued that the proper Class Period was limited to the six-plus-month period from April 28, 2017 to November 17, 2017. *See generally* ECF No. 263.  That is because Televisa argues that it made its first public statement about its acquisition of the 2026/2030 World Cup broadcasting rights on April 28, 2017, and

---

[6] Likewise, it is notable that in *Levin v. Resource Capital Corp.*, this Court awarded class counsel fees amounting to 33% of the $9.5 million settlement—a settlement that represented 17% of the class's recoverable damages.  No. 15-cv-7081, ECF No. 85 at 7 (S.D.N.Y. June 29, 2018).  The value of the settlement in this case is more than 50% greater than that in *Levin* on a settlement value-to-investor losses basis.

Defendants maintained that only alleged misrepresentations relating to those World Cups could trigger the start of the Class Period. At the certification stage, the Court rejected Defendants' argument and held that whether the alleged corrective disclosure related "to the 2018 and 2022 World Cups is a question of fact." *See* ECF No. 295 at 6. Accordingly, there remained a significant risk that a jury could conclude that Class Representative had not adequately established liability for the earlier World Cups or linked the corrective disclosure in November 2017 back to pre-2017 misrepresentations. Therefore, if Class Representative had prevailed on liability, but Defendants had convinced a jury that the proper Class Period was only six months long, the damages could have been at most approximately $65.5 million. In this scenario, Lead Counsel could have won a favorable verdict on behalf of the Class at trial, but the Class could have received a recovery that was 40% less than that achieved through the Settlement. And those issues—like many others in this case—were largely dependent upon the jurors' assessment of the testimony of Mr. Burzaco, a convicted felon with potential credibility issues.[7] All of this supports the reasonableness of Lead Counsel's forthcoming fee request.

> ***The relationship of the requested fee to the settlement.*** Lead Counsel's forthcoming request for no more than 30% of the Settlement Amount is reasonable and is on par with what courts in this District have awarded counsel in comparable securities class actions over the last ten years. *See, e.g.*, *Pearlstein*, 2022 WL 4554858, at *9 (awarding 33.33% of $165 million securities class action settlement); *In re JP Morgan Precious Metals Spoofing Litig.*, No. 18-cv-10356, ECF No.

---

[7] In the recent criminal trial in which Mr. Burzaco was a key witness, "[t]wo jurors told reporters following the verdict that they didn't find Burzaco credible and decided the case almost exclusively on the documentary evidence." *See* Rachel Scharf, *Ex-Fox Exec Convicted, Another Cleared in FIFA Bribery Trial*, Law360 (Mar. 9, 2023), https://www.law360.com/articles/1582865/ex-fox-exec-convicted-another-cleared-in-fifa-bribery-trial.

114 at 2 (S.D.N.Y. July 7, 2022) (awarding 33.33% of $60 million settlement in case concerning manipulation of commodities markets); *Scheufele v. Tableau Software, Inc.*, 2021 WL 9681019, at *1 (S.D.N.Y. Sept. 17, 2021) (awarding 28% of $95 million securities class action settlement); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-cv-7199, ECF No. 369 at 9 (S.D.N.Y. Sept. 5, 2019) (awarding 27% of $110 million securities class action settlement); *In re BHP Billiton Ltd. Sec. Litig.*, 2019 WL 1577313, at *1 (S.D.N.Y. Apr. 10, 2019) (awarding 30% of $50 million securities class action settlement); *New Jersey Carpenters Health Fund v. DLJ Mortg. Cap., Inc.*, 2016 WL 10980942, at *1-*2 (S.D.N.Y. May 10, 2016) (awarding 28% of $110 million securities class action settlement); *Landmen Partners Inc. v. Blackstone Grp. L.P.*, 2013 WL 11330936, at *3 (S.D.N.Y. Dec. 18, 2013) (awarding 33.33% of $85 million securities class action settlement); *see also Klein v. Altria Group Inc., et al.*, No. 20-cv-75, ECF No. 320 at 10-11 (E.D. Va. Mar. 31, 2022) (awarding 30% of $90 million securities class action settlement); *Cabot E. Broward 2 LLC v. Cabot*, 2018 WL 5905415, at *8 (S.D. Fla. Nov. 9, 2018) (awarding 33.33% of $100 million securities class action settlement).  Given that fee requests for 33% of the settlement fund have "been approved as reasonable in this Circuit," *Lea*, 2021 WL 5578665, at *12, Lead Counsel's forthcoming request for no more than 30% is appropriate.  *See also In re Flag Telecom Holdings, Ltd.* 2010 WL 4537550, at *24 (S.D.N.Y. Nov. 8, 2010) (noting that 30% of the "gross" settlement fund "is well within the range of fees awarded . . . by courts in this Circuit").  Indeed, this Court recently awarded fees totaling 33.33% of the common fund in a securities class action.  *See Levin*, No. 15-cv-7081, ECF No. 95 at 1 (awarding 33.33% of $9.5 million settlement).

It is also appropriate for the Court to use the fee applicant's lodestar as a cross-check on reasonableness.  *Goldberger*, 209 F.3d at 50; *see also In re AOL Time Warner*, *Inc. Sec. & ERISA Litig.*, 2006 WL 3057232, at *28 (S.D.N.Y. Oct. 25, 2006) ("It bears emphasis that the lodestar

computation here is a cross-check, calculated with less precision than would be required if lodestar were the primary methodology."). Lead Counsel's forthcoming fee request is appropriate under that metric, too. Here, Lead Counsel anticipates that, at the time it moves for final approval of the Settlement and submits its fee petition, its lodestar (combined with that of SSBH) will total between $8.5 and $9 million; for the calculations below it assumes the figure will be in the range of $8.5 to $9 million.[8]

In this contingency fee case, Lead Counsel bore substantial risk that it would be paid nothing for its work on behalf of the Class. Fees in excess of the lodestar are routinely awarded to account for this contingency-fee risk and other factors. *See In re Flag Telecom Holdings*, 2010 WL 4537550, at *26 ("[A] positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." (quoting *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *20 (S.D.N.Y. Dec. 23, 2009))). Lodestar multipliers ranging from 2 to 5 are commonly awarded in securities class actions. *See, e.g.*, *Wal-Mart*, 396 F.3d at 123 (affirming district court's fee award representing 3.5 multiplier); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005) (awarding fee representing 4.0 multiplier); *see also Telik*, 576 F. Supp.

---

[8] In calculating its lodestar, Lead Counsel anticipates using current, rather than historical, billing rates. The Supreme Court and courts in this Circuit have approved that approach, which compensates counsel for rising inflation (which is more salient now than at any time in the past 40 years) and the time-value of money. *See, e.g.*, *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989); *New York State Ass'n for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983) (explaining that if, as here, "the [legal] services were rendered over two or three years, relevant figures for the current year will normally still be appropriate"); *In re KeySpan Corp. Sec. Litig.*, 2005 WL 3093399, at *15 (E.D.N.Y. Sept. 30, 2005) ("Given that services for this litigation were rendered over three years, this Court finds that use of current rates may be appropriate for purposes of the [lodestar] cross-check."); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 n.25 (S.D.N.Y. 1998).

2d at 590 ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."); *In re EVCI Career Colleges Holding Corp.*, 2007 WL 2230177, at *17 (noting, in securities class action, that "[l]odestar multipliers of nearly 5 have been deemed 'common' by courts in this District"); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (lodestar multiplier of 4.65 was "well within the range awarded by courts in this Circuit and courts throughout the country"); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. at 489 (lodestar multipliers between 3 and 4.5 are common); Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 14:6 (lodestar multipliers up to 4 "frequently are awarded in common fund cases when the lodestar method is applied").

Here, based on an award of 30% of the Settlement Amount, the lodestar multiplier (on a lodestar ranging from $8.5 to $9 million, which includes the lodestar of BSF and SSBH) would range from 3.17 to 3.35. This is well within the range of reasonableness and consistent with the range of lodestar multipliers awarded to counsel in other, similar securities class actions. *See, e.g.*, *In re JP Morgan Precious Metals Spoofing Litig.*, No. 18-cv-10356, ECF No. 114 at 2 (S.D.N.Y. July 7, 2022) (awarding fee representing 3.24 lodestar multiplier in case involving $60 million settlement of commodities market manipulation class action); *Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2017 WL 3579892, at *1 (S.D.N.Y. Aug. 18, 2017) (awarding fee representing 3.14 lodestar multiplier in case involving $210 million settlement of securities class action); *NECA IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 2016 WL 3369534, at *1 (S.D.N.Y. May 2, 2016) (awarding fee representing 3.9 lodestar multiplier in case involving $272 million settlement of securities class action); *Cornwell v. Credit Suisse Grp.*, No. 08-cv-3758, ECF No. 117 at 5 (S.D.N.Y. July 20, 2011) (awarding fee representing 4.7 lodestar multiplier in case involving $70 million settlement of securities class action); *In re Deutsche Telekom AG Sec. Litig.*, 2005 WL

7984326, at *4 (S.D.N.Y. June 9, 2005) (awarding fee representing 3.96 lodestar multiplier in case involving $120 million settlement of securities class action); *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 376 (S.D.N.Y. 2005) (awarding fee representing 3.47 lodestar multiplier in case involving $75 million settlement of securities class action); *see also In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *18 (E.D.N.Y. Aug. 13, 2021) (awarding fee representing 3.56 lodestar multiplier after adjusting attorney billing rates in case involving $20 million settlement and noting that lodestar multiplier "is below what has been deemed reasonable for the common fund settlements in securities class action cases in this circuit"), *report and recommendation adopted*, 2021 WL 4173170 (E.D.N.Y. Sept. 14, 2021).  This Court, too, has approved class action attorneys' fee requests representing lodestar multipliers exceeding 3.0.  *See The Rick Nelson Co., LLC v. Sony Music Entertainment*, No. 18-cv-8791, ECF No. 97 at 2 (S.D.N.Y. May 25, 2021) (Stanton, J.) (awarding fee to class counsel representing lodestar multiplier of 3.1).

> *Counsel's time and labor*.  Lead Counsel expended substantial time and effort pursuing the litigation on behalf of the Class.  Unlike many firms that regularly participate in securities class action matters, Lead Counsel routinely serves as counsel for both plaintiffs and defendants in securities matters.  Lead Counsel is primarily a trial firm and prepares its case strategy based on anticipating the requirements for trial and working back from there in implementing strategy for discovery, experts, and motion practice.  Lead Counsel took precisely that approach here and respectfully submits that doing so led directly to the successful settlement.  Lead Counsel respectfully requests that the Court focus on the efforts of Lead Counsel and SSBH in light of the result achieved for the Class.

> When Lead Counsel was appointed to represent the Class in 2021, significant elements of the Litigation remained outstanding.  Lead Counsel took over the prosecution of the case and

immediately faced the necessities of completing essential aspects of fact and expert discovery, preparing an exhaustive order of proof, litigating key issues such as the proper Class definition, and preparing to oppose summary judgment and efforts to exclude critical expert testimony.  To effectively prepare this exceedingly complex securities fraud class action case for trial against highly sophisticated defense counsel who had been litigating the case for over three years, Lead Counsel independently organized and analyzed hundreds of thousands of pages of party and third-party discovery, and developed its own theories and strategies for establishing liability.  As a trial firm, Lead Counsel completed this work not just to defeat a motion for summary judgment but, more importantly, to shepherd the matter quickly to trial.  Lead Counsel undertook this work under intense time constraints because the close of fact discovery was extended only a few months, over Defendants' objection to Lead Counsel's request for additional time to master the three-year record.  *See* ECF Nos. 270, 272.

Fact Discovery and Development:  At the time Lead Counsel was appointed in 2021, critical discovery disputes remained unresolved, and as a result, Lead Counsel had to quickly master the Amended Complaint's key facts and legal theories, as well as years' worth of litigation history to obtain essential discovery on behalf of the Class.  Lead Counsel then engaged extensively with Defendants' Counsel to meet the fast-approaching discovery deadline, including numerous time-intensive meet-and-confer sessions and exchange of lengthy letters.

Defendants also served additional discovery on Class Representative in November 2021. Lead Counsel spent significant time preparing responses and objections, meeting and conferring with Defendants' Counsel about the scope of their requests, and producing responsive documents. Further, Lead Counsel negotiated with Defendants' Counsel regarding various deposition topics for Class Representative's 30(b)(6) deposition, prepared the witness, and defended the deposition.

At the same time, Lead Counsel identified, pursued, and obtained vital additional discovery.  One of the key issues in this case revolved around tracing money-in and money-out of various bank accounts to prove the payment and receipt of certain alleged bribes.  Through diligent efforts and multiple meet-and-confers, Lead Counsel obtained additional evidence as to this issue from multiple financial institutions, including evidence relating to new theories developed by Lead Counsel. Further, Lead Counsel, working with Swiss counsel, litigated to conclusion issues relating to discovery in Switzerland from multiple entities, including FIFA, and finally obtained production of documents after a Swiss court's order granting discovery was affirmed on appeal.

Lead Counsel spent substantial time analyzing documents produced by Televisa's auditor, PricewaterhouseCoopers ("PwC"), and taking the 30(b)(6) deposition of a PwC witness.  This deposition clarified issues relating Lead Counsel's developing theory of the case, which tied certain alleged corrective disclosures to earlier misrepresentations during the alleged Class Period.

In addition to undertaking extensive additional discovery, Lead Counsel analyzed hundreds of thousands of pages of previously produced documents, email correspondence between the parties, and approximately 20 deposition transcripts with hundreds of corresponding exhibits. With an eye toward summary judgment and trial, Lead Counsel marshalled all of the evidence into an exhaustive order of proof that presented the Class's best facts and legal theories.

Motion Practice:  Just two weeks after Lead Counsel was appointed, Defendants renewed their challenge to the definition of the Class Period.  *See* ECF Nos. 262, 267, 268.  The core issue of the length of the Class Period, and with that, the extent of the Class's potential damages (with the difference amounting to hundreds of millions of dollars), was not resolved until Lead Counsel litigated the issue and the Court ruled in July 2022.  *See* ECF No. 295.  It was due to this detailed briefing that the Court confirmed that the case would proceed with a Class Period beginning April

11, 2013 and ending November 17, 2017, bolstering the Class's potential recovery.  Lead Counsel then successfully opposed Defendants' petition to the Second Circuit under Fed. R. Civ. P. 23(f) seeking leave to appeal the Class definition, *see* ECF No. 331, further confirming the Class's potential monetary recovery of hundreds of millions of dollars.

Further, and only months into its role representing the Class, Lead Counsel had to evaluate the risks of the United States' motion to intervene in the action to stay the deposition of Alejandro Burzaco—a central witness in the case.  *See* ECF Nos. 274, 277.  That motion was intertwined with ongoing discussions with Mr. Burzaco's counsel, who indicated that Mr. Burzaco would assert his Fifth Amendment privilege in this matter if he were subpoenaed.  The Court ultimately stayed Mr. Burzaco's deposition but did not alter the remainder of the discovery and dispositive motion schedule, which resulted in Lead Counsel undertaking expert discovery without having taken Mr. Burzaco's critical deposition (nor resolved whether he could appropriately assert the Fifth Amendment privilege to refuse to answer certain questions).

Expert Discovery:  Between January and July 2022, Lead Counsel worked with three experts and their teams to produce affirmative and rebuttal expert reports.  Additionally, Lead Counsel took and defended four expert depositions on the important issues of loss causation, international corruption and corporate anti-corruption compliance, and forensic accounting with respect to multiple Televisa transactions.

First, Lead Counsel worked with an expert and his team to conduct a thorough forensic accounting analysis of Televisa and certain of its subsidiaries, such as Mountrigi—the entity that obtained the World Cup rights at issue in this Litigation—to attempt to trace the alleged bribery scheme.  Although Lead Counsel ultimately did not submit a report from this expert, his draft

report and knowledge of accounting rules provided invaluable analysis, including in assisting Lead Counsel in preparing for the deposition of PwC.

Second, Lead Counsel worked with two additional experts to prepare reports that were served on Defendants:  a 68-page report on loss causation and a 51-page report on corruption and bribery issues.  While the loss causation expert, Dr. Steven Feinstein,[9] had submitted a prior report in support of the class certification motion, a second report was necessary to analyze loss causation issues and legal theories developed by Lead Counsel.  Among other things, this expert report addressed a rarely-litigated loss causation issue regarding the use of multi-day event windows.  This analysis was key to sustaining the Litigation because, without applying a multi-day event window to evaluate Mr. Burzaco's four days of testimony in a prior case in which he implicated Televisa in the alleged bribery scheme, the Class's loss causation arguments (and potential for hundreds of millions in damages) would have been substantially undercut.

Defendants attacked Dr. Feinstein's loss causation report by serving two expert reports of their own, thus setting up a battle of experts.  Defendants requested to depose Dr. Feinstein, and Lead Counsel extensively prepared him for deposition, but Defendants ultimately decided not to depose him.

During the same period, Defendants deposed Class Representative's subject-matter expert, Dr. Andrew Spalding.  Dr. Spalding—a professor at the University of Richmond School of Law whose work focuses on corruption in international mega-sport athletics and who leads an anti-corruption task force that is designing a compliance framework for the 2024 Paris Olympics—provided opinions regarding the history of FIFA and Televisa's acquisition of World Cup media

---

[9] Dr. Feinstein holds a Ph.D. in Finance from Yale University and has taught economics and finance-related courses at Babson College for over 25 years.  He has appeared as an expert witness in dozens of securities matters.

rights.  Lead Counsel worked extensively with Dr. Spalding in preparation for his deposition, which Mr. Wachtell took and Lead Counsel defended.

Third, Lead Counsel spent considerable time preparing for and taking the depositions of Defendants' experts:  one accounting expert, and two experts on the topic of loss causation. The opinions of Defendants' accounting expert went to the heart of the case by disputing that any inadequacies in accounting, funds management, or internal investigation facilitated the alleged bribery payments.  Lead Counsel also extensively prepared for and deposed one of Defendants' loss causation experts, with particular focus on the use of multi-day event windows.

Finally, Lead Counsel worked with another accounting expert—Bruce Dubinsky—to prepare a 50-page rebuttal report to Defendants' accounting expert.  Mr. Dubinsky has a Master's degree in Taxation, is a Certified Public Accountant and Certified Fraud Examiner, and is a Master Analyst in Financial Forensics.  Lead Counsel prepared Mr. Dubinsky for and defended him in his deposition.

Summary Judgment, Mediation, and Settlement:  In August 2022, Defendants filed their motion for summary judgment, which was supported by an 80-page brief, over 100 exhibits, and a statement of undisputed facts containing approximately 200 factual assertions.  *See* ECF Nos. 316-322.  Moreover, Defendants sought leave to file *Daubert* motions seeking to exclude the testimony of Drs. Feinstein and Spalding, arguing that exclusion of these witnesses would substantially strengthen their position on summary judgment.  *See* ECF Nos. 300, 305, 312. Although labeled motions for leave to file, these motions essentially made the entire *Daubert* argument for each witness and were supported with nearly 50 pages of briefing and lengthy exhibits.  *See* ECF Nos. 306-307, 313-314.  Lead Counsel immediately began preparing opposition papers, relying in part on the exhaustive order of proof developed through extensive review of the

record and creative strategizing on trial theories.  By the time the parties reached an agreement to settle the Class's claims, Lead Counsel had already drafted a lengthy opposition to Defendants' summary judgment motion, responses to all of Defendants' alleged factual assertions in addition to a separate statement of material facts, and substantial briefing in opposition to Defendants' proposed *Daubert* motions.

On October 10, 2022, the parties engaged in a mediation before Robert A. Meyer, Esq.  In preparation for the mediation, Lead Counsel drafted a lengthy mediation statement supported by exhibits, which summarized the facts, legal theories, and damages claims, and analyzed Defendants' statement and exhibits.  The mediation, which included a lengthy PowerPoint slide presentation by Lead Counsel to the mediator, did not result in an agreement between the parties. Thereafter, the mediator engaged both sides in extensive additional conversations and negotiation discussions and the parties later agreed to settle the case for $95 million.

Lead Counsel has since spent considerable time drafting and revising a Memorandum of Understanding, which the Settling Parties signed on December 28, 2022, as well as the Stipulation of Settlement and all of the other settlement papers, including the proposed notice, claim form, final judgment, and this memorandum.  Additionally, Lead Counsel worked with the Class's damages expert to prepare the detailed proposed Plan of Allocation based primarily on an analysis estimating the amount of artificial inflation in the price of Televisa ADRs during the Class Period.

Throughout its time prosecuting the litigation, Lead Counsel staffed the matter efficiently and avoided any unnecessary duplication of effort.  Moreover, additional hours and resources will necessarily be expended seeking the Court's final approval of the Settlement, assisting Members of the Class with the completion and submission of Proof of Claim and Release forms, overseeing the claims process, responding to Class Member inquiries, and presenting the final proposed

allocation of settlement proceeds among the Class members.  Given the significant amount of time and effort devoted by Lead Counsel to obtain a $95 million recovery, a request for attorneys' fees not to exceed 30% of the Settlement Amount is appropriate.

*The litigation risks*.  As set forth above, while Class Representative remains confident in its claims, its ability to ultimately prove its case at trial—and obtain damages—was far from certain.  *See* §V.A.3., *supra*.  Defendants raised numerous challenges to Class Representative's allegations of falsity, scienter, loss causation, materiality, and damages.  Even if Class Representative's claims survived Defendants' motion for summary judgment, these arguments would no doubt have been raised at trial.  As noted, Defendants had sought leave to file *Daubert* motions seeking to exclude two of Class Representative's experts, including Dr. Feinstein, who was to opine on the critical issue of loss causation.   It is evident, then, that whether Class Representative ultimately would prove liability under the federal securities laws was far from assured.  And, as importantly and as described above, the range of potential damages—even if Class Representative succeeded in establishing liability at trial—was such that the Class faced substantial risk that a trial victory would have led to a recovery of a lesser amount than the Settlement Amount.  With those risks in mind, securing a guaranteed payout for the Class—and, as has been shown, an outstanding one—counsels in favor of awarding Lead Counsel its forthcoming fee request.

The fee award also should take into account the risk that Lead Counsel would walk away from this case with nothing.  Lead Counsel undertook this litigation on a wholly contingent-fee basis, jumping into the case mid-stream and investing millions of dollars in time and resources to independently learn and further develop the facts and legal theories, complete fact discovery and undertake full expert discovery, and oppose summary judgment and other critical motions, all with

no guarantee of compensation or even recovery of expenses.  Lead Counsel has not yet been compensated for any time or expenses since it began to represent the Class in 2021, and would have received no compensation or payment of its expenses had this case not been resolved successfully.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient attorney and paraprofessional resources were dedicated to prosecuting the litigation and that funds were available to pay the substantial out-of-pocket expenses.  Under such circumstances, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  With the specter of an exceedingly costly loss always looming, Lead Counsel's assumption of the contingent-fee risk strongly supports the reasonableness of a fee request.  *See Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 727 (2d Cir. 2023) ("The district court reasonably concluded that the significant litigation risk present in this case meant that class counsel had taken on a venture with a high risk of failure, and that the risk should be compensated."); *In re Flag Telecom Holdings*, 2010 WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award."); *see also Fresno Cnty. Employees' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63, 68 (2d Cir. 2019) ("[A]n unenhanced lodestar fee does not account for the contingent risk that a lawyer may assume in taking on a case.").

**The litigation's complexities and magnitude.**  Securities cases are challenging to litigate, and this case was no exception.  Indeed, it is widely recognized that "shareholder actions are notoriously complex and difficult to prove."  *In re Bayer AG Sec. Litig.*, 2008 WL 5336691, at *5 (S.D.N.Y. Dec. 15, 2008); *see Christine Asia*, 2019 WL 5257534, at *18 ("Securities class actions in particular are 'notably difficult and notoriously uncertain.'" (quoting *In re Sumitomo Copper*

*Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999))).  The PSLRA introduced "new procedural hurdles" and complexities, making securities litigation "more difficult from a plaintiff's perspective."  *In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000); *see In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 WL 903236, at *9 (S.D.N.Y. Apr. 6, 2006) ("[T]he legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages. These challenges are exacerbated . . . where a number of controlling decisions have recently shed new light on the standard for loss causation.").  Litigating such a case prior to and at trial on the many complex, contested issues inherent in this type of litigation requires substantial skill, resources, and experience, all while facing an uncertain outcome and with potentially hundreds of millions of dollars in damages at stake.

   ***Considerations of public policy.***  Public policy considerations support awarding the requested fee, particularly because private securities litigation is a necessary adjunct to the Government's resource-limited civil and criminal enforcement of the federal securities laws.  *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 478 (2013) ("Congress, the Executive Branch, and [the Supreme] Court . . . have 'recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission.'") (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007))).  The reality is that "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Stanley*, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).  Appropriately compensating Lead Counsel for its successful efforts in this case will enhance the incentives for competent counsel to shoulder the significant risk of contingent-fee litigation in service of the public's undeniable

interest in "vigorously enforcing the federal securities laws." *Maley*, 186 F. Supp. 2d at 373; *see In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.").

*     *     *

Additionally, pursuant to 15 U.S.C. § 78u-4(a)(4), Lead Counsel intends to move the Court for an award to Class Representative of no more than $10,000.  Such awards are routinely awarded in securities class actions "both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place," *Christine Asia*, 2019 WL 5257534, at *20 (quoting *Hicks*, 2005 WL 2757792, at *10).  Such awards are appropriate where, as here, the Class Representative prepared for and sat for a deposition, reviewed pleadings and briefs, assisted with discovery, participated in the mediation, and evaluated and approved the settlement.  *See id.*

### 6.  All Class Members Are Treated Equitably Relative to One Another

Rule 23(e)(2)(D) requires courts to evaluate whether the settlement treats class members equitably relative to one another.  Fed. R. Civ. P. 23(e)(2)(D).  Here, the proposed Plan of Allocation is fair, reasonable, and adequate because it does not treat Class Representative or any other Class Member preferentially.  The Plan of Allocation, which is set out in the Notice, explains how the Settlement proceeds will be distributed among Authorized Claimants.  Each Authorized Claimant, including Class Representative, will receive a *pro rata* distribution pursuant to the Plan of Allocation.  Courts have approved this *pro rata* approach in other securities litigation.  *See, e.g.*, *In re PPDAI Grp.*, 2022 WL 198491, at *13 (finding that a *pro rata* distribution plan "is appropriate

and consistent with many other securities class action settlements' plans of allocation, and treats class members equitably relative to each other"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020) (finding the requirement of Rule 23(e)(2)(D) met where, as here, "[l]ead [p]laintiff will receive precisely the same level of *pro rata* recovery (based on its [r]ecognized [c]laim as calculated under the [p]lan of [a]llocation) as all other [c]lass [m]embers"). Class Representative, like all other Class Members, will be subject to the same formulas for distribution of the Net Settlement Fund.

### B.  The Proposed Settlement Meets the *Grinnell* Factors

*The Complexity, Expense, and Likely Duration of the Litigation Supports Approval of the Settlement.*  The first factor of the *Grinnell* analysis overlaps with the Rule 23(e)(2)(C)(i) factor of "the costs, risks, and delay of trial and appeal" addressed above. Fed. R. Civ. P. 23(e)(2)(C)(i); *see* §V.A.3., *supra*.  This case is reflective of the complexity, expense, and duration of securities class actions.  The Parties advanced numerous complex legal and factual issues under the federal securities laws, especially with respect to falsity, scienter, materiality, loss causation, and damages.

*The Reaction of the Class to the Settlement.*  Class Representative supports the Settlement based on its direct participation in the prosecution of the case and in the mediation and decision to enter into the Settlement.  At this stage, prior to distribution of notice to Class Members, this factor is not further addressed.  *See In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 699 n.1 (S.D.N.Y. 2019) (consideration of *Grinnell* factor #2 "is generally premature at the preliminary approval stage"); *In re Warner Chilcott Ltd. Sec. Litig.*, 2008 WL 5110904, at *2 (S.D.N.Y. Nov. 20, 2008) ("Consideration of [the class reaction] factor is premature" when "no notice has been sent.").

***The Stage of the Proceedings.***  The extent and substance of Class Representative's and Lead Counsel's knowledge of the merits and potential weaknesses of the claims alleged are more than adequate to support the Settlement.  *See* §V.A.2., *supra*.  The voluminous discovery record of over 300,000 pages of documents and 20 depositions, as well as the extensive expert reports and depositions and the evidentiary submissions made during mediation, permitted Class Representative and Lead Counsel to intelligently weigh the strengths and weaknesses of the case and to engage in effective settlement negotiations.  *See, e.g.*, *In re Marsh ERISA Litig.*, 265 F.R.D. at 139; *In re Sumitomo Copper Litig.*, 189 F.R.D. at 281–82.

***The Risk of Establishing Liability and Damages.***  The fourth *Grinnell* factor is addressed above under Rule 23(e)(2)(C)(i) ("costs, risks, and delay of trial and appeal").  As explained above, Class Representative has satisfied the fourth *Grinnell* factor.  *See* §V.A.3., *supra*.

***The Risks of Maintaining the Class Action through Trial.***  Although the Class was certified in June 2020, the Court could have revisited certification at any time and Defendants continued to dispute the proper dates for the Class Period, which likely would have been a jury issue at trial and could have resulted in greatly reduced damages.  *See* §V.A.3., *supra*; *Amgen*, 568 U.S. at 482 n.11 ("a class certification order 'may be altered or amended before final judgment.'" (quoting Fed. R. Civ. P. 23(c)(1)(C))); *Christine Asia Co.*, 2019 WL 5257534, at *13 (this risk weighed in favor of final approval because "a class certification order may be altered or amended any time before a decision on the merits").

***Defendants' Ability to Withstand a Greater Judgment.***  While not generally a determining factor, a court may consider a defendant's ability to withstand a judgment greater than that secured by the proposed settlement.  *See D'Amato*, 236 F.3d at 86 (upholding district court's conclusion that the while "defendants' ability to withstand a higher judgment weighed against the settlement," it

did not alone "suggest that the settlement is unfair"). While Defendants here likely could pay a judgment greater than $95 million, courts generally do not find this factor to be an impediment to settlement when the other *Grinnell* and Rule 23 factors favor settlement. *See In re Vitamin C Antitrust Litig.*, 2012 WL 5289514, at *6 (E.D.N.Y. Oct. 23, 2012) ("[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement." (quoting *Weber v. Gov't Emps. Ins. Co.*, 262 F.R.D. 431, 447 (D.N.J. 2009))). This factor is neutral. *See Nichols v. Noom, Inc.*, 2022 WL 2705354, at *10 (S.D.N.Y. July 12, 2022).

**The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation.** The adequacy of the amount recovered in a settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987). The Court need only determine whether the Settlement falls within a "range of reasonableness"—a range that "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman*, 464 F.2d at 693; *see also Glob. Crossing*, 225 F.R.D. at 461 ("The certainty of [a] settlement amount has to be judged in [the] context of the legal and practical obstacles to obtaining a large recovery."); *In re Indep. Energy Holdings PLC Sec. Litig.*, 2003 WL 22244676, at *3-*4 (S.D.N.Y. Sept. 29, 2003) ("Few cases tried before a jury result in a verdict awarding the full amount of damages claimed."). Here, the Settlement amount is about 27% of the Class expert's estimate of maximum recoverable damages, which well exceeds the median and average recovery in securities fraud class action cases. *See* §V.A.3., *supra*. The $95

million cash settlement is an excellent recovery for the Class, and this factor strongly supports preliminary approval. *See, e.g.*, *In re Flag Telecom Holdings*, 2010 WL 4537550, at *23 (granting final approval of settlement whose "amount . . . far exceeds the national medians—in straight dollar terms and as a percentage of the recovery compared to the total alleged damages—for class action securities settlements after the passage of the PSLRA"); *In re Gilat Satellite Networks, Ltd.*, 2007 WL 2743675, at *12 (E.D.N.Y. Sept. 18, 2007) (finding settlement figure within the range of reasonableness where the figure exceeded historical median settlement amount and median settlement as a percentage of estimated damages).

In sum, all of the Rule 23 and *Grinnell* factors weigh in favor of preliminary approval of the Settlement, except possibly one neutral factor. Preliminary approval in these circumstances is entirely appropriate and warranted.

## VI.   NOTICE TO THE CLASS SHOULD BE APPROVED

As outlined in the agreed-upon form of the proposed Preliminary Approval Order, and described above, Class Representative will notify Members of the Class by mailing the Notice and Proof of Claim and Release form to all Members of the Class who can be identified with reasonable effort, using multiple sources of data, including (i) the list of record holders that purchased Grupo Televisa ADRs during the Class Period provided or caused to be provided by Defendants (as required by ¶3.2 of the Stipulation) and (ii) proprietary lists maintained by the Claims Administrator of banks, brokers, and other nominees.

The Notice will advise the Members of the Class of the essential terms of the Settlement and provide information regarding Lead Counsel's application for an award of attorneys' fees and expenses. The Notice also will provide specifics on the date, time, and place of the Settlement Hearing and set forth the procedures for both submitting valid and timely Proofs of Claim and Release pursuant to the proposed Plan of Allocation and objecting to the Settlement, the proposed Plan of Allocation, and/or

the application for attorneys' fees and expenses.  Further, the Notice will provide contact information for the Claims Administrator and Lead Counsel and advise Class Members on how to obtain further information regarding the Settlement.

In addition to mailing the Notice and Proof of Claim and Release, the Claims Administrator will cause publication of a Summary Notice in the national edition of *The Wall Street Journal* and once over a national newswire service.  Defendants will serve notice of the proposed Settlement on the appropriate federal and state officials under the Class Action Fairness Act, 28 U.S.C. § 1715, *et seq*.

The form and manner of providing notice to the Class satisfy the requirements of Due Process, Federal Rule of Civil Procedure 23, and the PSLRA.  Here, the manner of providing notice, which includes (i) individual notice by mail to all Members of the Class who can be reasonably identified, (ii) the creation of a dedicated website, and (iii) notices published in a national newspaper and over a newswire, represents the best notice practicable under the circumstances.  *See, e.g.*, *Rodriguez v. CPI Aerostructures, Inc.*, 2021 WL 9032223, at *13 (E.D.N.Y. Nov. 10, 2021) (finding that notice plan similar to that proposed here was "reasonable and adequate" because the proposed notice was "detailed enough to inform the class members of their rights and obligations, and the proposed methods of notice, including publishing the summary notice in the *Wall Street Journal* and sending it once over a national newswire, are practical and likely to be effective in reaching the affected individuals"); *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 119–20 (S.D.N.Y. 2009) (same).  In short, the Notice and Summary Notice satisfy all requirements of Due Process and Rule 23 because they "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  *Wal-Mart*, 396 F.3d at 114 (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)).

## VII.    PROPOSED SCHEDULE OF SETTLEMENT EVENTS

Class Representative proposes the following schedule for the Settlement-related events in this case:

| Event | Proposed Due Date |
|---|---|
| Deadline for Defendants to provide or cause to be provided to the Claims Administrator a list in electronic format of record holders that purchased Grupo Televisa ADRs during the Class Period | 5 business days after entry of Preliminary Approval Order |
| Deadline for commencing mailing of the Notice and Proof of Claim and Release to the Class (the "Notice Date") | 20 calendar days after entry of Preliminary Approval Order |
| Deadline for publishing the Summary Notice | 37 calendar days after the entry of Preliminary Approval Order |
| Deadline for filing of papers in support of final approval of Settlement, Plan of Allocation and Lead Counsel's application for attorneys' fees and expenses | 35 calendar days prior to Settlement Hearing |
| Deadline for Claims Administrator to receive Class Members' Requests for Exclusion | 30 calendar days prior to Settlement Hearing |
| Deadline for receipt of objections to final approval of Settlement, Plan of Allocation and Lead Counsel's application for attorneys' fees and expenses | 21 calendar days prior to Settlement Hearing |
| Deadline for Lead Counsel to serve on Defendants' Counsel and file with the Court proof, by affidavit or declaration, of mailing and publishing of the Summary Notice | At least 7 calendar days prior to Settlement Hearing |
| Deadline for filing reply papers regarding final approval of Settlement, Plan of Allocation and Lead Counsel's application for attorneys' fees and expenses | 7 calendar days prior to Settlement Hearing |
| Settlement Hearing | At the Court's convenience; Parties request 110 days after entry of the Preliminary Approval Order |
| Deadline for submitting Proofs of Claim and Release | 90 calendar days after the Notice Date |

## VIII.    CONCLUSION

Class Representative respectfully requests that the Court: (i) preliminarily approve the Settlement; (ii) approve the proposed form and manner of notice to be given to the Class; and (iii) schedule a hearing on Class Representative's motion for final approval of the Settlement and Lead Counsel's application for an award of attorneys' fees and expenses.  The Parties' agreed-upon form

of proposed Preliminary Approval Order and exhibits thereto (Notice of Proposed Settlement of Class Action, Summary Notice of Proposed Settlement of Class Action, Proof of Claim and Release Form, and Proposed Order and Final Judgment) are filed herewith.

Dated:  April 15, 2023

Respectfully submitted,

/s/ *David Boies*

David Boies
John T. Zach
David A. Barrett
Adam R. Shaw
Lauren M. Goldman
Boies Schiller Flexner LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Palm Tran, Inc. Amalgamated Transit Union Local 1577 Pension Plan and the Class*

43